IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                          NO. CR 05-1849 JH

DANA JARVIS et al.,

    Defendant.

**DEFENDANT AYLA JARVIS' MOTION FOR SUPPRESS EVIDENCE
FROM ILLEGAL TRAFFIC STOP AND SEARCH
ON OCTOBER 28, 2004 IN BLOOMINGTON, INDIANA**

    COMES NOW the Defendant, Ayla Jarvis, by and through her attorney John F. Robbenhaar, and pursuant to the Fourth Amendment to the United States Constitution, respectfully requests that the Court suppress evidence seized from the Defendant Ayla Jarvis on October 28, 2004 in Bloomington, Indiana based on an illegal traffic stop, illegal search and prolonged detention.

    In support, Ms. Jarvis states the following.

I.    BACKGROUND AND INTRODUCTION

    1.    On October 28, 2004, at approximately 3:45 p.m., the Defendant Ayla Jarvis was driving a vehicle in Bloomington, Indiana. Law enforcement suspected that Ms. Jarvis had traveled earlier that day to Bloomington to transport money back to New Mexico and/or Arizona. After conducting surveillance on Ms. Jarvis in the Bloomington area, agents decided to stop the vehicle driven by Ms. Jarvis. Accordingly, an Indiana State trooper followed Ms. Jarvis and, after some time, claims that he observed Ms. Jarvis make an improper u-turn as well as not signal properly when turning from the

roadway.  It is unclear if the Indiana State Trooper was aware of the prior surveillance and/or the federal agents' suspicion of currency transportation at the time of the traffic stop.

      2.      Indiana State Police Trooper Stailey writes that, after making the traffic stop, he approached the Defendant and requested her driver's license and registration.  Trooper Stailey writes that Ms. Jarvis was alone and appeared nervous, and provided the documents while allegedly apologizing for making an improper u-turn and indicating that she was from out-of-town and was trying to find her way back to the Monroe County Airport.  Trooper Stailey solicited more details of the travel plans of Ms. Jarvis, and instructed that Ms. Jarvis wait in her vehicle.  Meanwhile, Trooper Stailey returned to his vehicle to conduct further inquiries of Ms Jarvis' driver's license and registration and request backup.

      3.      Once backup arrived, Trooper Stailey claims that he re-approached Ms. Jarvis and asked if she would mind if he ran his drug dog around her vehicle.  According to Trooper Stailey, Ms. Jarvis replied that she would not mind if the drug dog inspected the vehicle.  Trooper Stailey then directed Ms. Jarvis back to the officers' vehicles.  Trooper Stailey still had in his possession Ms. Jarvis' driver's license and registration paperwork.

      4.      It is alleged that the drug dog gave a positive alert to the front driver's side door.  Based upon the drug dog's alert, Trooper Stailey returned to Ms. Jarvis, who was then seated in his patrol vehicle, and immediately issued *Miranda* warnings.  Trooper Stailey stated, however, that Ms. Jarvis was not under arrest but that he "was going to have to search her person, the vehicle and contents."  Upon information and belief,

Trooper Stailey did not have Ms. Jarvis sign or execute a written consent to search form.

5.  Trooper Stailey conducted a thorough search of the vehicle, and no illegal items were recovered. Trooper Stailey claims that Ms. Jarvis volunteered that there was a large sum of United States currency in the vehicle, which he recovered from a bag located therein. Trooper Stailey writes that, when asked by Ms. Jarvis if she were going to be arrested, he stated no since it is not illegal to possess currency. Nonetheless, Trooper Stailey noted that he informed Ms. Jarvis that the money would be seized, and notified Ms. Jarvis of the forfeiture process. Ms. Jarvis was then allowed to leave the scene. It was at this point–basically at the moment that Ms. Jarvis was allowed to leave–that Trooper Stailey finally returned the driver's license and registration to Ms. Jarvis.

6.  The pretextual traffic stop, and warrantless search of the vehicle and contents therein, were in direct violation of the Defendant Ayla Jarvis' constitutional right to be free from unreasonable search and seizure. Consent to search by the Defendant Ayla Jarvis was not provided or, if the Government claims that it was, such consent was not freely given and was tainted. In the event that the Government claims that consent was not necessary based upon the positive drug dog alert, the Defendant challenges this alert for its accuracy, especially given the fact that no illegal items were recovered during this search so as to validate the alert. Additionally, the manner in which the drug dog was deployed, without Trooper Stailey first informing Ms. Jarvis that she was free to leave and without reasonable suspicion that illegal drugs or contraband would be found in the vehicle, is also challenged. Finally, the Defendant argues that

her roadside detention by Trooper Stailey was unnecessarily prolonged. Accordingly, this Court should suppress all items seized from the Defendant Ayla Jarvis, including the bulk United States currency and all oral and written statements made by Ms. Jarvis during or as a result of the illegal detention.

