any information regarding the persons driving said vehicles or why they were at the listed locations.

78.     In December 2004, CS-3 met with JARVIS. As discussed in footnote 24 above, surveillance of this meeting was unsuccessful because it appeared to agents that JARVIS had individuals outside the meet spot acting in a counter-surveillance role looking to see if CS-3 was followed by law enforcement authorities.

### Use of Cooperating Sources

79.     The technique of using cooperating sources often is very productive in an investigation. In this case three cooperating sources of information have provided information about the JARVIS DTO that has been beneficial to the investigation. However, for the reasons set forth below, your Affiant believes that, at this stage of the investigation, the use of cooperating sources is unlikely to achieve the goals of the investigation.

80.     The objectives of this investigation include identifying the JARVIS DTO drug suppliers, identifying where and when the leaders of the organization meet their sources of supply, identify how the drugs are being smuggled into the United States from the Republic of Mexico, where and who is stashing the drugs in the various stash houses in Arizona and New Mexico, identifying where the money is being stored and fully identifying the participants in the conspiracy. While CS-1 provided valuable information regarding some of these objectives, CS-1's usefulness reached it's maximum potential in 2002 in furthering the goals of the investigation. CS-1 was not a member of the JARVIS DTO and is no longer in a position to learn anymore information about its members.

81.     Likewise. CS-2 has provided information useful to this investigation. CS-2's information was historical in nature, and was limited information regarding the JARVIS DTO. CS-2 is not in a position to learn how, when and where the marijuana is being smuggled into the United States. In addition, CS-2 is not in a position to learn about the nationwide co-conspirators or about details regarding the delivery methods, the times illegal activities are taking place, or the locations for said activities. Because of CS-2's personal relationship with many of the individuals he/she has provided information about, CS-2 has no interest in testifying or publicly providing information about the conspirators. Therefore, agents must develop independent evidence of crimes being committed by the conspirators.

82.     CS-3 was a money courier for the JARVIS DTO, but left the organization a year or more ago. CS-3 has provided detailed information about the methods, used by the targets of this investigation, many of the locations used by the organization, and has identified many conspirators involved in drug trafficking and or money laundering violations. In addition, CS-3 has provided unique information from an "insiders" perspective. This "unique" information allowed agents in October 2004 to anticipate the actions of Ayla JARVIS and David REID when they landed in Bloomington, Indiana aboard the private aircraft owned by Dana JARVIS. The information from CS-3 was instrumental in the seizure of $287,210.00. The bulk of the information from CS-3 is dated, and historical in nature. CS-3 does not currently have immediate access to information regarding JARVIS the organization conspirators and its methods. CS-3, under the direction of controlling agents, has been attempting to work back into the organization as a money courier, but to date has not been able to do so. CS-3 also has no interest in testifying or publicly providing information about the conspirators. CS-3 has expressed a fear of members

of the organization and worries that his/her family would be in significant danger if CS-3's involvement with law enforcement were revealed. Again agents must develop independent evidence of the crimes being committed by the conspirators.

### Use of Search Warrants

83. Your Affiant has experience with search warrants as an investigative technique in drug trafficking investigations. Search warrants often lead to the seizure of drugs, money, and other evidence of criminal violations. However, in this investigation the execution of search warrants at this time is not likely to achieve the objectives of the investigation. The premature execution of search warrants would not likely reveal the total scope of the illegal operations of the organization and would also alert the TARGETS to the scrutiny of law enforcement and thereby risk this investigation. Additionally, the fact that many of the target subjects are unidentified, renders law enforcement authorities unable to locate all potential search locations at this time. Furthermore, interception of wire communications for the TARGET TELEPHONE would aid in identifying stash locations which have not been identified at this time.

### Interviews with Witnesses and Use of a Grand Jury

84. At this stage of the investigation, your Affiant believes that the interviewing of witnesses and use of a grand jury would be premature and deleterious to the ongoing investigation. Agents have not yet identified any individuals (other than the cooperating sources of information) considered likely to provide information on the JARVIS DTO without revealing the investigation to its members. In many investigations, agents are able to identify a "weak link," an individual who is considered likely to cooperate with agents without exposing the investigation. Usually, such an individual is targeted because strong evidence has been gathered

implicating the individuals criminal activity. Agents are then able to approach the individual and seek his/her cooperation in exchange for a more lenient prosecution. In this investigation, no "weak links" have yet been identified. It is possible that such individuals will eventually be identified, particularly through the interception of wire communications. At this stage in the investigation it appears pointless and foolish to attempt to interview witnesses.

85.    If such interviews were attempted, your Affiant believes they would produce insufficient information concerning the identities of all of the persons involved in the conspiracy, the sources of the drugs and drug proceeds, the location of records, drugs, money or other pertinent information regarding the subject crimes. In addition, any responses to the interviews would contain a significant number of half-truths and untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Additionally, such interviews would likely result in non-targeted interviewees alerting other members of the conspiracy, thereby compromising the investigation and resulting in the possible concealment, movement or destruction of drugs, money, documents and/or other evidence.

86.    Furthermore, based upon my training and experience, your Affiant believes that issuing subpoenas to persons who are believed to be involved in this conspiracy compelling them to testify before a Federal Grand Jury would likely not be successful in achieving the stated goals of this investigation. Should the targets of this investigation, their co-conspirators and other participants be called to testify before the grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would then be unwise to seek use of immunity for any of these persons because the granting of such immunity could irreparably complicate or foreclose their prosecution, even though they might be among the most culpable