IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 05-1849 JH |
| | ) | |
| AYLA JARVIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

UNITED STATES' RESPONSE TO DEFENDANT AYLA JARVIS'S MOTION
TO SUPPRESS EVIDENCE FROM TRAFFIC STOP AND SEARCH ON OCTOBER 28, 2004

COMES NOW the United States of America, by and through David C. Iglesias, United States Attorney for the District of New Mexico, and James R.W. Braun, Assistant United States Attorney for said District, and hereby responds to Defendant Ayla Jarvis's "Motion to Suppress Evidence from Illegal Traffic Stop and Search on October 28, 2004 in Bloomington, Indiana" (Doc. 715).

**I.   Factual Background**

In 2004, the United States had information from a Confidential Source ("CS") that a twin engine Cessna 421B, tail number N3AJ, registered to Dana Jarvis ("Jarvis plane"), was being used by the Jarvis Drug Trafficking Organization ("DTO") to fly around the country in order to meet with drug associates and/or pick up bulk currency to be returned to Dana Jarvis in Santa Fe, New Mexico or Tucson, Arizona.

On October 27, 2004, Drug Enforcement Administration ("DEA") agents received information that defendant Ayla Jarvis flew to Oklahoma City, Oklahoma in the Jarvis plane and had a flight plan filed to travel to Bloomington, Indiana the following day.  CS informed agents

that the defendant was likely flying to Bloomington in order to pick up bulk currency for the Jarvis DTO from a man named "Greg."

On October 28, 2004, the defendant flew in the Jarvis plane to Bloomington, Indiana. Surveillance observed the defendant drive in a green 1994 Chrysler mini van, Indiana license plate 53B1695, from the airport to a local restaurant and meet for approximately thirty minutes with a man identified as Greg Hill. The defendant and Hill were observed in the parking lot leaning into Hill's truck and transferring something from it into the defendant's vehicle. Then the defendant and Hill each left the restaurant in their separate vehicles.

The defendant was followed and appeared to be returning to the airport. DEA agents contacted the Indiana State Police in order to have the defendant stopped. At that time, Trooper Kirby Stailey, a canine handler, was in close proximity to the defendant and witnessed her make an illegal U-turn and improperly signal. Based on these traffic violations, Trooper Stailey made a valid traffic stop. The defendant apologized to Trooper Stailey for her mistake and told him she was from out of town. Trooper Stailey obtained the defendant's driver's license and registration in order to run a computerized records check and to issue a warning citation. In addition, he called for a second officer.

The second officer arrived on the scene within 2-3 minutes[1] and while that officer waited for results of the computer check and completed the warning citation, Trooper Stailey walked his dog, Brix, around the outside of the defendant's vehicle. Brix gave a positive alert, indicating the

---

[1] This 2-3 minutes was the time it took Officer Stailey to request the computer records check. This time did not extend the length of the stop.

odor of narcotics, at the driver's front door.[2]

Following the alert, Trooper Stailey gave the defendant *Miranda* warnings and notified her he would search her person, the vehicle, and its contents. The defendant responded that there was a large duffel bag of money in the car. Trooper Stailey searched the vehicle and found $287,210.00 U.S. currency, along with a piece of paper that said "Old Man,"[3] located in a blue duffel bag between the two front seats. The money was seized and the defendant was subsequently released.

Once the search was completed, the money seized, the forfeiture process explained to the defendant, and a receipt provided to her, the defendant was released. The stop commenced at approximately 3:45 pm and the defendant was released at approximately 4:28 pm. The duration of the stop was approximately 43 minutes.

## II.    The Stop was Valid

Pursuant to the Fourth Amendment of the Constitution "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend IV.  Even if only briefly, "stopping an automobile and detaining its occupants constitute a seizure" under the Fourth Amendment. *Delaware v.*

---

[2]Brix was trained and certified at the time of the alert. The defendant cites to *United States v. Lambert*, 351 F.Supp.2d 1154 (D.Kan. 2004) for the proposition that probable cause may be vitiated if the dog was poorly trained or inaccurate, however the defendant does not actually challenge Brix's training or accuracy in this case. In response to a separate motion by the defendant requesting records relating to Brix's training and certification, the United States produced the requested records for the year preceding the seizure. The defendant has since withdrawn her discovery motion.

[3]Through their investigation, DEA agents knew that "Old Man" was Geno Berthod, a marijuana courier for the Jarvis Drug Trafficking Organization.

*Prouse,* 440 U.S. 648, 653 (1979).  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810.[4]

In *Whren* the stopping officer witnessed the defendants turn without signaling and then drive off at an "unreasonable" speed.  Subsequent to the stop, drugs were seized from the vehicle.  The defendants, claiming a Fourth Amendment violation, argued that the officer stopped them on pretext in order to search for narcotics.  The Supreme Court held that there was no violation because there was probable cause to believe a traffic violation was committed and "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id*. at 813.

