**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**

                                  **No:   05-CR- 1849 (JH)**

**DANA JARVIS,**

        **Defendant.**


### DEFENDANT DANA JARVIS' MOTION TO SUPPRESS FRUITS OF SEARCH OF HOUSE LOCATED AT 1440 CIELO VISTA, BERNALILLO

Defendant, Dana Jarvis, through counsel of record Joe M. Romero, Jr. and Jody Neal-Post, hereby moves the Court pursuant to the Fourth Amendment of the United States Constitution to suppress all evidence and testimony that is fruit of the August 25, 2005 search of the home located at 1440 Cielo Vista, Bernalillo, New Mexico.

### I. INTRODUCTION

As this Court is aware, the deadline for all Fed. R. Crim. P. 12(b)(3) motions, with the exception of the Joint Defendants' Wiretap Suppression Motion, was October 20, 2006. Because the joint wiretap suppression motion had yet to be filed as of that date, Defendant Jarvis filed his Motion to Extend the Deadline for the Filing of Wiretap Related Motions the day previous, on October 19, 2006. Doc. No. 708. This Court has not yet ruled on Mr. Jarvis' Motion for Extension, nor has the Joint Defendants' Wiretap Suppression Motion yet been filed.  Due to "[t]he unique importance of suppression motions to the determination of guilt and their critical timing in shaping the choice between a trial and plea" and ensuring the fundamental fairness of these especially complex proceedings, Defendant Jarvis files this single suppression motion, despite the lack of

ruling on his request for extension. *United States v. Prieto-Villa*, 910 F.2d 601, 610 (9th Cir. 1990).

The United States, through AUSA Braun, was given advance notice of this filing and remains opposed as to the merits, as well as on a basis of untimeliness.

Mr. Jarvis states as follows.

## II. BACKGROUND

On August 23, 2005, Special Agent Richard Stark submitted to United States Magistrate Alan C. Togerson a twenty-one page affidavit in support of a search warrant for 1440 Cielo Vista, Bernalillo, New Mexico. (Bates Nos. 1114-40.) At 4:23 p.m. that same day, Magistrate Torgerson issued the search warrant that Agent Stark sought, adding "No knock entry Authorized" and striking that part of the proposed warrant authorizing a nighttime search. (Bates Nos.1535-37.)

The search was executed on August 25, 2005, at 6:30 a.m. (Bates Nos. 1530.) Most of the items seized from this address were of the nature of business records and documents, computers, files, and computer files. (Bates No. 1530.)

For purpose of analysis, the Affidavit at issue can be broken down into four different types of information. The first type is the information that was obtained via interception of telephone calls. (Paragraphs 3 through 8 detail the court orders authorizing those interceptions.) Thirty-five of the fifty-three numbered paragraphs in the Affidavit concern these telephone interceptions. (Bates Nos. 1123-37, ¶¶ 9, 10, 14-17, 20, 30-50, 52.) Several additional paragraphs are fruit of telephone interceptions. (*e.g.,* Bates Nos. 1122-37, ¶¶ 1, 12,19-20.) As noted above, the constitutionality of the telephone interceptions is the subject of the forthcoming Joint Defendants' Wiretap Suppression Motion. If the Joint Defendants' Wiretap Suppression Motion is granted, most of the Affidavit for this search would be fruit of the poisonous tree, and hence, excised from the determination of probable cause. This motion addresses the other types of information in the Affidavit for the Warrant for 1440 Cielo Vista, and is analytically independent of the outcome of the

forthcoming Wiretap Motion.

The second type of information in the affidavit is from "Cooperating Defendant Witness 1" [CDW1], who was stopped for a traffic violation in Nebraska in May of 2005 with 205 pounds of marijuana in his car.  (Bates No. 1127 ¶ 21.)  This CDW1, now called simply CW1 in the discovery at this later stage of these proceedings, described the workings of the alleged Jarvis organization to agents.  His information makes up nine paragraphs of the Affidavit (Bates Nos. 1127-30, ¶¶ 21-29.) This information appears to be critical to connect the allegations of criminal activity in the Affidavit to the house that the agent claims is 1440 Cielo Vista.  However, all of this information was at least three months old and possibly as much as two-and-a-half years old.

The third type of information is from agents' physical surveillance and investigation, exclusive of CDW1. (Bates Nos. 1123-37,  ¶¶ 2, 11-13, 16-18, 36, 43, 51.)  This includes several arrests of others alleged to be involved in the organization, and some amount of physical surveillance.  This type of information, alone, supports the idea that a crime is occurring.  However, almost none of this type of information in the Affidavit relates at all to the 1440 Cielo Vista house and none relates to criminal activity at the 1440 Cielo Vista house.

