**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**THE UNITED STATES vs. DANA JARVIS, et.al**

**AFFIDAVIT OF SUZANE DOUCETTE**

Suzane Doucette, being duly sworn, states as follows:

I was employed as an FBI Special Agent from approximately 1984-1994. Currently, I am a consultant and expert witness in the area of law enforcement techniques, including wiretapping. I have testified in court on wiretap matters. I was a court appointed wiretap expert in *United States v. Gonzalez*, 2005 WL 1459569 (9th Cir. June 22, 2005). In addition to other cases, I was the court appointed wiretap expert in a multi-defendant death penalty case. (*United States v. Raymond Llamas; et.al*)  I have also served as an expert on surveillance and search warrants in a California trial.

As a court appointed wiretap expert on this case, I have not had time to review all of the disclosure in the case. It is my practice to request sixty days after the last "batch" of disclosure is received to complete a neutral, fact-based, analysis of the wiretaps in a case. In the case at bar, the Government has produced approximately 60,000 pages of disclosure.

When I review a wiretap, the work is far more extensive than the simple review of a search warrant. Because of wiretap law and subsequent court cases, I must review the case for the numerous requirements which, if violated, can result in suppression. These court-imposed requirements include probable cause, necessity, minimization, sealing, and the proper application for extensions. In addition, I must review each affidavit for particularity and specificity to the individual case. The courts have also held that every renewal must independently comply with the above requirements; therefore, I am

required to examine each extension with the same scrutiny as the original affidavit.

A. Facial Analysis:

The first step in reviewing a wiretap is to closely examine the application, and especially the affidavit the government filed in support of the application. My first analysis is a facial analysis to determine if the application contains the elements required by the courts. Normally, the applications and affidavits are drafted by skilled prosecutors and investigators relying on pre-screened forms. Thus, at first blush, the applications will appear to meet all of the elements. However, after further review, in some cases the affidavits will not have met with the legal requirements. A Title III warrant is a "super-warrant" due to the necessity requirement and the extraordinary invasion of privacy.

B. Initial meetings:

After I have reviewed all the affidavits for the first time, my practice is to meet with counsel to receive any input regarding the factual basis of the affidavits. Usually, an investigator will have conducted some investigation for the defense. Whenever possible, I meet with the investigator regarding any factual investigation. Together we continue the investigation into the facts surrounding the affidavits throughout the wiretap analysis. It is important for me to continue close communication with counsel and investigators.

Examination and analysis of the facts:

The next step is to carefully examine the Government's case leading to the initiation of the wiretap. What, if anything, was not disclosed to the court?

1. Omissions:

I must carefully review disclosure to find any omissions. Omissions are an importance factor in wiretap review as the omission may be later adjudicated as material.

As one possible example, the Government may have had more sources than it disclosed to the issuing court.

2. Misstatements or falsehoods:

During the examination of the Government's case leading up to the wiretap, I also must look for any misstatements or falsehoods. This task is accomplished by a painstaking vetting of the affidavit, "proving up" the Government's claims. I review the disclosure to provide the defense with any information that may indicate that the affidavit contains a knowing or reckless omission or distortion of facts that may have been misleading and material to the issuing judge. This examination may involve finding evidence tucked away in the most unlikely piece of disclosure, therefore I must not ignore any piece of disclosure.

3. *Franks* review:

I am tasked with reviewing the discovery to gather the necessary evidence that either suggests there is not a likely *Franks* violation, or in the alternative, that there is evidence that points to a material omission or misstatement upon which a *Franks* challenge may be brought. My review is not tailored to the outcome, but is simply an examination of inconsistencies, if any. When I do find inconsistencies, it is up to the defense to decide whether to pursue a *Franks* challenge. My review must be very thorough and may require from 60-250 hours depending upon the complexity of the case and the amount of disclosure.

D. Particularity:

On occasion, the Government may rely upon "boilerplate" language, non-specific to the case. Sometimes, instead of considering all the alternatives to wiretapping, the

government prefers to say that this type of case (e.g. gambling or narcotics) is too hard to crack without wiretapping. There must be reasons to proceed to the wiretapping technique that are specific and particular to *this case*. Boilerplate language may sometimes be found as a substitute for the particularity requirement. I must review the affidavit to try to determine if the assertions made by the Government are specific to the case at bar, or, in the alternative that the Government used generalizations and "boilerplate" language.

E. Necessity review:

The necessity test is a three prong review.

1. Did the Government try traditional investigative techniques and the techniques fail to accomplish the Government's goals?

