Defendant Jarvis' Reply Motion to Dismiss

Exhibit B

Professor Uphoff's Affidavit

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                           No:   05-CR- 1849 (JH)

DANA JARVIS,

    Defendant.

## SEALED DOCUMENT

### AFFIDAVIT OF PROFESSOR RODNEY UPHOFF, ESQ. IN SUPPORT OF DEFENDANT DANA JARVIS' REPLY TO THE UNITED STATES' RESPONSE TO HIS MOTION TO DISMISS FOR IRREPARABLE STRUCTURAL ERROR & ADDITIONAL FIFTH & SIXTH AMENDMENT VIOLATIONS

STATE OF FLORIDA    )
                       ) ss
COUNTY OF ALACHUA   )

1.   My name is Rodney Uphoff, and I am over the age of eighteen and competent to attest to the matters set forth in this affidavit. I am an attorney who has been admitted to practice law in the states of Wisconsin, Oklahoma, and Missouri. Currently, only my Missouri law license is active.

2.   My resume is attached to this affidavit, and it accurately summarizes my educational background, legal experience, teaching, publication, and professional service.

1

My address is the University of Missouri – Columbia School of Law, 213 Hulston Hall, Columbia, Missouri, 65211; my telephone number is (573) 882-3035.

3.      I received my J.D. from the University of Wisconsin School of Law in 1976. Most of my early legal career focused on indigent criminal defense. In 1978 I was employed as a trial attorney for the Legal Aid Society of Milwaukee, Wisconsin, handling both felonies and misdemeanor cases on behalf of indigent clients. I then became an attorney, and later chief staff attorney with the Wisconsin State Public Defender's Office. In 1984 I took a position as an associate clinical professor and director of the University of Wisconsin Law School's Legal Defense Project. After a brief period in private practice in 1988, I returned to clinical teaching as an associate professor (and later professor) and associate director (and later director) of clinical legal education at the University of Oklahoma College of Law. In 2001 I became the Elwood Thomas Missouri Endowed Professor of Law at the University of Missouri, Columbia. While I retain that chair, I am currently a visiting professor at the University of Florida Levin College of Law.

4.      In my various positions as a public defender in Wisconsin I represented numerous indigent defendants charged with felonies and misdemeanors. I personally handled over a thousand criminal cases during that period of time. I also supervised or observed countless other trials. In my position as chief staff attorney, I supervised over 40 trial lawyers, trained all the new staff attorneys, and developed training programs for the entire staff. I also consulted with all of the attorneys in the office regarding ethical matters, trial

2

strategies, legal issues, and pretrial strategies.

5.    In my clinical teaching at the University of Wisconsin and at the University of Oklahoma, my primary responsibility was to teach criminal litigation skills, ethics, and trial advocacy to law students, who worked under my supervision and the supervision of other clinical instructors to provide representation to indigent defendants. In addition to directing clinical programs at the University of Wisconsin Law School and the University of Oklahoma College of Law, I served as the Associate Dean for Academic Affairs at the University of Missouri- Columbia. I have taught courses in legal ethics and professional responsibility since 1984. I have also taught criminal procedure, trial techniques and criminal litigation skills. Much of my scholarship has focused on lawyering and the ethical demands that confront lawyers especially in the criminal area.

6.    In 1995, I was appointed by Oklahoma Governor Frank Keating to the Oklahoma Indigent Defense System ["OIDS"] Board. I also have been Vice Chair of the American Bar Association's Defense Services. At the request of the ABA Defense Services Committee, I edited a book published by the ABA entitled *Ethical Problems Facing the Criminal Defense Lawyer.* That book is cited in the leading hornbooks on legal ethics and the law of lawyering and is being translated into Japanese. This past March I was invited to speak at an international ethics symposium in Japan and to speak to the Japanese Bar Association about the Oklahoma City bombing case. As my resume reflects, I have been a speaker or presenter at numerous conferences and workshops around the country on

3

criminal practice, trial advocacy and a variety of ethical topics, especially involving the ethical duties of defense lawyers and prosecutors. As a result of my scholarship, teaching and speaking on ethical issues, I am contacted regularly by lawyers to consult about ethical issues. I have been qualified to testify as an expert on ethical issues in state court in Wisconsin, Kansas, and in federal court in Oklahoma.

