**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 11

| 1. Program Code ▓▓▓ | 2. Cross File ☐ | Related Files | 3. File No. ▓▓▓ | 4. G-DEP Identifier ▓▓▓ |
|---|---|---|---|---|
| 5. By: S/A Richard Stark  At: Group II  Albuquerque District Office | ☐ ☐ ☐ | | 6. File Title ▓▓▓ | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ | | 8. Date Prepared  01-14-2005 | |
| 9. Other Officers: S/As Ivar Hella and IRS S/A Mike Albers | | | | |
| 10. Report Re: A/ Interview of ▓▓▓ on 12-27-2005 | | | | |

**SYNOPSIS:**

On December 27, 2005 CW5 was debriefed regarding his participation with the Dana JARVIS drug trafficking organization. The following report details said interview. CW5 admitted to a long term drug relationship with the JARVIS which ended with CW5 storing millions of dollars for JARVIS at his Vail, Arizona residence that was eventually used to pay drug debts and purchase ton quantities of bulk marijuana.

**DETAILS:**

1. On December 27, 2005 CW5 was interviewed in the presence of his defense counsel ▓▓▓. Also present at the interview were DEA S/As Richard Stark and Ivar Hella, IRS S/A Mike Albers and Assistant United States Attorney (AUSA) James Braun.

2. CW5 stated that he began selling drugs in 1966 or 1967. He said that at the time he was living in Hammond, Indiana where he had moved to in the winter of 1964. He said he was working as a pipe fitter/firefighter for Shell Oil Company for about three years when a friend Dwight WORKER let him try some marijuana and hashish. Afterwards he did not have a hangover like alcohol and thought the drugs were great so he began selling small amounts purchased from WORKER.

3. CW5 said that he quit working for Shell Oil Company and moved to Bloomington, Indiana sometime near the end of 1966 or 1967. He said that he studied Fine Arts at Indiana University but never received a degree. While in Bloomington, CW5 said he sold small

| 11. Distribution:  Division EPFD  District  Other | 12. Signature (Agent)  S/A Richard Stark | 13. Date  02/13/2006 |
|---|---|---|
| | 14. Approved (Name and Title)  G/S Harry Paul Kaczmarek  Group Supervisor | 15. Date  02/13/2006 |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis   9.5.1

**U.S. Department of Justice**
Drug Enforcement Administration

|  | 1. File No. ▓▓▓ | 2. G-DEP Identifier ▓▓▓ |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ▓▓▓ | |
| 4. Page 2 of 11 | | |
| 5. Program Code ▓▓▓ | 6. Date Prepared 01-14-2005 | |

    amounts of marijuana, and then decided to harvest wild marijuana crops that grew openly in fields in Northern Indiana with a friend named Jim Opiet and other friends he could not remember their names.. CW5 said they harvested a marijuana bale 5' X 5' 10' (784 pounds) and placed it in a U-Haul trailer and took it back to Bloomington. CW5 said that they were unloading the marijuana in the driveway when the landlord for their residence stopped by. The landlord left in a hurry and CW5 said he knew there was nothing he could do about getting arrested because his car was in the middle of the driveway and the landlord had seen everything. CW5 said he told all the other people helping him unload the marijuana to leave and he would "take the rap" for them. CW5 said he waited for the police on the steps of the residence and they arrived a short time thereafter to arrest him. CW5 said he was arrested on state marijuana possession charges and was later released on bail.

4.   CW5 stated that his attorney told him "pay me or else," so he began selling marijuana again in late 1968 again to make money to pay his attorney's expenses and was re-arrested again in 1968 for selling marijuana. CW5 stated that he pleaded guilty to the marijuana possession charges and was placed on probation for two years. CW5 said he was not involved in any drug activity while on probation. In 1970, WORKER was living in Tucson, Arizona and convinced CW5 to move to Tucson, which HANNA said he did.

