**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**THE UNITED STATES OF AMERICA,**

        **Plaintiff,**

    **vs.**                          **No. CR 05-1849 JH**

**DAVID REID,
GREG HILL, et al.,**

        **Defendant.**

**SUPPLEMENT OF DEFENDANTS DAVID REID AND GREG HILL
TO THE DEFENDANTS' JOINT MOTION TO SUPPRESS
THE FRUIT OF TITLE III WIRETAPS
(FILED FEBRUARY 2, 2009)**

Defendants David Reid and Greg Hill, by and through their counsel of record,

Walter Nash, William Kirchner, and Billy Blackburn hereby respectfully submits this

supplement to the Defendants' Joint Motion to Suppress the Fruits of Title III Wiretaps

filed February 2, 2009.  Although the Government opposes the relief sought in this

supplement, it has indicated that it has no objection to this pleading exceeding the page

limit.[1]

## I.    DISCUSSION

### A.    THE GOVERNMENT FAILED TO USE TRADITIONAL

---

[1]  The defense has been informed that the Government agreed with counsel for Mr. Osgood that Osgood's supplement could exceed the page limit.  Counsel for the Government had also agreed that Counsel for Mr. Reid was to file a supplement. Counsel for the Government requested that Mr. Reid's counsel file their supplement as part of the Osgood supplement.  Counsel undersigned agreed with that request.  Mr. Osgood was subsequently taken out of the case by pleading guilty.  Accordingly, the defense presumes that the Government continues to have no objection to this pleading exceeding the page limit, particularly given the factual complexity of the issues.

INVESTIGATIVE TECHNIQUES AND RUSHED TO CONDUCT
ELECTRONIC SURVEILLANCE PREMATURELY.

With respect to the lack of necessity under Title III for the wiretap in this case, Mr. Reid and Mr. Hill supplement the Defendants' earlier-filed joint motion with the additional facts and argument set forth herein to support (1) conducting an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978); and (2) suppressing the evidence obtained as fruit of the Title III wiretaps in this case.

>    1.    *The Government failed to capitalize on the*
>          *opportunities afforded under the New Mexico Liquor*
>          *Control Act to vet an informant and to actively*
>          *investigate the Jarvis DTO.*

According to SA Stark, in September 2001, he was given information that Dana Jarvis was trafficking in marijuana through his Club Rhythm and Blues and by other means in Albuquerque. (Affidavit 1 at ¶ 25.)[2]  The Government knew that Mr. Jarvis owned a liquor license, #2599. (*See* Indictment at 10, ¶ 5 ("Liquor License")). Knowledge that Mr. Jarvis owned Club Rhythm and Blues and a New Mexico liquor license provided the Government with a potentially productive and cost-effective means of investigating the Jarvis Drug Trafficking organization ("DTO") without resorting to the needless intrusion into privacy that resulted from electronic surveillance.  Yet the Government never used the power it had under the liquor laws to scrutinize the Club, and thorough it Mr. Jarvis and his organization. (*See* Affidavit of Suzane Doucette dated 5/4/09 and filed herewith as Exh. F, at ¶ 105.)

-------

[2]  As used in this pleading, "Affidavit 1" refers to the Government's Affidavit in Support of Application filed 3/3/05, which was attached as Exhibit A to the Defendants' Joint Motion to Suppress the Fruits of Title III Wiretaps filed February 2, 2009.

Under New Mexico law, the Director of the Alcohol and Gaming Division (AGD) of the Regulation and Licensing Department has authority to investigate "all matters related to the issuance, denial, suspension or revocation of [liquor] licenses." NMSA 1978, § 60-3A-7 (1987, as amended in 2001). The New Mexico Department of Public Safety (DPS) is authorized to provide "investigatory and enforcement support as necessary" to the Director of AGD upon request. NMSA 1978, § 60-3A-7 (1987, as amended in 2001). New Mexico Liquor law grants to the Director broad powers of inspection: "the director is authorized to examine and to require the production of any pertinent records, books, information or evidence, to require the presence of any person and to require him to testify under oath concerning the subject matter of the inquiry and to make a permanent record of the proceeding." NMSA 1978, § 60-3A-9(A) (2001). The Director may also "issue subpoenas." NMSA 1978, § 60-3A-9(B) (2001). Failure to comply with a state district court order enforcing a subpoena is punishable by contempt of court. NMSA 1978, § 60-3A-9(D) (2001). Liquor licenses also require criminal background checks, including fingerprinting; fingerprinting cards "shall be submitted by the director to the department of public safety records bureau for processing through the federal bureau of investigation," subject to confidentiality rules established by the Director. NMSA 1978, § 60-3A-9(E) (2001).

There is also a Special Investigations Division (SID) within DPS, with similarly broad powers. *See, e.g.,* NMSA 1978, § 60-4B-4(A) (1981) (granting authority to require production of records, books, information, etc.); NMSA 1978, § 60-4B-4(B) (1981) (subpoena power). In addition, the Director of SID has the authority to "exchange records and information with law enforcement agencies for official use." NMSA 1978, § 60-4B-4(E) (1981). If the SID Director has "reasonable cause to believe"

that a licensee is in violation of any of a myriad of provisions of the Liquor Control Act,

SID investigators may investigate the licensee.

   a.   The Government could have used the liquor licensing provisions to
        determine that its informant had provided false information, which
        the Government included in its wiretap affidavit.

The affidavit supporting the initial application includes the following allegations:

> At one time, CS-2 said that JARVIS wanted to launder
> $750,000.00 per month through the club, but Eileen
> FITZGERALD stopped him because she thought such a
> large amount of cash would draw the attention of law
> enforcement authorities or the Internal Revenue Service.
> CS-2 stated that everyone employed at Club Rhythm and
> Blues was working for JARVIS in the drug trade one way or
> another.

(Affidavit 1 at ¶ 41.)  This statement makes no sense on its face, and raised a red flag

about the veracity of "CS-2" that the Government should have checked into.

One reason that the statement raises a red flag is because money laundering

makes sense only for **net profits**.  There is no reason for a drug trafficker to launder

money that he is merely going to use to pay for the drugs he buys, or pay to persons

who work for him transporting, packaging and so on.  If a marijuana trafficker sells

$750,000 per month of marijuana, but owes most of that to his suppliers, drivers, and so

on, there is no need for him to launder all of his proceeds. He simply pays the suppliers

and workers in cash.

Indeed "laundering" funds to make them appear to be the profits of a business

brings on the attendant problems of taxation and bookkeeping.  Accounting for how the

money is spent to make it appear to be a legitimate business expense, when in fact it is

spent on paying suppliers and workers, would be highly complex.  To launder funds

through a business one would have to claim the funds as pure profits to be paid to the owner.  If that were the case, however, then the owner would have to pay taxes on that income, eating up a large amount of the money needed to pay the suppliers and workers.  Thus, there are no incentives to launder money **_other than_** profits, and in fact there are great disincentives to doing so.

This being the case, what CS-2 was effectively saying was that Dana Jarvis was making $750,000 per month in **_net profits_** after his costs and expenses.  This is a massive amount of money, and is unlikely to be true for the quantities of marijuana discussed by CS-2 herself.  According to the affidavit, CS-2 stated that Mr. Jarvis trafficked in "multi hundred pound" shipments "three to four times per month."  It is difficult to see how these amounts could possibly produce a net profit of $750,000 per month after cost of goods and expenses.

