## AFFIDAVIT OF SUZANE DOUCETTE

STATE OF ARIZONA

COUNTY OF PIMA

I, Suzane Doucette, being duly sworn, depose and say as follows:

¶1. On February 2, 2009, I submitted an affidavit to this Court in support of a Motion Joint Motion to Suppress the Fruit of Title III Wiretaps, Exhibit "B" on behalf of Defendant David Reid. That affidavit is fully incorporated herein by reference. The following represents additional information that I have learned from additional review of documents and other investigation during the interim period. Again, this affidavit is based exclusively upon information made available to me, as well as the minimal amount of investigation that I was able to conduct. The Government may have additional information in its possession that either it has not released or that I have not seen in this matter. Additionally, the disclosure was received in a format that was extremely difficult to search and organize. Parts of the reports I have reviewed were heavily redacted. I understand there may also be sealed records that I have not seen. I have conducted hand searches and computer searches of the documents provided by the Government, but it is impossible to tell if there is additional information that may have assisted me in the review of this wiretap. As this Court may recall, a list of missing pages and documents within the disclosure was provided to the Government with a request that the Government supply the missing pages. According to the computer discovery expert, Mr. Demarest, the Government never provided any of the missing pages or documents. Additionally, I assisted defense counsel in preparing disclosure requests to obtain information that I routinely require to conduct a complete and fair wiretap review, but the Government has not provided any additional information.

¶2. Some investigation that the Government describes as surveillance were also summarized under such captions as "telephone subscriber information." Therefore, I cannot possibly ascertain that I have found all of the surveillances, although I did search repeatedly to find more surveillance activity. However, even under these circumstances, I have attempted to find every piece of information that I need to conduct an impartial review, but given the state of the disclosure, it is impossible to tell if I missed information or even if that information was provided in complete, readable

form to the defense. Therefore, I respectfully request that the Honorable Court consider the fact that I can only opine upon information that I have reviewed and/or have available for my review. Thus, my opinion is based solely upon information that I have been able to review at this time. It is impossible for me to know if I have found every reference to surveillance. I have tried, utilizing the resources available to me, to ensure that I have viewed and summarized as many documents as possible. Thus, any opinion provided herein is conditioned upon the above described circumstances and restraints.

¶3. There were investigations in Tucson, Arizona, and Indiana. Because these investigations, along with any others not yet disclosed, are part of a single, lengthy conspiracy, it is impossible to opine fully upon the wiretap without a review of the sources of information (SOI, CS, CW, CWD; all sources of information by any moniker). One of the initial steps in any review of a wiretap is to attempt to discover if all sources of information were revealed to the issuing court. Only this Court is able to determine through a hearing, whether the Government disclosed to the issuing court all of its sources of information. In my experience, training, and education, where there are separate investigations in numerous states, the Government may have had additional sources of information (by any name.) Further, other offices may have conducted extensive investigation into segments of this conspiracy that the issuing court may have wished to consider before granting the Government's applications for permission to conduct wiretap surveillance. However, even though this Court and the defense are aware of separate investigations aimed at this single conspiracy, it appears that complete disclosure was not received or in the alternative, I did not have access to or could not find everything. Therefore, disclosure and review of referenced investigations and sources may be required before I am able to conduct a complete review of the wiretap. Once again, please consider that my opinion is based solely upon the documents that I could find with many searches.

¶4. The following is a supplement to Attachment "1" in support of the premise that the Government did not fully attempt traditional (non-wiretap) investigative techniques in good faith prior to its applications for numerous wiretaps in this case:

**Surveillance:**

2

After a review of DEA 6s describing the pre-wiretap surveillance efforts in the case, it appears as the Government failed to utilize the surveillance opportunities at its disposal. The Affiant stated, "[A]gents have followed the TARGETS in an effort to identify their criminal associates and times and places of drug transactions, but those efforts have been fruitless." Government's Affidavit ¶75. The Government avers that "drug traffickers. . .often making exchanges of money and/or drug proceeds within residences or businesses. . ." Id. The Government also avers, "many of the primary locations suspected as being marijuana "stash house" locations, or money transfer locations are in rural areas very difficult to watch without being observed." Id. Therefore, I have attempted to keep my review of surveillance activities primarily focused on the targets' residences and stash house/money transfer locations. Only activities claimed as "surveillance" initiated after 4/11/2002 are included herein, as that is the date the DEA advised that it formally opened its investigation. The following observations supplement Attachment "1." It is impossible despite numerous efforts to prove the negative - or that information other than that which I reviewed existed.[1]

¶6. According to the DEA 6, this case was initiated upon information from a Tucson source that Jarvis was importing multi-hundred pounds of marijuana from Mexico and then distributing the marijuana. September 2001 (Bates 3.1)

¶7. On 4/11/2002 DEA Albuquerque initiated its investigation. (Bates 3.1)

**Important Surveillance Locations:**

The following is a supplement to Attachment "1" paragraphs 63-74.

