# AFFIDAVIT

STATE OF NEW MEXICO )
) ss.
COUNTY OF TORRANCE )

I, Dana Jarvis, being duly sworn, depose and say as follows:

I am a Defendant named in United States v. Dana Jarvis et. al, New Mexico District Court Cause no. CR 05-1849 JH. I am filing this Affidavit at the request of Walter Nash and William Kirchner, attorneys for Mr. David Reid, solely to assist the Court in the determination of a pretrial issue. By filing this Affidavit, I am not waiving any applicable right or privilege herein, including my right to remain silent, pursuant to Simmons v. United States, 390 U.S. 377 (1968).

I have reviewed the Government's Affidavit in Support of Wiretap Application in Support of Application for Authorization to Intercept Wire Communications Occurring Over Telephone Number 505-470-1811, dated and filed with the United States District Court, Albuquerque NM on March 3, 2005. The affidavit contains numerous untruths and unfounded assumptions, which are set forth below.

1. Trash run: Pages 35 and 36, concerning the "trash run" say that I "ran out" of my house. That is not true. I did not "run" out of the house. I was already outside, having a cigarette, having just wheeled my trash container to the street side. I was sitting next to the garage and watched this guy pull up in a little pickup truck with about six or seven new trash cans in the back of the truck. I had noticed that this truck, even when dropping another barrel off did not collect anyone else's trash in my neighborhood. I then watched as the driver got out and struggled to put my very full trash can into the back of his truck, and secure the lid with bungee cords. I asked him what he was doing, and he said they were giving out new cans in the neighborhood. I asked him why he only had six or seven containers in his truck for a neighborhood of over 2000 homes. He seemed to get all flustered from that question. His actions also seemed odd because the regular trash truck could be heard right down the street picking up trash. It would have been a lot easier for him to have followed the other truck, letting it empty trash before

picking up the old cans to put in his pickup. It was obvious that something was not right, and for these reasons I told him to put my can back, and asked him for identification. As I wrote down his information, I again questioned his actions. He told me he was just following orders.

2. The Government claims that I mentioned that private investigators were trying to learn "stuff" about me. (Affidavit at paragraph 74.) That is not true. Indeed, the word "stuff" is not even in my vocabulary. I never mentioned private investigators. The Government also claims that I waited for 30 minutes by my trash can. Again, untrue. I waited several minutes until the regular trash collection truck picked up my container. That was the end of the matter. I am sure that they could have easily obtained the trash if they had not made so many obvious mistakes.

3. CS-3 The Government's Affidavit discusses a person they call "CS-3" in considerable detail. This refers to an acquaintance of mine named Damian Vasquez. He was a close friend of Dakota Fitzner, who was like a son to me. Mr. Vasquez was well known in Santa Fe as a cocaine dealer. He was a sophisticated hustler, who dressed well and was usually accompanied by beautiful women. He was smart, he visited my home frequently, and he could have easily done much more for the DEA

4. His parents were wealthy and were giving him a monthly stipend. His cars were in their company name. His house was owned by his family. During the entire time of his involvement with the DEA he was panicked, worried his wealthy family might find out about his coke dealing. The police were aware of his cocaine dealing activities. In addition, it should be noted that when CS-3 said that I had him searched before speaking with him, this was not true.

5. CS-2 was a woman named Lisa, a friend of my ex-wife, Eileen. She lived nearby. Prior to the start of the wiretaps Lisa's boyfriend left her, and she became ill from her job. I felt sorry for her. She was wearing a "wire" when she met with my ex-wife Eileen, and she could have done the same when she met with me.

6. Red Van: I did not use the mentioned red van for any type of surveillance or counter-surveillance. (Affidavit paragraphs 50, 88.) There was never any surveillance equipment installed in the van. The owner of the red van is a friend of mine named Bill. He is a legitimate businessman who has an opal mine in Australia, and sells opals throughout the United States. He used the van to travel to gem shows. When he would go to Australia to obtain opals he would leave the van at my house. The DEA never bothered to check this out.

7. Surveillance, training and searching: The information in the affidavit is false regarding the alleged "training." (affidavit paragraph 49.) I did not ask anyone to conduct tasks so that I could follow them. I never used any type of radio frequency detection device, or any other type of device that would detect a wire. I did not search people or associates, and everybody knew this. If I did not trust someone, I would not talk to them. The mention of enforcers and recruits is pure fantasy.

8. The Blues Club: The Government wrongly implied that I wanted to launder $750,000 a month through this Club. (Affidavit paragraphs 41.) This statement is absurd on its face because I never made anywhere near $750,000 per month. In addition, the income of the club was between $20,000 and $30,000 per month, so it is obvious that it would have been impossible to launder the amount of money alleged by the government through the Club. There was a constant turnover of employees at the club, so I was always hiring, and people with minimal qualifications and experience were often hired. The Government could have easily have placed an agent in the Blues Club.

9. Pilot's License: My daughter Ayla never had a pilot's license, as the affidavit says on page 7. (Affidavit Paragraph 11.)

10. Surveillance:

    a. The Lazy B: Regarding the Lazy B, there are several places nearby where the DEA could have positioned a vehicle out of view from the main street without drawing

any attention from myself or the neighbors and looked directly into the garage.

b. The 1st St. House: There is a house in Albuquerque that the DEA refers to as the First Street House. There were several places nearby where they could have conducted surveillance. License plate numbers and video evidence could have easily been obtained.

c. 1013 Camino Carlos Rey: This was the house of my friend Bill, who owned the red van. The agents could have learned from surveillance that he was a legitimate businessman. They never could have seen vehicles going into a concealed location on the property. The house is right on a main street.

d. 28 Quail Run: I was the owner of this property, but Kathy Fitzgerald lived there. The Government could have observed comings and goings of vehicles.

e. 3 Enebro Road: This was my residence in Santa Fe. Right behind the house is a green belt with a public trail going down the middle of it. From the trail a person could see into the entire back yard and into the house. A short distance up the hill from the trail is a perfect spot for long-term surveillance. There is no fence around the property, so it was easy to approach. For example, they could have an agent pose as a utility man or surveyor, being that it was a new development. There were people around doing such things all of the time.

f. 1440 Cielo Vista: This was my house in Bernalillo. The driveway opened onto the main street. Analysis of the vehicles in the driveway would have been easy. Streets in the neighborhood included spots that would have offered views into both yards and into the house. Followup on license plates and ownership would have linked to specific times and activities of the group.

11. Violence: Neither I nor any of my associates to my knowledge, were violent or used violence.

12. Credit cards: I traveled a great deal on business, and often used my credit cards on those trips.

Dated this 19th day of MAY, 2009

Dana Jarvis
Signature of Dana Jarvis

SUBSCRIBED AND SWORN to before me on this 19th day of May, 2009.

Terri A. Trujillo
Notary Public

My Commission expires:

