# **Exhibit 1-B**
## (Pages 21-45)

TO
UNITED STATES' RESPONSE TO
DEFENDANTS' JOINT MOTION TO
SUPPRESS THE FRUIT OF
TITLE III WIRETAPS

recruit, however, was unaware that he/she was followed in the surveillance van to see if they

completed the task assigned.  If the assigned task was not completed, then that individual was not

allowed inside the organization.  Further, CS-3 stated that when couriers arrived with bulk cash

for delivery they were scanned by JARVIS with some type of electronic device to see if they

were wearing a wire transmitting device.

51.    CS-3 stated that Donald TRUJILLO was recently trained as a pilot to fly an

aircraft owned and operated by JARVIS.  TRUJILLO told CS-3 that he always flew with another

pilot, and that his (TRUJILLO's) mission was to fly JARVIS around the country to meet with

drug associates and to plan future drug transactions.  CS-3 stated that TRUJILLO also acted as a

drug and money courier for JARVIS, transporting drugs and/or money by vehicle.

52.    CS-3 stated that several large bulk cash shipments for JARVIS were picked up in

Indiana from a Greg LNU (last name unknown).  CS-3 stated that most of the large bulk cash

pick-ups that averaged $500,000.00 to $750,000.00 were from Greg LNU.

53.    A query of the Federal Aviation Administration national database of United States

registered aircraft revealed that a twin engine Cessna 421-B bearing the tail number N3AJ is

registered to Dana JARVIS at 4881 North Via Serenidad in Tucson, Arizona.  On October 27,

2004 the United States Customs Service Air/Marine Operations Center (AMOC) tracked the

aircraft bearing tail number N3AJ from Tucson, Arizona, to Oklahoma City, Oklahoma.  Your

Affiant followed N3AJ in a U.S. Customs aircraft and observed pilot David REID and passenger

Ayla JARVIS exit N3AJ in Oklahoma City.  REID and Ayla JARVIS were followed to a hotel

where Ayla registered under the name Imre PETROCZKY.[18]  On October 28, 2004, AMOC

tracked N3AJ from Oklahoma City to Bloomington, Indiana.  Your Affiant contacted CS-3 who

stated that Ayla JARVIS was most likely going to pick up a bulk cash shipment from Greg LNU.

    54.    Your Affiant contacted DEA agents in Indianapolis who established surveillance

at the Bloomington airport.  After the aircraft landed, Ayla JARVIS was observed departing the

aircraft and entering a van that appeared to have been left for her in the airport's parking lot.

Ayla JARVIS was observed driving away from the airport, the sole occupant of the vehicle.

Agents observed her meet a man later identified as Greg HILL at a local restaurant.  Ayla

JARVIS left the meeting with HILL and drove in the direction of the Bloomington airport.  Ayla

JARVIS was stopped by an Indiana State Police Officer for a traffic violation.  During the

interview of Ayla JARVIS, the Officer observed very nervous behavior.  The officer ran a canine,

trained to alert to the odors of illegal drugs, around the outside of the vehicle.  The dog alerted to

the driver's side door.  The Officer read Ayla JARVIS her <u>Miranda</u> rights and told her he

intended to search the vehicle.  JARVIS told the officer there was a bag of money beside her, but

that it was her father's.  She later told the officer her father did not believe in banks, and the

money was going to be used to buy an airplane.  The Officer subsequently seized $287,210.00

from Ayla JARVIS and allowed her to go.  Ayla drove back to the airport and was observed

meeting with the pilot, REID.  A short time later, the Officer received a call from REID stating

that he was Ayla's father.  REID left his cellular telephone number, 520-251-0243, as a contact

number.  He told the Officer that the Officer could keep half the money if the other half was

---

[18]Ayla JARVIS also paid for her hotel room with a credit card in the name of Emery
PETROCZKY.

returned. The Officer explained that the case would have to be adjudicated in court. Ayla JARVIS and REID flew back to Santa Fe, New Mexico a day later.

55.    CS-3 also stated that he/she picked up multiple bulk money shipments for the JARVIS DTO in the Boulder, Colorado, area from a man later identified by CS-3 as Dan CHOMYN. CS-3 stated that CHOMYN's drug associate/partner was arrested in Colorado on a drug related charge in 2003 or 2004.[19] CS-3 stated that since that time, CHOMYN temporarily stopped distributing marijuana for fear of being discovered by law enforcement authorities. CHOMYN told CS-3 in 2004 that he was only storing marijuana for the "old man," but that he needed to start selling marijuana again because it was hard making the monthly payments on a legitimate income.

56.    CS-3 stated that the "old man" referenced by CHOMYN received ton quantities of marijuana from JARVIS in Colorado and then distributed the marijuana throughout the East Coast of the United States.[20] An analysis of calls to/from cellular telephones subscribed to Dakota FITZNER, Eileen FITZGERALD, and Jean Sweeney (Dana JARVIS' mother) revealed several Denver, Boulder, and Longmont, Colorado, telephone numbers. Your Affiant obtained Colorado driver's license photographs for the subscribers of those telephones. CS-3 identified a photograph of Geno BERTHOD as being the "old man."

