IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )  | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cr. No. 05-1849 JH |
| ) | |
| DANA JARVIS, et al., ) | |
| ) | |
| Defendants. ) | |

UNITED STATES' RESPONSE TO DEFENDANTS' JOINT
MOTION TO SUPPRESS THE FRUIT OF TITLE III WIRETAPS

The United States of America hereby responds to Defendants' Joint Motion to

Suppress the Fruit of Title III Wiretaps as follows:

I.      BACKGROUND

In September 2001, the Drug Enforcement Administration ("DEA") initiated an

investigation into the narcotics trafficking activities of Dana Jarvis.  For nearly three and

a half years, agents attempted a variety of investigative techniques to further the

investigation, including surveillance, informants, telephone toll analysis, public and

private record searches, record searches for vehicles and residences, and pen registers.

These techniques were unsuccessful; while agents were able to gain valuable information

regarding the Jarvis drug trafficking organization (DTO), this information was limited in

scope and left numerous unanswered questions regarding the scope and methods of the

conspiracy and the identities of the conspirators.

Consequently, on March 2, 2005, DEA Special Agent Richard Stark submitted an affidavit to Senior United States District Judge John Edwards Conway in support of an application for an order authorizing the interception of wire communications of Dana Jarvis a/k/a Todd Ward, Ayla Jarvis, Eileen Fitzgerald, Cathy Fitzgerald, Donald Trujillo, David Reid, Jude Austin, Geno Berthod, Jacklyn Cook, Billy Joe Cook, Angela Cummings, Dakota Fitzner, Kara Gold, Joel Goodell, Barbara Hanna, Greg Hill, Matthew Hothan, Melania Kirwin A/k/a Mila, Joseph Martin, Rafal Mistrzak, Lloyd Montoya, John Nieto, Dan Chomyn, Salvador Abeyta, and John Whalen over cellular telephone number (505) 470-1811 (Target Telephone 1). A copy of SA Stark's affidavit (the "TT1 Affidavit") is attached hereto as Exhibit 1.

The purpose of requesting the wiretap was to gather evidence against the named subjects and co-conspirators yet unknown, including suppliers, with regard to drug trafficking and money laundering offenses. Specifically, the stated objectives of the investigation were to obtain evidence regarding:

1.  The nature, extent, and methods of operation of the illegal drug trafficking and money laundering of the SUBJECTS and others as yet unknown;

2.  The dates, times, places, and manner in which controlled substances and the proceeds of drug trafficking are being delivered to the SUBJECTS and others as yet unknown;

3.  The identification of other communications facilities used by the SUBJECTS and others as yet unknown in furtherance of the criminal activity alleged herein;

2

4.    The methods and means of payment for the controlled substances employed by the SUBJECTS and others as yet unknown, and the manner in which these transactions are conducted;

5.    The locations where the controlled substances are stored;

6.    The nature and extent of the mechanism used by the SUBJECTS and others as yet unknown to import, transport, and distribute controlled substances within the District of New Mexico;

7.    The identities of co-conspirators, accomplices, aiders and abetters, and other participants operating in concert with the SUBJECTS and their respective roles and participation in the above-mentioned offenses;

8.    The identities of the sources of supply of the controlled substances distributed by the SUBJECTS and others as yet unknown;

9.    The methods and means by which the SUBJECTS and others as yet unknown maintain, dispose of, and invest the proceeds from the sale of controlled substances; and

10.    The location and source of resources used to finance the illegal activities described herein.

TT 1 Affidavit at 5-6.

Judge Conway granted the application on March 2, 2005.  A copy of the order (the "TT 1 Order") is attached hereto as Exhibit 2.  Interceptions pursuant to that order began on March 4, 2005 and were terminated on April 1, 2005.

On April 7, 2005, Judge Conway signed an order authorizing the interception of wire communications over three other phones tied to the Jarvis DTO:  (1) a cellular telephone utilized by George Ripley, 505-615-1212 (Target Telephone 2); (2) a cellular telephone utilized by Dana Jarvis, 520-440-5731 (Target Telephone 3); and (3) the

landline telephone for Dana Jarvis's residence at 13 Enebro Road in Santa Fe, 505-466-4147 (Target Telephone 4).  Interceptions pursuant to that order (the "TT 2-4 Order") began on April 7, 2005 and were terminated on May 6, 2005.   A copy of the TT 2-4 Order is attached hereto as Exhibit 3.  A copy of the affidavit submitted by SA Stark in support of that order (the "TT 2-4 Affidavit") is attached hereto as Exhibit 4.[1]

---

[1]  The defendants do not specifically challenge the other wiretaps obtained in this case except to the extent that they were based on the initial wiretap.  For the Court's information, the additional wiretaps obtained in this case (including extension orders) are described below.

On May 17, 2005, United States District Judge James O. Browning signed an order authorizing the interception of wire communications over Target Telephones 2, 3, and 4, as well as the interception a cellular telephone utilized by Jorge Luis Ortiz-Moffett, 520-440-5257 (Target Telephone 5), and another cellular telephone utilized by Dana Jarvis, 520-705-7133 (Target Telephone 6).  Interceptions pursuant to that order began on May 17, 2005 and were terminated on June 15, 2005.

On May 27, 2005, Judge Browning signed an order authorizing the interception of wire communications over yet another cellular telephone utilized by Dana Jarvis, 520-705-7130 (Target Telephone 7).  Interceptions pursuant to that order began on May 27, 2005.

On June 22, 2005, United States District Judge Bruce D. Black signed an order authorizing the interception of wire communications over Target Telephone 2, 3, 5, and 7.  Interceptions pursuant to that order began on June 22, 2005 and were terminated on July 21, 2005.

On August 5, 2005, Judge Black signed an order authorizing the interception of wire communications over Target Telephone 2, as well as a cellular telephone utilized by Ralph Greene, 505-385-2798 (Target Telephone 8).  Interceptions pursuant to that order began on August 5, 2005 and were terminated on August 25, 2005.

The wiretaps were incredibly successful, and within less than six months after initiating the wiretaps – nearly four years into the overall investigation – the government had developed sufficient evidence to obtain an indictment in this case charging twenty-one members of the Jarvis DTO with drug trafficking and money laundering violations.[2] The investigation also resulted in substantial forfeiture of assets and the dismantlement of the Jarvis DTO.

II.    DEFENDANTS' MOTION

The defendants filed their Joint Motion to Suppress the Fruit of Title III Wiretaps on February 2, 2009,[3] and a supplement to the motion on May 4, 2009. In their motion, the defendants assert that there was no necessity for the initial wiretap in this case and that SA Stark made intentionally or recklessly false material statements in his affidavit. In connection with their motion, the defendants request a *Franks* hearing. The defendants assert that the remaining wiretaps are invalid because they are tainted by the first. Finally, the defendants also assert that there was no showing of necessity for the second wiretap as to George Ripley.[4]

---

[2] Eight additional defendants were subsequently charged in a superseding indictment.

[3] The motion was filed by defendants David Reid, Dennis Wilson, and Greg Hill. Defendant Wilson has since pled guilty. The only remaining defendants in this case are Reid and Hill.

[4] The defendants assert that they were "not able to analyze the issue of whether the minimization in this case was sufficient because the [] Court has not granted a defense request for the materials needed for this analysis." Def. Mot. at 72-73. The Court has,

This Court reviews Judge Conway's determination that necessity existed to issue the wiretap orders for abuse of discretion. *United States v. Zapata*, 546 F.3d 1179, 1185 (10th Cir. 2008); *see also United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008) ("we review for abuse of discretion the issuing judge's conclusion that the wiretap was necessary") (emphasis added).   An abuse of discretion occurs only if a trial court acted in a manner that was "arbitrary, capricious, whimsical or manifestly unreasonable[.]" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004).  The sufficiency of a wiretap application, including the necessity determination, is determined solely from the information within the "four corners" of the affidavit, unless there is a *Franks* violation. *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995); *United States v. Zapata-Hernandez*, No. 04-CR-00403-B, 2006 WL 954838 *7 (D. Colo., April 11, 2006); *United States v. Kelsor*, No. 2:08-cr-81-5, Opinion and Order, 2008 WL 3166327 (S.D. Ohio, August 4, 2008).  Moreover, "[o]nce a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity." *United*

---

however, previously ruled on the defendants' motion for discovery regarding the wiretaps, Docs. 733 and 819, and the United States long ago provided the defendants with the "line sheets" for all intercepted calls, ten day reports that detail the number of calls minimized, and the minimization instructions provided to the monitors.  The defendants have not requested any additional discovery in this regard since the Court's most recent order from December 27, 2006 (Doc. 819), nor do they state in their motion what additional materials they allegedly need.  Moreover, the United States would note that the defendants have not established that they even have standing to object to the minimization procedures used in this case.  *See United States v. Fury*, 554 F.2d 522, 526 (2nd Cir. 1977).  Accordingly, the defendants' "renewed" request should be summarily denied.