7. The Defendant Ayla Jarvis requests an evidentiary hearing on this motion.

8. Based on the nature of this motion, the Assistant United States Attorney James Braun objects to the relief sought.

II    ARGUMENT

A.    THE INITIAL TRAFFIC STOP WAS ILLEGAL

9. A traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001). A traffic stop "must be justified at its inception and the detention must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997) (internal quotations omitted); *United States v. Anderson*, 114 F.3d 1059, 1063 (10th Cir. 1997). Where an officer views "any... of the multitude of the applicable traffic and equipment regulations" of the jurisdiction, the stop if justified. *United States v. Hunnicut*, 135 F.3d 1345 (10th Cir. 1998), *quoting Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

10. In the present case, Trooper Stailey claims that he observed the Defendant Ayla Jarvis make an illegal u-turn and not properly use a turning signal to turn from the roadway. There is a question as to the accuracy of Trooper Stailey's rendition of the event, and Ms. Jarvis disputes the fact that she either made an illegal u-

4

turn or failed to properly use a turning signal.  Indeed, while Trooper Stailey makes it sound as if Ms. Jarvis "immediately apologized for making the u-turn" thereby suggesting that the illegal u-turn had in fact occurred, Ms. Jarvis only commented upon the alleged infraction *after* Trooper Stailey informed her of the reason for the traffic stop.

11.	The Defendant Ayla Jarvis submits that the legality of the traffic stop revolves on a factual dispute.  Ms. Jarvis disputes the Trooper's claim that she conducted any traffic violation which would justify the stop.  While the stop appears to be clearly pretextual in nature, Ms. Jarvis understands that the motivation of the officer is irrelevant for purposes of establishing probable cause, and she can not claim that the stop is illegal simply because it was based on a pretext.  *Whren v. United States*, 517 U.S. 806 , 116 S.Ct. 1769 (1996).  Nonetheless, given the surrounding circumstances, there is a serious question as to the legality of the traffic stop, and whether Trooper Stailey in fact had probable cause to justify the stop.  Clearly, this Court will need to receive testimony of Trooper Stailey and possibly others to determine this important issue.

B.	<u>TROOPER STAILEY LACKED PROBABLE CAUSE TO SEARCH OR, EVEN IF PROBABLE CAUSE RESULTED FROM A POSITIVE DOG ALERT, PROBABLE CAUSE WAS VITIATED BY THE MANNER IN WHICH THE DRUG DOG WAS EMPLOYED</u>

12.	Trooper Stailey indicates that after he had stopped and detained the Defendant, he waited until a backup officer arrived before he requested permission to run the drug dog around Ms. Jarvis' vehicle. Trooper Stailey claims that the dog positively alerted at the driver's side door, which then caused Trooper Stailey to read

Ms. Jarvis her *Miranda* rights and search the vehicle and its contents.

13.     Even if the initial traffic stop is deemed legal, the resulting search, seizure and prolonged detention may still run afoul of the Fourth Amendment.  In the present case, there is a serious concern as to Trooper Stailey's deployment of the drug dog without first informing Ms. Jarvis that she was free to leave, since rushing to the use of the drug dog, in the absence of reasonable suspicion that drugs may be present, exceeded the scope of the traffic stop.  The use of the drug dog essentially amounted to additional questioning unrelated to the purposes of the stop: "once the purpose of the stop is satisfied and the underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay."  *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).  And even though a trooper may ask questions *during* a lawful traffic stop that are unrelated to the stop, *see Muehler v. Mena*, 544 U.S. 93, 125 S.Ct. 1465 (2005), questioning that extends the valid length of the detention can still result in a Fourth Amendment violation.  *See United States v. Alcaraz–Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).  Accordingly, Defendant submits that the *use* of the drug dog was improper and illegal, in that it was unrelated to the initial purpose of the stop.

14.     While the law in the Tenth Circuit is clear that a positive drug dog alert provides probable cause to search a vehicle, *see United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004), such probable cause is vitiated if the drug dog in question has proven to be improperly or poorly trained, has had problems in accuracy in the past, or has health problems which might affect its accuracy.  *See United States v.*

*Lambert*, 351 F.Supp.2d 1154 (D.Kan. 2004).

15.    Similar to the legality of the traffic stop, there is a factual dispute as to the use of the drug dog. After taking possession of Ms. Jarvis' driver's license and registration, and after verifying through a computer check that there were no wants or warrants for Ms. Jarvis, and after waiting for a backup officer to arrive, Trooper Stailey requested permission to run his drug dog around the vehicle. *At no time did Trooper Stailey inform Ms. Jarvis that she was free to leave*. Accordingly, the manner in which Trooper Stailey employed his drug dog–by deploying the dog *before* releasing the Defendant and *then* asking for consent–vitiates any probable cause that was obtained through a positive alert. The resulting search was illegal.

16.    Finally, once Trooper Stailey informed Ms. Jarvis that the dog positively alerted to the vehicle, Trooper Stailey claims that Ms. Jarvis volunteered that "there was a large sum of US currency in the vehicle..." Further questioning by Trooper Stailey ensued. Clearly, Ms. Jarvis' statement about there being currency in the vehicle results directly from Trooper Stailey's actions, and if it is determined that the drug dog deployment was improperly done, then Ms. Jarvis' statement must be suppressed along with all other items and statements obtained from Ms. Jarvis on that date.