This case is very similar.  Trooper Stailey had probable cause to stop the defendant based upon his observation of her illegal U-turn and improper signaling.  The defendant herself apologized to the officer for the U-turn, though she now disputes that she made such a turn.  Whether or not the defendant knew the turn was illegal when she made it, there would be no reason to apologize had she not made a U-turn at all.  Additionally, the fact that Trooper Stailey might have hoped to search the vehicle for contraband does nothing to undermine the validity of the stop for Fourth Amendment purposes.

Further, even if the defendant had not committed any traffic violations whatsoever,

---

[4]The Tenth Circuit holds that "[w]hile either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary." *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001). "Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity." *Id*. at 1286, (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)). Probable cause exists when "the facts available to the officer 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (citing *Carroll v. United States,* 267 U.S. 132, 162 (1925)).

Trooper Stailey could have made a constitutionally valid stop of the defendant based on the request to stop her by DEA agents and the collective knowledge doctrine.

In *United States v. Hensley*, 469 U.S. 221 (1985), the defendants challenged evidence seized during the course of a stop based on the reliance of one police department on a flyer issued by another police department. There, the only basis the stopping officer had was that the issuing police department requested the defendant be stopped for questioning related to a robbery. However, the flyer did not contain the "specific and articulable facts which led the first department to suspect the [defendant's] involvement in a...crime." *Id.* at 230. The Supreme Court held that "...law enforcement officers may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." *Id.* at 226. The Court went on to apply the collective knowledge doctrine and conclude that

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

*Id.* at 232 (citations omitted). The Court did not require that the stopping officer have reasonable suspicion himself, only that the requesting department have reasonable suspicion based on articulable facts.

This proposition was extended across the line between state and federal law enforcement agencies in *United States v. Celio*, 945 F.2d 180 (7th Cir. 1991). There, after investigation and surveillance of a suspected large-scale drug smuggling operation, DEA agents requested state police officers stop and search a vehicle in connection with the drug smuggling investigation. *Id.* at 182. The vehicle was stopped for speeding and then towed to a garage and searched for

several hours by state police officers. *Id.* As a result, drugs were seized. The defendant challenged the admissibility of evidence found in the course of the search on the grounds that there was no probable cause for the warrantless search of the vehicle, or in the alternative, "if federal agents had sufficient suspicion of the transportation of contraband, their conclusory statements to the state police could not supply the arresting officers with probable cause to search." *Id.*

Federal agents in that case had firmly established a connection between the vehicle and a group they justifiably believed was involved in drug trafficking. That belief was justifiable based on an ongoing investigation including intercepted phone conversations and surveillance. The court concluded that "'facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] was committing an offense.'" *Id* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The court went on to apply *Hensley*, finding that an investigation was ongoing and the "automobile to be stopped was pointed out specifically by the requesting officer [to a state trooper who was]...merely acting as an 'extension' or agent of the DEA agent and [the state trooper] could act on the DEA agent's suspicions." *Id.* at 184.

This case is almost identical to *Celio*. DEA agents in this case were in the midst of an ongoing investigation of the Jarvis DTO. While they were not intercepting calls at the time of this stop, the agents knew the Jarvis plane belonged to Dana Jarvis, the suspected leader of the DTO, and that his daughter, Ayla, had flown to Bloomington, Indiana in the Jarvis plane on October 28, 2004. Agents had information from a reliable source that the defendant was likely meeting in Bloomington with a man named "Greg," and that the purpose of the meeting was

likely for the defendant to pick up currency for the DTO from "Greg." Surveillance observed a man identified as Greg Hill and the defendant meeting at a local restaurant and then transferring something from Hill's vehicle into the green mini van the defendant was driving.

Agents had "facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] was committing an offense." *Id.* at 182. Trooper Stailey was acting as an extension of the DEA agents requesting his assistance and the collective knowledge doctrine extends what they reasonably believed to him. Further, even if DEA agents did not communicate any facts regarding their suspicions of the defendant, their request that she be stopped is analogous to the flyer in *Hensley* and because the federal agents had at least reasonable suspicion - if not probable cause - for the stop, the collective knowledge doctrine would extend it to Trooper Stailey.

Therefore, whether based on the traffic violation observed by Trooper Stailey or upon the reasonable suspicion of DEA agents that the defendant was engaged in criminal activity, the stop of the defendant was lawful and did not violate the Constitution.

## II.    The Search was Valid

The Supreme Court long ago found that a "'canine sniff' by a well-trained narcotics detection dog...discloses only the presence or absence of narcotics, a contraband item...[and that] no other investigative procedure...is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore...[it does] not constitute a 'search' within the meaning of the Fourth Amendment." *United States v. Place,* 462 U.S. 696, 707 (1983). In *Illinois v. Caballes*, 543 U.S. 405 (2005), the Supreme Court further concluded that a "canine sniff" is not required to be justified by reasonable, articulable suspicion.