The fourth type of information in the Affidavit is the commentary and interpretation by the affiant agent.  While this Affidavit for the search warrant is uncommon in its length and detail, it is also unusual in the amount of its content that does not consist of facts, but of paragraph upon paragraph of the agent's *interpretation* of the facts.   Without the agent's conclusions and interpretation, there was insufficient *fact* on which the magistrate could find probable cause specific to the address 1440 Cielo Vista.

### III.  LEGAL STANDARDS

In determining whether a search warrant is supported by probable cause, the court reviews the sufficiency of the affidavit by looking at the totality of the circumstances and ensuring "that the

magistrate had a substantial basis for concluding that probable cause existed." *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001). Probable cause exists when the affidavit "sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Basham,* 268 F.3d 1199, 1203 (10th Cir. 2001); *United States v. Wicks*, 995 F.2d 964, 972-73 (10th Cir. 1993). A judge's task in assessing whether probable cause exists to issue a search warrant:

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 232 (1983). The court must determines the existence of probable cause for the warrant exclusively from the supporting affidavit's four corners. *See Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 565 n. 8 (1971).

Probable cause "requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990). Hearsay evidence may form the basis for a probable cause determination, "so long as a substantial basis for crediting the hearsay is presented." *See, e.g., Jones v. United States,* 362 U.S. 257, 269 (1960).

"A search warrant may not issue if based upon information that has grown stale, i.e., information that no longer supports an affidavit's underlying assertion that the item sought will be found in the area or location to be searched." *United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005). Staleness is not determined merely by counting the number of days between the observations recorded in the affidavit and the date of the application for a search warrant. *See United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir. 1990). Instead, staleness "depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Cantu,* 405 F.3d at 1177 (quoting *Snow,* 919 F.2d at 1460).

## IV. ANALYSIS

**POINT I.  The Affidavit Relies On The Inferences And Interpretation Of Agent Stark, Not The Conclusions Of A Neutral Magistrate.**

The Affidavit in this case is full of the inferences drawn by Agent Stark—not the magistrate—which are presented as facts.  In fact, it is the volume and detail of the Agent's conclusions throughout the Affidavit that makes this affidavit appear to be so sound and exhaustive.  However, probable cause cannot be based on the analysis and reasoning by the agent.  It must stand on the *facts*, alone.

The first five pages of the Affidavit are completely devoid on any facts that are individualized to this case, much less particular to the home to be searched. (Bates Nos. 1119-23.) Starting on Bates number 1120 and going through the bottom of Bates number 1123, there are twenty-one paragraphs (*a* through *u*) describing, in general and conclusory terms, the habits of drug traffickers.  Every one of the paragraphs in this section states "Drug traffickers often…." or "Drug traffickers commonly…." or "Drug traffickers will commonly…" and then describes a typical (or stereotypical) attitude among drug traffickers, generally.  There is not a single piece of information in Paragraphs *a* through *u* that is something other than the agent's generalizations from his training and experience about drug traffickers.  There is not a single *fact* in Paragraphs *a* through *u* that is a *fact* particularized to this case, observed in this case, or specific to this case. (Bates Nos. 1120-23, ¶¶ *a* to *u*.)

Similarly, the next paragraph, Paragraph 1 of the Affidavit, baldly lays out the agent's underlying assumption or conclusion: that Dana Jarvis runs a drug trafficking organization that moves tons of marijuana from Arizona throughout the United States.  Agent Stark does not lay out the facts that would allow the *reader* of the Affidavit to conclude this is the business and how it is run, he just *states* that this is the business and how it is run.  Typical is the last sentence of Paragraph 1, which states that "Agents have identified" two men in Tucson as sources of supply for the Jarvis

drug trafficking organization, without explaining how the agents have done so. (Bates Nos. 1122-23, ¶ 1.)

The remainder of the Affidavit, which is nominally reserved for facts and circumstances, is woven together with similar conclusions and inferences on the part of the agent. The Affidavit simply does not make sense without them. Thirteen entire paragraphs can fairly be characterized as purely agent interpretation and commentary. (Bates Nos. 1123-36, ¶¶ 1, 10, 15, 20, 31, 34, 38, 40, 42, 45, 47, 50, 53.) Two of these paragraphs of interpretation and commentary appear to be critical to the determination as to whether there was probable cause as to this particular address. (Bates Nos. 1134-35, ¶¶ 45, 47 (commentary explaining that agent had concluded Cielo Vista house was a "stash house").)