2. Did the Government's Affiant aver that traditional investigative techniques would be futile?

3. Did the Government's Affiant aver that traditional investigative techniques were too dangerous to try?

The Government's Affidavit will aver to the issuing court that a wiretap is necessary because normal investigative techniques could not achieve the Government's goals. Thus, I must review the Government's investigation to find out if normal (traditional) investigative techniques were attempted. I perform this task by comparing the Government's affidavit to the Government's disclosure, as well as the defense investigation into the case. Additionally, I rely upon my own on the ground experience in conducting investigations. I must provide the defense with a detailed portrait of the Government's case at the point the wiretap is requested. Then, if there are extensions, I

must provide the defense with a detailed portrait of the Government's case at the time that each extension is requested. In my experience, there is often less "necessity" with each subsequent application. Every extension must independently meet the same necessity requirement and therefore requires the same level of scrutiny.

Surveillance:

My review of traditional investigative techniques includes a review of the Government's attempts at surveillance. Did the Government attempt surveillance? Did the surveillance efforts equal surveillance efforts in other similar cases? The Government should use a normal amount of resources over a reasonable period of time. Is the Government able to support its claims of surveillance with the appropriate discovery, such as logs, etc.? Is the Government able to show that it used a pole camera, other fixed surveillance, audio or video surveillance? Did the Government utilize surveillance teams or an airplane to assist in surveillance? Did the Government utilize a tracking device, such as a "slap-on" beeper? Are any Government claims of counter-surveillance documented in a timely manner within a surveillance reports?

Often, I must visit locations where the Government deems surveillance to be "too difficult." Usually this inquiry requires me to examine every named location for places to install a pole camera, park a van, conduct covert surveillance, and places to locate "fixed-location" surveillance. Sometimes it is also necessary to visit these locations at various times of the day and night.

Many times, after the Government claims that it could not conduct surveillance before the wiretap, it conducts countless hours of surveillance after the wiretap is up and running. I must try to advise the defense as to what was reasonable surveillance in the

case at bar. My job is to review all of the surveillance logs and reports, as well as the Government's investigation to determine if opportunities to successfully conduct surveillance were missed. My review of the discovery is conducted so that any misstatements or overstatements of the difficulties involved in surveillance, if any, may be brought to the attention of the defense and ultimately the court.

In the case at bar, I have not had the time or opportunity to visit any surveillance locations. I estimate that these visits will take from four to fourteen hours spread over one or two days.

2. Pen register and "trap and trace" investigations:

I must review the statistical data in the Affidavit and review the pen register records by conducting random checks of the accuracy of the Government's numerical claims. If the random checks are accurate, I do not usually continue to check the numerical claims. When the numerical claims are incorrect, a much deeper investigation must take place to determine if all the numbers are "off." Sometimes, an incorrect numerical count will require a further investigation into the Government's equipment, software, and contractors, if any.

I look to see if the Government prepared an appropriate air time analysis. As a final step to the pen register/trap and trace review, I try to compare the disclosure and the pen register records to determine if logical investigative leads from the pen register were followed. In my experience, this review may take from four-six hours if my random checks are accurate. However, if I find problems then the investigation becomes more time consuming.

3. Confidential sources:

I must review the disclosure for information regarding the Government's sources of information, such as confidential sources. In particular, were there any sources of information not revealed to the court in the affidavit? Did the Government accurately report the ability of the sources to penetrate the organization? Did the Government attempt to recruit and utilize sources in good faith? I must also try to determine whether government sources had a criminal record or some "deal" with the Government. If so, the Government should report this information to the issuing court in the affidavit.

4. Undercover investigations:

Did the Government attempt to infiltrate the organization with an undercover operation? If so, was the operation given adequate time to bear fruit? If there was no attempt at an undercover operation, I must find facts that help the defense determine whether such an operation would have been reasonable under the circumstances.

5. Trash covers:

Did the Government attempt trash covers? If the Government did collect trash, did the Government follow the logical investigative leads generated by the trash? If no trash cover was performed, I must review the facts revealed in the discovery to help determine whether trash covers should have been attempted.

6. Search warrants:

Did the Government use search warrants to gather information? Did the Government utilize the fruits of the search warrants to conduct the logical investigation that became apparent from the search? If no search warrants were used, why not?

7. Grand jury:

There are three types of Federal Grand Jury inquiries that are very useful for the Government.

A. Witnesses:

Did the Government bring witnesses before the Federal Grand Jury? If so, I must review the transcripts to determine if the logical investigative leads from these interviews were followed. Where no witnesses were brought before the Federal Grand Jury, why not?