7.      While at the University of Wisconsin, I was appointed to the local bar committee that investigated bar complaints and made recommendations regarding resolution of those complaints to the Wisconsin bar disciplinary authorities. I also was retained twice by the Wisconsin Judicial Council to conduct judicial investigations on behalf of the Council.

8.      In the summer of 1999, while I was on the faculty at the University of Oklahoma College of Law, I was approached by Ponca City, Oklahoma attorney Brian Hermanson about joining the defense team in the state criminal prosecution of Terry Nichols, who was charged as a co-defendant in the bombing of the federal building in Oklahoma City, Oklahoma. Mr. Nichols had already been prosecuted in federal court for these same offenses in a capital murder prosecution, and had received a life sentence. After the federal prosecution, the State of Oklahoma elected to prosecute Mr. Nichols in Oklahoma state court and seek the death penalty. When the county public defender's office conflicted out of the case, private attorneys were called upon to undertake Mr. Nichols' representation. Mr. Hermanson agreed to represent Mr. Nichols as lead counsel and, along with Creekmore Wallace, I was appointed as one of three original team members.

4

Barbara Bergman joined the team shortly thereafter. Professor Bergman and I did much of the briefing and motion work on the case. I was the team member primarily responsible for dealing with a host of ethical issues that we faced during the case. I worked part time on the case until it concluded in the fall of 2004.

9.     On October 24, 2007 I was contacted by Jody Neal-Post, co-counsel with Joe M. Romero, Jr., the attorneys for defendant Dana Jarvis, and asked if I was willing to serve as an expert with respect to various ethical issues that had arisen in the case. I agreed to do so.

10.    On October 30, 2007, Docket entry 1100, Judge Judith Herrera appointed me to "evaluate and report on the appropriate ethical parameters raised by the United States' expressed intention to call a co-Defendant's counsel as an adverse witness against the defendant's Motion to Dismiss and the associated ethical landscape of the present procedural posture of this case."

11.    I have relied on the materials listed in Exhibit A attached to this affidavit in preparation of this affidavit. In addition, I reviewed a transcript of proceedings held in this case on October 11, 2007; Defendant Dana Jarvis' Motion to Seal Proceedings Related to Attorney-Client Issue Regarding Robert Gorence filed on October 16, 1007; Motion to Determine Whether an Alleged Conflict of Interest Exists with Robert J. Gorence's Representation of Dennis Wilson filed Oct. 26, 2007; an Entry of Appearance of Cliff McIntyre filed on October 11, 2005; the United States' Motion for Rule 44(c)

5

Hearing and Memorandum in Support dated October 17, 2005 and Clerk Minutes dated

October 27, 2005. Finally, I reviewed the affidavit of Dana Jarvis dated November 1,

2007, to be filed under seal with his Reply to his Motion to Dismiss and a letter to Ms.

Neal -- Post dated Nov. 1, 2007 from U.S. Attorney Larry Gomez.

12.    My opinions in this matter are based upon my review of these materials and my

review of the *Restatement (Third) of the Law of Lawyering* (2000) [hereafter *Restatement Third*],

of the ABA's Annotated Model Rules of Professional Conduct (5th ed 2003) [hereafter

Annotated Model Rules], of Hazard & W. Hodes, *The Law of Lawyering* (2d ed. 1990)[

hereafter *Law of Lawyering*], and caselaw related to the ethical issues involved in this case.

Moreover, my opinions reflect my professional experiences including my teaching and

writing in the area of professional responsibilities and legal ethics.

13.    As the *Restatement Third* § 14 indicates, a client-lawyer relationship arises when "a

person manifests to a lawyer the person's intent that the lawyer provide legal services for

the person" and "the lawyer manifests to the person consent to do so." As comment e to

§ 14 observes, "a lawyer may explicitly agree to represent the client or may indicate

consent by action, for example by performing services requested by the client." An

attorney-client relationship is created, therefore, when an attorney and client discuss that

lawyer taking on the representation of the client, exchange information relevant to that

representation, and then the lawyer takes steps to achieve that end of assuming

representation of the client. *See, e.g., In re S. Anita Ryan*, 760 A.2d 375 (D.C. Ct. App.