5.   CW5 said that WORKER, Steve EPSTEIN (deceased), and Dana JARVIS were living in a house on Mission Blvd in Tucson together. CW5 said WORKER was selling marijuana. HANNA said that when he moved out to Tucson he knew he (CW5) would be involved in the marijuana trafficking business to some extent. CW5 said that JARVIS had dropped out of college and his role in Tucson was always a "middleman" role. CW5 explained that JARVIS would arrange to purchase marijuana from various sources of supply (SOS) and broker the marijuana transfer to other marijuana distributors. At that time CW5 said that JARVIS primarily delivered bulk marijuana in the Tucson geographic region. CW5 said that JARVIS was so young at the time that he had to buy beers for him at the local bars. CW5 said that at first it was a collaborative effort between JARVIS, CW5 and WORKER. WORKER and JARVIS each knew their own SOS's for marijuana and they worked together to obtain and distribute the drugs. Later CW5 said that everyone eventually went their separate ways.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis    9.5.2

**U.S. Department of Justice**
Drug Enforcement Administration

| | REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| | | 3. File Title | |
| 4. Page 3 of 11 | | | |
| 5. Program Code | | 6. Date Prepared<br>01-14-2005 | |

6. CW5 said the money they received depended upon who's contact it was they were either buying and/or selling marijuana to. CW5 said that he worked transporting the marijuana and as a security officer for about six to eight months when everyone then "went their separate ways."

7. CW5 said that he went on a road trip with JARVIS with a car load of poor quality marijuana to Santa Fe and Denver, Colorado in 1971 or 1972. CW5 said that JARVIS's mother lived is Estes Park, Colorado and they visited her while JARVIS established new drug connections throughout Colorado. In Albuquerque, CW5 said they went to the University of New Mexico and sold marijuana and established new drug connections there. CW5 said that one of JARVIS's contacts was called "Strawberry Ken," a skinny red haired person who they would "front" (provide marijuana without payment) a brick or two of marijuana to at a time. Once Ken sold the marijuana he would return and then purchase more. CW5 said they kept the marijuana in the trunk of their car the whole time they were traveling to Colorado and New Mexico. CW5 said they finally got rid of the load of poor quality marijuana and returned to Tucson.

8. After the road trip, CW5 said that he and JARVIS began to drift apart. CW5 decided that he wanted to work to bring the bulk marijuana into the United States from the Nogales, Arizona area which is a town situated on the border between Arizona and the Republic of Mexico. CW5 explained that backpackers brought the marijuana to the border between the United States and the Republic of Mexico and either threw the bundles of marijuana over the fence, or left the marijuana on the border. CW5 said he then picked up the bundles/bales of marijuana and transported them to Tucson to prepare them for re-sale. CW5 said that he worked transporting bulk marijuana with a man named Tom DALY. DALY, through a friend knew a pilot. DALY set up a clandestine meeting with the pilot regarding a drug transaction, but the pilot turned out to be a United States Customs (USCS) agent. DALY and CW5 were arrested for conspiracy to distribute marijuana in November 1972. During the trial, CW5 said that a Steve Larry testified against him. CW5 said that he was accused of being "muscle" (an enforcer) for the drug organization. CW5 said he was convicted and sentenced to two to ten years in prison. CW5 said there was

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis          9.5.3

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. ▮ | 2. DEA Identifier ▮ |
|---|---|---|
| | 3. File Title ▮ | |
| 4. Page 4 of 11 | | |
| 5. Program Code ▮ | 6. Date Prepared 01-14-2005 | |

a visiting judge at his sentencing hearing that sentenced CW5 to two years of supervised release.

9. After the probation sentence (1973) CW5 said that he opened a silver smith shop in the 15000 block of Tanque Verde in Tucson. CW5 said that it turned out the man in the business behind the silver shop was a marijuana distributor. CW5 said that he then started working for Don Schwatken who owned Ornamental Iron Crafts on 47th Street that CW5 said eventually became Continental Steel Industries. CW5 said that he began working for Schwatken in 1973 doing odd jobs and has worked there ever since, actually purchasing the business in 1997 and changing the name to Continental Steel.

10. When asked how CW5 began working with JARVIS, CW5 said that between 1975 and 1978 JARVIS would periodically show up in Tucson and call CW5 to socialize. CW5 said that JARVIS always had money and user quantities of marijuana and cocaine to hand out. CW5 said that JARVIS's nickname was the "candy man." CW5 said that JARVIS then began stopping by and asking him to hold a box or a duffel bag with cash in it for him for which he was paid a couple of hundred dollars. CW5 said the first time was about 15 years ago at 4319 East Flower Street in Tucson and the money drop off involved approximately $150,000.00. When asked if he handled a million dollars, CW5 said no, the most he held for JARVIS was $550,000.00 at one time. CW5 said the money was always bundled in $10,000.00 increments. When asked about the photograph depicting him lying on a bed that was covered in United States currency that was found subsequent to a search warrant at his house, CW5 explained that the amount on the bed was only $150,000.00 and it was money being held on behalf of JARVIS.