Thus, the statement of CS-2 raised a red flag that the agents should have checked to verify the informant's veracity.  The defense submits that in fact income of the club was between $20,000 and $30,000 per month.  (*See* Affidavit of Dana Jarvis attached hereto as Exhibit G at ¶ 8.)[3]  The Government could have inspected  the books

---

[3]  The defense has reason to believe that Mr. Jarvis will provide a more complete affidavit at a future date containing even more information relevant to this motion and to a **_Franks_** hearing.  However, counsel for Mr. Jarvis are not now in a position to permit him to do so because the Government has recently refused to dismiss with prejudice the charges that were to be dropped as a part of Mr. Jarvis' plea agreement.  Nevertheless, it is submitted upon information and belief that Mr. Jarvis would have already provided a more complete affidavit regarding facts relevant to this supplement and the preceding Joint Motion, and will do so once the impediment created by the dismissal dispute has been removed.  Similarly, due to last minute complications caused by that dispute, the defense has only been able to obtain an unsigned copy of Mr. Jarvis' affidavit at this time.  However, a signed copy will be filed as soon as it has been executed by Mr. Jarvis.  This matter has been totally beyond the control of counsel undersigned.

under the liquor license provisions, which would have made it obvious to the authorities that laundering $750,000 per month through the Club would have been impossible. Thus, the Government ignored a red flag that it should have investigated, and in so doing it allowed false and misleading information to be placed in its affidavit, albeit coming from the mouth of a third party.

The Government has great experience in investigating cash-intensive businesses such as this one.[4]  That experience could have been brought to bear in this case, even if the case agents themselves did not possess such knowledge, by having expert agents examine the wide variety of material made available to them under the liquor-license laws, and passing the resulting information on to these agents.

In addition, CS-2 stated that "everyone employed at Club Rhythm and Blues was working for JARVIS in the drug trade one way or another."  (Affidavit 1 at ¶¶ 22, 41 .)  Again, this is a remarkable and counterintuitive statement that could have been verified or discredited by minimal investigation.  In fact, there was a constant turnover of employees at the club, so they were always hiring, and people with minimal qualifications and experience were often hired.  (Exhibit G at ¶ 8.)  Thus, with some effort the Government could have placed an agent in the Blues Club.  This would have provided an opportunity for an undercover officer to associate with Mr. Jarvis and other members of the group, and to verify whether "everyone employed at Club Rhythm and Blues was working for JARVIS in the drug trade one way or another."  It would have also given a further opportunity to determine whether money laundering was occurring. The failure to even attempt to place undercover agents or informants into a business

---

[4]  Banks, clubs and restaurants come under constant scrutiny from state, local and federal taxing agencies who have specific investigative tools at their disposal.

that regularly hired workers has been held to be a significant factor in finding that necessity for a wiretap had not been demonstrated. *See **United States v. Gonzalez, Inc**.*, 412 F.3d 1102, 1113-14 (9th Cir. 2005).[5]

        b.      The Government could have used the liquor licensing provisions to have actively investigated the Jarvis DTO.

In addition to vetting the statements of CS-2, whose improbable assertions are presented as fact in the Government's affidavit, the Liquor laws also provided avenues for investigation to which the Government turned a blind eye.  Mr. Jarvis' liquor license would expire by law each year on June 30 and would need to be renewed.  *See* NMSA 1978, § 60-4B-5 (1981, as amended through 1998).  At that time the Director of AGD is mandated to determine whether a licensee is "delinquent in any taxes administered by the taxation and revenue department as of June 1 of each renewal period."  NMSA 1978, § 60-4B-5.  The Director of AGD also has broad power to "determine whether or not there exists any other reason why a license should not be renewed."  NMSA 1978, § 60-4B-5.

SA Stark could have contacted either the Director of AGD or investigators in the

---

    [5]  Counsel undersigned were lead counsel in the wiretap litigation at both the trial and appellate court levels in ***Gonzalez, Inc***.  That case concerned a bus company accused of illegally transporting undocumented immigrants.  The Government claimed in ***Gonzalez, Inc.*** that it had tried and failed to have an undercover agent hired to work in the company's headquarters.  That claim was discredited in a ***Franks*** hearing, which was an important fact upon which the Court of Appeals relied in holding that the Government did not make an adequate showing of necessity.  Similarly, in the present case there was a legitimate business (the Club Rhythm & Blues) into which an agent could have been placed, who would then have been able to observe documents and activities in plain view, and associate with, and gain the confidence of, the defendants in this case.  The Government turned a blind eye to that opportunity, and this is an important component of its failure to use normal means of investigation before resorting to a wiretap.

SID to initiate an investigation of CRB about delinquent taxes or other reasons for non-renewal of the license under these broad mandates.  Access to the books of the Club would have given insight into Jarvis's income, cash flow, and whether there were discrepancies between the amount of alcohol bought, the amounts sold, receipts, deposits, and taxes paid.

New Mexico's liquor laws are violated if a business is open too long into the night, or if was closed too often.  A liquor license can be canceled for failure "to continuously operate during customary hours and days of operation for that type of business."  NMSA 1978, § 60-4B-7(A) (1981, as amended through 1998).  If liquor were served after midnight on a Monday, or after 2:00 a.m. on other nights, this would violate the Act.  *See* NMSA 1978, § 60-7A-1(A)(1) & -(2) (1981, as amended through 2002).  A liquor license could be suspended or revoked, or a fine up to $10,000 imposed, for any violation of the Liquor Control Act.  *See* NMSA 1978, § 60-6C-1(A)(1) (1981, as amended through 1998).  DEA could have easily sent undercover agents into the Club to see if the hours restrictions were strictly complied with.  Even a single violation could constitute grounds for suspension, and would support further investigation of the Club and Jarvis' business practices.

Similarly, revocation, suspension and fines could result if the premises were "a public nuisance in the neighborhood."  NMSA 1978, § 60-6C-1(A)(3) (1981, as amended through 1998); *see also* NMSA 1978, § 60-7A-15 (1981) (defining public nuisance). Service of alcohol to a minor, in violation of NMSA 1978, § 60-7B-1(A)(1) (1993, as amended through 1998), is grounds for revocation, suspension or fine.  *See* NMSA 1978, § 60-6C-1(B)(1) (1981, as amended through 1998).  Agents could have easily checked to see if these rules were being violated as well.

Likewise, if any of the licensee's agents "has made any material false statement or concealed any material facts in his application for the license," the license shall be suspended, revoked, or a fine imposed. NMSA 1978, § 60-6C-1(B)(2) (1981, as amended through 1998). It would not have been difficult for SA Stark to obtain a copy of the liquor license application and any renewals thereto to scrutinize for misstatements or omissions.

The licensee is required to maintain server permits for each server and produce a copy of such permits upon request by the DPS or any agent of the Director. *See* NMSA 1978, § 60-6E-6(A) (1999). Failure to do so can result in fines and penalties. *See* NMSA 1978, § 60-6E-6(B) (1999). An inspection of such records might have revealed errors or omissions. If there were any misrepresentation, either express or implied, of the contents of a bottle, that would violate the Act. *See* NMSA 1978, § 60-7A-146E-A (1981). Investigators for the DPS could have conducted an inspection to enforce compliance with these provisions of the Act.

Similarly, it would violate the Act if alcohol were sold to an intoxicated person. *See* NMSA 1978, § 60-7A-16 (1981, as amended through 1993). Mr. Jarvis would be vicariously liable for such a violation, even if committed by one of his staff. *See* ***Williams v. Ashbaugh***, 120 N.M. 731, 906 P.2d 263 (1986). An informant, cooperator, or DEA agent could have attempted to be served while intoxicated; if they were served, it would have triggered further investigation and remedial action.

Any attempt to impede or obstruct enforcement of the Liquor Control Act is subject to criminal penalties. *See* NMSA 1978, § 60-7A-24 (1981, as amended through 1993). In addition, violations of the Act are subject to criminal penalties. *See* NMSA 1978, § 60-7A-25(A) (1981, as amended through 1993).

Moreover, it was not necessary to wait until Mr. Jarvis' license was about to expire. To trigger a DPS investigation of a licensee's premises nothing more is needed than "a signed, written complaint" filed by any person that the licensee "has violated any of the provisions of the Liquor Control Act." NMSA 1978, § 60-6C-4(A) (1981, as amended through 1993). Such a report triggers an investigation by DPS and a report to the Director of AGD. *See* NMSA 1978, § 60-6C-4(B) (1981, as amended through 1993). A complaint from a DEA agent, informant, or cooperator claiming to be a neighbor, and claiming the Club is a public nuisance, or that any of the provisions of the Liquor Control Act (after hours, sale to minor, sale to intoxicated person, etc.) were violated, would suffice to generate an investigation by DPS.