¶8. During the nearly three-year period from 4/11/2002-3/5/05, various Government agencies described the following activities as surveillance at these locations:

¶9. Location 1. **13 Enebro, Santa Fe**

---

[1] Richard Demerast, the CJA appointed computer discovery expert reports that at least 750 pages of documents are missing.

## A. ICE/DHS Reports of Investigation (ROIs):

¶10.  On approximately six (6) occasions, ICE/DHS drove by[2] 13 Enebro, noting vehicles and individuals.  Each drive by was conducted by a single agent.
Note:  The ICE/DHS case title is redacted on most ROIs, but on one non-redacted ICE/DHS ROI the title of the ICE case is "Jude Austin."

¶11.  *OPINION:*  Among the above drive-bys, there may have been missed opportunities as the vehicles present were registered to targets or potential targets of the investigation.  As one example, vehicles registered to Montoya, Belian, and Abeyta were present during a single drive-by.  However, no surveillance team was organized to attempt to follow any of these targets or discover if illegal activities could be observed.  A single agent spending mere minutes at or driving by a location, while helpful, is not a real attempt at professional surveillance. [3]   One agent spending even thirty minutes at a location is not professional surveillance.

¶ 12.  On approximately one occasion, a solitary DHS/ICE agent conducted multiple drive-bys during a 45-minute period observing vehicles and individuals.  The report seems to reflect that the agent was not present for the 45 minutes at the location, but that the agent drove-by the location multiple times.  The report reflected that the agent did not follow any vehicles or individuals leaving the location.  On approximately one occasion, the ICE agent may have remained near the location for about 35 minutes.  The report reflected that the agent did not follow any vehicles or individuals leaving the location.

## B. DEA 6s

¶ 13.  On approximately two occasions, a team of two DEA agents or some combination of two federal agents drove by the location and observed vehicles including Montoya's, but did not attempt to "follow" any vehicle, nor did they spend enough time at the location for the efforts to be considered as fixed location surveillance.

---

[2] The term "drive-by" may be used interchangeably with "spot check," but herein I try to use the term "drive-by."

[3]  I am using the term, "professional surveillance," as a term of art.  See Attachment "A" ¶67.

¶14. OPINION: There may have been at least one missed opportunity for the surveillance of targets of the investigation based upon the above agent drive-bys at this location. On this occasion, the targets' vehicles are observed at the location, but no organized stationary or moving surveillance is then conducted to collect further information or evidence. From the reporting, it appears as if the two agents were in the same vehicle, although the report does not specifically state the number of vehicles used.

¶ 15. "Surveillance" at 13 Enebro over a period of nearly three years consisted of approximately less than two hours. There was no attempt at fixed location surveillance, utilizing a pole camera,[4] a lookout, or some other type of fixed location, other than the single ICE/DHS 35 minute observation.[5] During this period, I was not able to find any references to moving or professional surveillances. The Government did not attempt aerial surveillance utilizing an organized team. I have visited this location and have found it susceptible to surveillance.

## ¶ 16. Location 2. 1440 Calle Cielo Vista, Bernalillo

### A. ICE/DHS ROI

¶ 17. On approximately three occasions, one ICE agent drove by and observed vehicles. On one occasion, several vehicles were present, including vehicles owned by Vasquez and a vehicle with a license plate from the country of Mexico.

¶ 18. *OPINION*: One of the stated goals of the wiretap was to identify and prosecute the sources of supply from Mexico. The Government failed to exploit this opportunity by conducting surveillance of the vehicle to observe and photograph the driver and passengers, as well as to follow the vehicle to identify contacts, activities or possible evidence of illegal activity. There were vehicles from several states present.

---

[4] A "pole camera" is device commonly utilized by the authorities in investigations of this kind. It consists of a camera placed in a location with a view of the area the Government wishes to surveil. They are often placed in canisters that appear to be ordinary transformers on power poles. Their use does not require a court order, provides continuous surveillance, allows recording of what is seen and creates little risk of detection. Some set-ups allow remote control of the camera from off-site, permitting an operator to zoom only or sometimes zoom and pan on areas of importance.

[5] Fixed surveillance is a term of art. Based upon my training, education, and experience, it is a stationary surveillance, but consists of several days or at the very least several hours of observing a single location.

## B. DEA 6s

¶19. On approximately one occasion, one ICE agent drove by and recorded the license plate of an abandoned vehicle. Although reflecting ICE activity, the report was prepared by SA Stark and signed three months later.

¶20. On approximately four occasions, a team of two federal agents drove by the location observing vehicles and individuals. On one of these two occasions, two agents spent 20-30 minutes observing two locations on this block.

¶21. OPINION: During the nearly three-year period, approximately 80-100 minutes were spent conducting drive by observations. There was no attempt at fixed location surveillance, utilizing a pole camera, a lookout, or some other type of fixed location. During this period, there were no professional surveillances. The Government did not attempt aerial surveillance, nor did it ever attempt surveillance utilizing an organized team. I have visited this location and have found it susceptible to surveillance.