---

[19]Stanley BIRCH was arrested in Colorado on March 2, 2004, in relation to a suspected MDMA laboratory. During an interview with DEA agents on May 10, 2004, BIRCH stated that CHOMYN supplied BIRCH with 100-150 pounds of marijuana every two weeks. BIRCH stated that he paid CHOMYN $1,100.00 per pound. BIRCH stated that CHOMYN's marijuana source of supply was from Tucson, Arizona, and that the marijuana was shipped to CHOMYN in large duffel bags.
[20]A portion of the $287,210.00 seized from Ayla JARVIS on October 28, 2004 was bundled with a note that said "old man."

US v Jarvis et al    39

57.     On October 22, 2004, CS-3 placed a recorded telephone call to Donald

TRUJILLO at telephone number 505-920-3437. During the conversation, TRUJILLO told CS-3,

"So I'm supposed to take off as soon as I get the stuff…then I, the old man calls like I can't do

anything until tomorrow after 3:00. I was like 'well D wants to get this moving now…he wants to

get it out the door and to its destination' so he's like 'okay, well give me a call around when

you're leaving and we will figure something out. So it's 10:00 by the time I'm about to leave …

and I call him and he's like 'I can't meet you till before noon, or afternoon tomorrow any ways.' I

was like, because I was going to get in the car and drive and meet up with him some place on the

road. … He's like 'I can't meet up with you until after 12:00 tomorrow anyway' so I was like

'okay, I guess I will sleep and wake up early and drive. … Well next thing I know, fucking 1:30 in

the morning, Dana is calling like yelling at me, like 'you fucking lied. Who do you think you

are?' I was like 'what the fuck are you talking about.' He's like 'you're not at home.' I was like

'I'm at home sleeping.' The old man said you lied to him. … So he fucking sent Cathy over here,

picks it up, and then he's like 'search the house and see if his girlfriend is there.' I was like home

alone. … But I guess he ("the old man") told Dana a different story to cover his ass." CS-3 asked

if the load was "product" (marijuana) or "the other thing" (bulk cash). TRUJILLO responded that

it was "product." CS-3 said, "So there, there goes your business." TRUJILLO responded, "Yeah,

fucking old man just screwed me because the old man wanted to come to Santa Fe to make more

money." CS-3 asked if Cathy came over to the house in her small compact car. TRUJILLO

responded, "Yeah, because her van isn't working, so I let her take the 'burban (Suburban) and get

it out of here." CS-3 said, "Used your car and took your money." TRUJILLO responded "Yeah."

CS-3 told TRUJILLO, "you are like his (JARVIS's) right hand man, so I'm sure it will be cool."

24

TRUJILLO responded "Yeah, why would I lie to him when I do everything. I'm like 'what the fuck. I understand what is going on, just fucking mellow out.'"

58.     Based on my training and experience, as well information provided to me by CS-3, I believe that during this conversation, TRUJILLO explained to CS-3 that Geno BERTHOD ("the old man") would not take delivery of a load of marijuana immediately and wanted to delay the marijuana pick up a day. TRUJILLO explained that Dana JARVIS was now very upset with TRUJILLO because of the delay, and that JARVIS had sent Cathy FITZGERALD to TRUJILLO's residence to take the load of marijuana from TRUJILLO for delivery to BERTHOD.

59.     On October 22, 2004, agents established surveillance at the home of Cathy FITZGERALD at 28 Quail Run in Santa Fe County, Santa Fe, New Mexico in response to the listed telephone conversation between CS-3 and TRUJILLO. Agents observed a Chevrolet Suburban registered to Donald TRIJULLO, driven by Cathy FITZGERALD, returning to said residence at approximately 1:10 p.m. Cathy FITZGERALD was driving in a manner consistent with using counter-surveillance techniques.[21] Agents remained in the area of her Quail Run residence all afternoon. No vehicles were observed entering or departing the residence. At approximately 4:14 p.m. TRUJILLO's Suburban was observed departing the Quail Run residence. A woman matching the description of Cathy FITZGERALD was observed as the sole occupant of the Suburban. The Suburban was followed to the home of TRUJILLO located at 1917 Camino

---

[21]She was making frequent U-turns near her property, driving below posted speed limits and driving in patterns which appeared to try and reveal follow vehicles.

Lumbre in Santa Fe.  At approximately 5:00 p.m., TRUJILLO was observed departing the area, and surveillance was terminated.[22]

60.    CS-3 met with JARVIS in December 2004.[23]  CS-3 was telephonically debriefed by agents immediately after the meeting.  CS-3 stated that during the meeting, CS-3 was frisked twice to see if he was wearing a wire transmitting device.   During the meeting with CS-3, JARVIS stated that Cathy (FITZGERALD) and Ayla (JARVIS) were helping run his drug organization.  In addition, JARVIS told CS-3 that Donald TRUJILLO recently "stole" approximately 100 pounds of product (marijuana).  JARVIS said that TRUJILLO told him someone broke into his house and stole it, but JARVIS said he did not believe TRUJILLO. During the meeting, CS-3 told JARVIS that he/she was recently approached by a man named John Whalen who lived in Santa Fe.  CS-3 told JARVIS that Whalen wanted to purchase a 20 pound sample of marijuana and then purchase 200 pounds of marijuana on a regular basis for "clients" of his who planned to distribute the marijuana in Colorado.  CS-3 stated that JARVIS was excited

---

[22]Agents were unable to intercept the marijuana that was reported to be for the "old man" (BERTHOD), and believe that Cathy FITZGERALD had already delivered the load of marijuana to BERTHOD earlier in the day, when agents observed her returning to her home at approximately 1:00 p.m., or that the marijuana may have been stashed temporarily at FITZGERALD's home and delivered to BERTHOD while agents followed FITZGERALD and the Suburban back into Santa Fe where the vehicle was left with TRUJILLO at his Camino Lumbre residence.