*States v. Verdin-Garcia*, 516 F.3d 884, 890 (10th Cir. 2008); *accord United States v.*

*Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995).  As discussed below, Judge Conway was

well within his discretion in finding that the TT1 Affidavit and the TT 2-4 Affidavit met

the statutory requirement of necessity, and the defendants' have failed to meet their

burden of proving that the wiretaps in this case are invalid.  Therefore, their motion must

be denied.

    III.    <u>LAW AND ANALYSIS</u>

        A.    <u>Standing</u>

Under Title III, only "aggrieved persons" may assert standing to challenge

intercepted wire communications.  18 U.S.C. § 2518(10)(a).  An "aggrieved person" is

defined as someone who was a party to an intercepted communication or someone against

whom the interception was directed.  18 U.S.C. § 2510(11).  In this case, Reid and Hill

were each named in the orders authorizing the interception of wire communications.

Therefore, the United States does not contest that they have standing to move to suppress

the calls intercepted pursuant to those orders.

        B.    <u>The Necessity Requirement</u>

Federal wiretaps are governed by Title III of the Omnibus Crime Control and Safe

Streets Act of 1968, codified at 18 U.S.C. §§ 2510-2522.  Section 2518(1)(c) requires

each wiretap application to include "a full and complete statement as to whether or not

other investigative procedures have been tried and failed or why they reasonably appear

to be unlikely to succeed if tried or to be too dangerous."  This provision is known as the

"necessity requirement."  *Verdin-Garcia*, 516 F.3d at 889.  In addition, section 2518(3)(c)

requires the district judge issuing the wiretap order to determine that "normal

investigative procedures have been tried and have failed or reasonably appear to be

unlikely to succeed if tried or to be too dangerous."  In sum, "the government must show,

by a full and complete statement, and the issuing court must find, that normal

investigative techniques employing a normal amount of resources have failed to make the

case within a reasonable period of time."  *United States v. Ippolito*, 774 F.2d 1482, 1485

(9th Cir.1985); *see also United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986)

("This necessity requirement means that the affidavit must set out a factual background

that shows that ordinary investigative procedures, employed in good faith, would likely be

ineffective in the particular case.").

The purpose of the necessity requirement is to ensure that the government does not

resort to wiretaps when traditional investigative techniques would suffice to expose the

crime.  *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974); *Verdin-Garcia*, 516 F.3d at

889-90.  Traditional investigative techniques include the following:  "(1) standard visual

and aural surveillance; (2) questioning and interrogation of witnesses or participants

(including the use of grand juries and the grant of immunity if necessary); (3) use of

search warrants; and (4) infiltration of conspiratorial groups by undercover agents or

informants." *United States v. Cline*, 349 F.3d F.3d 1276, 1280 (10th Cir. 2003). They also include pen registers and trap and trace devices. *Id.*

The necessity requirement is not, however, "designed to force the Government to exhaust all other conceivable investigative procedures before resorting to wiretapping." *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981); *see also United States v. Dennis,* 786 F.2d 1029, 1035 (11th Cir. 1986) (holding that the purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques"); *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (stating that the wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope"). Indeed, "[t]he overall burden on the government [to demonstrate necessity] is not great." *Verdin-Garcia*, 516 F.3d at 890 (internal quotation omitted). The government's application must simply "provide some basis for concluding that less intrusive investigative procedures are not feasible." *United States v. Lilla*, 699 F.2d 99, 103 (2nd Cir. 1983).

Sufficient justifications for the use of electronic surveillance include "the identification of all the members of a conspiracy, learning the precise nature and scope of

the illegal activity, the apprehension of accomplices, and the determination of the dimensions of an extensive conspiracy." *United States v. Mesa-Rincon*, 911 F.2d 602, 607-08 (10th Cir. 1990). Where the objective is to discover the full scope of a drug operation, i.e. suppliers, major buyers, satellite conspirators, assets, the necessity requirement is met if normal investigative procedures have not succeeded in developing evidence against all members of the narcotics conspiracy. *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990).

The Tenth Circuit has recognized that "[b]oth the apprehension of so-called 'satellites' involved in the distribution scheme and the determination of the dimensions of an extensive drug conspiracy have been held to justify the use of electronic surveillance." *Johnson*, 645 F.2d at 867. Regarding the use of wiretaps to dismantle a conspiracy, the Ninth Circuit has stated:

> The law has long recognized that conspiracies pose a greater threat to society than individual action toward the same end. ... Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some or many conspirators are imprisoned, others may remain at large, free to recruit others eager to break the law and to pursue the conspiracy's illegal ends. Reflecting this concern, we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of ... other satellite conspirators. Because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy.

*United States v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002) (internal citations and quotations omitted). Moreover, a wiretap may be necessary when it gives the government the ability to develop "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." *Id.* at 1198.

A finding of necessity is not precluded just because conventional methods of investigation *might* have worked. *United States v. Commito*, 918 F.2d 95, 98-99 (9th Cir. 1990). Moreover, although portions of an affidavit may include general descriptions of the inherent limitations of particular investigative techniques, such "boilerplate" language does not preclude a finding of necessity. *See United States v. Fernandez*, 388 F.3d 1199, 1237 (9th Cir. 2004) (boilerplate assertions did not affect finding that affidavits satisfied necessity requirement where affidavits were not plagued by material misrepresentations and omissions); *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990) (presence of conclusory language in affidavit does not negate finding of necessity if affidavit as a whole alleges sufficient facts demonstrating necessity); *United States v. Carneiro*, 861 F.2d 1171, 1177 (9th Cir. 1988) (concluding that necessity requirement met for first wiretap based on affidavit as a whole, even though some statements in affidavit were mere conclusions). A reviewing court should consider "all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap, and read the necessity requirement in a common sense fashion." *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002).

C.    SA Stark's Affidavit Meets the Necessity Requirement

Here, SA Stark's affidavit[5] more than satisfied the statutory requirements.  In his affidavit, SA Stark discussed in detail the investigative techniques that had been tried and failed or reasonably appeared to be unlikely to succeed if tried or to be too dangerous. Those techniques included all of the traditional techniques discussed in *Cline* – physical surveillance, interviews of witnesses and use of the grand jury, use of search warrants, use of cooperating sources and undercover agents, and pen registers and trap and trace devices – as well as an additional technique, the examination of discarded trash ("trash runs").  The agents' use of each technique is discussed below.

1.    Surveillance

In his affidavit, SA Stark states that surveillance had been conducted "on several occasions," but that it had resulted in "minimal success in achieving the objectives of the investigation."  TT 1 Affidavit at ¶75.  He noted that agents had conducted intermittent surveillance of several locations between July 2002 and February 2005 and "did not observe any criminal activity that would provide evidence toward accomplishing the objectives of this investigation."  *Id.* at ¶76.  SA Stark proceeded to describe some of the specific instances where surveillance had been conducted, and he explained why it was

---

[5]  Because the focus of the defendants' motion is on SA Stark's initial affidavit, the United States refers generally herein to that affidavit.  The sufficiency of the showing of the necessity in the TT 2-4 Affidavit is specifically discussed below in section B.8.

unsuccessful. *Id.* at ¶76-78. For example, SA Stark noted that "many of the primary locations suspected as being marijuana 'stash house' locations, or money transfer locations are in rural areas very difficult to watch without being observed." *Id.* at ¶75. The Tenth Circuit has accepted an affiant's assertion that the rural nature of a target area "made concealing surveillance vehicles almost impossible." *Ramirez-Encarnacion*, 291 F.3d at 1222.

The affidavit recites that "CS-3 stated the Jarvis DTO was very conscious of police surveillance techniques, and that Jarvis trained his drug/money couriers in methods to avoid police detection." TT 1 Affidavit at ¶49. SA Stark also described a specific instance where Jarvis had individuals conducting apparent counter-surveillance during agents' attempted surveillance of a meeting between CS-3 and Jarvis. *Id.* at ¶78. Courts have accepted affiants' assertions that undetected visual observations are difficult. See e.g., *United States v. Turner*, 528 F.2d 143, 152 (9th Cir. 1975); *United States v. Hyde*, 574 F.2d 856, 868 (5th Cir. 1978) (noting that visual surveillance would be fruitless where conspirators were on guard, maintained constant vigilance for surveillance teams, and warned neighbors to be on alert for strangers).