C.    <u>THE DETENTION WAS UNNECESSARILY AND ILLEGALLY PROLONGED</u>

17.    Once an initial stop is properly made, an officer may request a driver's license and vehicle registration, run a computer check on those items, and issue a citation. *United States v. Elliot*, 107 F.3d 810, 813 (10th Cir. 1997); *Anderson*, 114 F.3d at 1064. The officer may also run a computer check on whether the driver has any

outstanding warrants of whether the vehicle has been stolen.  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose if the stop", *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999), and "the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983).  This means that once a driver has produced a valid driver's license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then must allow the driver to proceed without further delay or questioning.  *Patten*, 183 F.3d at 1193, *citing United States v. Hunnicut*, 135 F.3d at 1349.  An officer may question the driver further only if (1) "the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to further questioning."  *Id.*

  18. Assuming *arguendo* that the initial stop of the Defendant's vehicle was constitutionally valid, the detention of the Defendant Ayla Jarvis must be examined to verify that it didn't exceed a constitutionally permissible length.  Trooper Stailey writes that after stopping Ms. Jarvis, he obtained her driver's license and registration, and proceeded to question her about her travel plans.  The Trooper then had her wait in her vehicle while he returned to his patrol vehicle to conduct radio checks and complete a written warning.  Trooper Stailey then requested backup, and states that another officer arrived on scene within 2-3 minutes.  Curiously, the backup officer was requested to complete the warning citations, despite the fact that this officer did not observe the alleged driving infractions.  Trooper Stailey resumed his questioning of Ms. Jarvis, and after some time requested Ms. Jarvis' consent to run the drug dog around her vehicle.

The Trooper had Ms. Jarvis step out of the vehicle and wait near the backup officer's vehicle. At this time, the Trooper retrieved his drug dog, and then proceeded to have the dog circle the vehicle. Trooper Stailey claims the dog alerted, after which he proceeded to read Ms. Jarvis her Miranda warnings. Trooper Stailey then searched Ms. Jarvis' vehicle, and located currency inside a blue nylon bag. Nothing illegal was located during the vehicle search.

19.     The purpose of the traffic stop, ostensibly, was for a u-turn violation and failure to use turn signal. Nonetheless, the evidence will show that Trooper Stailey engaged in lengthy questioning concerning Ms. Jarvis' travel plans in Indiana. At no time will the evidence show that Trooper Stailey obtained probable cause or reasonable suspicion to believe that criminal activity was afoot; Trooper Stailey does note however, that Ms. Jarvis exhibited nervousness by her "animated behavior" and hands "excessively shaking". At no time did Ms. Jarvis consent to further questioning.

20.     Once Trooper Stailey had obtained the driver's license and registration, and had verified that there were no wants or warrants for Ms. Jarvis, he was obligated to issue any appropriate citations and allow Ms. Jarvis to leave. *United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005). Only if Trooper Stailey developed reasonable suspicion to believe that Ms. Jarvis was engaged in criminal activity could the Trooper continue to detain Ms. Jarvis. Because the Trooper never developed this reasonable suspicion and was limited by the scope of the initial traffic stop, he was obligated to allow Ms. Jarvis to leave. Asking for consent to run his drug dog around the vehicle without first informing Ms. Jarvis that she was free to leave, resulted in an illegal, prolonged detention. It is worth noting that Trooper Stailey kept possession of

Ms. Jarvis' driver's license and registration until the moment that she actually did leave, after the money was seized, after the vehicle was fully searched, and after he explained about the forfeiture process and provided Ms. Jarvis a receipt.

### III.	CONCLUSION

21.	Trooper Stailey conducted a pretextual traffic stop of the vehicle being driven by the Defendant Ayla Jarvis. Despite the fact that the stop was for simple moving violations–illegal u-turn and failure to use turn signal–Trooper Stailey unnecessarily detained Ms. Jarvis and refused to allow her to leave. Trooper Stailey kept in his possession Ms. Jarvis' driver's license and registration, and before advising Ms. Jarvis that she was free to leave, he improperly ran his drug dog around the exterior of Ms. Jarvis' vehicle. Trooper Stailey only advised Ms. Jarvis that she was free to leave once he had completed the search and seizure. As a result of the illegal traffic stop, of the improper drug dog deployment, and of the prolonged and illegal detention, Ms. Jarvis suffered a violation of her Fourth Amendment rights. Accordingly, all items and statements obtained from Ms. Jarvis on October 28, 2004 in Bloomington, Indiana should be suppressed.

Respectfully submitted:

*Filed Electronically*
JOHN F. ROBBENHAAR
Attorney for Defendant Ayla Jarvis
1011 Lomas NW
Albuquerque, NM 87102
(505) 242-1950

I HEREBY CERTIFY that a
true and correct copy of the
foregoing pleading was mailed/
delivered to Assistant United States
Attorney James Braun on
October 20, 2006.

*Filed Electronically*
JOHN F. ROBBENHAAR

11