"[T]he use of a well-trained narcotics detection dog...during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id.* at 409-410.  There, the defendant was stopped for speeding.  While one officer wrote out a warning ticket, a second officer arrived on scene and, without consent or any suspicion of narcotics activity, walked a narcotics detection dog around the defendant's vehicle.  Upon a positive alert by the dog, the vehicle was searched and marijuana was found.  The Supreme Court upheld the procedure and the probable cause, created by the alert, to subsequently search the vehicle.

    Here, the defendant contests the use of the drug dog "without first informing Ms. Jarvis that she was free to leave, since rushing to the use of the drug dog, in the absence of reasonable suspicion that drugs may be present, exceeded the scope of the traffic stop."  (Def. Mot. at p. 6). She additionally challenges her consent to the search because the officers had not yet returned her driver's license and paperwork.

    The defendant asks this Court to impose a standard far higher than the law requires. When the defendant made an illegal U-turn and improperly signaled in front of him, Trooper Stailey had not only reasonable suspicion, but probable cause to stop her, request her driver's license and paperwork, run a computerized records check, and issue a ticket or a warning.  If the officer could walk a narcotics dog around the defendant's vehicle during the time it took to complete the records check and warning, pursuant to *Caballes*, he could do so without consent or even reasonable suspicion that illegal narcotics activity was afoot.  That is precisely what happened in this case.  During the time it took the second officer to listen for the results and write out the warning, Trooper Stailey walked Brix around the defendant's vehicle. That Trooper Stailey asked the defendant for permission to walk the dog around her vehicle was merely a

courtesy and her assent was not actually required.

Once Brix positively alerted at the driver's front door, Trooper Stailey had probable cause to search the vehicle, *United States v. Souza*, 223 F.3d 1197, 1206 (10th Cir. 2000) (holding an alert by a certified narcotics dog is itself sufficient to create probable cause to search); *see also United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997), and the subsequent search was permissible. *Pennsylvania v. Labron*, 518 U.S. 938 (1996) (holding that if probable cause exists to believe a readily mobile car contains contraband, the Fourth Amendment permits police to search the vehicle without more). Thus, though the total duration of the stop might have been longer than it would have taken to issue the warning, the time it took for the dog sniff did not exceed such time and, once Brix gave a positive alert, probable cause existed to extend the stop in order to search the vehicle.[5]

The defendant further seems to challenge the accuracy of the alert by Brix claiming that "[n]othing illegal was located during the vehicle search." (Def. Mot. at p. 9). However, the fact that drugs were not subsequently found does not negate the facially valid probable cause to search as a result of the canine alert. Further, while possession of cash itself is, of course, not illegal, possession of the proceeds of drug transactions or the act of money laundering is illegal and there was probable cause to believe that the money was in fact related to drug trafficking and/or money laundering, as detailed above. *See United States v. Thirty Thousand Six Hundred*

---

[5] Alternatively, if the Court determines that the 2-3 minutes it took for the second officer to arrive, impermissibly lengthened the stop, the United States argues that there was reasonable suspicion to believe the defendant was engaged in illegal activity, and thus the lengthening was permissible. *United States v. Hunnicut*, 135 F.3d 1345, 1349 (10th Cir. 1998) (holding that it is permissible to lengthen the detention for questioning beyond that related to the initial stop where the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring...").

*Seventy Dollars*, 403 F.3d 448 (7th Cir. 2005) (holding dog alerts to currency are entitled to probative weight on review of government proof by a preponderance of evidence that seized currency represented proceeds of illegal drug transaction and was therefore forfeitable).

Therefore, the search of the defendant's vehicle was valid and did not violate the Constitution.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the United States respectfully requests that the court deny the defendant's motion to suppress.

Respectfully submitted,

DAVID C. IGLESIAS
United States Attorney

*/s/ James R.W. Braun*

JAMES R.W. BRAUN
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, NM   87103
(505) 346-7274

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing pleading was mailed on this 15th day of December 2006 to the following counsel of record:

Joe Romero, Jr., and Jody Neal-Post, Attorneys for Dana Jarvis
John F. Robbenhaar, Attorney for Ayla Jarvis
Jason Bowles, Attorney for George Ripley
William Kirchner and Walter B. Nash, Attorneys for David Reid
Kari Converse, Attorney for Greg Hill
Stephen D. Aarons, Attorney for Matthew Hotthan
Timothy Padilla, Attorney for Manuel Gil
Ann Steinmetz, Attorney for Mary Cannant
Robert Cooper, Attorney for Adrian Sanford
Gregory D. D'Antonio, Attorney for Benjamin Swentnickas
Robert Gorence, Attorney for Dennis Wilson
Charles S. Aspinwall, Attorney for John Nieto
Roberto Albertorio, Attorney for Lloyd Montoya
John Samore, Attorney for Melania Kirwin
Todd B. Hotchkiss, Attorney for Dakota Fitzner
Rudolph B. Chavez, Attorney for Rafal Mistrzak
Scott M. Davidson, Esq.

*/s/ James R.W. Braun*

JAMES R.W. BRAUN
Assistant U.S. Attorney