In fact, every single reference to the house that is the subject of this warrant, save one, relies upon the agent's interpretation that the phrases "the Bernalillo house" or "Mary's place" means 1440 Cielo Vista. In Paragraph 22 (Bates No. 1128, ¶ 22), the agent interprets for the magistrate that the location the informant CDW1 referred to as "the Bernalillo house" is "known to agents" to be 1440 Cielo Vista, without describing how this is known. At Paragraph 27 (Bates No. 1129, ¶ 27), the agent does the same. In Paragraphs 44 and 45 (Bates No. 1134, ¶¶ 44-45), the agent interprets for the magistrate that when Ayla states "that thing at the Bernalillo house," it should be interpreted to mean marijuana stored at 1440 Cielo Vista, based on the agent's training and experience and unspecified "participation with this investigation." In Paragraphs 46 and 47 (Bates No. 1134-35, ¶¶ 46-47), the agent interprets for the magistrate that a telephone reference to "Mary's" should be read to mean "the stash house in Bernalillo, New Mexico, where marijuana was stored." The agent adds as a note to the magistrate his assurance that "Agents are aware of the stash house location and know a Mary Cannant is employed by JARVIS to watch said location." (Bates No. 1135, ¶ 47.) There is nothing in the Affidavit to explain the facts that allow the agents to "know" this.

6

The one paragraph with *factual* references to the specific address 1440 Cielo Vista in the Affidavit in is Paragraph 52 (Bates No. 1136, ¶ 52), wherein it was described that State Police Officer Mike Row followed Ayla Jarvis from Dana Jarvis' home at 13 Enebro in Santa Fe to 1440 Cielo Vista in Bernalillo on August 6 and 7, and that a DEA agent observed Ayla Jarvis parking her vehicle at 1440 Cielo Vista on August 20, a short time after an intercepted telephone call in which Mr. Jarvis asked Ayla to meet him in person.  This same paragraph states that telephone intercepts (unspecified and not detailed) indicate that in the August 6-7 time frame, Mr. Jarvis was moving his possessions from his Santa Fe address to "the Bernalillo house."  Notably, these facts do not corroborate any criminal activity.  Nor does this seemingly corroborate the agent's interpretations of CDW1's assertions concerning "the Bernalillo house" made back in May—a full three months before agents claim they saw Mr. Jarvis move into the home at 1440 Cielo Vista.

It was especially important for the agent to explain the facts underlying his leaps of logic pertaining to the 1440 Cielo Vista house, because none of the typical background investigation information (such as ownership, tax, or utility records) tied Mr. Jarvis to the property.  (*See* Bates No. 1136, ¶ 51 (utility records for 1440 Cielo Vista indicate name Mary Cannant).)

The key to the soundness of an affidavit is an "independent assessment" by a neutral, detached magistrate.  The "independence" required is independence from the suspicions and analysis and thought process of the law-enforcement officer.  *See Nathanson v. United States,* 290 U.S. 41, 47 (1933) (judicial officer could not make an independent assessment of probable cause because the officer had provided the judicial officer with only his own suspicions and beliefs).

Due to training and work experience, law enforcement officers perceive the work differently than do civilians:

> [P]olice work…by its nature, puts officers in personal jeopardy, and often requires officers to assert authority over others ….[T]hese two phenomena—personal danger and the need to assert authority—deeply affect officers' views of the world…. "Working together, the

> factors of danger and authority tend to make police officers
> constantly vigilant, suspicious, and ready to assert dominant
> authority" over civilians in situations where an officer's authority is
> questioned in even the most minor of ways.  Necessarily, it would
> appear, the same vigilance that officers apply to detect criminality, as
> part of their work becomes a "fact of life" for their interactions with
> the broader public.

Elliot Spitzer, Office of the Attorney General of the State of New York, *The New York City Police Department's "Stop and Frisk" Practices:  A Report to the People of the State of New York from The Office Of The Attorney General* 67 (1999) (footnotes omitted).  While this police world view is completely normal and in fact desirable among police officers, the founders of this nation deliberately chose to place the decision to give authority to search people's homes with an entity wholly *outside* that police world-view: with a detached and neutral magistrate.  Reliance on the reasoning of a police officer, the founders believed, would not adequately protect the civil liberties of the people, thus "the mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment." *Arkansas v. Sanders*, 442 U.S. 753, 758 (1979).