B. Witnesses under a grant of immunity:

Did the Government conduct an appropriate investigation into the feasibility of granting immunity to a lesser target? The "general questioning or interrogation under an immunity grant" was specifically highlighted in the Omnibus Crime Control Senate Report. *See* S. REP. 90-1097-98, 1968 U.S.C.A.N. 2112, 2190. In my experience, the Government rarely utilizes this technique prior to pursuing a wiretap. The Government may have logical reasons for refusing to utilize this technique. However, the Government must then set forth those reasons in the affidavit. My job is discovering the facts to determine if this technique was considered, or if the statements of the Affiant are merely boilerplate.

C. Financial investigations:

The subpoena power of the Federal Grand Jury is a vast, powerful, and effective law enforcement technique. Did the Government use the Grand Jury to obtain the targets' bank records, credit card records, mortgage and property records, as well as other logical financial reports. The existence of other records is often discovered through surveillance or a trash cover. As an example of the combination of another technique

with a subpoena, the fruits of a trash cover may reveal a brokerage account in a target's name. Upon this discovery, the Grand Jury will issue a subpoena to order the brokerage company to provide copies of the records. Additionally, various government agencies have the ability to use administrative subpoenas. The administrative subpoena power allows the Government to bypass the Federal Grand Jury to obtain records.

8. Other techniques:

Other techniques may useful in a specific case. These techniques include, but are not limited to, controlled buys, consensual monitoring, exploitation of jailhouse "wires" and jailhouse sources, witness interviews, mail covers, reviewing information from other agencies, and previous law enforcement wiretaps.

Minimization:

After the appropriate review for necessity, I conduct a review of minimization. I must review the training received by monitors, the minimization logs, the wiretap room "sign-in/out" sheet, and the actual calls to determine if minimization was attempted and performed lawfully.

I must review any periodic reports to the issuing court. (Ten day reports). These reports of the Government's progress are important to my analysis of minimization and necessity issues.

In the case at bar, some minimization documents do not appear to have been produced to the defense. Additionally, in this case civilian contractors were employed as monitors. As a consultant, I must determine if the contractors understood and performed minimization as well as sworn law enforcement personnel.

G. Sealing:

When I conduct a technical check to determine if the Government met the sealing requirement of the statute, I must visit the location where the sealed wiretap evidence is kept. Then, I will also review Government reports in order to determine whether the dates on the sealed evidence records match the dates contained in the Government reports. The Government must present the evidence for the court seal in a timely manner.

Because the Government has yet to produce necessary disclosure, I cannot provide the defense with a neutral opinion regarding the wiretap at this time.

The Government's letter to defense counsel, dated February 6, 2007, forwards selected transcripts from conversations among Confidential Source 2 (CS2), Confidential Source 3 (CS3) and certain targets of the wiretaps. The defense received these transcripts on approximately February 7, 2007. The above letter also informs the defense that the remaining transcripts are forthcoming at a later date. I cannot conduct a complete review without reviewing the conversations; therefore, my review is delayed until the Government produces the documents or the recordings of the conversations.

The Government produced several boxes of discovery at the end of January, 2007. These boxes include important DEA 6, reports of investigation, DEA 7a, reports of non-drug evidence collected, sealed plea agreements, ten day reports, as well as other documents that I must examine to complete my review.

The defense transcripts of the wiretaps are not completed at this time. In a complete wiretap review, I must compare the defense transcripts with the Government's transcripts and the Government's summaries provided to the court. In this case, the defense transcripts are very important because it appears that the Government did not

prepare transcripts of all the intercepted phone calls.

I cannot review the wiretap for the above court-imposed requirements, including the minimization requirement until the defense transcripts are complete.

I perform these time consuming, labor intensive tasks to help inform the defense on several wiretap issues including, whether the Government employed traditional investigative techniques in good faith, met with the technical requirements of the wiretap, and whether a *Franks* challenge may be present. In order to conduct a neutral review, a complete review of the discovery is required before I can provide an informed opinion. In this case, the discovery received to date totals approximately 60,000 pages. My best estimate as to the number of additional hours I will require to complete this wiretap review is somewhere between 100-200 hours. In terms of a timeline, I respectfully request a deadline after the transcripts are prepared and a date that is at least sixty days after the Government has produced complete discovery.

FURTHER, AFFIANT SAYETH NOT.

_____
Suzane Doucette

STATE OF NEW MEXICO
COUNTY OF BERNALILLO

Subscribed and sworn to me this 31st day of January, 2007, by Suzane Doucette.
13th February

_____
Notary Public

My Commission Expires:

Oct. 4, 2009