6

1995).

14. In my opinion, Robert Gorence formed an attorney-client relationship when he met with Dana Jarvis in December 2005, discussed Jarvis' desire to retain Gorence to represent Jarvis in this matter, discussed various aspects of the case, and then Gorence took steps to become Jarvis' counsel of record. *See, e.g., Tambourine Comercio International S.A. v. Solowsky*, 2007 U.S. Dist. Lexis 14905 (S.D. Fla. Filed March 4, 2007) (attorney-client relationship with attendant duties of loyalty and confidentiality created despite the fact prior representation was limited in time and scope). As the Jarvis affidavit indicates, Gorence and Jarvis discussed the charges Jarvis faced and the liens lodged against his assets. Given the nature of the charges and the existence of the liens that encumbered Jarvis' property, it is inconceivable that a competent, experienced lawyer would not have gained access to considerable information about Jarvis' financial situation and its relationship to the charges Jarvis faced before taking on the representation of a case of this magnitude. Indeed, to set a reasonable fee in this matter and to ensure he would be paid with money not subject to forfeiture, Gorence was professionally obligated to have a thorough, honest discussion with his prospective client regarding his financial situation and Jarvis' ability to pay Gorence with money that was not illegally earned.

15. New Mexico Rules of Professional Conduct, Rule 16-106 is virtually identical to ABA Model Rule of Professional Conduct Rule 1.6. The range of information that a lawyer is prohibited from revealing and must jealously safeguard by Rule 1.6 is "extremely

7

broad, covering information received from the client or other sources, and even information not in itself protected but that may lead to the discovery of protected information by a third party." Annotated Model Rules at p88. Absent one of the narrow exceptions spelled out in Rule 1.6, lawyers generally should "operate on the presumption that essentially no unfavorable client information may be disclosed without client consent." *Law of Lawyering* § 9.7. As *Restatement Third* § 59(b) indicates:

> [A] client's approach to a lawyer for legal assistance implies that the client trusts the lawyer to advance and protect the interests of the client. The resulting duty of loyalty is the predicate of the duty of confidentiality.

Indeed, the protection of confidential client information is "a fundamental principle" of the attorney-client relationship because it promotes the trust and open communication that is essential to effective representation. See Model Rule 1.6. cmt [2]. Not only is a lawyer obligated not to use or disclose client information except in very limited circumstances, the lawyer must also take positive steps to safeguard confidential client information and the client's interests. *Restatement Third* § 60.

16.     Unquestionably, Gorence gained access to information protected by New Mexico Rules of Professional Conduct Rule 16-106 during his discussions with Jarvis. *See In the Matter of Lichtenberg*, 117 N.M. 325, 871 P.2d 981 (1994). Despite Gorence's attempt in his motion of Oct. 26, 2007 to characterize the exchange of information with Jarvis as limited, his actions speak louder than the words in his motion.

8

17. On January 9, 2006 Gorence filed a motion on Jarvis' behalf seeking to secure the release of assets that would permit Jarvis to retain Gorence. The filing of this motion, his effort to file a limited entry of appearance at the hearing on January 19, 2006 and his statements at that hearing demonstrate unequivocally that Gorence and Jarvis had taken the necessary steps to form an attorney-client relationship. Moreover, Gorence's comments at the January 19, 2006 hearing and assertions in his Motion to release Assets, ¶ 3 demonstrate an awareness of details about Jarvis and his property that he must have gained from his client The fact that the Court did not permit Gorence to file his entry and ultimately refused to release funds that would have permitted Jarvis to hire Gorence does not nullify the creation of an attorney-client relationship between Gorence & Jarvis. *See Cole v Ruidoso Mun. Schools*, 43 F. 3d 1373 (10th cir. 1994). Rather, as Jarvis' affidavit indicates, after the hearing on Jan. 19th 2006, Jarvis instructed Joe Romero to attempt to secure the release of assets that would enable Jarvis to proceed with this plan to hire Gorence.