11. CW5 said that JARVIS gave the bulk U.S. currency to count and to hold until he needed it to pay for the purchase of bulk marijuana. CW5 said he would count the bundles and report back to JARVIS with the amount. CW5 said that JARVIS was worried that the money would be stolen from him while he negotiated for the purchase of bulk marijuana and JARVIS trusted CW5 to hold it for him until he needed it.

12. CW5 said that at first the money drop offs were very sporadic, maybe two or three times a year, and the drop offs were not scheduled. CW5 said that gradually the money drop offs became

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis          9.5.4

**U.S. Department of Justice**
Drug Enforcement Administration

|  | **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ▓ | 2. G-DEP Identifier ▓ |
|---|---|---|---|
|  |  | 3. File Title ▓ |  |
| 4. Page 5 of 11 |  |  |  |
| 5. Program Code ▓ |  | 6. Date Prepared 01-14-2005 |  |

more regular. CW5 said that for any bulk cash load he kept that was under $100,000.00 he was paid $500.00 for its safekeeping. Any load of money in excess of $100,000.00 he was paid $1,000.00. CW5 said that he met a lot of people only once that dropped off money on behalf of JARVIS. CW5 said that he met Jude AUSTIN once at the Holidome in Tucson to pick up money, "Big John" (John NIETO) was reported to be the most frequent person to drop off cash. CW5 said that NIETO dropped off large sums of money more than 20 times. NIETO was reported to drive a rental car once, but usually drove a brown Dodge truck, and once dropped off money on a gold "Goldwing motorcycle with lights." CW5 said that he would meet the couriers in different locations in Vail or Tucson, Arizona. NIETO was very careful on the telephone, but always called him and said he was one hour outside of their meet location. CW5 said that NIETO was very prompt and was never more than two minutes late to their established rendezvous location. CW5 said that NIETO usually showed up to deliver bulk cash on a Monday or Tuesday, days when Club Rhythm and Blues was closed. When the money was delivered, CW5 said he counted it, put it in his safe in his bedroom, and awaited instructions from JARVIS. CW5 said that MOFFETT (marijuana SOS) would call and ask for money to deliver marijuana, but the money could not be released without explicit instructions from Dana JARVIS.

13. CW5 said that when JARVIS purchased Club Rhythm and Blues JARVIS told CW5 that "the place is weird, all the tables look like washing machines," CW5 explained that JARVIS meant the Club was used for the purpose of laundering drug money. CW5 said the Club never made money, and was lucky to break even.

14. CW5 stated that on one occasion, he was dating JARVIS's sister and went to Jeanne SWEENEY's residence, JARVIS's mother (since deceased). CW5 said that JARVIS was in the garage packaging a load of marijuana. CW5 said that JARVIS's mother and sister knew about JARVIS's illegal drug activities. CW5 said that JARVIS's sister Lynn used to work transporting bulk cash for JARVIS, but in 1997 or 1998 she had a falling out with JARVIS after she left $100,000.00 cash in a hotel room in Albuquerque. CW5 said that Lynn went fishing and forgot the money under the bed, which was later found by a maid who turned the money over to the police. CW5 said that JARVIS made her work for free after that until that debt was paid off. CW5 said the airport that she left the money

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis     9.5.5

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. ▓▓▓ | 2. G-DEP Identifier ▓▓▓ |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ▓▓▓ | |
| 4. Page 6 of 11 | | |
| 5. Program Code ▓▓▓ | 6. Date Prepared 01-14-2005 | |

    in was located at the Albuquerque International Airport, possibly named the Amfac Hotel.

15. CW5 said that instructions from JARVIS, if one was caught with the money, was to claim it as your own, and then let the lawyers battle to get the money back from the police.

16. CW5 said that JARVIS would call him and give him advanced notice that he should be receiving ``a package.'' A day or two later CW5 said a courier would contact him, set up a meet location, and then drop off bulk cash on behalf of JARVIS. His instructions once received the money were to count it, and hold it until he received instructions on who to pay and how much. CW5 said that he met with Jorge (MOFFETT-ORTIZ), Dennis COX, and ``Doc,'' and ``tall Paul'' to pay for marijuana loads. CW5 described ``Doc'' as an older gray haired man who had a hip replacement and used to be part of a Special Operations Group during the Vietnam War.