If the Government had pursued any of these investigative avenues, it would have been in a position to obtain additional information about Dana Jarvis, the DTO, financial matters and the role of the Club in the DTO. For example, if any employee were found to have violated any of the myriad provisions of New Mexico's Liquor Control Act—some of which involve bureaucratic omissions, such as failure to maintain on premises current copies of each server's permit—those individual employees would be ripe for pressure by the Government to exchange damaging information regarding the Jarvis DTO, or perhaps cooperation in further investigation, in return for agreement not to prosecute for Liquor Control Act violations. The Government's failure to even attempt to exploit the advantages enuring to it by Mr. Jarvis' status as a liquor licensee is another example of its failure to use ordinary investigative methods before resorting to a wiretap.

**2.      The Government failed to adequately use the**

**numerous avenues available to it for physical surveillance.**

The Government's statements in the Affidavits regarding surveillance contain several false statement and numerous material omissions.  The Government deliberately, or at least recklessly, concealed from the Court in its affidavits the fact that its agents conducted only a small fraction of the physical surveillance that it could have on numerous properties that the Government had already identified as key locations for the Jarvis DTO.

For the most part, the Government conducted only intermittent, superficial surveillance in this case.  When one compares the Albuquerque DEA's surveillances in this case with what it could readily and cheaply have done, one is led to the inexorable conclusion that the Government had no real interest in exposing the Jarvis DTO's crimes through normal investigation; its real aim was to conduct a wiretap investigation and see what they found *after* tapping thousands of private phone calls.  This conduct is directly contrary to the law's requirements, which mandate that the Government determine what it can find out about criminal activity through normal investigative techniques *before* conducting wiretaps.  It did not fulfil that obligation here.  Ten instances known to the defense in which the Government failed to utilize surveillance opportunities are set forth below, followed by a discussion of the ramifications of these failures.  It is respectfully submitted that the defense has met the requirements for a *Franks* hearing to elucidate this information, which may also disclose further facts supporting this point.

**A.    THE GOVERNMENT REPEATEDLY FAILED TO UTILIZE**

### *SURVEILLANCE OPPORTUNITIES AT IT DISPOSAL.*

*1.      13 Enebro Road:*  Mr. Jarvis' residence was located at 13 Enebro Road in Santa

Fe, and it is mentioned frequently in the Government's initial affidavit.  (Exh. G at ¶ 10e;

Affidavit 1 at ¶¶ 10, 11, 29, 42, 45, 46, 74, 76, 77.)   Surveillance of that location would

have revealed a wealth of information for agents, such as the identities of

co-conspirators and their vehicles.  Yet there was little effort to have conducted any

such surveillance.  All the DEA agents did was conduct a few "intermittent" or drive-by

surveillances.  (Exh. F at ¶¶ 9-15; Affidavit 1 at ¶ 76.)  Moreover, not only did the DEA

Agents never establish a true surveillance at Mr. Jarvis' home, their affidavit told the

issuing Judge ***exactly the opposite***: "Later that same day surveillance was established

at JARVIS's Santa Fe residence located at 13 Enebro."  (Affidavit 1 at ¶ 77.)  This was

simply false, as their own report from that day shows – the only surveillance at that

location on that day was a "drive-by."  (*See* Affidavit of Suzane Doucette filed as Exhibit

B to Defendants' Joint Motion to Suppress 2/2/09 at ¶¶ 65-66.)[6]  Nor was there any

attempt at surveillance of the residence utilizing a pole camera[7] here either.  (Exh. F at

¶ 15.)

The failure to conduct a surveillance of this home was certainly not due to any

---

[6]  An ICE agent apparently did observe the location for approximately 35 minutes on a different occasion.  It is not clear from the disclosure whether this was even part of the same investigation.  (Exh. F at ¶ 12.)

[7]  A "pole camera" is a device commonly utilized by the authorities in investigations of this kind.  It consists of a camera placed in a location with a view of the area the Government wishes to surveil.  They are often placed in canisters that appear to be ordinary transformers on power poles.  Their use does not require a court order, provides continuous surveillance, allows video recording of what is seen and creates little risk of detection.  Some set-ups allow remote control of the camera from off-site, permitting an operator to zoom and pan on areas of importance.  (Exh. F at ¶ 13, n. .)

inherent difficulty in doing so.  On the contrary, the Enebro Road property was highly susceptible to surveillance.  Right behind the house is a green belt with a public trail going down the middle of it.  (Exh. G at ¶ 10e.)  From the trail a person could see into the entire back yard, and into the house.  (*Id.*)  A short distance up the hill from the trail is a perfect spot for long-term surveillance.  (*Id.*)  There is no fence around the property, so it was easy to approach.  (*Id.*)  The authorities could have also had agents pose as utility workers, surveyors, and so on, being that it was a new development, and there were people around doing such things all of the time.  (*Id.*)  Visual surveillance from a utility box (*i.e.* a pole camera), or aerial surveillance, of this property was feasible as well.  (See Affidavit of Investigator Milton  Rodriguez ("Rodriguez aff."), attached hereto as Exhibit H, at ¶ 9.)  Yet, the Government gave this location, home of the principal target of the investigation, nothing more than an occasional drive-by look.

2.    **1440 Cielo Vista**: Mr. Jarvis also owned a house in Bernalillo, N.M., located at 1440 Cielo Vista.  (Exh. G at ¶ 10f; Affidavit 1 at ¶¶ 10, 11, 29.)  As with the Enebro property, the Government's affidavit ***affirmatively misled the Court*** to think that the agents conducted a true surveillance there: "On November 3 2004 agents established surveillance at 1440 Cielo Vista in Bernalillo New Mexico."  (Affidavit 1 at ¶  77.)  In fact, their report indicates that this was merely a drive-by, as was the Enebro "surveillance" discussed above.  (*See* Affidavit of Suzane Doucette filed as Exhibit B to Defendants' Joint Motion to Suppress 2/2/09 at ¶ 65; *see also* Exh. F at ¶ ¶ 15-19.)  This false statement was clearly made knowingly, or at least recklessly.

The Government spend something like an hour and a half ***total*** observing this residence over a period of ***three years***.  (Exh. G at ¶ 21.)  Again, it is hard to

understand why a home owned by the alleged leader of this organization would merit so little scrutiny.  Such locations are traditionally a target-rich environment for law enforcement.  Surveillance was clearly possible.  The driveway opened onto the main street, and the streets in the neighborhood included spots that would have offered views into both yards and into the house.  (Exh. G at ¶ 10f.)  Analysis of the vehicles in the driveway and persons coming and going would have been easy.  (*Id.*)  Obviously, a residence belonging to the main target of a wiretap should be subject to extensive surveillance, if such can easily be done, before a wiretap is resorted to.

3.     **The "Lazy Be" property**:  The Government's documents show that it knew as early as May of 2002 that Mr. Jarvis owned property with a trailer on it located at 9160 W. Lazy Be Place, near Tucson, Arizona.  (Exh. F at ¶ 25.)  Mr. Jarvis owned it under the alias Todd Ward, and the Government was aware in that same year that this was actually Dana Jarvis.  (Affidavit 1 at ¶ 30; Exh. F at ¶ 26.)  The agents were well aware that Mr. Jarvis allegedly received his marijuana from Tucson.  (Affidavit 1 at ¶ 25.)