## ¶22. 3. Lazy Be Place, Tucson, Arizona

¶23. No surveillance of any type is attempted prior to wiretap affidavit.[6]

¶24. Please see below relevant information about this address:

¶25. On 5/23/02 SA Hella (DEA-Tucson) drives by a location looking for the Joe Martin residence. Subsequently, he obtains information from a subpoena that as of March, 2001, Todd Ward was a utility subscriber at 9160 S. Lazy Be Place, Tucson, Arizona. (Report signed by SA Hella on 7/15/02, copy provided to SA Stark on 7/18/02.)

¶26. OPINION: The above information is significant because by the date of SA Hella's report, the Affiant is aware that Dana Jarvis (the head of the Jarvis DTO) is utilizing Todd Ward as an alias. (Bates 3.522.) No surveillance of this location, utilized by the head of the Jarvis DTO, was conducted prior to the initiation of the wiretap. No pole camera was installed. In my opinion, if the Government had conducted even minimal

---

[6] Again, if there were efforts made, numerous computer and hand searches could find no record or report reflecting surveillance.

6

surveillance, or pole camera surveillance at this location, the Government may have discovered that this location was a major transfer/wrapping station for marijuana coming from Mexico.

¶27. Further, a Governmental goal of the wiretap was to discover the source(s) of supply from Mexico. The Lazy Be address reflected that the main target is utilizing a trailer in a rural location, where a utility is listed in the main target's (Jarvis) *alias*. Tucson is close to Mexico. The trailer is in the general location of other stash houses previously discovered in the area. The trailer is by Ryan Field and allows easy access to routes from Mexico, such as the route through Sells, a known route for the transportation of marijuana from Mexico into the United States. The Affiant served the DEA in the Tucson area for several years and was surely aware of the significance of this location. It is difficult for me to imagine a decision making process where the Government would decide against conducting several fully-staffed surveillances at this location. At the very least, if feasible, a pole camera would have provided information on the comings and goings of high-ranking members of the DTO, such as Dana Jarvis and Jorge Moffit Ortiz, a source of supply. It is possible that a pole camera or other surveillance method could have even photographed bales of marijuana in transit.

¶28. Subsequent to the initiation of the wiretap, the Government was able to conduct successful surveillance at this location. On June 5, 2006, the Affiant took photographs of the location, but this was after the wiretap was up and running. (Bates 3.804) For further reference, please see the following documents: 3.949-3.955; 9.12.1-9.12.21; 9.07.01-9.07.25; 3.492-3.662.

### ¶29. Location4. 3 Dovela

#### ICE/DHS ROI:

¶30. On approximately one occasion, an ICE agent drove by the location and observed vehicle.

¶31. OPINION: I have visited this location and found it to be susceptible to professional surveillance efforts. Note: I cannot understand why the disclosure contains no further surveillance at this location. It appears the Government may have spent less than 10 minutes on this effort.

### ¶32. Location 5.  28 Quail Run

#### DEA 6s

¶33. On approximately one occasion, two DEA agents drove by the location and observed a vehicle.  During this same surveillance, the agents drove by several addresses, primarily observing license plates.

¶34. On approximately 10/22/04, four DEA agents conducted fruitful surveillance for the afternoon.  (Previously detailed as an example of successful surveillance in Attachment "1.")[7]

¶35. OPINION:  Although the 10/22 surveillance was an example of a fruitful surveillance, the DEA agents arrived too late to intercept the marijuana.  As stated in my previous affidavit, the agents were close to observing criminal activity so it would seem to make sense to continue surveillance at this location, but this is the last pre-wire surveillance conducted at this stash house location.

¶36. "Agents have followed the TARGETS in an effort to identify their criminal associates and times and places of drug transactions, but those efforts have been fruitless.  The TARGETS have been observed meeting with individuals and entering residences and businesses, but there has been no overt activity observed that suggested "criminal" activity was occurring.  However, based upon my training and experience, I am not surprised that agents have been unable to observe any criminal activity."  Government's Affidavit ¶75.

¶37. The agent further states, "from July 2002-February 2005, agents conducting *intermittent* surveillances of JARVIS listed residences at 13 Enebro, 1440 Cielo Vista, Eileen FITZGERALD's residence at 3 Dovela, and at Cathy FITZGERALD's house at 28 Quail Run *did not observe any criminal activity that would provide evidence toward accomplishing the objectives of this investigation.*"  Government's Affidavit ¶ 76.

¶38. In my opinion, the above averments to the issuing court are misleading because the 3 Dovela address was not surveilled intermittently.  The agents

---

[7] SA McClung is a pilot and participated in this surveillance, but the report does not contain any reference to aerial support.

drove by the location once. Once drive by in three years is not intermittent by my definition. The statements regarding the frequency of the so-called surveillances are misleading because the investigation proceeded over a nearly three-year period. Quail run was driven by once and surveilled one. Two surveillances over a three-year period is not intermittent by my definition of the word. At 1440 Calle Cielo Vista, the Government drove-by approximately on eight occasions over a three-year period or not quite twice per year.