[23]Agents attempted to conduct surveillance of this meeting.  However, agents observed at least two individuals believed to be working for the JARVIS DTO acting in a counter-surveillance posture.  Agents removed themselves from the immediate area of the meeting in an attempt to avoid detection by the individuals and to prevent compromising the investigation.  Your affiant heard one of the individuals, a woman, talking to the other unidentified male.  The woman stated "I got the license plate."  In addition, agents later learned from CS-3 that JARVIS approached the meeting location through a back alley and parked his vehicle a block away from the meet spot. Agents never observed JARVIS at the meeting with CS-3 because of the counter-surveillance techniques used by the organization.

26

about the prospect of setting something up with Whalen. CS-3 stated that he/she told JARVIS

that he/she would attempt to set things up for the first 20 pound deal at a future date. According

to CS-3, JARVIS said that would be great and told CS-3 that TRUJILLO had already mentioned

Whalen's name to him as a prospective marijuana client.

61.    On January 20, 2005, at approximately 12:13 p.m., CS-3 called JARVIS on the

TARGET TELEPHONE. The conversation was recorded. During the conversation, JARVIS said

that he was "up here in Colorado." CS-3 asked JARVIS, "do you remember that guy um we had

our little sit down and had some drinks at that restaurant a while back? ... and we were talking

about that guy that our mutual friend uh was going to do something with." JARVIS said,

"Right."[24] CS-3 said, "His initials are J.W." JARVIS responded, "um, oh yeah yeah I remember I

remember it was decent conversation." After some social conversation, CS-3 said, "Anyway I've

been um hanging out with this guy uh Mr. Whalen and um he..he started talking to me about

things and I was like 'maybe I can get in touch with a friend of mine' and he knew about you

through our mutual friend and…you know he said he goes up, up in that area a lot and he is really

interested and I said maybe I can get you guys to uh maybe have a little sit down or you know if

you want me to talk to him." JARVIS responded, "Yeah." CS-3 then said, "Or maybe our mutual

friend could deal with it, but he is definitely curious and he's around so he wants to have a talk

with you or our mutual friend or...." JARVIS said, "Well, I think Donald is out of the picture."

CS-3 told JARVIS that Whalen said TRUJILLO had "been coming into this bar, this new bar,

over on Agua Fria a lot and he's just telling everybody, you know, what happened at his house

_____

[24]This portion of the conversation confirms the meeting between CS-3 and JARVIS discussed in
paragraph 60 above.

and it's, it's pretty much the entire town knows. JARVIS responded, "Yeah that's really out of line." Later in the conversation, CS-3 stated, "So back to what I was saying, uh this friend of mine is really interested in having a talk with me or you or ... me on your behalf, so lets, uh, so you'll be back in town tomorrow?" JARVIS responded, "I like, I like that 'behalf' word better." CS-3 said, "Absolutely, I'd be more than happy to as a matter of fact I think." JARVIS said, "I remember you mentioning it to me one time I know that Donald talked to me about uh that he was just poking around I guess [unintelligible] he knew anything that might be helpful." CS-3 then described a meeting between John Whalen and CS-3. CS-3 then asked JARVIS, "Then I can go and represent some uh friends?" JARVIS responded, "Let's figure out, lets see what he's got on his mind or what maybe, how we could work something out that could be mutually beneficial." CS-3 responded, "Exactly, exactly, it sounds like it's a pretty good deal, it sounds like it's is a done deal. So if I can just have a quick chat with you we can get this done, but uh you'll be back tomorrow did you say?" JARVIS said, "I was thinking I could get off in Santa Fe, but [unintelligible] I've got to be in Tucson tomorrow night. ... but uh you could always come visit me down there. Uh [unintelligible] this is all based on me getting the plane back out of the shop, it just had it's annual ... annual inspection."

62.     Based on my training and experience, and information provided to me by CS-3, I believe that during this conversation, CS-3 and JARVIS discussed the possible sale of marijuana by JARVIS to John Whalen. I believe that when JARVIS stated, "I like that 'behalf' word better," and later told CS-3 to "see what he's got on his mind or what maybe, how we could work something out that could be mutually beneficial," JARVIS was instructing CS-3 to negotiate the marijuana deal with Whalen on JARVIS' behalf. The "mutual friend" referenced by CS-3 during

28

this conversation was Donald TRUJILLO. JARVIS told CS-3, "I think Donald is out of the picture." I believe that JARVIS was telling CS-3 that TRUJILLO was now out of the organization because of the 100 pounds of missing marijuana that JARVIS believed TRUJILLO stole from the organization. JARVIS also stated during the conversation that he had an airplane, which was "in the shop" for its annual inspection. On January 20, 2005, a DEA agent in Reno, Nevada, interviewed the owners of an aircraft repair business in Minden, Nevada, who confirmed that they performed an annual inspection on JARVIS' aircraft (tail number N3AJ) in January 2005.