The defendants would have the court believe that, despite the fact that agents investigated the Jarvis DTO for over three years before resorting to wiretaps, the government "had no real interest in exposing the Jarvis DTO's crimes through normal investigation; its real aim was to conduct wiretap investigation and see what they found

after tapping thousands of private phone calls." Def. Supp. at 11. They argue, in an

attempt to obtain a *Franks* hearing, that SA Stark's affidavit contains false statements or

material omissions with regard to the usefulness of surveillance. Def. Mot. at 54-57; Def.

Supp. at 11-25.[6] The defendants focus on ten locations associated with the Jarvis DTO

where they claim agents could have conducted additional or more effective surveillance.[7]

When looking at the four corners of SA Stark's affidavit, however, the defendants have

failed to meet their burden of establishing that SA Stark's statement that surveillance had

been unsuccessful in achieving the goals of the investigation is either false or

insufficient.[8]

---

[6] These assertions are based largely on two affidavits prepared by Suzane Doucette in which she expresses her opinion about how certain aspects of the investigation could have been conducted differently, Affidavit of Suzane Doucette attached to Def. Mot. as Exhibit B ("First Doucette Affidavit") and Affidavit of Suzane Doucette attached to Def. Supp. as Exhibit F ("Second Doucette Affidavit"), an affidavit signed by co-defendant Dana Jarvis attached to Def. Supp. as Exhibit G, and an affidavit signed by defense investigator Milton Rodriguez, attached to Def. Supp. as Exhibit H.

[7] The United States notes that Ms. Doucette's opinions regarding the adequacy of the surveillance conducted in this case are based on the assumption that agents generated a report every time they conducted surveillance. Agents, however, conducted "spot check" surveillance on numerous occasions without generating reports because nothing significant was observed.

[8] The defendants assert that SA Stark made misleading statements in his affidavit by referring to a "spot check" or "drive-by" of a location as "surveillance." *See* Def. Supp. at 12 (alleging that SA Stark's assertion that surveillance was established at Jarvis's Santa Fe residence was false because "the only surveillance at that location on that day was a 'drive-by'"); *id.* at 13 (making the same assertion with regard to surveillance conducted at Jarvis's Bernalillo residence). They fail, however, to provide any definition of the word "surveillance" that is contrary to SA Stark's use of the word in his affidavit.

Indeed, the sheer number of locations associated with the Jarvis DTO cuts against the defendants' argument. It is simply unreasonable to expect agents to conduct continued surveillance at numerous locations without information that some relevant activity was afoot – it would be a waste of resources and the surveillance would eventually almost certainly be compromised.[9] In fact, when agents had such "actionable intelligence" they were able to conduct effective surveillance. For example, CS-3 stated that bulk cash was picked up by the Jarvis DTO from Greg LNU in Indiana. TT 1 Affidavit at ¶52. When agents learned that Reid's airplane was traveling to Indiana, they were able to follow the airplane to Bloomington, Indiana, observe Ayla Jarvis meeting with Greg Hill, and subsequently seize approximately $287,000.00 from Ayla Jarvis. *Id.* at 53-54. The defendants state that "[t]his surveillance by the Indianapolis DEA is a good example of the type of police work that should have been employed in this investigation." Def. Supp. at 23. But that surveillance <u>was</u> in conjunction with this investigation, which is why it was discussed in SA Stark's affidavit.[10]

---

[9] The same reasoning applies to pole cameras, which the defendants assert agents should have utilized. *See* Def. Supp. at 12, 17. On information and belief, the only pole cameras available to agents conducting this investigation were microwave cameras with a range of approximately one mile. Agents had to monitor such cameras in the field, which still would have subjected the agent to being compromised.

[10] Also with regard to surveillance, Ms. Doucette finds it "puzzling" that SA Stark stated that surveillance of Cathy Fitzgerald's residence at 28 Quail Run was difficult, when on one occasion, "just three agents watched the location closely enough to recount in their report several paragraphs of details regarding activities at and around the stash house location" with "no aerial or lookout support." First Doucette Affidavit at ¶73 (in her second affidavit, Ms. Doucette corrects herself to note that four agents conducted the

The fact that during the course of the wiretaps, "the Government employed additional surveillance activity with productive results," Def. Supp. at 24, does not support the defendants' argument. Indeed, the wiretap provided precisely the type of actionable intelligence that made surveillance more effective.

2.      Interviews of Witnesses and Use of a Grand Jury

In his affidavit, SA Stark explains why interviewing witnesses and using the grand jury would compromise the ongoing investigation. TT 1 Affidavit at ¶¶84-86. The defendants discuss how "records, documents, and a host of other items of evidence" can be obtained through the use of grand jury and administrative subpoenas. Indeed, the government did obtain such records from uninvolved third parties, such as banks, during the course of the investigation. The point of this section of SA Stark's affidavit, however, it that it was not feasible to subpoena people who were involved in the conspiracy to testify in front of the grand jury. The defendants do not challenge SA Stark's conclusion on that point.

With regard to interviewing witnesses, SA Stark stated: "Agents have not yet identified any individuals (other than the cooperating sources of information) considered

---

surveillance, Second Doucette Affidavit at ¶114). In fact, two of the "other officers" listed in SA Stark's report of that surveillance, SA McClung and SA Schmoler, are pilots who were conducting aerial surveillance. DEA 6 prepared October 29, 2004, attached hereto as Exhibit 7. As is clear from SA Stark's report, agents had actionable intelligence that Fitzgerald may have been in possession of several hundred pounds of marijuana, which justified the use of aerial surveillance on that day.

likely to provide information on the Jarvis DTO without revealing the investigation to its members." TT 1 Affidavit at ¶84; *see also Id.* at 85. In their supplement, the defendants also assert that agents should have interviewed "a potential source of information, Ms. Julie Sutton Laughton." Def. Supp. at 31-32. Surveillance had observed Ms. Laughton meet with Reid in Minden, Nevada. At that time, agents did not know whether Ms. Laughton might be involved with the Jarvis DTO, and the same reasoning regarding the risks of approaching a witness who might refuse to cooperate and compromise the investigation applied to her. Agents learned that Ms. Laughton's husband was a law enforcement officer and referred the matter to his department's internal affairs. In any event, the defendants do not even allege that Ms. Laughton possessed any relevant information regarding the Jarvis DTO that agents would have learned from interviewing her.

### 3.    Use of Confidential Informants

Throughout his affidavit, SA Stark describes in detail the information that had been supplied by three confidential sources during the course of the investigation. He then explains why those sources were not sufficient to allow the government to achieve the objectives of the investigation.

The defendants, however, claim that CS-3 was "underutilized" by the government. Def. Mot. at 31; Def. Supp. at 25-26.[11]  But CS-3 was far from being "the functional equivalent of an undercover officer who had penetrated the organization," as the defendants assert.  Def. Mot. at 33.  In his affidavit, SA Stark explained how useful CS-3's information had been to agents, but that CS-3 did not "currently have immediate access to information regarding the Jarvis organization conspirators and its methods" and that, despite attempts, CS-3 had been unable to "work back into the organization as a money courier."  TT 1 Affidavit at ¶82.  It is clear from SA Stark's affidavit that CS-3 had no specific real-time information regarding marijuana loads or money shipments.

The defendants also make much of a marijuana transaction that CS-3, under agents' direction, was attempting to negotiate between Jarvis and a man named John Whalen, and the fact that this transaction was ultimately abandoned.  As described in SA Stark's affidavit, CS-3 told Jarvis that Whalen wanted to purchase a 20 pound sample of marijuana before purchasing larger quantities on a regular basis; according to CS-3, Jarvis "was excited about the prospect of setting something up with Whalen."  TT 1 Affidavit at ¶60.  During subsequent negotiations between Whalen and CS-3, Whalen requested a one

---

[11]  In their supplement, the defendants also assert that CS-2 "could have done much more than she did."  Def. Supp. at 28-29.  But, other than to baldly assert that CS-2 could have worn a wire when meeting with Dana Jarvis, they fail to even allege precisely what more CS-2 could have done to obtain additional evidence of Jarvis's drug trafficking activities.  And they utterly fail to establish that SA Stark's statement in his affidavit regarding CS-2's ability to assist in the investigation is in any way false.

pound sample of marijuana.  *Id.* at ¶65.  Agents subsequently instructed CS-3 not to negotiate this transaction any further.  Although the reason for terminating this deal is not spelled out in the affidavit, it is clear that it simply was not feasible to consummate the deal – agents could not let CS-3 turn over a "sample" of marijuana to Whalen, and the alternative would be to arrest either Whalen or Jarvis for distribution of a relatively small amount of marijuana, thus compromising the investigation.  Contrary to the defendants' claim, the government did not "create its own 'necessity,'" Def. Mot. at 38, by terminating this deal.