The reason that the founders of this country included the warrant requirement was to ensure that a neutral judicial officer, not a law-enforcement officer, looks at the facts and draws the inferences from the facts.  In *Johnson v. United States,* the United States Supreme Court stated:

> The point of the Fourth Amendment … is not that it denies law
> enforcement the support of the usual inferences with reasonable men
> draw from evidence.  Its protection consists in requiring that those
> inferences be drawn by a *neutral* and *detached* magistrate i*nstead of being
> judged by the officer engaged in the often competitive enterprise of ferreting out
> crime.*

*Johnson*, 333 U.S. 10, 13-14 (1948) (emphasis added).  A warrant is required because law enforcement officers "may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interest in protecting his own liberty."  *Steadgold v. United States,* 451 U.S. 204, 212 (1981). "[T]he detached scrutiny of a neutral magistrate [ ] is a more

reliable safeguard against improper searches than the hurried judgment of a law enforcement officer." *United States v. Chadwick,* 433 U.S. 1, 9 (1977).  The warrant requirement is "an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly over-zealous executive officers' who are a part of any system of law enforcement." *Sanders,* 442 U.S. at 758  (citation omitted).

The weight and importance of the facts in the affidavit has to be evaluated *independent* from——meaning without reliance upon—the interpretations and impressions and thought-process of the law-enforcement officer.  For example, in *Florida v. Royer*, 460 U.S. 491, 507 (1993), the high court held that there was *not* probable cause based on a collection of otherwise-innocuous factors—nervousness, paying cash for ticket to a "target city," use of assumed name—because a reasonable person, as opposed to a police officer, would not conclude that a crime was occurring.  Similarly, *United States v. Infante-Ruiz* held that there was *not* probable cause based on the officer's knowledge of the defendant's "dangerous reputation" and drug connections and knowledge, from experience, that drug traffickers often carry weapons, because the officer's personal beliefs were insufficient without the facts supporting them having been laid out. *Infante-Ruiz,* 13 F.3d 498, 502-03 (1st Cir. 1994).  Likewise, in *United States. v. Valenzuela*, the Tenth Circuit held that there was no probable cause based on the officer's reasoning that a clean car traveling with a dirty car was suspicious, even though the officer in his experience had observed several recent alien smuggling cases involving a clean and a dirty car traveling together, because an independent and detached magistrate would not have followed the officer's leap in logic.  *Valenzuela,* 365 F.3d 892, 901 (10th Cir. 2004); *see also Graves v. City of Coeur D'Alene,* 339 F.3d 828, 844 (9th Cir. 2003) (not probable cause to search protester's backpack based on officer's experience and training that backpacks are often used to contain explosives, because the suspicion was not individualized).

While the impressions and thought-processes of the Agent certainly make him very good at his job, and appear to know far more about this case than he put down on paper, his impressions and thought-processes were not useful nor appropriate for the magistrate, whose job it was to make the neutral and detached probable cause determination in this case. *Cf. United States v. Johnson,* 256 F.3d 895, 905-06 (9th Cir. 2001) (no probable cause to search property for suspect based on officer's "gut feeling" from his years of experience that the suspect would be on the property, because without the objective facts supporting the officer's belief, this was a mere hunch); *see Aguilar v. Texas,* 378 U.S. 108, 109, 111-113 (1964), *overruled on other grounds by Illinois v. Gates,* 462 U.S. 213 (1983).

It is often in the law pointed out that courts must review affidavits for search warrants in a common-sense manner, not a hyper-technical manner. *See, e.g., Illinois v. Gates,* 462 U.S. at 238; United *States v. Ortega Jimenez,* 232 F.3d 1325, 1328 (10th Cir. 2000) (court must determine practical meaning of warrant's content, not requiring technical precision). The flip side of this coin, however, requires that the affidavit be reviewed with a *neutral* and *detached* common-sense, not the kind of crime-ferreting common sense that a law enforcement officer has. *See United States v. Chadwick,* 433 U.S. at 9 ("the detached scrutiny of a neutral magistrate [ ] is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.'"); *cf. State v. Vargas*, 2007-NMCA-006, ¶ 22 ("We are also concerned that a purely police-centric standard will shortchange individual privacy interests."). Indeed, the more that an affidavit relies upon the training, experience, and thinking of the law-enforcement officer, the more the conclusions drawn from its facts tend toward hunches, not probable cause.

The backbone of this Affidavit is the agent's interpretation and his conclusions. In order for a detached and neutral Magistrate reading the Affidavit to understand the significance of most of the events and telephone conversations, and even to figure out what the parties are talking about, the

affidavit required the agent's translation of the facts into suspicion. (Bates Nos. 1123-36, ¶¶ 1, 10, 15, 20, 31, 34, 38, 40, 42, 45, 47, 50, 53.)  Agent Stark in twenty-one paragraphs must explain how drug traffickers operate.   (Bates Nos. 1120-22, ¶¶ *a* to *u* (Drug traffickers often…" and "Drug traffickers commonly…".)   Then in thirteen of the "factual basis" paragraphs and several other points, the agent takes the Magistrate aside to explain, "In my training and experience and my participation with this investigation I believe that when *x* said *y* it meant *z*."  It is the "*z*'s"  in the Affidavit that make up any probable cause as to 1440 Cielo Vista, not the "*x's"* and the "*y*'s."