18. If, as of January 19, 2006, Gorence wished to terminate his professional relationship with Jarvis, he should have clearly done so. Absent clear communication by counsel, a client is likely to believe that the lawyer with whom he has been dealing is still his lawyer. As the oft-cited case of *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W. 2d 689 (Minn. 1980) demonstrates, a lawyer has a duty to clearly apprise a client that he will not act as the client's attorney. Any ambiguity in the creation or termination of an attorney-

9

client relationship will be resolved against the attorney because he or she as a professional is in a better position to clarify the situation. *Law of Lawyering* § 2.5. Thus, it was reasonable for Jarvis to assume that Gorence was still prepared to take over as his counsel should funds be released to him. I have not seen any document that shows that Gorence communicated to his client he was terminating their relationship up until the point Gorence returned his file to Jarvis. Up until that point, then, even if Gorence viewed his relationship with Jarvis as over, Gorence still had an obligation to clearly communicate to Jarvis that he was no longer interested in acting on Jarvis' behalf.

19.     Unquestionably, even after an attorney-client relationship is terminated, a lawyer owes fiduciary duties to his former client including the duty to protect all confidential information gained during their relationship. *Law of Lawyering* §9.7; *Damron v. Herzog,* 67 F. 3d 211 (9th Cir. 1995); *Perez v. Kirk & Carrigan,* 822 S.W. 2d 261 (Tex. App. 1991). A lawyer is simply not free to volunteer any information related to the representation of a client except as permitted by the exceptions spelled out in Rule 1.6. *Law of Lawyering* § 9.7. Additionally, the fact that certain communications are ultimately deemed by a court to be non-privileged or the fact that the information the lawyer is disclosing is generally known does not afford an attorney the right to voluntarily reveal such communications. *In the Matter of Bryan,* 61 P. 3d 641 (Kan. 2003). Rather, the ethical rules and norms of the profession are perfectly clear: a lawyer is to hold those communications confidential unless and until compelled to reveal them. *Law of Lawyering* § 9.2 and 9.7. In fact, lawyers

are generally obligated to take proper steps, including moving to quash subpoenas and filing appeals if warranted, to preserve a client's confidences. See ABA Formal Op. 94-385. Furthermore, as *Restatement Third* § 33 spells out, not only is a lawyer obligated to provide notice to the client and protect his confidences, the lawyer is to take steps to the extent reasonably practicable to protect the clients interest, including avoiding conflicts of interest and not abusing the client's trust.

20.     Gorence's letter of October 11, 2007 to Jody Neal-Post suggests that Gorence mistakenly equates his duty under Rule 1.6 with the attorney-client privilege. The attorney-client privilege is an evidence rule that covers only a subset of the communications between an attorney and client. Rule 1.6, of course, applies to all information gained during the course of a lawyer's professional representation and the lawyer's duty to safeguard a client's confidences extends to communications between a lawyer and a prospective client. *See In the Matter of Lichtenberg*, 117 N.M. at 327, 871 P.2d at 983 ("Members of the public who share their confidences and secrets with an attorney are entitled to have those confidences and secrets held inviolate except in certain unusual circumstances. In order for an attorney to develop all facts necessary to effective representation, the client or potential client must be encouraged to communicate fully and candidly with the attorney even as to embarrassing or legally damaging subject matter."); *Restatement Third* § 15.

21.     In my opinion, having formed an attorney-client relationship, albeit a relatively

11

brief one, Gorence owed certain fiduciary duties to Jarvis, no matter how his professional relationship with Jarvis is characterized. *See, e.g., Tambourine Comercio International S.A. v. Solowsky,* 2007 U.S. Dist. Lexis 14905 (S.D. Fla. Filed March 4, 2007); *Sealed Party v. Sealed Party, et. al,* 2006 U.S. Dist. LEXIS 28392 (S.D. Tex. 2006); *Nolan v. Foreman,* 665 F.2d 738 (5th Cir. 1982). This fiduciary duty is "of the very highest character, and binds the attorney to most conscientious fidelity- uberrima fides." *American Airlines v. Sheppard, Mullin, Richter & Hampton,* 96 Cal. App. 4th 1017, 1044 (Cal. App. 2 Dist., 2002). Gorence had an absolute duty to Jarvis not to reveal any information that Jarvis disclosed to him or that Gorence gained during his professional relationship with Jarvis. Moreover, Gorence had a duty of loyalty to Jarvis that demanded that he scrupulously avoided aligning himself with a new client with an interest adverse to his former client. *American Airlines,* 96 Cal. App. 4th at 1044; *Restatement Third* § 132; ABA Standards for Criminal Justice Standard 4-3.5, commentary. So too he had a duty to avoid taking action that would harm Jarvis. *Perez,* 822 S.W. 2d 261.