17. CW5 said that a few years ago JARVIS changed how he paid CW5 for holding the bulk cash to a percentage scheme where he was only paid .5 to 1% of the total. CW5 said JARVIS really started working him ``hard'' after that and the payment scheme was not as lucrative as it was before when he was paid a flat fee.

18. When asked about the conversation between Ayla JARVIS and her father Dana JARVIS regarding the ``108'' needed for the purchase of marijuana that was intercepted as part of a court authorized wire tap, CW5 said that only D. JARVIS could authorize the release of the money from him. A. JARVIS had a connect she wanted to purchase bulk marijuana from and she wanted to do the deal quickly so she called CW5 and asked him for the ``108'' which was code for asking for $108,000.00. CW5 said he called JARVIS but there was no answer on his telephone. CW5 said that he finally received authorization from D. JARVIS to release the money, but D. JARVIS was very upset with A. JARVIS for calling CW5. CW5 said that he later met D. JARVIS at a steak house on Old Spanish Trail in Tucson and delivered the $108,000.00. CW5 said that D. JARVIS had a black male with him, they walked out to CW5's truck where the money was already pre-packaged in a box that CW5 handed to JARVIS. CW5 said that JARVIS introduced the black male to him. CW5 described the black male as thin 6' or more in height, short tightly cut hair who's name may have been

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis    9.5.6

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. File Title | |
| 4. Page 7 of 11 | | |
| 5. Program Code | 6. Date Prepared 01-14-2005 | |

"Carl," and who was very well spoken. CW5 said it was very unusual for him to meet JARVIS with the source.

19. CW5 said that there was one exception to releasing the money on JARVIS's authorization and that was the "Navigator," Joe RAMIREZ. CW5 said RAMIREZ had authorization to take up to $100,000.00 from CW5 without JARVIS's authorization. CW5 said that RAMIREZ had been arrested before in Tucson on his roof naked with a shotgun. CW5 said that RAMIREZ was approximately 5' 10" in height and worked as a landscaper, but was a marijuana SOS for the JARVIS DTO.

20. CW5 said that JARVIS's extended family knew that he was a drug dealer. Last year, JARVIS showed up late for his mother's funeral and his sister's husband commented "here comes the Godfather."

21. CW5 said the rule was that if someone was arrested and in prison and the organization used that persons connection to complete a drug deal, then the person in prison was given a cut from the proceeds from the sale of drugs.( Agent Note: MOFFETT-ORTIZ was a marijuana SOS for COX. When COX was arrested and MOFFETT-ORTIZ was directed to supply JARVIS, a percentage from the profits of marijuana supplied by MOFFETT-ORTIZ was put aside for COX. When COX was released from jail it was reported the money was then given to him)

22. CW5 said that on one occasion he heard JARVIS and "one eyed Joe" (Joel GOODELL) the book keeper talking and JARVIS told GOODELL "that is enough for her." CW5 said the two were talking about Eileen FITZGERALD, Dana's wife at the time and were either talking about the delivery of bulk marijuana and/or bulk cash..

23. CW5 stated that Adrian SANFORD was married to GOODELL's daughter. SANFORD was a "gopher" for the organization who ran errands for JARVIS. CW5 said that JARVIS ran him ragged. CW5 said that SANFORD would also pick up money from him on behalf of JARVIS. CW5 said that approximately one year ago he met SANFORD at a McDonalds Restaurant on 22nd Street in Tucson and picked up either $50,000.00 or $100,000.00 from him. CW5 said it was an interesting money delivery because Dennis COX was in the same parking lot with SANFORD, but in another vehicle.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis   9.5.7

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ▓▓▓ | 2. G-DEP Identifier ▓▓▓ |
| | 3. File Title ▓▓▓ | |
| 4. Page 8 of 11 | | |
| 5. Program Code ▓▓▓ | 6. Date Prepared 01-14-2005 | |

24. CW5 said that a year or two ago Ayla JARVIS started getting more involved with D. JARVIS's DTO. CW5 said that A. JARVIS started renting houses for her father in Tucson. CW5 said that on her fathers instructions he delivered bulk cash in the amounts of $50,000.00 to $150,000.00 to her.