This property is variously referred to in the Government's reports as the "Lazy Bee," Lazy B," or "Lazy Be" property, or sometimes as the "Ajo Trailer," possibly from its proximity to Ajo Road in Tucson.  This was a trailer home in a relatively remote location with easy access to the Mexican Border and to Ryan Airfield, a small airport near Tucson.  (Exh. F at ¶ 27.)  It was owned under an alias by a person reputed to be a major marijuana trafficker -- all factors that would make one suspicious that it was being used for drug business, which ***post-wiretap*** surveillance confirmed.  Agt. Stark described it in the ***James*** hearing as "a trailer used to reroute . . . bulk marijuana."  (R.T.

4/1/09 at 29.)[8]  Yet, there is no indication known to the defense that the Government

ever conducted surveillance there ***before*** the wiretap.  (Exh. F at ¶ 23.)  Again, as noted

in the previously-filed motion, methods *claimed* to be too dangerous or unlikely to

succeed before a wiretap seem to somehow be employed with ruthless efficiency after

wire interception starts.  There are several places nearby where the DEA could have

positioned a vehicle out of view from the main street without drawing any attention from

Mr. Jarvis or the neighbors, and looked directly into the garage.  (Exh. G at ¶ 10a.)

Failure to explain to the issuing Court that opportunity the Government had to conduct

surveillance here constituted a knowing, or at least reckless, omission of a material fact.


***4.     3 Dovela Road:***  Mr. Jarvis' ex-wife Eileen Fitzgerald owned a residence at 3

Dovela in Santa Fe.   (Affidavit 1 at ¶¶ 12, 29.)   Ms. Fitzgerald is described in the

affidavit as a person who "distributes drugs for the organization and is also attempting to

establish her own independent drug distribution network.  (*Id.* at ¶ 12.)  Although the

affidavit gives the impression that agents conducting more than one intermittent (drive-

by) surveillance at this address (*id.* at ¶ 76), a defense review of the disclosure reveals

only one drive-by observation.  (Exh. F at ¶ 30.)

        Yet, the house at 3 Dovela Place, also in Eldorado, outside Santa Fe, could have

been easily surveilled.  Experienced Investigator Milton Rodriguez noted that

surveillance of this area could be conducted from "from the Avenida Vista Grande area

or from a cooperating neighbor's property."  (Exh. H at ¶ 8.)  In addition, there are

"high-line poles," at the rear of the property that would offer a good vantage point for

_____

        [8]  As used herein "R.T. 4/1/09" refers to the Reporter's Transcript of the ***James***
hearing conducted on April 1, 2009.

pole cameras; aerial surveillance would also have been an option. (*Id.*) Ms. Doucette also found that this location would be susceptible to professional surveillance efforts. (Exh. F at ¶ 31.) Yet it appears that the agents spent less than 10 minutes watching this location over a 3-year investigation. (*Id.*)

**5.    28 Quail Run:** The Government apparently conducted one full afternoon of surveillance at the residence of Cathy Fitzgerald, sister of Mr. Jarvis' ex-wife, 28 Quail run in Santa Fe. (Affidavit 1 at ¶¶ 39, 59 76.) The Government's affidavit also implies that it conducted "intermittent" (i.e. drive-by) surveillance on a few other occasions. (Affidavit 1 at ¶ 76.) In fact, however, the reports indicate that there was only one drive-by, not several. (Exh. F at ¶ 33.) On the one occasion that the agents actually spent the afternoon there they saw Ms. Fitzgerald arrive in a vehicle owned by co-defendant Donald Trujillo, and then return to Mr. Trujillo's residence late in the afternoon.[9] Thus, the one surveillance at which they made more than minimal effort bore some fruit, supporting the conclusion that pursuing this avenue of investigation would have been productive.

Had the agents conducted professional surveillance of this location over time they could have observed the comings and goings of the group's transport vehicles. (Exh. G at ¶ 10d.) Moreover, to surveil this location the agents did not have to spend days and nights parked outside the residence. Constant surveillance could have been

_____

[9] The agents allegedly observed Ms. Fitzgerald "driving in a manner consistent with using counter surveillance techniques." (Affidavit 1 at ¶ 59.) This is a misleading statement because the "slow driving" they witnessed was most likely due to the poor roads in the area. (*See* Affidavit of Suzane Doucette at ¶¶ 71-72, included as Exhibit B to Joint Motion to Suppress filed 2/2/09.)

accomplished by the use of a "pole camera," which could have been mounted at any of a number of poles in the area. (*See* Doucette Affidavit filed as Exhibit B to Motion to Suppress filed 2/2/09 at ¶ 69.) Photographs of that property are included as Attachment 1 to Exhibit F, which show that virtually the entire property could have easily been watched by pole camera. In particular, Investigator Milton Rodriguez has identified a utility box service location at 22 Oak Street, which offers a clear view of 28 Quail Run. This location sits high and away from the property. It would have also been a prime location for a pole camera, or a surveillance team to set up under the guise of utility workers. (*See* Exh. H at ¶ 6.) Aerial surveillance of the area could have been used as well, allowing load vehicles to be followed. (*Id.*) Yet no pole camera was set up, and after one afternoon of surveilling this residence the agents seemed to have just given up, with nothing more between that day and the initiation of the wiretap.

**6.    5 Lauro Road:** Another property that was susceptible to surveillance was a house at 5 Lauro Road, in Eldorado, which the Government describes as a "marijuana stash house and bulk cash counting house for the JARVIS DTO." (*See* Affidavit 1 at ¶¶ 42, 77.) This location was susceptible to surveillances, both fixed and moving, with excellent "choke points" that agents could take advantage of to monitor who came and went from this address. (Exh. F at ¶ 45.) The agents could have observed the location with equipment such as a "pole camera" in a utility box at the front of the property. (*See* Exh. H at ¶ 7.) In addition, to the north of the property there is a hill from which a camouflaged surveillance team could have used "telescopes, binoculars, video and still cameras" to conduct surveillance of activity at this property. (*Id.*) Also, there is an area near the property "where teams disguised as plumbers, utility workers, or a highway

crew could easily set up to watch the residence as well as cars entering Lauro Road."

(*Id.*)  Yet the Government appears to have conducted no surveillance here, not even a

momentary "drive-by."  (Exh. F at ¶ 42.)


**7.    *1013 Camino Carlos Rey:*  The Government's first affidavit quotes "CS-3"** as

stating that "the organization had a red Volkswagen van equipped with digital cameras

and night vision equipment that it used for surveillance." (Affidavit 1 at ¶¶ 50, 88.)  The

Government goes on to allege as follows:

> Agents discovered a red Volkswagen van at 1013 Camino Carlos Rey in
> Santa Fe New Mexico. This residence was reported by CS-3 to be a
> money count house for JARVIS and was previously occupied by Angela
> CUMMINGS.

It is puzzling how the Government could peddle such an absurd statement to a Court at

face value, without at least attempting to verify or refute it.  One's curiosity is certainly

piqued as to why anyone would use such a notoriously slow vehicle (and one that would

stick out like a sore thumb) as a red Volkswagen van for a covert activity like

surveillance.

In fact Mr. Jarvis never used that red van for any type of surveillance or

counter-surveillance, and there was never any surveillance equipment installed in it.

(Exh. G at ¶ 6.)  Had the Government bothered to check the residence where the van

was seen it would have found that the property was occupied by Mr. Jarvis' friend

William B. Kasso, who was the owner of the van.  (*Id.* at ¶ 6*; see also* Affidavit of

Suzane Doucette filed as Exhibit B to Defendants' Joint Motion to Suppress 2/2/09 at ¶

81.)  Mr. Kasso is a legitimate businessman who has an opal mine in Australia, and

sells opals throughout the United States.  (Exh. G at ¶ 6*;* Affidavit of Suzane Doucette

filed as Exhibit B to Defendants' Joint Motion to Suppress 2/2/09 at ¶ 81.)  He used the

van to travel to gem shows.  (*Id.*)  The affidavits give no explanation for why the DEA

never bothered to check the van to see if any surveillance equipment was actually

installed therein, or investigate the registered owner.