¶39. I once again visited the location at 28 Quail Run. The trailer that was previously located on the property is now gone. However, even with the trailer present, the property might have been easily observed by a pole camera. Milton Rodriquez and I located power poles and a perfectly located power box on a hill above the location. In my opinion, movement of bales of marijuana might have been observable from a pole cam at any of the locations. Attachment "1" to this affidavit consists of photographs of the Quail Run location and photographs looking into the property from the power box and the power pole. We did not climb up on the pole or box, so the pole camera view would be better than the photographs suggest.

¶40. In my opinion, this is the perfect location for a pole cam. Perhaps, the Government has an excuse for this failure to conduct investigation, but at this time I cannot think of any possible reason for not using this inexpensive and frequently successful technique. (Please see my previous affidavit for further discussion.) I conducted numerous searches for any documentation that the Government had conducted a pole cam investigation and did not find any documentation. However, it is impossible to prove the negative, so the Government may have conducted such an investigation, but if it did, its affiant should have informed the issuing court in his investigation.

### ¶41. Location 6. 5 Lauro Road, Santa Fe

¶42. No surveillance was apparently conducted prior to the wiretap affidavit.

¶43. After extensive computer searches conducted by the defense discovery expert, Richard Demarest, and me, I found no surveillances conducted at this location prior to the wiretap.

¶44. I conducted extensive hand-searches of defense printed versions of the discovery and found no surveillances conducted at this location prior to the wiretap. The Government may have conducted surveillance, but I certainly could find no such record.

¶45. OPINION: I have personally visited this location in the El Dorado sub-division and found it to be susceptible to surveillances, fixed and moving. Further, there are excellent choke points, and a team of agents with aerial support would probably be successful. In ¶42 of the Government's first affidavit, the Affiant discusses the relationship between Dana Jarvis and Barbara Hanna, the owner of this rental property. A CS told the Government "the 5 Lauro Road property was used to re-package and ship bulk marijuana as well as receive bulk cash from couriers." Government's First Affidavit at ¶42.

## ¶46. Location 7. 1013 Camino Carlos Rey, Santa Fe

### DEA-6s

¶47. On approximately one occasion, two DEA agents drove by this location and observed vehicles.

¶48. This is the location of the "red van" more fully described in my previous affidavit. Mr. Demerast and I have both searched for references to the license plate number of the red van and found no other surveillances of this van or this location.

¶49. OPINION: I have visited this location, and believe that it is a relatively easy location to place a pole camera and conduct professional surveillance. The Government placed significance upon the "red van" at this location because CS-3 stated the van was equipped with night vision equipment and that a money counter for the DTO resided at this location. See my previous affidavit.

## ¶50. Location 8. 639 Kinley

### ICE/DHS ROI:

¶51. On approximately two occasions, one agent drives by observing vehicles and workers.

### DEA 6s

¶52. On approximately two occasions, one DEA agent drives by location and observe vehicles. One vehicle belonged to a neighbor of the Cielo Vista address.

¶53. Opinion: This was the residence of Dakota Fitzner, a close associate of Dana Jarvis and target of the Government's investigation. Over a period of three years, approximately four drive-bys were completed. I have visited this location and found it to be susceptible to surveillance.

### ¶54. Location 9. 10604 Calle del Elena, Corrales

¶55. After conducting numerous searches, I was unable to locate any surveillance at this location. This location is described as the residence of Jude Austin, a target of this investigation.

### ¶55. Location 10. 551 W. Cordova

¶56. Location of mailboxes, including one for Dana Jarvis.

¶57. After numerous searches, I could find no record of surveillance of this location. Additionally, I saw no evidence of a "mail cover"[8] ordered for these mailboxes. The mail cover might help establish if the mailboxes were utilized for some type of drops, and possibly provide addresses of banks, credit card companies, utility companies, and individuals who may have been communicating with the targets. This technique, if successful, could also be combined with subpoenas to discover if the DTO had additional properties for which it was receiving utility bills, even if the bills arrived under new alias identities. The Government may have discovered whether credit card bills were being received, either in true name or in alias.

¶58. To my knowledge, although the subscribers to the mailboxes were known, no mail cover was conducted.

---

[8] A mail cover is a court order provided to the Postal Inspector to obtain photocopies of the front and back outer envelope or both sides of a post card. This technique is common, easily done and does not risk blowback.

**¶59. Surveillance of additional locations:**

¶60. 2924 Santa Cruz; approximately three drive-bys were conducted by one DEA Agent.

¶61. 1019 Camino del Pueblo, Bernalillo

¶62. On approximately one occasion, one agent drove by the location. Reports redacted.