63.    At agents' request, on January 21, 2005, at approximately 6:29 p.m., CS-3 called John Whalen to continue to negotiate a drug transaction on behalf of JARVIS. The conversation was recorded. During the conversation, Whalen said, "I just talked to the people and they have assured me that by the end of the month they are down so ...." CS-3 asked, "By the end of the month, as far as getting [unintelligible] or as far as wanting it?" Whalen said, "No no no, no no like this is, this is a cash deal. ...This isn't, this isn't on the arm or anything else. They are buying and they will have the money. ... Like I'm, I'm not in the same position because I generally don't handle quantity like that ... but I do have the network, okay." Later in the conversation, Whalen said, "... I think, I think you should grab what ever you feel comfortable working with. ... And, and if that is the whole package ... grab the whole package, I don't need to control all of it, I don't need to be part of anything. ...You can keep control of it wherever you want to, I don't really care, drop off something small, go day to day with it, when my homies get in town do the deal." Later in the conversation, Whalen said, "...let's, let's get it going, I mean let's get it going because these people I'm dealing with, like this is a small buy for them too. ...You know this is just, like okay,

29

this is a 'get the ball rolling see what you can do' type situation. ...And this is one of maybe three or four clients I have like this." CS-3 then made arrangements to meet Whalen at a bar to discuss the transaction.

64.     Based on my training and experience, and information provided to me by CS-3, I believe that during this conversation, Whalen told CS-3 that he was arranging the marijuana deal for out-of-town buyers and that it would be a cash deal, "not on the arm." Based on my training and experience, I know that the phrase "on the arm" refers to having drugs provided without immediate payment.

65.     CS-3 met with Whalen later that day at a bar in Santa Fe.[25] Affiant telephonically debriefed CS-3 immediately after the meeting. CS-3 stated that during the meeting, Whalen again requested a one pound sample of marijuana and stated that if the marijuana was as good as the samples of marijuana that Donald TRUJILLO provided several weeks earlier, he and his associates would have no problem purchasing marijuana from JARVIS. CS-3 stated that Whalen requested an initial 20 pound amount of marijuana and some cocaine if available. Whalen stated that his associates planned on distributing the drugs in the Boulder, Colorado, area, and that if they liked the 20 pounds of marijuana then they planned on purchasing 200 pounds of marijuana on a regular basis.

66.     On January 23, 2005 at approximately 1:56 p.m., JARVIS called CS-3 from the TARGET TELEPHONE.[26] Affiant telephonically debriefed CS-3 after the call. CS-3 stated that

---

[25]Agents did not conduct surveillance of this meeting.
[26]The conversation was not recorded. CS-3 was not in a position to record the conversation when contacted by JARVIS.

US v Jarvis et al     46

he/she talked to JARVIS about his meeting with Whalen and that JARVIS instructed CS-3 to negotiate a deal on his behalf.[27]

67.     On January 30, 2005, Club Rhythm and Blues closed for business.  On February 1, 2005, CS-3 called Dakota FITZNER at 505-450-4131, subscribed to Dakota FITZNER.  The conversation was recorded.  During the conversation, CS-3 stated with regard to Dana JARVIS, "...he's very unreliable."  FITZNER responded, "Yeah, you know before he was on top of shit, shit got done and that business made money now it doesn't do shit."  CS-3 said, "Really?" FITZNER stated, "He doesn't do shit...I mean he makes some money, but he's in the fucking hole.  ...The club is closed, he's selling the club, he's selling the liquor license, selling the property, selling the house in Bernalillo."  Based on my training and experience, and information provided to me by CS-3, I believe that during this conversation, FITZNER informed CS-3 that Dana JARVIS was selling off assets in order to purchase more marijuana in an attempt to increase his drug profits.

68.     On February 14, 2005, Donald TRUJILLO left a voicemail message on CS-3's cellular telephone.  CS-3 returned the call that day and spoke with TRUJILLO.[28]  Affiant telephonically debriefed CS-3 immediately after the call.  CS-3 stated that TRUJILLO told CS-3 he was in Tucson at a hotel and that he was back in with the organization.  TRUJILLO stated that he was exhausted and worried about falling asleep at the wheel and therefore might stay an extra day and sleep.  CS-3 replied that would be a very good idea because one never wanted to fall

---

[27]The drug transaction between CS-3 and John Whalen never occurred.  Agents ordered CS-3 not to negotiate the transaction any further.
[28]The conversation was not recorded because CS-3 had not expected TRUJILLO to answer the telephone.

asleep while driving, especially when one was coming back from Tucson. CS-3 reported that TRUJILLO stated "exactly." CS-3 told your Affiant this conversation meant that TRUJILLO was driving a load of marijuana from Tucson, Arizona to an unknown location.