SA Stark also explained in his affidavit that because CS-3 had "no interest in testifying or publicly providing information about conspirators" out of fear, "agents must develop independent evidence of the crimes being committed by the conspirators."  *Id.* The defendants assert that this statement is somehow misleading because "CS-3 was beholden to the Government," and therefore, "any claim in an affidavit that a cooperator 'has no interest in testifying' ought to fall on deaf ears."  Def. Mot. at 35; *see also Id.* at 36-37.  Courts, however, have upheld applications for wiretaps where the affidavit indicated that "potential witnesses were unwilling to testify in court because of fear of reprisal."  *United States v. Edwards*, 69 F.3d 419, 429-30 (10th Cir. 1995) (citation omitted).  *See also United States v. Scibelli*, 549 F.2d 222, 227-28 (1st Cir. 1977) (necessity requirement met where affidavit stated, among other things, that informants were unwilling to testify); *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976)

(determining that exhaustion requirement was satisfied where informants would not

testify because their lives and their families' lives would be in jeopardy); *United States v.*

*Matya*, 541 F.2d 741, 744-46 (8th Cir. 1976) (holding that necessity requirement met

where seven confidential informants refused to testify for fear of their personal safety);

*United States v. McCoy*, 539 F.2d 1050, 1056 (5th Cir. 1976) (necessity requirement met

where affidavit stated that informants would be unwilling to testify and no witness was

known who could testify as to full extent of gambling business); *United States v. Turner*,

528 F.2d 143, 152 (9th Cir. 1975) (finding necessity where informants were unwilling to

testify for fear of retaliation).

    The defendants go on to propose four members of the Jarvis organization – Donald

Trujillo, Barbara Hannah, Joseph Martin, and Dan Chomyn[12] – who they claim "the

Government could have recruited as informants, but chose not to."  Def. Mot. at 39; *see*

*also* Def. Supp. at 30-31 (regarding Donald Trujillo).  In his affidavit, however, SA Stark

specifically notes that "[a]gents have not yet identified any individuals (other than the

cooperating sources of information) considered likely to provide information on the Jarvis

DTO without revealing the investigation to its members" and that no "weak links" in the

organization had yet been identified.  TT 1 Affidavit at ¶84.  The agents who were

conducting this covert investigation simply could not take the chance of approaching

---

[12]  The defendants also reference Kara Gold and Jude Austin later in their motion.
Def. Mot. at 43.

someone who would then reveal the existence of the investigation to Jarvis or another member of his organization.  As SA Stark stated:  "At this stage in the investigation it appears pointless and foolish to attempt to interview witnesses."  *Id.*  After-the-fact supposition about who may have been willing to cooperate with the government is insufficient for the defendants to sustain their burden.[13]

The Ninth Circuit has noted the inherent reliability and high value of wiretap evidence compared to informant testimony:

> [T]he government is to be commended for its interest in wiretap evidence, which, compared to the word of an informant either in the field or in court, is the gold standard when it comes to trustworthy evidence.  The truth-seeking function of our courts is greatly enhanced when the evidence used is not tainted by its immediate informed source and has been cleansed of the baggage that always comes with them.  Moreover, wiretap evidence out of the mouths of defendants is valuable corroboration of informant testimony.  Such evidence also serves to ensure that what investigators are being told by informants is accurate, a very valuable function that guards against the indictment of the innocent. . . . Thus, we conclude that a reasoned review of a wiretap request must take into account the added difficulty, expense, and danger of using informants . . .

---

[13]  The defendants note that Trujillo, Hannah, Martin, and Chomyn are each "listed by the Government as a cooperating witness."  Det. Mot. at 40-41.  Of course, the fact that someone decides to cooperate after being arrested or after an investigation has gone overt and the organization has been dismantled does not mean that the same person would have otherwise cooperated when approached by agents.  In fact, in his affidavit, SA Stark notes that a "weak link" in an organization is usually targeted by agents "because strong evidence has been gathered implicating the individuals in criminal activity.  Agents are then able to approach the individual and seek his/her cooperation in exchange for a more lenient prosecution."  TT 1 Affidavit at ¶84.  That is precisely what happened with Donald Trujillo after he was arrested while transporting 205 pounds of marijuana during the course of the wiretaps.

*United States v. Canales Gomez*, 358 F.3d 1221, 1227 (9th Cir. 2004).

4.    Use of Undercover Agents

SA Stark addressed this investigative technique in his affidavit, stating that there were no undercover agents who had infiltrated the Jarvis DTO, and that none of the confidential informants had the ability to introduce an undercover agent into the organization. TT 1 Affidavit at ¶90. SA Stark concluded that "there is no reasonable way to use the traditional investigative technique of undercover agents to achieve the objectives of the investigation."

The defendants argue that CS-3's apparent ability to arrange a deal between Whalen and Jarvis suggests that CS-3 could have introduced an undercover agent to Jarvis. Def. Mot. at 44. However, Jarvis never agreed to meet with Whalen. In fact, when CS-3 told Jarvis that Whalen was interested in meeting with Jarvis or with CS-3 on Jarvis's behalf, Jarvis responded, "I like that 'behalf' word better." *Id.* at 61. If anything, this conversation demonstrates that Jarvis did not completely trust CS-3.

In their supplement, the defendants assert that "with some effort the Government could have placed an agent in [Club Rhythm and Blues]." Def. Supp. at 6. Placing an undercover agent in the club, however, would have taken tremendous resources. Such an agent likely would have had to work several shifts a week. During each shift, other agents would have been required to conduct surveillance for the safety of the undercover agent. It would likely have taken months – if ever – for the undercover agent to gain

enough trust to be invited into the organization.  And even then, as noted in SA Stark's affidavit, "[i]t is likely that even if an undercover agent was introduced to the organization, that agent would be assigned a task that involved illegal activity" in which the agent would be prohibited from engaging under DEA policy.  TT 1 Affidavit at ¶ 88.

The use of a professional informant, Def. Mot. at ¶45, is no different than the use of any undercover agent.  If the informant was not already a member of the organization, he would have to be introduced into the organization.  And, as SA Stark made clear in his affidavit, that simply was not feasible.

5.    Use of Search Warrants

In his affidavit, SA Stark noted the beneficial aspects of using search warrants to obtain evidence, but concluded that "the execution of search warrants at this time is not likely to achieve the objective of the investigation."  TT 1 Affidavit at 83.  The defendants do not directly challenge this conclusion.  Rather, they discuss other techniques that they claim should have been used in this case, such as "knock and talks" or "wall-off" traffic stops (referred to by the defendants as "whisper stops").  Def. Mot. at 51-52.  Oddly, the defendants then reference three "wall-off" stops purportedly conducted in this case, the first two of which occurred before the initiation of the wiretaps.  The first, involving the seizure of $400,000.00 in U.S. currency from Kara Gold and Jude Austin, TT 1 Affidavit at ¶¶31-37, was not a "wall off" stop at all.  Rather, agents investigating this case found out about the currency seizure after the fact.  The second, involving the

23

seizure of roughly $287,000.00 in U.S.currency from Ayla Jarvis, was a true "wall off"

stop. And, far from concealing the possibilities of such a stop from Judge Conway, as the

defendants assert, Def. Mot. at 53, SA Stark discusses this incident in detail. *See* TT 1

Affidavit at ¶¶53-54.[14]

True, these techniques are not listed in SA Stark's discussion of alternative

investigative techniques. But "knock and talks" and "wall off" stops are not listed by the

Tenth Circuit as traditional investigative techniques. And for good reason. Agents

cannot indiscriminately knock on the doors of organization members or stop their cars.

"Knock and talks" and "wall off" stops require knowledge about specifics of a load –

actionable intelligence – that agents simply did not consistently have in this case.

6.    Pen Register and Trap and Trace Devices

In his affidavit, SA Stark describes how toll records, pen register, and trap and

trace information had been used in the investigation. TT 1 Affidavit at ¶70 and 73. He

noted, however, that "[p]en register information only indicates contact between

telephones from which inferences can be drawn." *Id.* at ¶73. Thus, he concluded that

"these techniques can only provide limited information and will not reveal the full scope

of this investigation." *Id.* It has been held to be sufficient for a wiretap application to

show that trap and trace devices were tried but reasonably appeared to be unlikely to

---

[14]  The third stop referenced by the defendants, the traffic stop of Donald Trujillo
during the course of the wiretaps, was not a "wall off" stop. Trujillo was stopped by a
local officer in Nebraska without the prior knowledge of DEA agents.

succeed in advancing the investigation. *See United States v. Garcia*, 232 F.3d 1309, 1315 (10th Cir. 2000).