As a specific example, in Paragraph 14 the telephone interceptions showed that one Barbara Hanna called Mr. Jarvis and the two agreed they needed to meet and talk about money.  (Bates No. 1126, ¶ 14.)  In Paragraph 15, Agent Stark translates that for the Magistrate to mean that Ms. Hanna wanted to look at Mr. Jarvis' drug ledgers and see if she was owed any money for her work for the drug organization.  The call about money (the *x* and the *y*) do not, however, indicate probable cause. The explanation that the conversation really was about drug-dealing book-keeping (the *z*), does. Likewise in Paragraphs 33 and 34 Agent Stark tells the Magistrate that "get something smokin'" translates (in his training and experience) into "pick up some marijuana."  (Bates No. 1131, ¶¶ 33-34.)  In Paragraph 36, the Magistrate is told that an ice cooler in the back of a car translates into someone "picked up several pounds of marijuana".  (Bates Nos. 1131-32, ¶ 36.)  In Paragraphs 37 and 38, Agent Stark tells the neutral Magistrate that a telephone conversation between Mr. Jarvis and his accountant about closing the sale of some real property translates into credit against a previous drug debt.[1]   (Bates No. 1132, ¶¶ 37-38.)  He also tells the reader, the magistrate, that terms like "goodies" and "consignment" and "quality" and "home improvement stuff" refer to marijuana and

---

[1] Agent Stark does include that agents corroborated the actual real estate sale through title company and bank records.  What he does not explain is his translation of the reference "real estate George," into the name "George Clark," who in turn had been arrested with more than $200,000 back in 1986.

marketing and its packaging.  (Bates Nos. 1125-33, ¶¶ 10, 31, 42.) These may or may not be fair inferences from the facts presented in the affidavit, but in any event they needed to be inferences that the magistrate drew, not conclusions that the agent drew.

The Magistrate reading the Affidavit is required to follow the agent on a similar leap from Paragraphs 46 to 47 in the Affidavit. (Bates No. 1134, ¶¶ 46-47.)  In Paragraph 46, the reader learns that Mr. Jarvis and Mr. Greene speak on the telephone about a "project" and a "place to meet" and "Did you ever get out to Mary's?"  In Paragraph 47, Agent Stark informs the Magistrate that what the telephone call was *really* about was a marijuana shipment, finding an isolated safe location for re-packing the marijuana shipment, and that "Mary's" means that 1440 Cielo Vista and that 1440 Cielo Vista is a known "stash house location."  The agent does not walk the Magistrate through his reasoning equating "Mary's" with "known stash house" and then with "1440 Cielo Vista." Without the commentary, the reader Magistrate would not read Paragraph 46 as remotely helpful to establish probable cause to search the address 1440 Cielo Vista.

The reviewing Magistrate is likewise required to follow the agent's leap of logic on another of the Affidavit's few references to 1440 Cielo Vista in Paragraphs 44 to 45. (Bates No. 1134, ¶¶ 44-45.)  In Paragraph 44, the Magistrate learns that Ayla said to Mr. Jarvis on the telephone "that thing at the Bernalillo house…Manny wanted to get a little if that is possible."  Then Mr. Jarvis replied that Manny has a "little football" and "nobody takes anything more out of there unless it is cash up front."  Agent Stark in Paragraph 45 then explains that his training and experience and participation in this case lead him to believe that "that thing" is a stash of marijuana, "the Bernalillo house" means 1440 Cielo Vista, and "football" is a quantity of marijuana.  It was the Magistrate's job to draw (or not draw) those conclusions, not the agent's.

Some of the inferences made in the Affidavit itself might be fair inferences from the facts presented in the affidavit; others come right out of the Agent's head.  But in any event, each of these

inferences needed to be inferences that the *Magistrate* drew, not conclusions that the *agent* drew.  To a large extent all of these conclusions require the Magistrate to accept as *fact* the conclusion that Agent Stark has come to in Paragraph 1—that Mr. Jarvis runs a far-ranging drug trafficking organization. An affidavit cannot bootstrap itself into probable cause like this.  *Cf. Johnson v. United States,* 333 U.S. at 13-14 (the protection of the Fourth Amendment "consists in requiring that those inferences be drawn by a *neutral* and *detached* magistrate i*nstead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime*" (emphasis added)).  Moreover, without Agent Stark's translation about references meaning the house at 1440 Cielo Vista, there is not sufficient nexus between the probable cause in the Affidavit and the place to be searched.  *Cf. United States v. Tisdale*, 248 F.3d 964, 971 (10th Cir. 2001); United *States v. § 149,442.43,* 965 F.2d 868, 874 (10th Cir. 1992).