22.     Accordingly, Gorence never should have sought to represent a co-defendant in the same matter. *Rael v. Blair,* 2007-NMSC-006, 153 P.2d 657, 2007 N.M Lexis 60; *Restatement Third* § 132. Certainly it would have been ethically improper and a breach of his duty of loyalty to Jarvis for Gorence to have solicited Dennis Wilson and offered his services. If, however, Wilson approached Gorence and requested his services, Gorence should have declined to have had any discussions with Wilson unless he first talked to

12

Jarvis and secured his informed consent. If after securing that consent, Gorence was satisfied that he ethically could represent Wilson in the matter while still protecting Jarvis' confidentiality then, and only then, could he talk to Wilson to determine if he could, in fact, provide him conflict free representation. It would then have been necessary to secure Wilson's consent as well.

23.    Given Gorence's professional relationship with Jarvis and the nature of the indictment in this case, Gorence could not have reasonably believed he would have been able to assume representation of Wilson without any discussion with Jarvis. Even if Gorence erroneously considered Jarvis only a prospective client, he did not proceed ethically appropriately. *Law of Lawyering* § 13.9. That is, he should not have sought to take on the defense of a co-defendant in the same matter without securing a waiver from Jarvis. According to Jarvis' affidavit, Gorence sought no such waiver from Jarvis. Moreover, Gorence should have resolved any doubts as to whether Jarvis was a client or only a prospective client in favor of Jarvis or, at the very least, sought a judicial determination before attempting to represent Wilson. Just as it is improper to attempt to convert a current client into a former client to facilitate the representation of a new client at the expense of the other client, it is wholly inconsistent with a lawyer's professional responsibilities to attempt to convert a former client into a prospective client to enable the lawyer to assume the representation of a party with adverse interests. *See, e.g., American Airlines v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th at 1044; *In re Gonzalez*, 773

13

A.2d 1026 (D.C. 2001). In the end, no matter if Jarvis was a former client or a prospective client, Gorence was ethically barred from representing Wilson absent Jarvis' consent. *Law of Lawyering* § 13.9.

24.    As Jarvis affidavit states, however, Gorence did not discuss his proposed representation with Wilson or secure Jarvis' consent. Rather, Gorence knowingly took on the representation of a co-defendant and in so doing, acted contrary to interests of his client, Jarvis. *See Restatement Third* § 16 (3), § 33, and § 132. Gorence breached his duty of loyalty to Jarvis by representing a party with adverse interests to Jarvis and imperiling Jarvis' confidences even if Gorence has not yet actually revealed confidential information to his new client. *American Airlines v. Sheppard, Mullin, Richter & Hampton,* 96 Cal. App. 4th at 1032-45; *Tambourine Comercio International S.A. v. Solowsky,* 2007 U.S. Dist. Lexis 14905.

25.    It is unclear what if any discussions Gorence had with his new client Wilson about Jarvis at the time he entered into a relationship with Wilson. Gorence would not been ethically allowed to reveal any information communicated to him by Jarvis regardless of whether Jarvis was a former or a prospective client. *See Restatement Third* § 15; *In re Matter of Lichtenberg,* 117 N.M. at 327,  871 P.2d at 983. Because it would have been improper for Gorence to talk to Wilson about anything learned from Jarvis without Jarvis' consent, it would have been ethically impossible to have secured informed consent from Wilson. *In the Matter of Bryan,* 61 P. 3d 641 (Kan. 2003).