25. CW5 said that JARVIS had multiple cellular telephones which he used to conduct his drug trafficking activities on. CW5 estimated that JARVIS had 15 to 20 cellular telephones at one time at a house JARVIS rented in the foothills of Tucson.. CW5 also said that JARVIS's attorney recommended that he burn them after using them.

26. When asked about Dennis COX, CW5 said that he did some time in prison for a drug related offense, got out and went back to selling marijuana. CW5 said the first time he met COX was before he went to jail. CW5 said he was working with some installers to complete a construction project, and COX came out with a tray of marijuana and asked if anybody wanted any. CW5 said that he delivered bulk cash to COX on at least three occasions. One time he brought COX $15,000.00, but misunderstood the instructions because he was supposed to deliver $50,000.00. CW5 said he had to drive all the way back to his Vail, Arizona residence and then return to Tucson to deliver the correct amount of money to COX. The last time CW5 said he delivered $150,000.00 to $180,000.00 to COX at his Vine Tree Street Residence. The first time he delivered money to COX a year or more ago, CW5 said it was a bulky/large load of cash that consisted of $150,000.00 to $200,000.00 U.S. Currency. CW5 said that COX told him he was diagnosed with a liver tumor in the summer of 2005 and the medical prognosis was poor.

27. CW5 said that he met ``Doc'' and received $100,000.00 to $175,000.00 two times a year for a three or four year period from him. CW5 said he met ``Doc'' on North Oracle near Prince. Doc was reported to drive an older yellow Cadillac. (Agent Note: Doc believed to be Thomas Benjamin SWENTNICKAS DOB: 04-19-1949.)

28. CW5 said that Cathy FITZGERALD was Eileen FITZGERALD's sister and she did odd jobs for the DTO. CW5 said that he met her in June or July 2005 at the Hideout Bar on Mission Blvd in Tucson and then drove her to an area near COX's Vine Tree residence. CW5 said that C. FITZGERALD then took the package CW5 provided her

| | | |
|---|---|---|
| DEA Form - 6a (Jul. 1996) | **DEA SENSITIVE** Drug Enforcement Administration | |

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.    US v Jarvis   9.5.8

**U.S. Department of Justice**
Drug Enforcement Administration

|  | **REPORT OF INVESTIGATION** *(Continuation)* |  |  |
|---|---|---|---|
| 4. Page 9 of 11 | | | |
| 5. Program Code | | 6. Date Prepared 01-14-2005 | |

(bulk cash) to JARVIS who was driving a blue Sport Utility Vehicle (SUV). CW5 said that C. FITZGERALD first came into his shop last July and she was driving a black Porsche Carrera. CW5 said that she came to pick up a $50,000.00 "package" for JARVIS.

29. CW5 said that he met Barbara HANNA several years ago when she was dating JARVIS. CW5 said that he met her at the Holidome in Tucson with JARVIS. CW5 described HANNA (Barbara HANNA is no relation to Mike CW5) as having a very cold and distant side to her. CW5 said that he thought she brought him money in Tucson a long time ago on one occasion.

30. CW5 said that he heard HANNA "snitched JARVIS off" (reported to the authorities) about having two driver's licenses in the names of Todd WARD and Dana JARVIS. When asked if JARVIS used the alias WARD, CW5 said JARVIS used the alias so much that he was told "not to call him Dana," but "Todd" instead. CW5 said that JARVIS was being chauffeured around at one time because he lost his driver's license. CW5 said that JARVIS told him that he got in trouble with the authorities for having two driver's licenses in different names (Todd WARD/ Dana JARVIS). Further, five or six years ago JARVIS was simply called "Todd" or the "egg man." CW5 explained that the egg man was a code because people would call JARVIS and ask for two dozen eggs which meant that person wanted 24 kilograms of marijuana.

31. CW5 said that Joseph MARTIN was a drug associate of JARVIS's who did odd jobs for the organization. CW5 said that MARTIN and JARVIS had a falling out one or two years ago. CW5 said that MARTIN would take delivery of money on a regular basis from CW5 on JARVIS's behalf. When asked how often MARTIN would pick up money, CW5 said three to four times a year and the amounts were $150,000.00 to $200,000.00. Sometimes, however, MARTIN would just pick up $5,000.00 to $10,000.00 for expense money.