The agents could have learned the truth about the van and its owner from

surveillance of the 1013 Camino Carlos Rey residence.  According to Investigator Milton

Rodriguez, two nearby parks in the area offered locations from which surveillance using

binoculars, video, and still frame cameras was possible.  (Exh. H at ¶ 5.)  There are

"utility poles on the street and at the rear of the property that would have offered clear

views of the property and residence with the use of pole cameras." (*Id.*)  Mr. Rodriguez

also notes that aerial surveillance could have been used "because of clear unobstructed

views from above."  (*Id.*)  Had the agents bothered to conduct surveillance they never

would have seen vehicles going into a concealed location on the property, as would be

expected if this was actually "a money count house," as alleged in the affidavit .  (Exh. G

at ¶ 10c.)  Yet, the disclosure reflects that the agents only drove by this location one

time.  (Exh. F at ¶ 47.)

**8.    *639 Kinley Avenue:*  According to the Government, co-defendant Dakota Fitzner

resided at 639 Kinley Avenue N.W. in Albuquerque.  (Affidavit 1 at ¶ 16.)  The

Government described Mr. Fitzner in its affidavit as a person who "transported bulk

marijuana and cash on behalf of the JARVIS DTO" (*id.*), so the events at his residence

would be likely to be important.

This house is located in the middle of a residential neighborhood.  (Exh. H at ¶

15.)  Kinley Avenue is a long street with an unobstructed view.  (*Id.*)  Surveillance of the

target residence could be conducted from anywhere on the street.  (*Id.*)  There are two ways to access this street and both sides offer good surveillance positions. (*Id.*) Surveillance crews, again under the guise of utility or road workers, would have fit perfectly into this type of setting.  (*Id.*)  Utility poles on Kinley Avenue, as well as on the back of the property. also offered clear views for pole cameras.  (*Id.*)  Yet, despite the importance of Mr. Fitzner claimed by the Government, and the ease with which they could have monitored the property, the disclosure indicates that a single DEA agent merely drove by the location twice.  (Exh. F at ¶ 52.)

**9.     *10604 Calle de Elena:*** Agents determined that co-defendant Jude Austin (who had been stopped in Texas with Kara Gold carrying $400,000 in cash back in 2001) used 10604 Calle de Elena in Corrales as his mailing address.  (Affidavit 1 at ¶ 38.) This location, too, is eminently surveilable.  There is a utility pole to the rear, and a utility box in front of the house.  (Exh. H at ¶ 13.)  "Both offer clear direct views of this residence," according to Mr. Rodriguez.  (*Id.*)  Monitoring traffic coming and going could have been accomplished by a surveillance team operating near the intersection of Calle de Elena and Cottonwood Drive.  (*Id.*)  The defense knows of no attempts to surveil this residence.  (Exh. F at ¶ 54.)

**10.     *551 West Cordova Road:*** Another property connected both with Mr. Jarvis and his co-defendants Eileen Fitzgerald and Dakota Fitzner is located at 551 West Cordova Road.  (Affidavit 1 at ¶¶ 29, 35, 33.)  This is the address for "Plaza Sienna," a multiple-business building located across the street from Cordova Shopping Center in Santa Fe, where these individuals apparently received mail.  (*See* Exh. H at ¶ 12.)  This location

could have easily been monitored from the shopping Center parking lot conveniently located across the street, as well as from a pole camera mounted on one of the numerous utility poles in the area, all of which offer clear views of the building's parking lot and store entrances.

Moreover, a technique known as a "mail cover" could have would helped to establish whether the mail boxes were utilized for some type of drops, and possibly provide addresses of banks, credit card companies, utility companies, and individuals who may have been communicating with the targets.  (Exh. F at ¶ 57.)  This technique, if successful, could be combined with covert subpoenas to discover if the DTO had additional properties for which it was receiving utility bills, even if the bills arrived under new alias identities.  (*Id.*)  The Government could have discovered whether credit card bills were being received, either in the defendants' true names or under an alias.  (*Id.)* This, in turn could provide information necessary for obtaining a records subpoena. (*Id.)*  Yet, there is no indication the Government ever attempted to surveil this location, or order a "mail cover" for the boxes of the defendants.  (*Id.)*

B.    ***The Government's failure to conduct surveillance violated its responsibility to utilize traditional investigative techniques that would have sufficed to expose the crime***.

The law is very clear: "standard visual and aural surveillance" of suspects is one of the "normal investigative procedures" that the Government is required to try before obtaining wiretap authorization, pursuant to  U.S.C. § 2518(1)(c).  ***United States v. VanMeter***, 278 F.3d 1156, 1163 (10th Cir. 2002).  Yet, in this case the Government's surveillance efforts were cursory at best, with perhaps a few exceptions.

The Albuquerque DEA failed to do a thorough investigation.  They never

-21-

conducted location-oriented surveillance with more than four agents. (Exh. F at ¶ 89.)
As Ms. Doucette noted, "[m]ost of the time, they never followed anyone, even when they
had information that the Jarvis DTO was conducting illicit business." (*Id.* At ¶ 89.)  In
total, during the entirety of the Government's investigation of the Jarvis DTO prior to
initiating the wiretap, the Albuquerque DEA spent no more than a day or two worth of
time conducting drive-bys and other forms of surveillance at ten important fixed
locations. Yet, **_after_** the wiretap was initiated, and **_during the course of_** the wiretap, the
DEA conducted numerous surveillance operations with numerous agents, with success.
(*See, e.g.* Exh. F at ¶ 28, 100.)  Indeed, the Albuquerque DEA conducted no
surveillance whatsoever for more than three months between July 7, 2004 and October
13, 2004 (*See* Exh. F at ¶ 89.)  This is puzzling, given that the Government
characterized the Jarvis DTO as a massive, multi-state illegal drug distribution
organization, laundering millions of dollars of U.S. Currency, and distributing tons of
marijuana in the Midwest, the Northeast, Colorado, and New Mexico.

Similarly, it is hard to understand why the Government **_never_** tried the oft-used,
standard technique of surveillance by a pole camera in this case.  There were many
locations where such a device could have been used, yet none ever was.  The
Government's failure to conduct more than superficial surveillance at the many known
locations involved in this investigation flies in the face of its own statements regarding
the seriousness of the allegations.

Ms. Doucette's supplemental affidavit illustrates the contrast between the
cursory, bare-bones investigation conducted by the Albuquerque DEA, and the
professional investigations conducted by the Indianapolis DEA and ICE personnel from
Columbus, Ohio. (Exh. F at ¶¶ 72-91.)  When Albuquerque DEA contacted Indianapolis

DEA regarding activity in their jurisdiction, particularly involving Ayla Jarvis and Greg Hill

in Bloomington, the Indianapolis DEA promptly deployed approximately eight agents to

conduct surveillance of Ms. Jarvis and Mr. Hill.  *(See* Exh. F at ¶¶ 77-89.)  This allowed

Indianapolis DEA, and associated law enforcement agencies, to closely monitor Ms.

Jarvis and Mr. Hill—both of whom were regarded by the Government as important

individuals in the Jarvis DTO—without being detected.  (*Id.*)  Using only traditional

investigative techniques, the Government was able to observe the Jarvis airplane, Ms.

Jarvis at the airport, the green Dodge minivan she entered, her entering a Cracker

Barrel restaurant, her activities inside the restaurant, the vehicle parked next to hers

(including the fact that it was registered to Mr. Hill), the activities of Ms. Jarvis and Mr.

Hill as they exited the restaurant together, their activities near the two cars in the

restaurant parking lot, and Ms. Jarvis's return to the airport.  (*Id.*)  They decided to stop

Ms. Jarvis' vehicle as she made an illegal U-turn, leading to her consenting to a canine

search of her vehicle, and ultimately netting the seizure of almost $300,000 in U.S.