¶63. 2710 Vereda Rodiado

¶64. The Rodiado address is described as Donald Trujillo's residence. On approximately two or three occasions, two DEA agents conducted drive-bys at this location. However, reports regarding surveillance are redacted, so additional information may be present. No pole camera was utilized

¶65. Note: See below: one moving surveillance of Donald Trujillo of 30-40 minutes is reported under CS surveillances.

¶66. OPINION: Donald Trujillo was a major target of the investigation. It is odd that such minimal investigation at this location was conducted over a period of nearly three years. However, there seems to be some redaction of documents. Additionally, ¶57 of the Government's Affidavit reflects a recorded phone call between CS-3 and Mr. Trujillo. At the time of this phone call, Mr. Trujillo was holding a load of marijuana at his residence. Government's Affidavit ¶58.

¶67. On approximately 2/11/05, the Affiant conducts surveillance at the La Posada Hotel for approximately 30 minutes. From the report, it appears that he is alone and is in a fixed location where he can observe activity at the loading zone area. He conducts a fruitful surveillance observing Ayla Jarvis and Melania Kirwin.

¶68. OPINION: It is unknown why only one agent was attempting to conduct a surveillance. If the agent had hoped to follow or identify individuals that met with the targets, it would be nearly impossible to do successfully with only one agent.

¶69. There was a single minimal drive by surveillance at two additional locations.

## ¶70. **SURVEILLANCE BY OTHER FIELD DIVISIONS**:

¶71. 4/8/2002 Tucson SA Hella and Griffin attempt to locate Joseph Martin's residence in the 13400 block of Woodwalker Lane.

¶72. 12/15/04 ICE RAC in Columbus, Ohio, conducts fruitful surveillance after the Jarvis aircraft arrives.

¶73. A professional surveillance was conducted on this date when the Jarvis aircraft arrives at Lane Aviation at 11:35 a.m. Prior to that time, ICE/RAC Columbus deployed two teams to the two private aircraft service providers to ensure coverage at both locations. The agents overheard conversations and interviewed Lane Aviation personnel. The agents determined that a rental vehicle was obtained and followed the vehicle for several miles until they lost the vehicle. However, the agents had overheard conversation that the targets were going to the Columbus Convention Center. They proceeded to the Convention Center and re-initiated the surveillance after the discovery of the vehicle.

¶74. On 1/14/2004, Affiant was advised by the Customs Service Air/Marine Operations Center (AMOC) that the Jarvis plane had lifted off from Casa Grande, AZ en-route to Minden, NV. At 5:58,S/A Rossi, DEA Reno, observed the Jarvis aircraft land at the Minden airport. S/A Rossi observed a man, believed to be Mr. Reid exit the aircraft. At 6:19 p.m., a vehicle picks up Mr. Reid. The next paragraph (paragraph 4) of the report is redacted. At 7:00 p.m., the surveillance was terminated. This report was prepared by the Affiant on 2/ 7/2005.

¶75. SA Rossi and her team conducted successful surveillance of David Reid upon his arrival at Minden, NV.

¶76. 10/27-29/2004 The Affiant was advised by AMOC that the Jarvis plane was going to Oklahoma. USCS flew the Affiant to Oklahoma arriving prior to the Jarvis plane where he coordinated surveillance by Oklahoma law enforcement. The Affiant was able to overhear conversations. Other agents overheard Reid asking to utilize a telephone to make reservations. A flight

plan was filed for Indianapolis. The surveillance was terminated at 10:10p.m. From the report it appears that Affiant did not continue to Indianapolis.

¶77. The Affiant contacts the Indianapolis division to advise them that Ayla Jarvis would be meeting Greg Hill to pick up a large sum of U.S. currency. The Affiant had placed a flight watch on Mr. Jarvis' aircraft. Because of this flight watch, the Affiance received information about the aircraft from Immigration and Customs Enforcement Flight Control Center in California. (AMOC) At 11:35 a.m., the AMOC advised S/A Steele (Indianapolis) that the aircraft was 50 miles out. (The pilot had also filed a flight plan.)

¶78. I would like to point out the contrast between the Government's surveillances in New Mexico up until this date with the surveillance conducted by Indianapolis on short notice. The Indianapolis Division initiated surveillance with approximately eight agents as follows:

¶79. *** (formatting issue with word processing program)

¶80. 2:16 p.m. Jarvis aircraft arrives. The surveillance team (hereinafter "team") observes the pilot and Ayla Jarvis. The team observes Ayla Jarvis enter a green Dodge minivan.

¶81. 2:37 p.m. The team follows Jarvis to Cracker Barrel restaurant. Jarvis is observed in her vehicle for six minutes.

¶82. TFO Buchman enters the restaurant to observe Ayla Jarvis. She was observed sitting alone.

¶83. 3:00 p.m. Buchman exits the restaurant and observes a vehicle next to Jarvis' car. The vehicle is registered to Greg Hill. Buchman observes Hill. Buchman then observes Hill and Ayla Jarvis conversing.