## TOLL RECORDS, PEN REGISTER AND TRAP AND TRACE INFORMATION

69.     I, along with Intelligence Research Specialists and other investigative agents, have analyzed toll records obtained pursuant to subpoenas for the TARGET TELEPHONE, as well as other telephones believed to be used by the SUBJECTS. The toll records for the TARGET TELEPHONE cover the time period from December 29, 2004 through February 22, 2005.

70.     Analysis of the toll records available to me shows the user of the TARGET TELEPHONE has had contact with the following telephone numbers believed to be relevant to this investigation:[29]

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
| 505-470-1956 | Richard Belian, PO Box 868, Tesuque, N.M. At this time, agents have not determined whether "Richard Belian" is an alias for Dana JARVIS or an actual person. | 12/30/04 - 2/22/05 | 141 |
| 505-466-4147 | Dana JARVIS,13 Enebro, Santa Fe, N.M. See paragraph 10 above for information regarding Dana JARVIS. | 1/1/05 - 2/22/05 | 78 |

---

[29] The last date listed for each telephone number in the column "Time Period of Calls" indicates the last known phone call to or from the TARGET TELEPHONE.

US v Jarvis et al     48

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
| 505-730-5161 | Nicole RICHMOND, P.O. Box 32214, Santa Fe, N.M. RICHMOND is believed to be an ex-girlfriend of Donald TRUJILLO. She is currently residing in New York. An analysis of toll records for this telephone (505-730-5161) revealed that it is being used in Arizona and New Mexico. Based on my training and experience, I believe that a drug/money courier for the JARVIS DTO is using this telephone. | 12/30/04 - 2/23/05 | 76 |
| 505-501-2766 | Cathy FITZGERALD, 28 Quail Run, Santa Fe, N.M. See paragraph 13 above for information regarding Cathy FITZGERALD. | 1/1/05 - 2/23/05 | 80 |
| 505-466-1946 | Eileen FITZGERALD, 3 Dovela, Santa Fe, N.M. See paragraph 12 above for information regarding Eileen FITZGERALD. | 12/30/04 - 2/23/05 | 56 |
| 520-251-0243 | RC Computer & Graphics Inc., c/o David REID, 9227 Weaver Circle, Casa Grande, AZ. See paragraph 15 above for information regarding REID. | 12/30/04 - 2/22/05 | 63 |
| 505-385-2923 | John NIETO, P.O. Box 4279, Albuquerque, N.M. See paragraph 21 above for information regarding NIETO. | 12/30/05 - 2/16/05 | 47 |
| 505-471-2139 | Cathy FITZGERALD, 28 Quail Run, Santa Fe, N.M. See paragraph 13 above for information regarding Cathy FITZGERALD. | 12/30/04 - 2/16/05 | 31 |
| 505-463-3794 | Rafal MISPRZAK, 624 Tulane N.E., Albuquerque, N.M. See paragraph 20 above for information regarding Rafal MISTRZAK. | 12/30/04 - 2/14/05 | 29 |
| 505-577-5747 | Eileen FITZGERALD, 3 Dovela, Santa Fe, N.M. See paragraph 12 above for information regarding Eileen FITZGERALD. | 1/1/05 - 2/21/05 | 24 |
| 505-412-1520 | Barbara HANNA, P.O. Box 22882, Santa Fe, N.M. See paragraph 17 above for information regarding HANNA. | 1/2/05 - 2/20/05 | 24 |

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
| 505-920-3437 | Donald TRUJILLO, 2710 Vereda Rodiando, Santa Fe, N.M.  See paragraph 14 above for information regarding TRUJILLO. | 1/1/05 - 2/16/05 | 24 |
| 505-450-4131 | Dakota FITZNER, 639 Kinley, Albuquerque, N.M.  See paragraph 16 above for information regarding FITZNER. | 1/1/05 - 2/21/05 | 14 |
| 505-470-2938 | Eileen FITZGERALD, 3 Dovela, Santa Fe, N.M. See paragraph 12 above for information regarding Eileen FITZGERALD. | 1/17/05 - 2/8/05 | 5 |
| 505-470-1811 | Richard Belian, PO Box 868, Tesuque, N.M. | 1/3/05-2/20/05 | 77 |
| 505-771-0590 | Julianna Kirwin, 1019 Camino del Pueblo, Bernalillo, N.M.  See paragraph 18 above for information regarding Melania KIRWIN. | 1/1/05 - 2/22/05 | 24 |
| 505-362-0433 | Salvador ABEYTA, 2516 Vernada Rd., NW, Apt. 4, Albuquerque, N.M.  See paragraph 22 above for information regarding ABEYTA. | 12/31/04 - 2/21/05 | 26 |

## NEED FOR INTERCEPTION

71.     I am aware that a number of normal and routine investigative techniques are available for the investigation of drug trafficking and money laundering offenses.  These techniques are used in conjunction with one another and include:  physical surveillance, the use of confidential informants and cooperating sources, the introduction of undercover officers into the organization, the execution of search warrants, the examination of discarded trash, the use of grand jury or administrative subpoenas to – or interviews of – subjects and potential witnesses, and the analysis of pen register and trap and trace data and toll records.