      7.    <u>Other Investigative Techniques</u>

      a.    <u>Trash Runs</u>

SA Stark also described in his affidavit agents' unsuccessful attempt to examine discarded trash from Jarvis's residence at 13 Enebro in Santa Fe. TT 1 Affidavit at ¶74. Thus, this investigative technique was attempted and had failed. Moreover, trash runs were unlikely to be successful in this investigation because, as noted by SA Stark, "[a]ccording to CS-3 Jarvis instructs his workers to watch what they throw away." *Id.* The defendants' second-guessing of the manner in which the trash run was attempted at 13 Enebro, Def. Mot. at 47-48; Def. Supp. at 26-28, is nothing more than "Monday morning quarterbacking."[15]

      b.    <u>Financial Investigation</u>

The defendants assert that conducting a financial investigation of a drug trafficking organization is "a normal investigative technique that was not utilized, without explanation." Def. Mot. at 46; *see also* Def. Supp. at 29-30 (regarding tracking of

---

[15] The defendants' criticism is based in part on a false premise, that "[t]he trash run utilized a plain pick-up truck with no trash company markings on the side to attempt to exchange the trash barrels." First Doucette Affidavit at ¶60. But SA Stark's report of this attempted trash run clearly states that "a representative of Waste Management <u>in an official company truck</u> attempted to replace the full trash receptacle on the street in front of 13 Enebro with an empty container." DEA 6 prepared June 13, 2002, attached hereto as Exhibit 6 (emphasis added).

Jarvis's credit cards). However, financial investigations are not deemed by the Tenth

Circuit to be a traditional investigative technique that must be discussed in a wiretap

affidavit. The fact that SA Stark did not discuss in his affidavit the "technique" of

conducting a financial investigation does not cut against Judge Conway's finding that the

affidavit demonstrates necessity. *See Cline*, 349 F.3d at 1280 (If it has not tried [the five]

traditional techniques, the government must explain that failure with particularity).

c.    <u>Investigation of Club Rhythm and Blues</u>

In their supplement, the defendants assert that the government should have

investigated Club Rhythm and Blues under the guise of a liquor license inspection. Def.

Supp. at 7-10. The defendants' discussion is replete with examples of how certain

violations could result in "revocation, suspension or fine." *Id.* at 8-9. It is unclear

precisely how such penalties would have assisted agents in their drug trafficking

investigation. According to the defendants, such an inspection would have put the

government "in a position to obtain additional information about Dana Jarvis, the DTO,

financial matters and the role of the Club in the DTO." *Id.* at 10. However, agents

already knew that the role of the club in the Jarvis DTO was to launder drug proceeds.

<u>Even if</u> a liquor license inspection would have somehow confirmed that money was being

laundered through the club, the government would still have had to prove that the money

was the proceeds of a specified unlawful activity – such as drug trafficking. And such an

inspection would have produced no evidence in that regard. The defendants have failed

26

to establish that this is the type of ordinary investigative procedure that must be attempted before obtaining authorization for a wiretap.

### 8.     Investigations Conducted by Other DEA Offices

The defendants assert that SA Stark's affidavit did not contain a "'full and complete statement as to whether or not other investigative procedures have been tried ...'" as required by 18 U.S.C. § 2518(c) because "there were at least two investigations being conducted into this group by other agents that were not disclosed in the Government's affidavits." Def. Supp. at 35-37. Parallel investigations are simply not, however, "investigative procedures" that must be discussed pursuant to Section 2518(c). Moreover, the investigations being conducted by agents in Tucson, Arizona and Bloomington, Indiana, however, were in conjunction with this case, as specifically noted in SA Stark's affidavit. *See* TT 1 Affidavit at ¶¶25-28 (discussing information obtained by DEA office in Tucson and subsequent investigation); *Id.* at ¶54 (discussing investigation in Bloomington).

### 9.     The TT 2-4 Affidavit

The defendants assert that there was an insufficient showing of necessity in the TT 2-4 Affidavit because "[t]he affidavit does not explain whether standard investigative techniques were attempted with regard to Ripley,[16] or why agents would not reasonably

---

[16] As noted above, George Ripley was the person who was utilizing Target Telephone 2.

expect standard investigative techniques to be fruitful as to him." Def. Mot. at 70. The government's investigation in this case, however, was not targeting George Ripley individually. It was targeting the Jarvis organization as a whole. In that regard, SA Stark's discussion of necessity was more than sufficient. *See Cline*, 349 F.3d at 1283 (Many of the problems the agents encountered investigating the drug organization were not unique to Cline, but applied to the entire organization and its structure, and so the failure to specifically name Cline repeatedly was not fatal to the affidavits"); *United States v. Mitchell*, 274 F.3d 1307, 1312 (10th Cir. 2001) (rejecting argument that the government had to show necessity as to all named interceptees).

> D.    Post Cut-Through Dialed Digits

The defendants claim in their motion that they have "reason to believe that in this case the Government unlawfully obtained the content of certain communications before court-ordered wiretap authorizations were signed, by capturing digits dialed after telephone calls were connected." Def. Mot. at 60. The pen register statute, however, simply requires the following:

> A government agency authorized to install and use a pen register or trap and trace device under this chapter or under State law shall use technology reasonably available to it that restricts the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communications.

18 U.S.C. § 3121(c) (emphasis added).

28

The defendants cite to no authority whatsoever for the proposition that suppression of the wiretaps would be the appropriate remedy for obtaining post cut-through dialed digits through the court-authorized use of a pen register or trap and trace device. In fact, violation of the pen register statute does not result in an unconstitutional search and Congress did not provide for exclusion of evidence for violation of the statute. *United States v. Thompson*, 936 F.2d 1249 (11th Cir. 1991); *see also United States v. German*, 486 F.3d 849, 853-54 (5th Cir. 2007).

In *Thompson*, the defendant filed a motion to suppress information gained from an illegally obtained pen register. There was no disagreement that the information from the pen register was, in fact, illegally obtained. The defendant claimed that since such information was utilized to support probable cause in an affidavit supporting a Title III wiretap, the information obtained through the wiretap must also be excluded. In rejecting the defendant's claim, the court found no constitutional or statutory basis to support the defendant's claim, and specifically held, "that information obtained from a pen register placed on a telephone can be used as evidence in a criminal trial even if the court order authorizing its installation does not comply with the statutory requirements." *Thompson*, 936 F.2d at 1249-1250.

Moreover, it is clear from a reading of the four corners of SA Stark's affidavit that no post cut-through dialed digit information was used to obtain the wiretaps in this case. Therefore, this section of the defendants' motion is simply irrelevant.[17]

      E.    *Leon* Good Faith

Under *United States v. Leon*, 468 U.S. 897, 914-923 (1984), an agents good faith reliance on a facially valid warrant precludes suppression of the evidence. Exclusion of wiretap evidence is provided for by statute, as opposed to the judicially-created exclusionary rule dealt with in *Leon*. Nevertheless, two of the three circuit courts that have considered this issue have held that the *Leon* good faith doctrine applies to wiretap orders. *United States v. Moore*, 41 F.3d 370, 376-77 (8th Cir. 1994); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988). As noted by the defendants, the Sixth

---

[17] The defendants assert that they "requested that the Government disclose the raw data from its pen register interceptions to determine whether content was captured that should not have been," but that "the Government "instead has disclosed data in a manipulated format that does not permit the defense to ascertain whether content was captured or not." Def. Mot. at 61-62. As discussed in the United States' response to defendant George Osgood's "Motion to Compel Discovery Related to Pen Register, Cell Phone Site, or GPS Data" (Doc. 1633) (the Osgood Motion), the "manipulated format" to which the defendants refer is a computer program used by DEA called Penlink. On information and belief, all of the pen register / trap and trace data received by DEA was downloaded into the Penlink program. The United States previously provided the defense with this Penlink data in response to a defense request. The defendants did not claim that this data was insufficient until now – more than two years later. For the reasons stated in the United States' response to the Osgood Motion, the Court should deny the defendants' request for additional discovery in this regard.

Circuit has held to the contrary. *United States v. Rice*, 478 F.3d 704, 711-14 (6th Cir. 2007). The Tenth Circuit has not passed on this issue.

The United States urges this Court to adopt the reasoning of the Eighth and Eleventh Circuits and hold that, even if SA Stark's showing of necessity was somehow lacking, suppression of the wiretap evidence in this case is not appropriate because the agents relied in good faith on the existence of a facially valid wiretap order. The wiretap order in this case is supported by a forty-five page affidavit in which SA Stark discusses in detail the probable cause supporting the issuance of a wiretap order and the necessity for the wiretap. In these circumstances, suppression would simply provide no deterrent effect.