**POINT II.   The Warrant Did Not Describe The Things To Be Seized With Sufficient Particularity To Prevent Officers From Using Their Discretion, And To Protect Against The Seizure of Expressive, Constitutionally-Protected Documents.**

ATTACHMENT A to the Affidavit and Warrant set out what was to be seized in the search. Under this list, agents were authorized to seize any conceivable document that they found, whether on paper or electronic.  This made the warrant unconstitutionally broad in two ways.  First, it gave officers discretion, but no method or protocol, to seize what they thought was relevant.  Second, the list of things to be seized was broad enough to include constitutionally-protected expressive speech.

The agents were to seize "[b]ooks, records, receipts, notes, ledgers, designated codes or other papers" and all "[p]apers, tickets, notes, schedules, receipts and other items" and all "wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, records and agreements *and other documents*." (emphasis added). They were to seize all of these documents if the agents thought they related to transportation or distribution of controlled substances, or they related to travel, or they related to purchases, or they related to ownership, or they related to contacts, or they related to "secreting assets." (Bates Nos. 1138-39, ¶¶ 1, 2, 3, 5, 10,

11, 12, 17, 18.) There was no protocol or method or even guidance by which the agents should determine what among the universe of documents "relates to" the long list of things the documents *could* relate to.

The agents were also instructed to seize all photographs, videos, "as well as other notes, records, *diaries, journals*" that make reference to "entities in paragraphs 2 and 3 above." (emphasis added) . Paragraphs 2 and 3 above do not list any individuals or entities; these paragraphs just refer to Jarvis "and associates." Again, there was no specified protocol or method for determining which among these notes, diaries, journals, and records might be relevant. Likewise agents were instructed to seize "[d]ocuments, books and papers reflecting names, addresses, and/or telephone numbers pertaining to but not limited to the individuals listed in paragraphs 2 and 3, above." Again, the paragraphs referred-to do not contain any list of individuals. Agents were also instructed to seize any documents relating to ownership of telephone accounts and vehicles. Finally, they were instructed to seize "[c]omputers, computer software, mass storage devices, digital memory devices and or hand held electronic devices" used by Mr. Jarvis "or others." (Bates Nos. 1138-39, ¶¶ 1, 2, 3, 5, 10, 11, 12, 17, 18.) All of these documents were listed in addition to the typical weapons, paraphernalia, currency and jewels, radio scanners and the like.

It is hard to conceive of any document, in paper or computer form, that is not covered by the above.

The Fourth Amendment requires that a warrant describe with "partiular[ity]…the place to be searched and the persons and things to be seized." U.S. Const. amend IV; *see also* Fed. R. Crim. P. 41(e)(2) ("The warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned.").

The purpose of the particularity requirement is "to prevent a general exploratory rummaging in a person's belongings." *United States v. Carey,* 172 F.3d 1268, 1272 (10th Cir. 1999) (citing *Marron v.*

*United States*, 275 U.S. 192, 196 (1927)); *see also United States v. Stefonek,* 179 F.3d 1030, 1033 (7th Cir. 1999) ("one of the purposes of the Fourth Amendment was to outlaw general warrants").  This Affidavit and Warrant clearly described the *place* to be searched, complete with aerial photograph. (*See* Bates No. 1140.)     But its instruction on "things to be seized" allowed, if not encouraged, a "general exploratory rummaging" through a person's belongings (in fact, through the belongings of up to 12 people named in the ATTACHMENT A).

A warrant must describe objects to be seized with sufficient particularity so as to leave "nothing … to the discretion of the officer executing the warrant."  *Andresen v. Maryland,* 427 U.S. 463, 480 (1976) (quoting *Marron*, 275 U.S. at 196).  This Warrant's description left entirely to the discretion of the officers which among the universe of documents should be seized.

To authorize the seizure of potentially expressive written material, the government must do more than generally show probable cause regarding criminal conduct at the location searched. *See Stanford v. Texas,* 379 U.S. 476-485-86 (1965) (written materials must be described with "most scrupulous exactitude").  It must in addition show probable cause that the specific written documents were used to facilitate criminal activity.  *See, e.g., Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996). A showing of probable cause—no matter how strong—does not authorize a court to dispense with the independent requirement of particularity. *Groh v. Ramirez,* 540 U.S. 551, 555 (2004) (a warrant that met the probable cause requirement nonetheless was "plainly invalid" where it failed to satisfy the particularity requirement). This added layer of review and scrutiny is necessary to protect a "people's right to privacy and right against self-incrimination." *Stanford v. Texas,* 379 U.S. at 484.  The added layer of scrutiny is also required to respect the writer's human dignity and that most cherished of American ideals, freedom of expression.  *Id.*