26.    Similarly, it is unclear what discussions Gorence had with any of the prosecutors in

14

this case about Jarvis. Yet, the prosecutors' express intent to call Gorence coupled with the statements contained in Gomez' letter of Nov. 1, 2007 strongly suggest that such conversations have taken place. It is inexplicable why the prosecutors in this case did not file a Rule 44(c) motion when Gorence entered an appearance on behalf of Wilson given Gorence's attempt several months earlier to appear on behalf of Jarvis. In light of the Rule 44(c) motion that prosecutors filed to prevent Cliff McIntyre to represent Jarvis, it is clear that the prosecutors were well aware of their responsibility to take appropriate steps to ensure that trials are not infected by lawyers with conflicting interests. Apparently, no such motion was filed because Gorence some how persuaded them that Jarvis was not then and never had been his client. If, indeed, Gorence voluntarily revealed any information about Jarvis to the prosecutors in this case in order to justify his entrance into the case on behalf of a co-defendant, then Gorence breached his duty of confidentiality and loyalty to Jarvis. *Damron v Herzog,* 67 F. 3d at 214; *Restatement Third* § 132.

27.    None of the permissive exceptions of Rule 1.6 would allow for Gorence to voluntarily disclosure of any of the information related to the representation of Mr. Jarvis to the prosecutors in order to justify his desire to represent Wilson. Under some circumstances, a lawyer embroiled in a claim with a client or one who is facing disciplinary action or a criminal charge based on his or her representation has the right to defend himself or herself, including the limited right to disclose confidential communications to do so. Rule 1.6(3). But the right to respond does not arise until a claim of complicity or

15

misconduct by the lawyer has actually been made. Rule 1.6 cmt. [8]. Moreover, a claim by Jarvis of a professional relationship with Gorence is not the type of accusation envisioned by the self defense provision of Rule 1.6. Rather, the self-defense exception only applies when a lawyer is directly implicated in a completed or well-advanced wrong that is actually the fault of the client. *Law of Lawyering* § 9.22. Simply put, the self-defense exception is entirely inappropriate in the context of this case.

28.    At this point, Gorence's motion requesting an evidentiary hearing comes too late. He has already breached the duties of loyalty and confidentiality owed to Jarvis. In fact his unsealed motion filed on October 26, 2007 further reflect his failure to appreciate and to respect his fiduciary duty to Jarvis, his failure to jealously safeguard Jarvis' confidentiality, and his disloyalty to a former client. *See In the Matter of Silverberg*, 108 N.M. 768, 779 P.2d 54 (N.M. 1989) (client's former attorney filed an affidavit in client's civil case accusing client of perjury; court held that conduct "demonstrated contempt for some of the most important and fundamental concepts embodied in the legal profession" and "displayed a ... disloyalty that cannot be tolerated"). His claim in that motion that a definitive ruling would benefit both Wilson and Jarvis is spurious and highlights the conflict created by his conduct and that of the prosecutors. Just as it would be ethically improper for Gorence to voluntarily reveal information protected by Rule 1.6 to the prosecutors, it would be improper for them to solicit such information from Gorence. See Annotated Rules at 439 ("a lawyer must not elicit confidential or privileged information from others."). If

16

Gorence initiated a conversation with a prosecutor about his professional relationship
with Jarvis, the prosecutor should have warned him about the impropriety of such a
conversation and sought a judicial ruling on the propriety of Gorence's assuming
representation of Wilson. Contrary to Gomez's position in this letter of Nov. 1, 2007,
prosecutors have a duty as ministers of justice beyond that of the normal advocate. Like
the prosecutors in *Rael* and in *State v Wong*, 40 P. 3d 914 (Hawaii 2002), the prosecution in
this case should not have sought to exploit ethical lapses on the part of defense counsel to
the detriment of a defendant. By knowingly receiving confidential information from a
defense lawyer about a former client, the prosecution gained access to information that
they had no legitimate right to receive. *See In re Shell Oil Refinery*, 143 F.R.D. 105 (E.D.
La.), *amended and reconsidered on other grounds*, 144 F.R.D. 73 (E.D. La. 1992). Additionally,
the prosecutors failed to faithfully carry out their responsibility to assist the court in
ensuring conflict free representation.