32. CW5 said that he met Dave REID the pilot for the JARVIS DTO one time off Interstate 10 near Avre Valley, Arizona at the request of JARVIS. CW5 said that REID pulled up to meet CW5 with his whole family in the car and handed CW5 $50,000.00 to $80,000.00 in bulk U.S. Currency in a small duffel bag. CW5 said it was obvious what was in the bag and REID mad no attempt to disguise the bulk cash transfer. CW5 thought he met REID another time socially. CW5 said that JARVIS offered his aircraft to CW5 to

DEA Form -6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis      9.5.9

**U.S. Department of Justice**
Drug Enforcement Administration

| | REPORT OF INVESTIGATION *(Continuation)* | 1. File No. ▮▮▮ | 2. G-DEP Identifier ▮▮▮ |
|---|---|---|---|
| | | 3. File Title ▮▮▮ | |
| 4. Page 10 of 11 | | | |
| 5. Program Code ▮▮▮ | | 6. Date Prepared 01-14-2005 | |

fly anywhere. CW5 said that JARVIS told him that the private aircraft owned by JARVIS made it much easier to fly after "911."

33. CW5 said that he met Kelley SCHMIDT once at a ranch JARVIS rented East of Tucson which had a small guest house and backed up to the mountains. CW5 thought she may have been employed as a house cleaner. (Agent Note: JARVIS used cellular telephones which were issued in the name of Kelley SCHMIDT)

34. CW5 said that Donald TRUJILLO was a tile contractor that did jobs for the JARVIS DTO. CW5 said that he gave money to TRUJILLO on one occasion.

35. CW5 said that Dennis WILSON a.k.a. "Big D" was a karate expert who was had been a drug associate of JARVIS's "for a very long time." CW5 said that he delivered $5,000.00 to WILSON once off of Vail Road in Tucson. CW5 said he first met Wilson at JARVIS's mothers house the time JARVIS and WILSON were packaging a load of marijuana in the garage of that residence. CW5 said that JARVIS brought different people to Tucson to help package the marijuana and WILSON would appear on an irregular basis to help package the marijuana. CW5 said that WILSON stands out because of his size. CW5 described WILSON as a violent individual.

36. When asked why he got involved with JARVIS and his DTO, CW5 said that he got addicted to the pocket change that holding the money for JARVIS provided. CW5 said that on a good year he made between $8,000.00 and $10,000.00. CW5 said that he still owes JARVIS $17,500 that he borrowed from him to use as a down payment for his building at Continental Steel. CW5 said he borrowed the money from JARVIS last May or June of 2005.

37. When asked about the checks that were written to Santa Fe Consulting from CW5's Continental Steel Account, CW5 said that JARVIS told him that he needed to show some legitimate income. CW5 said that JARVIS would give him $1,500.00 cash, tell him to keep $100.00 and write a check to Santa Fe Consulting for the remaining amount.

38. CW5 identified the following individuals by photograph. Salvador ABEYTA (looks familiar), Jude AUSTIN (looks familiar), Amor DOMINGUEZ (looks familiar), Kathy FITZGERALD, Eileen FITZGERALD,

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis    9.5.10

**U.S. Department of Justice**
Drug Enforcement Administration

|  | **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. [redacted] | 2. G-DEP Identifier [redacted] |
|---|---|---|---|
|  |  | 3. File Title [redacted] |  |
| 4. Page 11 of 11 |  |  |  |
| 5. Program Code [redacted] |  | 6. Date Prepared 01-14-2005 |  |

Josh GAMBOA (looks familiar), Barbara HANNA, Ayla JARVIS, Dana JARVIS, Raymond MAYNARD (looks familiar), Joseph MARTIN, Dave REID (looks familiar), Adrian SANFORD, Dennis COX, Kelley SCHMIDT, Todd WARD (as Dana JARVIS), John NIETO, Donald TRUJILLO, and Dennis WILSON.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

US v Jarvis    9.5.11

# Internal Revenue Service
# Criminal Investigation

# Memorandum of



| | | | |
|---|---|---|---|
| **In Re:** | ▮▮▮▮▮ | **Location:** | U.S. Attorney's Office<br>7th Floor Conference Room<br>201 3rd Street NW<br>Albuquerque, NM 87103 |

**Investigation #:** ▮▮▮▮▮
**Date:** March 24, 2006
**Time:** 11:15 am - 12:03 pm (Approx.)
**Participant(s):** ▮▮▮▮▮ Interviewee
▮▮▮▮▮ Attorney
Richard Stark, Special Agent, DEA
Kelley Wigley, Special Agent, DHS, ICE
James Braun, Assistant United States Attorney
Michael A. Albers, Special Agent, IRS-CID