Currency.  (*Id.*)

        This surveillance by the Indianapolis DEA is a good example of the type of police

work that should have been employed in this investigation.  The Indianapolis DEA's

investigation established a connection between Mr. Hill and Ms. Jarvis, it showed that

she was taking large amounts of currency from Indiana back to New Mexico, it

connected the flights of that aircraft to the Jarvis DTO, and more specifically, to the task

of hauling cash from places where the marijuana was sold back to Jarvis in Tucson.

        The Albuquerque DEA failed to do this kind of ordinary police work, which is far

less intrusive into protected privacy interests than a wiretap.  Instead, the Albuquerque

DEA halfheartedly did some minimal surveillance in what appears to have been just an

effort to "check off some boxes" that needed to be "checked off" in order to get what it really wanted -- a wiretap. Preventing such unnecessary trespasses into privacy is precisely why Title III was enacted. The Albuquerque DEA's investigation of the Jarvis DTO prior to initiating the wiretap was superficial, incomplete, cursory, and anything but a diligent, serious effort to investigate this DTO using the ordinary tools available.

Yet, **_after_** the wiretap was in place, the Government employed additional surveillance activity with productive results, and without danger to any of the agents, cooperators or informants. (*See* Exh. F at ¶ 28, 100.) The success of additional *post-hoc* surveillance shows that the Government's claims of futility and danger are false, and violated the strictures of Title III. *See, e.g., **United States v. Giordano***, 416 U.S. 505, 515 (1974) ("[S]urreptitious interception of wire and oral communications . . . [is] not to be routinely employed as the initial step in criminal investigations[.]"); **Gonzalez, Inc.**, 412 F.3d at 1113-14 (Title III requires the Government to do more than "conduct only the most cursory investigation before seeking a wiretap").

In summary, the Government could have productively done far more surveillance than it did, which, along with the other techniques mentioned in the preceding Motion and in this supplement, would have obviated the need for a wiretap. The Government withheld that information from the issuing court, affirmatively misled the Court as to what it had done, left out the reason for at least one surveillance being less successful than it could have been, and then told the Court that the surveillance it had conducted was "fruitless." (Affidavit 1 at ¶ 75.) Thus, there were knowing, or at least reckless, false statements and material omissions that together misled the Court as to the efficacy of surveillance in this case. Accordingly, this Court must conduct a **_Franks_** hearing on the

matter, and should suppress the fruits of these wire interceptions upon sufficient showing of these facts.

**B.    FURTHER INFORMATION HAS BECOME AVAILABLE SUPPORTING ARGUMENTS MADE IN THE PREVIOUSLY-FILED MOTION ABOUT THE ABILITY OF CS-3 TO PENETRATE THIS ORGANIZATION, AND OTHER MATTERS THEREIN.**

The defense hereby supplements its Joint Motion to Suppress filed 2/2/09 with the following facts and argument.

1.    CS-3:

The first argument made in the Defendants' Joint Motion to Suppress was that the Government failed to utilize the *entrée* it had into this organization through its informant known as "CS-3." (Defendants' Joint Motion to Suppress filed 2/2/09 at 31-39.) The defense is now able to supplement that argument by noting that CS-3 had a long-standing acquaintance with Mr. Jarvis, as CS-3 was a close friend of Dakota Fitzner, who was like a son to Mr. Jarvis. (Exh. G at ¶ 3.) As noted in the previous pleading, Mr. Vasquez was well known in Santa Fe as a cocaine dealer. (*Id.*) Moreover, CS-3 was a formidable person when he wanted to be. Mr. Jarvis describes him as a "sophisticated hustler, who dressed well and was usually accompanied by beautiful women." (*Id.*) According to Mr. Jarvis, CS-3 was "smart," and he visited Mr. Jarvis' home frequently. (*Id.*) Mr. Jarvis states that CS-3 could have easily done much more for the DEA than he did. (*Id.*)

Moreover, CS-3 was susceptible to being coerced to help the Government far

more than he did.  His parents were wealthy and were providing him with a monthly stipend, cars, and a house.  (*Id.*)  During the entire time of his involvement with the DEA CS-3 was panicked that his wealthy family might find out about his coke dealing and cut him off.  (*Id.*)  The police were aware of his cocaine dealing activities.  (*Id.*)  Accordingly, they were in a position to have applied pressure on him, as previously discussed.

In addition, it should be noted that there is a recorded call in the disclosure (*i.e.* made **after** the wiretap was running) in which Mr. Jarvis called CS-3 and asked him to do a drug transaction with him.  (Exh. F at ¶ 112.)  CS-3 declined to do so, saying he was too "busy."  (*Id.*)  This is a clear indication that one of the Government's confidential sources had direct access to Mr. Jarvis and was able -- indeed invited -- to do drug transactions right up to the time of the wiretap, and indeed beyond, but simply refused to do so.  "[I]nfiltration of conspiratorial groups by undercover agents or informants" is one of the steps that the Government must pursue before seeking wiretap authority. *VanMeter*, 278 F.3d at 1163.  It clearly failed to meet that obligation here.  A *Franks* hearing will demonstrate these facts and clear up what CS-3 actually did in addition to what is recited in the Government's affidavit, and what more he would have been able to accomplish for the Government if he had not been called off.

2.    Trash Run:

One of the points made in the Defendants' Joint Motion to Suppress was that the Government failed to conduct any "trash covers" except for one botched attempt at Mr. Jarvis' residence, which the Government then used to make it seem that Mr. Jarvis obsessively guarded his trash from inspection.  (Defendants' Joint Motion to Suppress

filed 2/2/09 at 46-49.)  The defense has now obtained further corroboration of just how false and misleading that portrayal was, and how badly that one attempt was conducted.

The portrayal was simply false in several ways.  One is the Government's claim that Mr. Jarvis "ran out" of his house when he saw a man attempting to switch his trash can.  (Affidavit 1 at 74.)  That is not true.  Mr. Jarvis did not run out of the house -- he was already outside, smoking a cigarette, having just wheeled his trash container to the street side.  (Exh. G at ¶ 1.)  The Government also claimed that Mr. Jarvis told the man that private investigators were trying to learn "stuff" about him.  (Affidavit 1 at ¶ 74.)  Again, false -- he never mentioned private investigators.  (Exh. G at ¶ 2.)  The Government further falsely stated that Mr. Jarvis waited for 30 minutes by his trash can. In fact, the regular trash collection truck picked up his container after a few minutes and that was the end of the matter.  (*Id.*)  Thus, the Government's version is studded with false statements, all aimed at making it seem as though Mr. Jarvis was jealously guarding his garbage, which was simply untrue, in order to obviate the need to pursue this avenue further and instead to justify a wiretap.

Moreover, it is almost comical how badly the Government's attempted trash run was mismanaged.  They simply had a man drive up to Mr. Jarvis' house in a pickup truck with about six or seven new trash cans in the back of the truck, while Mr. Jarvis happened to be sitting there.  (*Id.* at ¶ 1.)  Mr. Jarvis then watched as the man struggled to lift his "very full" trash can by hand into the back of his pickup truck.  (*Id.*)  The can was so full he had to secure the lid with bungee cords to keep the trash in.  (*Id.*)  This raised the question -- why would anyone do such a thing?

These actions were even stranger because it would have been a lot easier for the man to have followed the regular garbage truck (which could be heard nearby picking up trash), letting it empty trash before manually picking up the old cans to put in his pickup. (*Id.*) Thus, the man's actions were odd enough that anyone would wonder who he was and what he was doing. Moreover, when questioned, the man seemed "flustered," had an explanation that made no sense, and ended up telling Mr. Jarvis he was just "following orders." (*Id.*)

Had they not made so many obvious mistakes they would not have had any problem obtaining the trash. (*Id.* at ¶ 2.) In sum, the Government made only one attempt at a trash cover, botched it and then gave up on the technique, despite the fact that trash covers have been successfully conducted in many other cases. They then misled the issuing Court to believe that the failure was because the Jarvis DTO carefully guarded its trash. The Government cannot create "necessity" (like in the case of a claim of exigency), by its own errors and omissions.