¶84. 3:32 p.m. The team observes Jarvis and Hill exit the restaurant and walk to vehicles. Some activity is observed between their two vehicles— perhaps getting something from the car. At this point, the surveillance team discontinues its surveillance of Hill and stays with Ayla Jarvis. Ayla Jarvis heads back to the airport and a decision was made to conduct a traffic stop. (This may also be called a "pretext" stop, a "whisper" stop, or simply a "hand-off.")

14

¶85. A marked K-9 unit observes Ayla Jarvis make an illegal u-turn. The unit conducts the stop. Ayla Jarvis gave consent for a K-9 search of her vehicle and the K-9 alerts. Jarvis then tells the trooper that there was a large sum of currency in the vehicle. Ayla Jarvis is then interviewed. The cash (over $200,000.00 is seized) and Ayla Jarvis is released. The trooper was later advised to contact the pilot, Mr. Reid.

¶86. As a further follow-up to this surveillance, S/A Cline went to Hill's residence and was able to observe Hill.

¶87. Prior to the conclusion of the traffic stop, Steele and Buchman re-established surveillance at the airport. During this time, they observed the pilot, Mr. Reid. They overheard conversation between the pilot and a possible mechanic where the pilot states he is trying to sell the airplane. They observed Mr. Reid conducting a lengthy phone conversation on his cell phone.

¶88. At 4:52 p.m. the surveillance was terminated. As a result of this surveillance, the Government was able to discover that Mr. Reid was contacting the state trooper attempting to have Ms. Jarvis' money returned to her. The Indianapolis agents identified Mr. Hill, located his residence and vehicle, tied Mr. Hill to the Jarvis family, and opened a separate investigation into Mr. Hill's alleged illicit activities.

¶89. OPINION: Prior to the initiation of the wiretap, there were no similarly well-staffed, well-executed surveillances conducted in New Mexico or Arizona of any of the numerous Jarvis DTO suspects residences or businesses. The Albuquerque Division never conducted a location-oriented surveillance with more than four agents. Most of the time, they never followed anyone, even when they had information that the Jarvis DTO was conducting illicit business. The Court might note that the Indiana and Ohio surveillances never resulted in any blowback. During a successful surveillance at Quail Run, the Government arrived after the time the drugs were to have been transferred/transported. The disclosure reveals that no Government surveillances were conducted between July 7, 2004 and October 13, 2004.

¶90. 12/15  Surveillance by ICE RAC in Columbus, Ohio.

¶91. On 12/18/2004, the Customs Service Air/Marine Operations Center (AMOC) advised the Affiant that the Jarvis plane had lifted off from Casa Grande, AZ en-route to Minden, NV. At 5:58 S/A Rossi, DEA Reno, observed the Jarvis aircraft land at the Minden airport. S/A Rossi observed a man, believed to be Mr. Reid exit the aircraft. At 6:19 p.m., a vehicle picks up Mr. Reid. The next paragraph (¶ 4) of the report is redacted. At 7:00 p.m. the surveillance was terminated. The Affiant prepared this report on 2/7/2005.

¶92. **SURVEILLANCE OF CONFIDENTIAL SOURCES**: Portions redacted. Locations redacted.

¶93. 10/25/2002  CS meet with Eileen Fitzgerald, location redacted. Approximately three agents conducted surveillance. The meeting was recorded.

¶94. 10/13/04 CS information resulting in surveillance. S/A Stark states that "agents" followed Donald Trujillo for about forty minutes before terminating surveillance. Information redacted. No report was located of the surveillance prepared by the "agents."

¶95. 12/09/04 CS meeting with Dana Jarvis, location redacted. SA Stark and SA Hella cover CS source meet with Dana Jarvis in Santa Fe. The agents never observe Dana Jarvis, but they discuss in detail what they describe as counter-surveillance by two unidentified persons, one of whom they think may be Cathy Fitzgerald. However, on information and belief, Dana Jarvis was not conducting counter-surveillance during this meeting. Jarvis trusted CS-3; the fact that CS-3 had been in Mr. Jarvis' home providing additional evidence of this trust. The difficulty inherent in conducting surveillance with only two agents, is that it then becomes impossible to have other agents follow or photograph (long-range lens) individuals believed to be conducting counter-surveillance for the purpose of full identification.

¶96. TRACKING OF JARVIS AIRCRAFT:

¶97. There were approximately sixteen surveillances tracking the Jarvis aircraft based upon information obtained from AMOC. The Government's Affidavit did not reflect a mention of numerous events where the aircraft was tracked by AMOC. AMOC phoned the Affiant whenever it had

16

knowledge that the aircraft was moving. Some of the surveillance tracking involved actual physical surveillance, but some did not. On some occasions, the targets were observed at the Double Eagle Airport. On a couple of additional occasions, it appeared that some surveillance following individuals who exited the airplane was conducted.