72.     Based upon my training and experience, and based upon all of the facts set forth herein, I believe that the interception of wire communications is the only available technique that

34

has a reasonable likelihood of achieving all the objectives of this investigation and securing the

evidence necessary to prove beyond a reasonable doubt that the SUBJECTS and others as yet

unknown are engaged in the above-described offenses.  The following investigative techniques,

which are usually employed in the investigation of this type of criminal case, have been tried and

have failed, reasonably appear to be unlikely to succeed if they are tried, or are too dangerous to

employ, as detailed in the paragraphs below.

## ALTERNATIVE INVESTIGATIVE TECHNIQUES

### Pen Registers, Trap and Trace, and Toll Records

73.    Agents conducting this investigation have used normal investigative techniques to

include informants, surveillance, telephone toll analysis, public and private record searches,

record searches for vehicles and residences, and telephone "dialed digit recorders" (commonly

referred to as pen registers).  These techniques have been successful, however, these techniques

can only provide limited information and will not reveal the full scope of this investigation.  Pen

register information can provide useful information, but that information alone cannot result in a

prosecutive effort.  Pen register information only indicates contact between telephones from

which inferences can be drawn.  It cannot provide the identities of the speaker or the contents of

the conversations.  Telephone toll records suffer the same critical limitations.  When used in

conjunction with a wire interception, pen registers and toll records supply useful confirmation of

the numbers called.

### The Examination of Discarded Trash

74.    On June 13, 2002 your Affiant attempted a "trash run" at JARVIS's 13 Enebro

residence.  Working in conjunction with a supervisor at Waste Management of Santa Fe, workers

attempted to replace several trash cans on JARVI's street with new ones. JARVIS ran out of his

house and confronted said supervisor. JARVIS made the supervisor empty his trash can into the

new one. He told the supervisor that there were private investigators trying to learn stuff about

him. JARVIS then stood beside his trash can for approximately half an hour until the Waste

Management garbage truck picked up his trash and dumped it into the garbage truck.[30] According

to CS-3 JARVIS instructs his workers to watch what they throw away. In addition the JARVIS

DTO is very surveillance conscious and if an agent was observed picking up someone's trash it

would risk tipping the drug traffickers off about the investigation.

**Physical Surveillance**

75.       Physical surveillance is an investigative technique that is often used to identify

criminal co-conspirators and addresses associated with criminal activity. In this investigation

surveillance was conducted on several occasions. However, those surveillances have had minimal

success in achieving the objectives of the investigation. Agents have followed the TARGETS in

an effort to identify their criminal associates and times and places of drug transactions, but those

efforts have been fruitless. The TARGETS have been observed meeting with individuals and

entering residences and businesses, but there has been no overt activity observed that suggested

"criminal" activity was occurring. However, based on my training and experience, I am not

surprised that agents have been unable to observe any criminal activity. Most sophisticated and

significant drug traffickers conduct their illegal activities in a secretive manner, often making

exchanges of money and/or drug proceeds within residences or businesses where their actions

---

[30] The supervisor of Waste Management did not drive a trash truck. Agents felt they could not
trust the employees of Waste Management who drive the trash trucks to use the trucks in order to
effect a trash pick-up of JARVIS's trash outside his residence.

cannot be seen. Furthermore, the TARGETS are reported to be adept at counter-surveillance techniques used to reveal following law enforcement authorities. In addition, many of the primary locations suspected as being marijuana "stash house" locations, or money transfer locations are in rural areas very difficult to watch without being observed. Therefore, surveillance in conjunction with the interception of wire communications is likely to enable agents to identify the targets to be observed and aid in the achievement of the objectives of the investigation.

76.    From July 2002 to February 2005, agents conducting intermittent surveillances of JARVIS listed residences at 13 Enebro, 1440 Cielo Vista, Eileen FITZGERALD's residence at 3 Dovela, and at Cathy FITZGERALD's house at 28 Quail Run did not observe any criminal activity that would provide evidence toward accomplishing the objectives of this investigation.

77.    On November 3, 2004 agents established surveillance at 1440 Cielo Vista in Bernalillo, New Mexico. Agents observed several vehicles outside said location. There was a white Chevrolet Stingray[31] registered to a Felipe Cordova in Santa Teresa, New Mexico, and a white Chevrolet Avalanche truck registered to Melania KIRWIN at 4891 North Via Serenidad in Tucson, Arizona parked outside the house. (The white Avalanche truck was previously seen at 13 Enebro in Santa Fe on November 1, 2004.) Later that same day surveillance was established at JARVIS's Santa Fe residence located at 13 Enebro. Agents observed a silver Mercedes registered to Barbara HANNA at 5 Lauro Road[32] in Santa Fe, New Mexico and a vehicle registered to a Kimberly Puckrin at 18735 Kennedy Road in Sharon, Ontario Canada. Agents did not observe any activity or any persons associated with the drug trafficking conspiracy, nor did agents learn

---

[31] CS-3 indicated the White Stingray belonged to Dana JARVIS.
[32] 5 Lauro Road address reported by CS-3 to be a marijuana stash house and bulk cash counting house for the JARVIS DTO.

37

any information regarding the persons driving said vehicles or why they were at the listed locations.