F.    The Defendants Are Not Entitled to a *Franks* Hearing

Allegations of misrepresentations and omissions in a wiretap application are reviewed "under the standards for challenges to search warrants developed by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 171 [ ] (1978)." *United States v. Small*, 423 F.3d 1164, 1172 (10th Cir. 2005). Under *Franks*, "when a defendant shows that an affiant made a false statement knowingly and intentionally, or with reckless disregard for the truth, the search warrant must be voided if the affidavit's remaining content is insufficient to establish probable cause." *United States v. Knapp*, 1 F.3d 1026, 1028 (10th Cir. 1993). The *Franks* rule extends to an affiant's intentional or reckless omission of material facts which, if included in the affidavit, would vitiate probable

31

cause.  *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001).  It is the

defendants' burden to demonstrate the affidavit's falsity or reckless disregard for the truth

or the intentional or reckless omission of material facts from the affidavit by a

preponderance of the evidence.  *See United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir.

2001).  A defendant is entitled to a hearing on allegations of falsities in or material

omissions from an affidavit only where he "makes a substantial preliminary showing that

a false statement knowingly and intentionally, or with reckless disregard for the truth, was

included by the affiant in the warrant affidavit, and if the allegedly false statement is

necessary to the finding of probable cause."  *Franks*, 438 U.S. at 155-56.

In *Franks*, the Supreme Court "was careful . . . to avoid creating a rule which

would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a

bare allegation of bad faith. It crafted, therefore, a rule of very limited scope." *United

States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982).  "To mandate an evidentiary

hearing, the challenger's attack must be more than conclusory and must be supported by

more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

Mere assertions by counsel in a pleading, unsupported by an affidavit, are not

acceptable evidence. *United States v. Michlin*, 34 F.3d 896, 899 and n.1 (9th Cir. 1994)

(statement in brief was not evidence).  This principle applies when a wiretap affidavit is

challenged on the basis of *Franks*.  "A bare assertion falls short of the preponderance of

the evidence that *Franks* requires." *Chavez-Miranda*, 306 F.3d at 979.  Thus, in order to

obtain a *Franks* hearing, the defendant must offer real evidence, not just unsupported assertions.

> Allegations of deliberate falsehood or of reckless disregard for the truth . . . must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits, or sworn or otherwise reliable statements, of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.

*Id.*  When a defendant's counsel represented that he would present evidence of reckless disregard for the truth if given a *Franks* hearing, but provided no affidavit or offer of proof to support his allegations, the district court "correctly held that the failure to make a substantial showing precluded holding a *Franks* hearing."  *United States v. Furrow*, 229 F.3d 805, 815 (9th Cir. 2000), overruled on other grounds by *United States v. Johnson*, 256 F.3d 895, 913 (9th Cir. 2001); *see also Meling*, 47 F.3d at 1553-54 (where defendant offers "nothing more than his own speculation" and expressions of disbelief about FBI statements in a wiretap application, "that disbelief does not amount to the substantial showing required under *Franks*").

1.    The Defendants Have Not Shown That SA Stark Intentionally or Recklessly Included Any Material False Statements or Omitted any Material Information in His Affidavit

Nine specific allegations of SA Stark including material false facts or omitting material facts from his affidavit are apparent in the defendants' motion and supplement. The United States addresses each assertion below.

a.     <u>CS-3</u>

The defendants assert that "the Government has more leverage over CS-3 than it disclosed and that it intentionally withheld this fact from the Court." Def. Mot. at 35; *see also* Def. Supp. at 26 (asserting that agents "were in a position to have applied pressure" on CS-3). This assertion is not based on fact, however, but on co-defendant Dana Jarvis's conclusory claim that CS-3 was "well known in Santa Fe as a cocaine dealer," Def. Ex. G at ¶3, and Ms. Doucette's "information and belief" that CS-3 "was a cocaine dealer in Santa Fe and his cooperation with the Government was as [sic] result of his activities selling cocaine ...." First Doucette Affidavit at ¶79. In his affidavit, SA Stark stated the following with regard to CS-3:

> CS-3 initiated contact with law enforcement regarding the Jarvis DTO and has provided information and active cooperation in exchange for payment and an offer of immunity. As detailed more fully below, CS-3 was a member of the Jarvis DTO for several years and is still in contact with Jarvis. CS-3 was convicted of commercial burglary and sentenced to probation. CS-3 has no pending criminal charges. The information provided by CS-3 has been substantially corroborated by subsequent investigation and by information provided by other confidential sources. Therefore, CS-3 is believed to be reliable and the information provided is believed to be accurate.

TT 1 Affidavit at ¶24(c).

The defendants have not established that anything in this statement is untrue or that SA Stark withheld any material fact regarding CS-3. Even if the defendants' allegation

about CS-3's cocaine trafficking were true,[18] they do not show that SA Stark knew of it.

Moreover, SA Stark specifically noted CS-3's involvement in the Jarvis DTO and that one

of CS-3's motivations in providing information was an offer of immunity.  Therefore, any

information about CS-3 being a cocaine dealer would have had minimal, if any, impact on

CS-3's credibility.

          b.    <u>The Red Van</u>

In his affidavit, SA Stark recites that "CS-3 stated the organization had a red

Volkswagen van equipped with digital cameras and night vision equipment that it used

for surveillance."  TT 1 Affidavit at 20.  SA Stark then noted that agents had discovered a

red Volkswagen van at a residence that CS-3 had reported was used as a money count

house by Jarvis and had previously been occupied by Angela Cummings.  The defendants

assert that this was "completely untrue."  Def. Mot. at 55.  They base this assertion on an

interview by Suzanne Doucette of the alleged owner of the van, William Kasso, who

claims that "Dana Jarvis has never driven the van, that there has never been any

surveillance equipment in the van, including night vision equipment," First Doucette

Affidavit at ¶81, and on Dana Jarvis's claim that he "did not use the mentioned red van

for any type of surveillance or counter-surveillance" and that "[t]here was never any

---

    [18]  The government disputes this allegation and to date – contrary to the
defendants' assertions – has no knowledge of CS-3 being a cocaine dealer.  Agents did,
however, instruct CS-3 to inform others that he/she was a cocaine dealer to bolster CS-3's
credibility as he/she attempted to work back into the Jarvis DTO.  It is highly likely that
this is the basis for Ms. Doucette's unattributed "information and belief."

surveillance equipment installed in the van." Def. Supp., Exhibit G at ¶6. Ms. Doucette proceeds to assert that information from CS-3 that Mr. Kasso's wife, Angela Cummings, "was involved in criminal conduct was apparently untrue." First Doucette Affidavit at ¶83. Even assuming the truth of Mr. Kasso's and Mr. Jarvis's statements, however, this does not establish that CS-3 was not truthfully relaying to SA Stark what he/she had been told about the van. Furthermore, Ms. Cummings has admitted to agents that she indeed counted bulk cash for the Jarvis organization at that very house and stored bulk cash in safes owned by Mr. Kasso, thus corroborating CS-3's information.

In any event, the defendants have failed to establish that SA Stark intentionally or recklessly included false information in the affidavit. "It is not enough to show that the informant deliberately lied to the unsuspecting affiant." *United States v. Hernandez*, 829 F.2d 988, 992 (10th Cir. 1987).

### c.    Closed Organization

In his affidavit, SA Stark stated: "Information from CS-2 and CS-3 indicates that Jarvis and his associates are long time, long term drug associates, family members, or individuals that have worked with Jarvis at his night club and were later recruited into the organization." *Id.* at ¶88. The defendants claim that this statement is untrue, but the only person they point to who does not fit this description is David Reid. Def. Mot. at 42. The basis of this statement is information provided by CS-2 and CS-3, neither of whom even knew Reid. Of course, during the course of its investigation, the government learned

36

more about the members of the Jarvis DTO, including Reid. So while the government's

theory of <u>prosecution</u> as to Reid may be that he became aware of Jarvis's illegal activities

after he began flying for Jarvis, the defendants fail to even allege that SA Stark knew how

Reid became a member of the organization when he executed the affidavit in this case.