A warrant that gives the executing officers discretion to review documents and the decide if the material is criminal is overbroad.  The discretion conveyed increases the likelihood that private

and constitutionally-protected materials will be reviewed, if not seized. *See Marcus v. Search Warrant*, 367 U.S. 717, 722, 732 (1961) (warrant authorizing seizure of "obscene" materials overbroad because it gave officers the task, and discretion, to review material and determine if it was "obscene"). The degree of particularity that is required in any given situation "varies depending on the circumstances of the case and the types of items involved." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

In this circuit, seizure of large quantities of documents or a computer requires careful scrutiny of the particularity requirement. *See United States v. Carey*, 172 F.3d 1268, 1275 n.7 (10th Cir. 1999) ("the storage capacity of computers requires a special approach" in assessing the particularity requirement); *United States v. Hunter*, 13 F. Supp. 2d 574, 583-84 (D. Vt. 1998) ("Computer searches present the same problem as document searches—the intermingling of relevant and irrelevant material" which requires that each search be "independently evaluated for lack of particularity").

A warrant authorizing a search of a mass of documents or a computer should contain a clear protocol or methodology for officers to follow that limits their discretion and hues the search close to the purpose of the search as possible. The Court should use the factors set forth in *Spilotro* in determining the degree of particularity required: (1) whether probable cause exists to seize all items of a particular type described in the warrant, (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *Spilotro*, 800 F.2d at 963. There is not probable cause to believe that every document in the home and on the computers was evidence of the alleged criminal activity. The Warrant fails to set forth "objective standards by which executing officers can differentiate items subject to seizure from those which are not." *Spilotro*, 800 F.2d at 963. The Warrant in this case thus fails both of the factors. *See Carey*, 172 F.3d at 1275 ("law enforcement

must engage in the intermediate step of sorting various types of documents and then only search the ones specified in the warrant"). The Warrant should have been structured with more particularity, like the warrant in *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001), where the appellate court held that the search was not over-broad because it was done "[u]sing clear search methodology" designed to protect private files and seek only those that had to do with the drug business.

This Warrant called for almost every document conceivable to be seized, and gave officers discretion to divine the purpose and relevance of the various documents. Moreover, it authorized a completely generic search of computer and electronically-stored files. "Generic classifications in a warrant are acceptable only when a more precise description is not possible." *United States v. Kow,* 58 F.3d 423, 427 (9th Cir. 1995). The "things to be seized" portion of the Warrant rendered it overbroad, and the fruits of the Warrant, at least the documents that are fruit, should be suppressed.

**POINT III. The Information from Cooperating Defendant Witness 1 Was Too Stale To Provide Probable Cause.**

The Search of 1440 Cielo Vista all happened on August 25, 2005. Paragraphs 21 to 28 of the Affidavit for the Warrant, containing all the information provided by Cooperating Defendant Witness 1 [CDW1], was obtained by law enforcement on May 20, 2005—three months before the warrant and search. (Bates Nos. 1127-30, ¶¶ 21-29.) All the information that CDW1 relayed on May 20, save the facts surrounding his own arrest, came from some unspecified time before May 20. By CDW1's own account, the information he provided could have been as much as two and one-half years old. (Bates No. 1127, ¶ 21.)

CDW1 never once mentioned the address 1440 Cielo Vista. He provided only two references to "the Bernalillo house," which the agent translated for the Magistrate to mean the 1440 Cielo Vista house: that "he [CDW1] stored or observed marijuana" at three homes, including "the Bernalillo house." CDW1 did not provide details or an address, but Agent Stark added to the

Affidavit the parenthetical, "(known to agents to be located at 1440 Cielo Vista in Bernalillo, New Mexico)". (Bates No. 1128, ¶ 22.) The Affidavit does not explain how this came to be "known to agents." CDW1 also stated that, at some unspecified time in the past, "he saw between 300 and 700 pounds of marijuana at the Bernalillo house." (Bates No. 1129, ¶ 27.) Again, the agent added the parenthetical explaining that "the Bernalillo house" meant "(1440 Cielo Vista)". The Affidavit included information from CDW1 about the business practices of the alleged distribution organization, including the fact that Mr. Jarvis kept "meticulous' records, and that Mr. Jarvis "was not always in possession of these drug ledgers as he often had different employees of the DTO hold them for extended periods of time." (Bates No. 1129 ¶ 25.) It was almost three months *after* CDW1 gave this information that agents said they observed Mr. Jarvis moving into the house at 1440 Cielo Vista. (Bates No. 1136 ¶ 52.)