29.     Should the court in this case wish to take testimony from Gorence regarding his
discussions with Jarvis or about his professional relationship with Jarvis, it should only do
so in an *ex parte* proceeding. Such a procedure minimizes the disclosure of confidential
communications. Certainly Jarvis and his current counsel should be permitted to
participate at such a hearing in order to protect Jarvis' interests and his confidentiality. A
lawyer can, of course, be compelled to reveal client communications otherwise protected
by Rule 1.6 if the court determines that those communications are not covered by the

17

attorney-client privilege. Having the prosecutor present when the court makes those determinations, however, threatens to further impinge upon the Jarvis' right of confidentiality. Jarvis has a continuing interest in his confidentiality despite Gorence's failure to protect their communications. Moreover, when ordered by a court to reveal information adverse to a client, a lawyer is required to limit the disclosures as much as possible. Rule 1.6 cmt [12]; Arizona Ethics Op 2000-11 (2000). RI Ethics Op 2000-8 (2000). Unquestionably, Jarvis no longer trusts Gorence to carry out his profession responsibilities. Given that Gorence's prior voluntarily disclosures appear wholly inconsistent with his professional responsibilities, counsel's presence is critical to assure that Jarvis' interests are not further undermined by disloyal counsel.

30. In sum, Gorence breached his duty of loyalty to Jarvis by taking on the representation of another co-defendant in the same case without securing Jarvis' consent. He further violated that duty as well as his duty of confidentiality by communicating with the prosecution about his relationship of Jarvis and agreeing to voluntarily testify to a position adverse to that of his former client. Contrary to his duty to act "with complete fairness, honor, honesty, loyalty, and fidelity in all his dealing with his client," *Damron v Herzog*, 67 F. 3d at 214, Gorence erroneously placed his duty to his current client Wilson ahead of the interests of his former client Jarvis thereby breaching the duties he owed Jarvis. In addition, given that the prosecutors have failed in their responsibility to assist the court in ensuring that all defendants are represented by counsel unburdened by

18

conflicting interests and that they have knowingly sought to exploit Gorence's ethical

lapses for their benefit, this court ought not permit Gorence to be called to testify against

his former client in this matter. In light of the prosecutor's complicity in Gorence's ethical

violations, the government should not be allowed to profit from his testimony. Perhaps

even more significantly, any testimony Gorence offers cannot undo the harm he has

already done by accepting the representation of a co-defendant whose case he was

ethically required to decline to take on absent Jarvis' consent. As the *Tambourine* court

recognized when it quoted with approval from the *United States v. Culp*, 934 F. Supp. 394,

398 (M.D. Fla 1996):

> [Counsel] states in his affidavit, however, that due to the
> limited nature of his representation of [the former client], he
> learned no information during the course of that
> representation which he could now use against [him].... *This
> argument ignores the fact that under the ethical cannons
> a duty of loyalty exists apart and distinct from the duty to
> maintain client confidences.* Compare Model Rules, Rule
> 1.6 with Rules 1.7 & 1.9. One need only compare Model Rule
> 1.6, which outlines the lawyer's duty of confidentiality, with
> Model Rule 1.9(a), which imposes a blanket prohibition on
> the representation of clients with interests adverse to those of
> a former client without the former client's consent. *The
> prohibition set forth in Rule 1.9 applies without regard to
> whether the prior representation entailed the disclosure
> of confidential communications.* The rule thereby furthers
> two purposes simultaneously; it promotes the attorney's duty
> of loyalty to his clients while furthering the objectives of rules
> protecting confidential communications between attorney and
> client by obviating the need for intrusive judicial fact-finding
> that would require the disclosure of such communications.
> The policies underlying this rule are equally relevant here ...

19

*Tambourine Comercio International S.A. v. Solowsky*, 2007 U.S. Dist. Lexis 14905 at *30-31 (quoting *Culp*, alterations by *Tambourine* court). There is simply no need for any intrusive judicial fact finding here. For as in *Tambourine*, Gorence's brief representation of Jarvis prevented him from ethically taking on Wilson as a client in the same case and now prevent him from representing anyone in this matter.

FURTHER AFFIANT SAYETH NAUGHT.

This $\underline{8^{th}}$ day of November, 2007.

Rodney Uphoff

Sworn to and subscribed before me this $\underline{8}$ day of November, 2007.

Notary Public

My commission expires:



MARILYN B. HENDERSON
MY COMMISSION # DD 352732
EXPIRES: September 30, 2008
Bonded Thru Notary Public Underwriters

20