▮▮▮▮▮ = CW5

I entered a conference room in which Special Agent (S/A) Richard Stark was completing an interview of ▮▮▮▮▮ concerning the drug ledgers seized from DANA JARVIS on August 25, 2005. ▮▮▮▮▮, ▮▮▮▮▮ attorney was also present. Special Agent Kelley Wigley entered the room approximately 15 minutes after I entered the room. ▮▮▮▮▮ provided the following information voluntarily in response to questioning:

1. JARVIS would give ▮▮▮▮▮ cash and ▮▮▮▮▮ would keep ten percent and the balance would be issued to JARVIS in the form of a check payable to Santa Fe Consulting. ▮▮▮▮▮ issued four checks to Santa Fe Consulting. ▮▮▮▮▮ stated that JARVIS came up with the name and issued invoices to ▮▮▮▮▮ for the amounts listed on check numbers 7351 and 7321. ▮▮▮▮▮ stated that he owed JARVIS $15,000 and did not have a choice. Therefore, he went along with JARVIS' plan to help JARVIS launder his drug proceeds.

2. ▮▮▮▮▮ stated the amount of the four checks were minimal, because JARVIS knew ▮▮▮▮▮ was reluctant to issue the checks to Santa Fe Consulting. ▮▮▮▮▮ further stated that only four checks were issued prior to JARVIS' arrest.

3. Check number #8038 was issued in the amount of $1,350 to Santa Fe Consulting, JARVIS gave ▮▮▮▮▮ $1,500 in cash to deposit into ▮▮▮▮▮ business bank account, #87080587. ▮▮▮▮▮ in turn issued the check to Santa Fe Consulting.

4. JARVIS gave cash to ▮▮▮▮▮ on May 2, 2005. On May 9, 2005, ▮▮▮▮▮ issued

check number #7723 in the amount of $1,500 payable to cash with a note in the memo section of the check stating "SFC". ████ stated that "SFC" was in fact an abbreviation for Santa Fe Consulting.

5. ████ stated that he received cash from legitimate customers 1 to 2 percent of the time.

6. ████ main operating account for his business Continental Steel West Corp. is at Compass Bank. The account number is #87080587. The business' payroll account is also located at Compass Bank and is #87080579. ████ personal account is at Compass Bank and is ████. ████ has account ████ at Compass Bank, which is in the name of 3101 E. 4th Street LLC. This account is used to make the mortgage payments for the building utilized by Continental Steel West Corp. ████ stated that he has no other accounts at Compass Bank.

7. Garfield Gulbranson is the Vice-President of Continental Steel West Corp. ████ stated that Gulbranson had met JARVIS, but was unaware of the four checks issued by ████ to JARVIS, a/k/a Santa Fe Consulting.

8. ████ purchased the assets of Don Schwatken's business, Continental Steel Industries in 1997 for $110,000. ████ made payments on this loan to Lawyers Title, which was paid in full in 2000. All payments made were in the form of a check.

9. ████ purchased the building where is business is located from Bill Assmacher d/b/a T.A. Caid Industries. ████ made payments on this loan with checks issued from his business account at Compass Bank.

10. ████ has a personal account at Bank One, which he issued checks to his business account to cover the business' payroll.

11. ████ was aware that JARVIS was utilizing the alias of TODD WARD. ████ did not issue checks or wire transfers to JARVIS in the name of WARD.

12. ████████████████████████

13. ████ recalled that on one occasion David Reid acted as a courier for JARVIS. ████ stated that on or about December 26, 2004, he met Reid on the side of the highway near a cement plant and airport on Avra Valley Road. ████ further stated that Reid arrived driving a vehicle with his daughter and his grandchildren carrying $15,000 in a paper bag from JARVIS. ████ stated that if the money was double wrapped it represented $5,000 and single wraps totaled $1,000.

14. JARVIS contacted ████ by phone and informed him how much money he was sending to ████ as well as the name of the courier.

The interview with ▓▓▓▓ concluded at approximately 12:03 p.m.

*Michael Albers* E

Michael A. Albers
Special Agent

I this memorandum on April 11, 2006, after refreshing my memory from notes made during and immediately after the interview with ▓▓▓▓.

*Michael Albers* E

Michael A. Albers
Special Agent

US v Jarvis    9.5.14