3.    <u>CS-2</u>:

In addition to the access created by CS-3, the Government also had an informant it called CS-2, who could have done much more than she did. CS-2 was a friend of Mr. Jarvis' ex-wife. (Exh. G at ¶ 5.) CS-2 lived near Mr. Jarvis. (Id.) Before the start of the wiretaps CS-2's boyfriend left her, and she became ill from her job. (*Id.*) Mr. Jarvis felt sorry for her. CS-2 was wearing a "wire" when she met with Mr. Jarvis' ex-wife, and she could have done the same when she met with Mr. Jarvis. Again, the Government failed to give a full and complete statement of the resources at its disposal and/or to

pursue them.  A **Franks** hearing will elucidate what CS-2 actually did in addition to what is recited in the Government's affidavit, and what more she would have been able to accomplish if the Government had utilized her fully.

4.    Ayla Jarvis was not a pilot:

In the Joint Motion to Suppress the defense noted that the Government falsely told the issuing Court that co-defendant Donald Trujillo was a licensed airplane pilot. (Defendants' Joint Motion to Suppress filed 2/2/09 at 63.)  Along the same lines, the defense now notes that Government's affidavit also falsely stated that Mr. Jarvis' daughter Ayla had a pilot's license.  (Affidavit 1 ¶ 11.)  Mr. Jarvis has now confirmed that this was not true -- his daughter Ayla never had a pilot's license.  (Exh. G at ¶ 9.) Once again, the Government knowingly, or at least recklessly, inserted a falsehood into its sworn affidavit that made it appear that the people around Mr. Jarvis were highly professional drug runners who went so far as to become an airplane pilot while still a teenager, presumably to transport drugs.

5.    Credit Cards: In the Joint Motion to Suppress the defense argued that the Government failed to conduct an adequate financial investigation into Mr. Jarvis. (Defendants' Joint Motion to Suppress filed 2/2/09 at pp. 45 -46.)  The defense now supplements that argument (in addition to the liquor-regulation avenues set forth above) by noting that Mr. Jarvis  traveled a great deal on his illegal business, and often used his credit cards on those trips.  (Exh. G at ¶ 12.)  Obviously, tracking his credit card use could have given the authorities a wealth of information about his activities without any

risk of breaching the security of the investigation, yet they never seem to have
conducted such an analysis before the wiretaps were approved.

6.    <u>Bribery attempt</u>: In the Joint Motion filed by the Defense on February 2,
2009 there is a discussion about certain false statements contained in the
Government's affidavit concerning a supposed attempt to bribe a police officer who had
seized $287,210 from Ayla Jarvis in Indiana.  According to the Government's Affidavit
Mr. Reid supposedly offered to let the Officer "keep half the money if the other half was
returned."  (Affidavit 1 ¶ 54.)

In the Joint Motion the defense contended that what Mr. Reid actually did was to
offer a compromise settlement, donating $25,000 to a fund for State Troopers, rather
than giving $143,605 directly to the trooper, as the Government told the issuing Court in
its sworn affidavit.  The defense version of these events has now been confirmed by the
testimony of the Government's own case agent at the **James** hearing in this case.
During that hearing Agt. Stark testified that Mr. Reid stated that he had spoken with an
attorney and suggested that they enter into a "compromising" agreement wherein
$25,000 would go to a trooper fund, and specifically stated that "This was not a bribe."
(R.T. 4/1/09 at 28-29.)  Forfeiture cases are commonly settled, particularly state cases,
by means of a compromise.  Thus, the argument that the Defense made in the initial
motion has been factually confirmed by the Government's own witness.

7.    <u>Potential use of Donald Trujillo</u>: In the Joint Motion there is a discussion
concerning the fact that the Government could have used its resources to turn Donald

Trujillo into an informant before resorting to a wiretap.  (Joint Motion filed 2/2/09 at 39-

40.)  That discussion is hereby supplemented by the fact that it is clear from the record

that, although Mr. Trujillo (the alleged "right-hand man" of Dana Jarvis) did have a falling

out with Mr. Jarvis, he nevertheless got back within Mr. Jarvis' good graces before the

wiretap commenced, as evidenced by the fact that he was arrested in Nebraska with

205 pounds of Mr. Jarvis' marijuana.  (Affidavit 4 at ¶ 79.)  Yet, the Government never

tried to use him as a source before obtaining wiretap authorization.  Moreover, even

after he started to work for them as an informant after the wiretap had begun, they

never used him proactively to set up a deal with Mr. Jarvis.  After Mr. Trujillo started

cooperating on May 20, 2005 the Government's necessity for any more wire

interceptions was drastically reduced, yet the Government continued to wiretap this

group through August of 2005.  A *Franks* hearing can provide answers to the question

of what Trujillo did and could have done for the Government, and the relevant points in

time.


### C. THE GOVERNMENT FAILED TO INTERVIEW A POTENTIAL SOURCE, WHO COULD HAVE GIVEN INFORMATION ABOUT THE GROUP'S MOVEMENTS.

The Government's disclosure makes it clear that the agents knew that Mr. Jarvis'

aircraft occasionally landed in the small town of Minden, Nevada.  (Exh. F at ¶¶ 74,

108.)  As Ms. Doucette's affidavit notes, in Minden there was a potential source of

information, Ms. Julie Sutton Laughton.  (*Id.*)  Ms. Laughton is a friend of Mr. Reid, and

her husband is a police officer.  (*Id.* at ¶ 108.)  At the very least Ms. Laughton's husband

should have been interviewed by the DEA.[10]  (*See* Exh. F at ¶ 108.)  If the Government

truly believed that Mr. Reid was a member of this conspiracy then Ms. Sutton, or her

husband, could have been moles with access into the Jarvis DTO, if the Government

had bothered to follow up on information that was in its possession.  Thus, in this way

the Government again failed to utilize ordinary investigative resources at its disposal,

and failed to provide the issuing Court with a full and complete statement concerning

that failure, in contravention of its duty under 18 U.S.C. § 2518.


### D.    THE AFFIDAVITS ARE REPLETE WITH THE AGENT'S INTERPRETATION, SPECULATION, AND SURMISE, AS OPPOSED TO UNADORNED STATEMENTS OF OBSERVED FACT.

SA Stark falsely stated to the Court that "[t]he following investigative techniques,

which are usually employed in the investigation of this type of criminal case, have been

tried and failed, reasonably appear to be unlikely to succeed if they are tried, or are too

dangerous to employ, as detailed in the paragraphs below."   (*See, e.g.,* Affidavit 1 at ¶

72.)  The implication that traditional investigative techniques would have somehow

endangered law enforcement officers is utterly false.  In all of the arrests in this case,

there was not a single case of resisting arrest.  There were no guns used anywhere in

this case.  There was no violence in this case.  This was a loose-knit, rag-tag collection

of "pot-heads" and aging hippies more or less centered around Dana Jarvis, that sold

marijuana and delivered it to places in the Midwest and East Coast.  It was not a gang,

---

[10]  The defense is unable to locate any document in the disclosure indicating that Sutton or her husband were contacted and interviewed by the DEA, or its surrogates. (*See* Exh. F at ¶ 110.)  A ***Franks*** hearing can provide more information.

cartel or mafia-style group; there was no violence.  (Exh. G at ¶ 12.)  These individuals broke the law by selling marijuana and laundering money, but they were not a threatening or violent lot.  Any suggestion that traditional investigative techniques were dangerous in this case is completely false and is but the oft-mouthed Government boilerplate.

There are numerous other example of this kind of boilerplate, conclusory language in the affidavits supporting the conclusion that wiretaps were the only way to disrupt and prosecute these individuals.  *See* Affidavit of Suzane Doucette submitted as Exhibit B to Defendants' Joint Motion to Suppress filed 2/2/09 at ¶¶19-37. In fact. however, the defense has shown repeatedly that in this case the Government had at its disposal a plethora of normal, traditional, cost-effective, safe, and potentially fruitful investigative techniques that were under-utilized or simply ignored in favor of electronic surveillance.