¶98. Despite the fact that AMOC was providing information on the movements of the Jarvis aircraft, on 1/12-13/2005, the Albuquerque DEA conducted numerous hours of surveillance with several agents (eight or so) to allow for the safe placement of a court ordered tracking device on the aircraft. There was no mention of the Court Order for the tracking device in the wiretap affidavit. The tracking of the Jarvis aircraft was pursuant to the installation of a tracking device on the Jarvis aircraft, Customs case number AL02PR02AL001. In my opinion, it would have been important to report this tracking device to the issuing court.

¶99. The above recitation reflects my understanding of the entirety of the Government's efforts at surveillance prior to the initiation of the wiretap and is a supplement to the information that I provided in February of this year. The Albuquerque Division spent at most several hours conducting drive-bys and other forms of surveillance. The Division spent several hours installing the tracking device and some hours apparently following passengers of the plane closer to the time of the initiation of the wiretap.

¶100. In my opinion, the Albuquerque division failed to conduct even one professional surveillance of a residence or the target's business (Club Rhythm and Blues) prior to requesting court authority for a wiretap. There were numerous important locations within the Albuquerque field division where the DEA "knew" from their CS information that illegal activity was occurring. Many of the targets of the wiretap, including high-ranking members of the Jarvis DTO resided in New Mexico. Although the other field divisions were very helpful in conducting surveillance, it would seems to be incumbent upon the Albuquerque DEA to conduct prolonged professional surveillance of its targets before resorting to a wiretap. If the Division could not staff surveillance, then at the least attempts should have been made to install pole cameras where possible. Additionally, in my experience with wiretaps and as an expert witness, the wiretap technique is the most costly and time-consuming investigative technique. If the division could staff a wiretap and the surveillance teams to assist in the wiretap investigation, I find it difficult to imagine that the division was not capable

17

of conducting some professional surveillance prior to resorting to a wiretap.
Subsequent to the initiation of the wiretap, the DEA seems to have
conducted extensive surveillance.

¶101. Based upon the above information, I believe the Government stated it
had conducted surveillance, but in reality, the surveillance technique was not
professionally attempted at target locations, including stash houses. Further,
there is no indication in the disclosure available to me that any consideration
was ever given to a pole camera installation at any of the target locations
addressed herein.

¶102. FINANCIAL INVESTIGATIONS:

The following supplements my previous affidavit, ¶93 and 94.

¶103. On information and belief Dana Jarvis was in financial trouble in
2004-2005 and would have sold drugs to almost anyone with money. The
Government might have been able to exploit this information had it
subpoenaed the financial records of various targets of the Jarvis DTO.[9]  The
Government was aware of the fact that Jarvis' business was failing and he
was having to sell properties. Government's First Affidavit at ¶67.
Additionally, where the Government relies on a confidential source who tells
it that the target was laundering money through the business, a financial
investigation is essential and creates no risk that the underlying criminal
probe will be compromised.

¶104.

Stemming from the Jude Austin and Kara Gold arrest, there may have been
numerous leads not pursued. For example, the discovery disclosed that the
searches subsequent to these arrests netted a paper with bank account
information. The paper revealed a routing number 122000247 and an

---

[9] I conducted both a hand search of financial records and computer searches. Several of the exhibits
consisting of financial records provided to the defense by the Government have no provenance. Certain
bank records should have subpoenas indicating the date the records were requested and received, but there
are no matching subpoenas. As an example, Exhibit 02 is Dana Jarvis' Visa account from the Bank of
America. There is a cover letter dated, November 12, 2005. The first 12 pages of the Visa records and any
accompanying records are missing. It is my understanding that the Government has decided these 12 pages
of the Visa account are privileged. Exhibit 37 has the first seven pages missing. Exhibit 45 (Liquor
license) has the first page missing. Exhibit 61 consists of seven pages of which, six are missing. Many of
the subpoenas that presumably accompanied financial records are missing, further complicating any review
of documents.

account number of 0644234080. Richard Demarest performed a search of all discovery received by the defense to date, and found nothing in the disclosure suggesting that the Government followed up on obtaining a subpoena for these records, or even account holder information.

¶105. Prior to the wiretap, the Government apparently never examined the books of the Club Rhythm and Blues.[10] Working with a liquor license investigator is a technique commonly utilized by law enforcement for LEO to gain access inside a business or to obtain information on the employees or owners of the liquor license. Further, upon information and belief, liquor license investigators working with law enforcement conducted an exhaustive sting undercover operation in Albuquerque, New Mexico, to stop establishments from selling liquor to minors. The undercover operative would enter the establishment with a co-undercover operative who was older. The younger UCA was slightly under the legal age (21), but looked older. He would order alcohol and if the establishment served him, the team would arrest the server/waiter on the spot and place the arrestee in a "paddy" wagon before moving on to the next location for the sting. They would hit several locations in one night. Subsequent investigations were conducted on the establishment. If the Government had pursued this avenue, it might have provided access to the Club's books and employees. A DEA UCA could have participated in this activity at the Jarvis Club without creating any suspicion. Further, when preparing CS2 for a recorded meeting with a target, the DEA utilized the services of a female Special Agent of the IRS (presumably to assist in the placement/retrieval of the recording device). It is my understanding that involving the IRS as an investigating agency comes with the added benefit of access to the tax records of targets suspected of unlawful conduct. Additionally, the DEA may have also utilized highly skilled IRS personnel who would interpret records and conduct important net worth financial investigations. Perhaps the Government was unable to utilize these techniques in its investigation for some unknown reason, but it did not tell the issuing court of any problems or restrictions on conducting financial investigations or utilizing the assistance of liquor license investigation.