78.    In December 2004, CS-3 met with JARVIS. As discussed in footnote 24 above, surveillance of this meeting was unsuccessful because it appeared to agents that JARVIS had individuals outside the meet spot acting in a counter-surveillance role looking to see if CS-3 was followed by law enforcement authorities.

### Use of Cooperating Sources

79.    The technique of using cooperating sources often is very productive in an investigation. In this case three cooperating sources of information have provided information about the JARVIS DTO that has been beneficial to the investigation. However, for the reasons set forth below, your Affiant believes that, at this stage of the investigation, the use of cooperating sources is unlikely to achieve the goals of the investigation.

80.    The objectives of this investigation include identifying the JARVIS DTO drug suppliers, identifying where and when the leaders of the organization meet their sources of supply, identify how the drugs are being smuggled into the United States from the Republic of Mexico, where and who is stashing the drugs in the various stash houses in Arizona and New Mexico, identifying where the money is being stored and fully identifying the participants in the conspiracy. While CS-1 provided valuable information regarding some of these objectives, CS-1's usefulness reached it's maximum potential in 2002 in furthering the goals of the investigation. CS-1 was not a member of the JARVIS DTO and is no longer in a position to learn anymore information about its members.

38

81.    Likewise. CS-2 has provided information useful to this investigation. CS-2's information was historical in nature, and was limited information regarding the JARVIS DTO. CS-2 is not in a position to learn how, when and where the marijuana is being smuggled into the United States. In addition, CS-2 is not in a position to learn about the nationwide co-conspirators or about details regarding the delivery methods,  the times illegal activities are taking place, or the locations for said activities.  Because of CS-2's personal relationship with many of the individuals he/she has provided information about, CS-2 has no interest in testifying or publicly providing information about the conspirators.  Therefore, agents must develop independent evidence of crimes being committed by the conspirators.

82.    CS-3 was a money courier for the JARVIS DTO, but left the organization a year or more ago.  CS-3 has provided detailed information about the methods, used by the targets of this investigation, many of the locations used by the organization, and has identified many conspirators involved in drug trafficking and or money laundering violations.  In addition, CS-3 has provided unique information from an "insiders" perspective.  This "unique" information allowed agents in October 2004 to anticipate the actions of Ayla JARVIS and David REID when they landed in Bloomington, Indiana aboard the private aircraft owned by Dana JARVIS.  The information from CS-3 was instrumental in the seizure of $287,210.00.  The bulk of the information from CS-3 is dated, and historical in nature.  CS-3 does not currently have immediate access to information regarding JARVIS the organization conspirators and its methods.  CS-3, under the direction of controlling agents, has been attempting to work back into the organization as a money courier, but to date has not been able to do so.  CS-3 also has no interest in testifying or publicly providing information about the conspirators.  CS-3 has expressed a fear of members

of the organization and worries that his/her family would be in significant danger if CS-3's involvement with law enforcement were revealed. Again agents must develop independent evidence of the crimes being committed by the conspirators.

### Use of Search Warrants

83.    Your Affiant has experience with search warrants as an investigative technique in drug trafficking investigations. Search warrants often lead to the seizure of drugs, money, and other evidence of criminal violations. However, in this investigation the execution of search warrants at this time is not likely to achieve the objectives of the investigation. The premature execution of search warrants would not likely reveal the total scope of the illegal operations of the organization and would also alert the TARGETS to the scrutiny of law enforcement and thereby risk this investigation. Additionally, the fact that many of the target subjects are unidentified, renders law enforcement authorities unable to locate all potential search locations at this time. Furthermore, interception of wire communications for the TARGET TELEPHONE would aid in identifying stash locations which have not been identified at this time.

### Interviews with Witnesses and Use of a Grand Jury

84.    At this stage of the investigation, your Affiant believes that the interviewing of witnesses and use of a grand jury would be premature and deleterious to the ongoing investigation. Agents have not yet identified any individuals (other than the cooperating sources of information) considered likely to provide information on the JARVIS DTO without revealing the investigation to its members. In many investigations, agents are able to identify a "weak link," an individual who is considered likely to cooperate with agents without exposing the investigation. Usually, such an individual is targeted because strong evidence has been gathered

40

implicating the individuals criminal activity.  Agents are then able to approach the individual and

seek his/her cooperation in exchange for a more lenient prosecution.  In this investigation, no

"weak links" have yet been identified.  It is possible that such individuals will eventually be

identified, particularly through the interception of wire communications.  At this stage in the

investigation it appears pointless and foolish to attempt to interview witnesses.

85.    If such interviews were attempted, your Affiant believes they would produce

insufficient information concerning the identities of all of the persons involved in the conspiracy,

the sources of the drugs and drug proceeds, the location of records, drugs, money or other

pertinent information regarding the subject crimes.  In addition, any responses to the interviews

would contain a significant number of half-truths and untruths, diverting the investigation with

false leads or otherwise frustrating the investigation.  Additionally, such interviews would likely

result in non-targeted interviewees alerting other members of the conspiracy, thereby

compromising the investigation and resulting in the possible concealment, movement or

destruction of drugs, money, documents and/or other evidence.