Moreover, the government's theory of prosecution as to Reid does fit the description of

Reid being someone who worked legitimately for Jarvis and was subsequently recruited

into the drug organization.

        d.     <u>Arrests for Which Dispositions Were Unavailable</u>

The defendants assert that SA Stark omitted information regarding the dispositions

"for many of the arrests discussed" in his affidavit. Def. Mot. at 63. The only specific

arrests that the defendants address, however, are two arrests of Dana Jarvis. The first was

a May 7, 1979 arrest for possession of marijuana, fleeing from police and driving while

intoxicated, for which SA Stark stated the disposition was unknown. TT 1 Affidavit at

¶10. The second was a February 24, 1984 arrest for distributing a controlled substance,

which SA Stark stated was transferred to the state of New Mexico for prosecution and the

disposition of which he stated was unknown. *Id.* While the defendants claim that the

dispositions could have been easily obtained,[19] they do not show that SA Stark's

statement that the dispositions were unknown to him is false. Nor do they establish that

---

[19] The United States disputes this claim, at least with regard to the second arrest.
Even Pretrial Services was unable to determine the correct disposition of that arrest at
Jarvis's initial detention hearing.

these dispositions, if they had been included in the affidavit, are material to the determination of probable cause.

e.    Donald Trujillo

The defendants next assert that CS-3's statement that Donald Trujillo was a pilot for the organization was false, and that if SA Stark had checked FAA records he would have learned that Trujillo was not a licensed pilot.  Def. Mot. at 63.  Nowhere in his affidavit, however, does SA Stark assert that Trujillo was a <u>licensed</u> pilot, and it is not uncommon for large-scale drug trafficking organizations, which are already engaged in an illicit enterprise, to use unlicensed pilots.[20]  In any event, the defendants do not even attempt to demonstrate how this information is material to Judge Conway's finding of probable cause.  Even if SA Stark had included the fact that Trujillo was not a licensed pilot in his affidavit, it does not undercut CS-3's credibility, as CS-3 was simply relaying to SA Stark what Trujillo had told him/her.  *See* TT 1 Affidavit at ¶51 ("Trujillo told CS-3 that he always flew with another pilot, and that his (Trujillo's) mission was to fly Jarvis around the country to meet with drug associates and to plan future drug transactions").

---

[20]  Just as one can physically drive a car without a valid driver's license, one can pilot a plane without a pilot's license.

f.    Ayla Jarvis Money Seizure

In his affidavit, SA Stark included the following information with regard to the

seizure of approximately $287,000.00 from Ayla Jarvis in Bloomington, Indiana on

October 28, 2004:

> On October 27, 2004 the United States Customs Service Air/Marine
> Operations Center (AMOC) tracked the aircraft bearing tail number N3AJ
> from Tucson, Arizona, to Oklahoma City, Oklahoma. Your Affiant followed
> N3AJ in a U.S. Customs aircraft and observed pilot David REID and
> passenger Ayla JARVIS exit N3AJ in Oklahoma City. REID and Ayla
> JARVIS were followed to a hotel where Ayla registered under the name Imre
> PETROCZKY. On October 28, 2004, AMOC tracked N3AJ from Oklahoma
> City to Bloomington, Indiana. Your Affiant contacted CS-3 who stated that
> Ayla JARVIS was most likely going to pick up a bulk cash shipment from
> Greg LNU.

> Your Affiant contacted DEA agents in Indianapolis who established
> surveillance at the Bloomington airport. After the aircraft landed, Ayla
> JARVIS was observed departing the aircraft and entering a van that appeared
> to have been left for her in the airport's parking lot. Ayla JARVIS was
> observed driving away from the airport, the sole occupant of the vehicle.
> Agents observed her meet a man later identified as Greg HILL at a local
> restaurant. Ayla JARVIS left the meeting with HILL and drove in the
> direction of the Bloomington airport. Ayla JARVIS was stopped by an Indiana
> State Police Officer for a traffic violation. During the interview of Ayla
> JARVIS, the Officer observed very nervous behavior. The officer ran a
> canine, trained to alert to the odors of illegal drugs, around the outside of the
> vehicle. The dog alerted to the driver's side door. The Officer read Ayla
> JARVIS her *Miranda* rights and told her he intended to search the vehicle.
> JARVIS told the officer there was a bag of money beside her, but that it was
> her father's. She later told the officer her father did not believe in banks, and
> the money was going to be used to buy an airplane. The Officer subsequently
> seized $287,210.00 from Ayla JARVIS and allowed her to go. Ayla drove
> back to the airport and was observed meeting with the pilot, REID. A short
> time later, the Officer received a call from REID stating that he was Ayla's
> father. REID left his cellular telephone number, 520-251-0243, as a contact
> number. He told the Officer that the Officer could keep half the money if the

other half was returned.  The Officer explained that the case would have to be adjudicated in court.  Ayla JARVIS and REID flew back to Santa Fe, New Mexico a day later.

TT 1 Affidavit at ¶¶53-54 (emphasis added).

The officer's report regarding this incident, which is attached hereto as Exhibit 5,

details the following facts:

Shortly after leaving the scene, I received a message from the Jasper Post to contact a DAVID REED @ (520) 521-0243 reference the money that I seized. I called MR. REED and he told me that the money that I seized was his and that it was to be used on a down payment on a King Air airplane.  He also to me that there was $287,300.00 in the bag.  He further stated that he could send me written documentation to verify that the money was for an airplane.  I explained to him that we had probable cause to seize the money based on the suspicious circumstances.  I also explained the forfeiture process to him and told him that I had provided a written receipt to his daughter for the currency. On 10-29-04, I received another message to contact MR. REED.  During this conversation, he told me that he had spoken to his attorney and that he was willing to enter into a "compromising agreement" where he would donate $25,000.00 to the Troopers fund in exchange for the return of the remainder of the money.  He also told me that it was not a bribe.  I told him that those decisions were not up to me, but would be handled between his attorney and the asset forfeiture personnel.  He told me that he hoped that all that could be avoided by making a "compromising agreement".  I told him that he would be contacted by the forfeiting agency in the near future.  On 10-29-04, I learned that the money would be adopted and seized federally.

Indiana State Police Case Report of Trooper Kirby Stailey at 3, attached hereto as Exhibit

5 (emphasis added).

There is clearly a discrepancy between SA Stark's affidavit and the officer's report

regarding Reid's offer to donate money to the Troopers Fund.  But this discrepancy is not

material to Judge Conway's finding of probable cause.[21]  The defendants assert that the

discrepancy is somehow material because it gives "much greater weight to designation of

Mr. Reid as a target interceptee," Def. Mot. at 66, but they do not demonstrate how the

inclusion of the correct information would have negated probable cause for the wiretap.

Moreover, the undisputed facts still show a suspicious offer by Reid to "donate" a

substantial amount of money to the Trooper's fund as part of a hasty "compromising

agreement" in exchange for the return of the remainder of the bulk currency.

g.    Ayla Jarvis's Pilot's License

In the introductory portion of his affidavit, in his description of Ayla Jarvis, SA

Stark included the following sentence:  "A query of the Federal Aviation Administration

database revealed that Ayla Jarvis has a listed address of 12711 East Cabeza de Vaca in

Tucson, Arizona on her pilot's license."  TT 1 Affidavit at ¶11.  The defendants assert

that this is false because Ayla Jarvis "never had a pilot's license."  Def. Supp. at 29.

Federal Aviation Administration records confirm, however, that Ms. Jarvis did, in fact,

have a student pilot's license.  *See* Exhibit 8.  Thus, this statement is not false.  But even

---

[21]  The defendants assert that SA Stark's statement that the officer received a call
from Reid is false.  Def. Mot. at 64.  In fact, as reflected in Trooper Stailey's report, Reid
did call and left a message for Trooper Stailey.  When Trooper Stailey called Reid, he was
returning Reid's call.  Furthermore, SA Stark's affidavit and the officer's report are
consistent regarding Reid claiming to be Ayla Jarvis's father.  *See* Def. Mot. at 64
(claiming that Reid did not state that he was Ayla's father).  In any event, these facts are
simply not material to the probable cause determination.

if it were false, it is not material, as it was not included in the affidavit to establish

probable cause but simply to provide Ms. Jarvis's address.

        h.      <u>Information from CS-2 Regarding Amount of Money
Dana Jarvis Wanted to Launder Through Club Rhythm
and Blues</u>

The defendants claim that a liquor license inspection of Club Rhythm and Blues

"would have made it obvious to the authorities that laundering $750,000 per month

through the Club would have been impossible." Def. Supp. at 5-6. According to the

defendants, this would have called into question the veracity of CS-2. *Id.* The

information provided by CS-2, however, was that "Jarvis wanted to launder $750,000.00

per month through the club, but Eileen Fitzgerald stopped him ...." That Jarvis may have

wanted to launder an amount of money that was not feasible through the club does not

call into question the veracity of CS-2. But even if it did, the defendants have not

established that this statement is material to the determination of probable cause.

        i.      <u>Tracking of Reid's Airplane</u>

Finally, the defendants allege that SA Stark should have informed the court in his

affidavit that he had placed a "lookout" on Reid's airplane through the Customs Service

Air/Marine Operation Center ("AMOC"), and that a tracking device had been installed on

the plane. Def. Supp. at 34-35. SA Stark did, however, inform the court of agents'

ability to track the airplane through AMOC. TT 1 Affidavit at ¶53 (discussing tracking of

plane Tucson to Bloomington, Indiana). Furthermore, a "lookout" and a tracking device

are simply aids to surveillance, and their existence does nothing to change SA Stark's overall opinion regarding surveillance.