The little mention of "the Bernalillo house" (with no mention of the address on Cielo Vista) in the information provided by CDW1 was even more than three months old and potentially much older. CDW1's information in the Affidavit tends to provide an inference that he was present at "the Bernalillo house" one time, at some unspecified point in the past. (Bates No. 1128, ¶ 22.) Agent Stark wrote that, as of May 20, 2005, "CDW-1 said that he saw between 600 to 700 pounds of marijuana at the Bernalillo house (1440 Cielo Vista) packed in duffel bags *recently*." (Bates No. 1129, ¶ 27.) Nothing CDW1 stated concerning "the Bernalillo house" indicated he had been there more than once. Note, again, that at the time CDW1 told the agents these things on May 20, Dana Jarvis did not live at 1440 Cielo Vista. (Bates No. 1136, ¶ 52 (on August 6-7 agents say Jarvis moved possessions).)

CDW1 was interviewed again on August 11 and 18, but his information was no less stale than before. CDW1 had not obtained any new or more recent information since his arrest. He made no mention whatsoever of "the Bernalillo house." (Bates No. 1130, ¶ 29.)

Thus all of CDW1's information (Paragraphs 21 to 28 of the Affidavit) was more than three months old.  All of CDW1's information relating to "the Bernalillo house" was even older.  It was not CDW1 who specified the address 1440 Cielo Vista—that address was provided, later, by the agent, writing *after* Mr. Jarvis was observed moving in there almost three months later.

The Tenth Circuit Court of Appeals has held that "probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Snow,* 919 F.2d 1458, 1459 (10th Cir. 1990).  To determine whether information is stale, the court must look at the element of time passed, "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Id.* at 1460 (internal quotation marks omitted).  The court has also stated that "where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant." *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972).

The Affidavit as a whole does in this case fairly set forth an activity that is continuing—that is, an alleged drug trafficking organization.  So in the sense of helping to support probable cause that such an organization existed and was continuing, the information from CDW1 was arguably not, under *Snow*, stale and irrelevant.  However, to support this search warrant the Affidavit had to present probable cause to find criminal evidence specifically *at the 1440 Cielo Vista house.*  The scant information that CDW1 provided regarding "the Bernalillo house" (allegedly 1440 Cielo Vista) did not support the inference of a continuing activity *at that location. Cf. United States v. Helton*, 314 F.3d 812, 822 (6th Cir. 2003) (allegations regarding stored drug money was stale after two months because stacks of money not likely still present when warrant was executed).

A showing of a continuing organization is not the same as showing the continued probability of evidence at this particular location.  The evidence specific to the Cielo Vista house is sparse in the Affidavit, and there is nothing in the Affidavit that supports the conclusion that if the organization

continued, the Cielo Vista house necessarily contained evidence. In fact, CDW1's statements to Agent Stark lead to an opposite inference. CDW1 stated that things like organization ledgers and records were *not* kept in one place. (Bates No. 1129, ¶ 25 ("CDW-1 stated that JARVIS was not always in possession of these drug ledgers as he often had different employees of the DTO hold them for extended periods of time.").)

Thus the statements from CDW1 concerning "the Bernalillo house" were too stale to provide probable cause. Probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched. *United States v. Shomo,* 786 F.2d 981, 983 (10th Cir. 1986). What CDW1 claimed he saw "at the Bernalillo house" at some unspecified point in the past, at least three months prior, was not the mound of business records sought by the agents, but a bulk amount of marijuana. The whole alleged purpose of the organization was to distribute such bulk marijuana, making it unlikely what CDW1 saw there would remain at "the Bernalillo house" for that length of time. *See Shomo,* 786 F.2d at 984 (if property likely to remain in the same place for a lengthy time, probable cause may be found despite delay between events relied on and issuance of warrant). CDW1 made his claims about "the Bernalillo house" almost three months before the agents claimed Mr. Jarvis moved into 1440 Cielo Vista. The claims from CDW1 were simply too stale to support probable cause.

WHEREFORE, Defendant Jarvis moves this Court to suppress the fruits of the search warrant executed on 1440 Cielo Vista.

Respectfully submitted:

*Electronically filed 2/1/07*

By: _____

Joe M. Romero, Jr.
Attorney for Defendant Jarvis
1905 Lomas NW
Albuquerque, NM 87104
(505) 843-9776

*Electronically filed 2/1/07*

By: _____

Jody Neal-Post
Attorney for Defendant Jarvis
317 Amherst SE
Albuquerque, NM  87106
(505) 268-7263

I hereby certify that on February 1, 2007,
I filed the foregoing pleading electronically through
The CM/ECF system, which caused counsel of
record for the United States to be served by
electronic means.

*Electronically filed*

_____

Joe M. Romero, Jr.