Moreover, these kinds of vague generalities about traditional investigative techniques are precisely the "boilerplate assertions" that are "unsupported by specific facts relevant to the particular circumstances of this case" and so disfavored by Courts. **Blackmon**, 273 F.3d at 1210-11 (citing **United States v. Kalustian**, 529 F.2d 585, 588-59 (9th Cir. 1976)) .The Government's unsupported boilerplate generalities cannot meet the Tenth Circuit's requirement of close scrutiny and exacting compliance with the statutory requirements of Title III.  *See **United States v. Castillo-Garcia***, 117 F.3d 1179, 1185 (10th Cir. 1997), *rev'd on other grounds in **United States v. Ramirez-Encarnacion***, 291 F.3d 1219, 1222 (10th Cir. 2002) ("Strict adherence to [statutory] procedural steps is a prerequisite to issuance of a wiretap order."); *see also **Kalustian***,

-33-

529 F.2d at 589 ("[U]tmost scrutiny must be exercised to determine whether wiretap orders conform to Title III."); *Gonzalez, Inc.*, 412 F.3d at 1112 ("To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity.").  As the Tenth Circuit has stated, "[T]he purpose of the necessity requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997).  The inclusion of these kinds of boilerplate conclusions further justifies the suppression requested in this case.

### E.    THE GOVERNMENT DID NOT INCLUDE A FULL AND COMPLETE STATEMENT REGARDING ITS ABILITY TO TRACK MR. JARVIS' AIRPLANE.

The Government, in its initial affidavit, told the issuing Court about one instance in which it was able to track Mr. Jarvis' aircraft.  (Affidavit 1 at ¶ 53.)  To the uninformed reader the description makes it seem that this was an uncommon and one-time occurrence.  (*Id.*)  In fact, however, the Government had a far greater ability to track that aircraft than the issuing Court was told.  Agt. Stark disclosed in the *James* hearing that the Government had in fact placed a "lookout" on this aircraft, a fact not disclosed in the affidavit.  As a result of this "lookout," the Customs Service Air/Marine Operation Center would notify Agt. Stark whenever the aircraft was leaving, and tell him where it was going.  (R.T. 4/1/09 at 24.)  As a result the agents were able to track this aircraft approximately 16 times, and in some instances beat it to its destination by flying in a jet,

and so being on hand to monitor its arrival.  (Exh. F at ¶¶ 76, 97.)

In addition, the Government had a tracking device installed on the aircraft.  (*Id.* at ¶ 98.)  This was installed several months ***before*** the Government's affidavit in support of the wiretap was filed, and gave the Government even more ability to track this airplane.  (*Id.*)  Yet, the issuing Court was never informed of this fact.  Consequently, it is clear that the Government did not make a "a full and complete statement as to whether or not other investigative procedures have been tried and failed," as required by 18 U.S.C. § 2518(1)(c).  Instead, there was a deliberate, or at least reckless, omission of a fact that was material to the issuing Court's decision.  Accordingly, the Court should suppress the fruits of these wire interceptions.

### F.    THE CASE AGENT FAILED TO FULFILL THE GOVERNMENT'S DUTY TO PRESENT TO THE ISSUING COURT A FULL AND COMPLETE STATEMENT REGARDING THE DEA'S INVESTIGATIONS INTO THIS GROUP.

As previously stated, any wiretap application mush contain a "a full and complete statement as to whether or not other investigative procedures have been tried . . .."  18 U.S.C. §§ 2518(c).   The ***James*** hearing conducted in this case last month shows that this requirement was not met in this case because there were at least two investigations being conducted into this group by other agents that were not disclosed in the Government's affidavits.

During the ***James*** hearing Agt. Stark was asked whether Mr. Hill had ever been the subject of a pretext stop in Indiana based on his activities in this case.  (RT 4/1/09 at 74-75.)  Agt. Stark replied that Mr. Hill was stopped by "a trooper omission the direction

of DEA agents.  And <u>DEA started two cases, one on Greg Hill to wall things off, and</u> <u>also to establish a case on Ayla Jarvis</u>."  (*Id.* at 75.)  The fact that there were two "walled-off" investigations that occurred in Indiana was never disclosed to the issuing Court.  Nor were the sources, methods, successes, failures and information derived therefrom ever disclosed to the Court.

Similarly, there was an investigation opened in Tucson that Agt. Stark apparently did not bother to familiarize himself with:

> Q.      (By Ms. Sirignano) So for clarification, Agent Stark, did Tucson
> have an open investigation pre-wiretap in Tucson?
>
> A.      I don't know the exact date that they opened their case.  It could
> have been right after the wiretap was initiated; it could have been just prior
> to.

(RT 4/1/09 at 109-10.)  What the disclosure does show is that as early as 2002 DEA Special Agent Hella learned as the result of a subpoena that Todd Ward was a utility subscriber for that address.  (Exh. F at ¶ 25.)  Exactly when the Tucson investigation was opened is still unclear.  It entirely possible that there was a significant amount of information uncovered that has not yet been disclosed; a ***Franks*** hearing is needed to clear that up.  What is amazing, however, is that the Government's own case agent does not seem to know the details of the Tucson investigation into this group.  The Government cannot simply remain wilfully blind to information regarding its investigation, and thereby fail to inform the issuing Court of that information.  The law requires a "full and complete" statement, of what investigatory steps have been tried, and strict compliance with statutory mandates and close scrutiny of wiretap orders is necessary.  *See **United States v. Castillo-Garcia***, 117 F.3d 1179, 1185 (10th Cir.

1997), *rev'd on other grounds in* **United States v. Ramirez-Encarnacion**, 291 F.3d 1219, 1222 (10th Cir. 2002) ("Strict adherence to [statutory] procedural steps is a prerequisite to issuance of a wiretap order."); *see also* **Kalustian**, 529 F.2d at 589(The "utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III."). Applying such scrutiny, this application cannot be said to conform to the legal requirements.

## III.    CONCLUSION

For the reasons set forth in the Defendants' Joint Motion to Suppress the Fruits of Title III Wiretaps filed February 2, 2009, as well as those set forth herein, Mr. Reid and Mr. Hill respectfully move this Honorable Court to suppress all evidence obtained from the wiretaps that were conducted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510-22, and in violation of the Fourth Amendment to the United States Constitution. The six wiretaps conducted by the Government from March 2005 through September 2005 violate 18 U.S.C. § 2518 because there was no necessity for the highly-invasive wiretaps of private telephone conversations when less-invasive, fruitful and cost-effective investigative tools could have been, but inexplicably were not, tried in good faith. Section 2518(10)(a) mandates suppression of the fruit of these wiretaps as the remedy for these statutory violations. The six affidavits filed by Special Agent Richard Stark are riddled with material falsehoods, omissions, and misleading statements. Even when these are corrected, the affidavits fail to support the authorizing Judge's wiretap orders.

Mr. Reid and Mr. Hill also respectfully request that this Court set an evidentiary hearing pursuant to ***Franks v. Delaware***, 438 U.S. 154 (1978).  A ***Franks*** hearing is required in light of the substantial showing made by the Defendants in their February 2, 2009 filing, and in this supplement.

Electronically filed

_____/s/_____    _____/s/_____
Walter Nash, for Defendant Reid    William J. Kirchner for Defendant Reid
P.O. Box 2310    P.O. Box 2310
Tucson, Arizona 85702    Tucson, Arizona 85702
(520) 792-1613    (520) 792-1613

_____/s/_____
Billy R. Blackburn for Defendant Hill
1011 Lomas NW
Albuquerque, New Mexico   87102

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of May, 2009, I filed the foregoing

electronically through the CM/ECF system, which caused all counsel to be served

by electronic means, as more fully reflected on the Notice of Electronic filing.

<u>Electronically filed</u>

Walter Nash