¶106. The Government had access to information obtained from the Gold/Austin arrests identifying a travel agent utilized by members of the Jarvis DTO. Richard Demarest performed a search of all available

---

[10] Id.

19

discovery for any follow-up investigation in this matter but there was nothing in the file.

¶107.  As a result, of information obtained during the stop, the Government utilized a contact at Southwest airlines to obtain the flight records for Austin and Gold including information on individuals who had traveled on the same itinerary.  The report dated on 3/5/2002, discusses a cruise taken by Eileen Fitzgerald on March 31, 2002, after the purported date of the report.  This report also references flight information obtained from Southwest airlines on May 13, 2002 (Exhibit N/2) which is over two months after the purported date of the report.  The report by signed on 7/15/2002 by the Affiant and on 7/23/2002 by his supervisor.

¶108.  The Government apparently failed to conduct follow-up investigation regarding the contact made by David Reid in Minden, Nevada. Although the Nevada agent interviewed individuals at/near the airport, there was no investigation or interview of the contact, Julia Laughton. David Reid met with a friend, Julie Sutton Laughton in Minden, where she picked him up at the airport and was followed to her home.  The reports are redacted. However, investigation reveals that Mr. Laughton was employed as a police officer.  Had the Government completed minimal follow-up investigation stemming from the Minden, NV surveillance, it could have interviewed the Laughtons, or at least Mr. Laughton, the police officer.  After a routine background check, it should have been discovered the Mr. Laughton was a police officer and presumably, trustworthy.  Because Mr. Reid did not have any criminal convictions and was not a longtime acquaintance of Dana Jarvis, I believe that he would have been an excellent source of information. Upon information and belief, the Laughtons would have told the Government that David Reid was a trustworthy man who could be utilized by the Government in infiltrating the Jarvis DTO.  For information of the Court, the Minden area is well known among many law enforcement circles as an excellent retirement area because of tax considerations and lifestyle concerns. Minden, for its population, has a high number of retired federal agents, law enforcement, and other state and federal retired officials.  As indicated in my prior affidavit, the Government did not "recruit" sources in this investigation.  All of the sources were volunteers. Government's Affidavit at ¶10, 11, and 12.

¶111.
 CS-3: A review of the drug ledgers reflects continued involvement of CS-3.

¶112. A review of the wiretap transcripts reflects calls between CS-3 and Dana Jarvis. Dana Jarvis called CS-3 (recorded on the wiretap) to ask CS-3 to conduct some work for him, but CS-3 was busy at the time. The Government indicated that CS-3 had left the organization a year prior to the first wiretap affidavit. Government's Affidavit ¶82. Four and a half months prior to drafting the affidavit, on October 22, 2004, CS-3 recorded a call with Mr. Trujillo discussing drug transactions and resulting in DEA surveillance. Due to the recorded conversations (consensual and wiretap) and CS-3's references in the drug ledgers, CS-3 may have been involved with the Jarvis DTO much longer than reported in the Government's Affidavit. The Affiant stated "CS-3 does not currently have immediate access to information regarding JARVIS the organization conspirators and its methods." Government's Affidavit ¶82.

### ¶113. Corrections to my previous affidavit:

¶114. In discussion the Quail Run surveillance I inadvertently did not include the author of the report as a member of the surveillance team. Therefore, the actual number of agents participating should read "four" not "three" as reflected in Attachment 1. See my affidavit, ¶63, ¶73.

¶115. At the end of ¶31 please add the words, "or some variant thereof."

¶116. At ¶32, the Affidavit states "Every DEA affidavit…" The Affidavit should read, "Every boilerplate DEA affidavit…"

¶117. ¶47 reads, "In my opinion the Government. . ." The statement should read, In my opinion where the Government's case is based in part upon information . . ."

¶118. ¶91 reads, "However, the Government never approached Mr. Reid, a professional pilot who had no criminal record." The sentence should read, "However, the Government never approached Mr. Reid, a professional pilot who had no criminal convictions."

¶119. There are typographical errors in the document not corrected herein.

21

Dated this 4 day of May, 2009



Signature of Affiant Suzane Doucette

SUBSCRIBED AND SWORN to before me on this 4th day of May, 2009

Notary Public

My Commission Expires:

OFFICIAL SEAL
CARMEN L. ORTIZ
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. July 17, 2011

22