86.    Furthermore, based upon my training and experience, your Affiant believes that

issuing subpoenas to persons who are believed to be involved in this conspiracy compelling them

to testify before a Federal Grand Jury would likely not be successful in achieving the stated goals

of this investigation.  Should the targets of this investigation , their co-conspirators and other

participants be called to testify before the grand jury, they would most likely be uncooperative and

invoke their Fifth Amendment privilege not to testify.  It would then be unwise to seek use of

immunity for any of these persons because the granting of such immunity could irreparably

complicate or foreclose their prosecution, even though they might be among the most culpable

41

members of this conspiracy.  Also, to corroborate the testimony given by these immunized witnesses before the grand jury would usually require that other conspirators and witnesses be immunized, especially when there may not be evidence in the form of intercepted communications other than those obtained through consensually monitored conversations, such as when a cooperating source or an undercover agent meets with a conspirator or participant in a criminal venture.  Under the facts and circumstances of this investigation as set forth above, only the highest level conspirators and participants would be knowledgeable as to the source(s) of the drugs, the whereabouts of the proceeds generated from drug trafficking, etc.  It cannot be expected that the highest level conspirators who are the subject of this investigation would either give information or testimony without their receiving use immunity through an agreement with the government or through a compulsion Order issued by a Federal Magistrate.  Nor should the government be required to seek to give use immunity to the highest level conspirators and participants.  Additionally, the serving of the grand jury subpoenas upon the targets and/or their co-conspirators would only alert the targets and/or their co-conspirators to the existence of this investigation, thereby causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, or to otherwise compromise this investigation.

### Use of Undercover Agents

87.     There are presently no undercover agents who have infiltrated the JARVIS DTO, nor id there the likelihood that one could be introduced to them.  In most investigations in which an undercover officer has infiltrated an organization, a cooperating source has introduced the officer into the organization.  CS-1, CS2 and CS-3 do not have the ability to introduce an undercover agents into the JARVIS DTO.

42

88.     Information from CS-2 and CS-3 indicates that JARVIS and his associates are long time, long term drug associates, family members, or individuals that have worked with JARVIS at his night club and were later recruited into the organization.  In addition, CS-3 told agents the JARVIS DTO uses a "surveillance van" equipped with digital cameras and night vision equipment to watch new members of the organization perform specified assignments.  If the assignments are not performed, or not performed correctly, the individual in not allowed to join the organization.  It is likely that even if an undercover agent was introduced to the organization, that agent would be assigned a task that involved illegal activity.  If the agent did not perform the task, which is prohibited by DEA policy, it is unlikely the agent would be allowed into the organization, and at best would be able to collect "peripheral" information regarding the organization.  Therefore, there is no reasonable way to use the traditional investigative technique of undercover agents to achieve the objectives of the investigation.

## CONCLUSION

89.     Based upon the foregoing, I believe that the interception and recording of wire communications to and from the TARGET TELEPHONE is an essential investigative means in obtaining evidence of the offenses in which the SUBJECTS and others as yet unknown are involved.

90.     I further believe that the facts stated herein establish that the SUBJECTS and others yet unknown are engaged in an ongoing criminal enterprise and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the object of this request.  Therefore, I request that the Court order that the interception need not terminate when the communications described herein are first

intercepted, but may continue until the full scope of the enterprise is developed, including the

identities of all participants, their places and methods of operation and the various activities in

which they are engaged in furtherance of the enterprise, or for a period of thirty days from the

earlier of the day on which law enforcement officers first begin to conduct the interception or ten

days from the date this Order is entered.

## MINIMIZATION

91.    Conversations intercepted pursuant to the Court's Order will be minimized in

accordance with Chapter 119 of Title 18, United States Code. Monitoring of intercepted

conversations will be suspended when it is determined that the conversation is unrelated to

communications subject to interception under Chapter 119 of Title 18, United States Code.

Interception will also be suspended when it is determined through voice identification, physical

surveillance, or otherwise, that none of the SUBJECTS or any of their confederates, when

identified, are participants in the conversation, unless it is determined during the portion of the

conversation already overheard that the conversation is criminal in nature. If a conversation is

minimized, the monitoring personnel will be instructed to spot check to ensure that the

conversation has not turned to criminal matters. To avoid interception of privileged

communications, the monitoring personnel will be instructed to minimize privileged

communications between husbands and wives, between physicians and patients, between clergy

and penitents, or between those named SUBJECTS and legal counsel that pertain to strategy or

conduct of any trial or otherwise privileged communications. If a privileged communication is

intercepted, such interception be minimized and the monitoring personnel will be instructed to

44

enter into the logs kept pursuant to the monitoring a notation that the communication was minimized, and the supervising attorney will be immediately notified of the interception.

92.    The investigation has revealed that the SUBJECTS may sometimes communicate in coded language and in the Spanish language.  It is anticipated that mostly persons who are fluent in both Spanish and English will be assigned to monitor communications during this investigation.  However, in the event that an intercepted communication is in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, I request authority for the monitoring personnel to intercept the entire communication, with minimization to be accomplished as soon as practicable after the interception.

RICHARD L. STARK
Special Agent

Sworn to before me this ____ day of _____, 2005.

UNITED STATES DISTRICT JUDGE

45