2.    Defendants' General Assertions the SA Stark's Affidavit Was "Misleading" Do Not Warrant a *Franks* Hearing

Ultimately, with respect to their *Franks* claim, the defendants appear to assert that SA Stark's statement that a wiretap was necessary was itself false. *See, e.g.*, Def. Supp. at 32-34.[22]  That claim, however, begs the legal question: were the sections discussing necessity in the affidavits legally sufficient?  There is no need for a *Franks* hearing for this Court to decide that question.  That is a question of law that now has properly been presented to the Court in the pleadings.[23]

---

[22]  In this portion of their supplement, the defendants allege that "[t]he implication that traditional investigative techniques would have somehow endangered law enforcement officers is utterly false."  Def. Supp. at 32.  Incredibly, the defendants assert that there "were no guns used anywhere in this case" and "[t]here was no violence in this case."  *Id.*  The reality is far different.  For example, during the course of the wiretap interceptions, a call was intercepted between Dana Jarvis and Melania Kerwin, whom Jarvis believed was selling marijuana that she had stolen from him.  During the call, Jarvis told Kirwin, "Do you know what happens to people who burn other people?  They get gasoline splashed on them and they get lit on f—ing fire."  And after the initial indictment was returned in this case, agents learned of a storage unit utilized by Jarvis in Tucson.  During a subsequent search of the storage unit, agents discovered a cache of weapons, including an Uzi submachine gun.  The report detailing this information is attached hereto as Exhibit 9.  The defendants are also in possession of a report of interview of CW4 in which she describes acts of violence committed against her by Jarvis, including an incident in which he fired a gun at her.

[23]  In their motion, the defendants repeatedly ask this Court to conduct a *Franks* hearing so that they can obtain evidence to support their allegations.  *See, e.g.*, Def. Mot. at 35, 38-39, 45, 53; Def. Supp. at 26, 29, 31, 32 n.10, 36.  In other words, the defendants ask this Court to order a *Franks* hearing so that they can fish for evidence that would entitle them to a *Franks* hearing.  But a *Franks* hearing is not the mechanism by which to

3.    The Affidavits Attached to the Defendants' Motion Do Not
Merit a *Franks* Hearing

In an attempt to meet their burden of making a substantial preliminary showing that SA Stark's affidavit includes material false information or omits material information, the defendants attach the affidavits of Suzanne Doucette, David Reid, Dana Jarvis, and defense investigator Milton Rodriguez.  Specific allegations of false statements or omissions in SA Stark's affidavit are discussed above; no allegation in any of the affidavits is sufficient to merit a *Franks* hearing.  Ms. Doucette's affidavits, which are more as an act of advocacy on her part than the detached exposition of the opinions of an expert witness,[24] do nothing more than establish that Ms. Doucette would have conducted the investigation differently.  That the defense, in hindsight, can suggest

_____

obtain evidence to make the preliminary showing necessary to trigger a *Franks* hearing. This Court should reject this circular reasoning and decline to conduct such a hearing.

    [24]  A single sentence sums up Ms. Doucette's lack of credibility as a detached expert:  "In my opinion, this case was a routine marijuana case."  First Doucette Affidavit at ¶8.  As this Court is well-aware from over three and a half years of extensive litigation, this case is anything but routine.  Even defendant Reid has acknowledged the complexity of this case:

> The nature and background of this case is unique.  It is an incredibly complex case for a number of different reasons.  There are well over one hundred thousand pages of disclosure.  Initially, more than twenty defendants were indicted as allegedly involved in a far-flung conspiracy spanning fifteen or more years.  The roles of the defendants were extremely disparate in that some had pervasive, overall, long-term activity while others simply engaged in isolated acts over a brief time span.

Supplemental Memorandum in Support of Previously Filed Discovery Motions (Doc. 1532) at 1-2.

alternative ways in which  the investigation might have been conducted does not matter. What matters is whether Judge Conway abused his discretion in finding that the government, given the practicalities of the particular investigation, had reasonably exhausted the traditional methods of investigation available to it.  And it is for this Court, not Ms. Doucette, to make that determination.

Under the defendants' approach, a defendant can satisfy his burden of demonstrating intentional or reckless falsity simply by imagining ways in which the government could have investigated the case without resorting to a wiretap.  This approach is impermissible under the Tenth Circuit's precedents because it dramatically lowers the *Franks* bar and would permit virtually every defendant to force the government into a hearing.

This Court should find that the defendants have not satisfied their burden of showing that any statements in the affidavits were intentionally or recklessly false.  The Court should not conduct a *Franks* hearing and should deny the defendants' motion on the pleadings.

IV.     <u>CONCLUSION</u>

In the final analysis, the defendants' objection to Judge Conway's finding that the government sufficiently demonstrated the necessity of intercepting wire communications amounts to second-guessing the manner in which the government conducted its investigation.  The Court should reject the defendants' methodology. *See, e.g., Carneiro*,

861 F.2d at 1178 ("Appellants' contentions are not persuasive.  They merely suggest, with the benefit of hindsight, alternative ways that the DEA could have pursued its investigation.  The investigative methods used by the DEA were potentially productive. The fact that the DEA could have taken different or some additional steps in its investigation does not demonstrate that the district court abused its discretion in upholding the wiretap order").

In *United States v. Orozco*, 630 F.Supp. 1418, 1509 (S.D. Cal. 1986), the defense presented evidence of the viability of other investigative steps short of a wiretap.  The court acknowledged that the opinions of the defense witnesses were "offered in hindsight, employing the 'retrospectoscope' with its distorting lens, and without a complete knowledge of all the factors that went into the investigating agents' assessment of the case." *Id.*  The court emphasized that "[p]ost factum suggestions as to how an investigation might have been handled are entitled to little weight in analysis of statutory compliance with § 2518(1)(c)." *Id.*  That the defense "would have conducted an investigation differently does not now make insufficient what was otherwise sufficient compliance with § 2518(1)(c)." *Id.*

In sum, the TT 1 Affidavit set forth in detail the nature and contours of the organization, the goals of the investigation, and the reasons why traditional investigative procedures would be unlikely to succeed if tried or to be too dangerous to attempt.  SA Stark explained to Judge Conway his experience generally in investigating narcotics-

distribution organizations and how those types of organizations typically operate. But SA Stark did not stop there and he did not rely on boilerplate conclusions. Instead, he provided a substantial amount of information that was specific to the Jarvis DTO. The affidavit clearly met the necessity requirement of Title III, thus supporting Judge Conway's finding that, "It has been adequately demonstrated that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." TT 1 Order at 4. Based on the information presented in SA Stark's affidavit, Judge Conway's decision to grant the application for the wiretap was the quintessence of sound discretion, rather than its abuse. *See United States v. Staves*, 383 F.3d 377, 981-82 (9th Cir. 2004) (necessity requirement satisfied where, among other things, investigators obtained information from confidential informants, conducted surveillance, and obtained pen registers and trap and trace devices but were unable to uncover full scope of conspiracy because organization used counter-surveillance strategies, confidential informant was unwilling to cooperate further, use of undercover agent was dangerous due to suspicion of organization, toll analysis of phone calls was of limited use, and search warrants would not likely reveal full scope of conspiracy).

_____Based on the foregoing, this Court should conclude that Judge Conway did not abuse his discretion in finding that the affidavits in support of TT 1 and TT 2-4 complied with the necessity showing required by 18 U.S.C. § 2518(1)(c). Because the TT 1

affidavit complied with the necessity requirement, the subsequent affidavits were not

tainted and the calls intercepted based on the subsequent affidavits should not be

suppressed.

Respectfully submitted,

GREGORY J. FOURATT
United States Attorney

*ELECTRONICALLY FILED*

JAMES R.W. BRAUN
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, NM   87103
(505) 346-7274

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 8th day of June, 2009, I filed the foregoing
pleading electronically through the CM/ECF system, which is designed to cause counsel
of record for the defendants to be served by electronic means.

*ELECTRONICALLY FILED*

JAMES R.W. BRAUN
Assistant U.S. Attorney