# Exhibit 4

## To

UNITED STATES' RESPONSE TO
DEFENDANTS' JOINT MOTION TO SUPPRESS
THE FRUIT OF TITLE III WIRETAPS

FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

APR - 7 2005

MATTHEW J. DYKMAN
CLERK

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS OCCURRING OVER THE CELLULAR TELEPHONE BEARING INTERNATIONAL MOBILE IDENTIFICATION NUMBER IMSI 310260912507942 WITH CURRENTLY ASSIGNED TELEPHONE NUMBER 505-615-1212, THE CELLULAR TELEPHONE BEARING IMSI 310260204454041 WITH CURRENTLY ASSIGNED TELEPHONE NUMBER 520-440-5731, AND RESIDENTIAL TELEPHONE NUMBER 505-466-4147. | Misc. No. 05-20JC<br><br>FILED UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Richard L. Stark, being duly sworn, depose and state as follows:

## INTRODUCTION

1.    I am a Special Agent of the United States Drug Enforcement Administration (DEA) and have been employed as a Special Agent since 1996.  As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  As an agent with the DEA, I attended a 16 week academy, after which I was assigned to the wire intercept and long term conspiracy investigations group in Tucson, Arizona for approximately 4 years.  I have been involved with approximately 10 Title III wire investigations as either the affiant or as a Special Agent assigned to assist with the Title-III investigation.  I have been assigned to the Albuquerque District Office since September 2000.

2.    This case is being investigated by the DEA, the Bureau of Immigration and Customs Enforcement (BICE), and other federal, state, and local law enforcement officers. I have personally participated in the investigation of the offenses described below and make this Affidavit based on my personal participation in the investigation and based on reports made to me by other agents and law enforcement authorities. Except where otherwise noted, the information set forth in this Affidavit has been provided to me by other law enforcement agents and officers who have assisted in the investigation.

3.    Because this Affidavit is being submitted for the sole purpose of obtaining authorization for the interception and recording of wire communications, I have not included each and every fact known to me concerning the underlying investigation. I have set forth only the facts that I believe are essential to establish probable cause for an order authorizing the interception and recording of the wire communications described in this Affidavit.

4.    This Affidavit is made in support of an Application for an order pursuant to 18 U.S.C. § 2518, authorizing Special Agents of the DEA and BICE ("the investigative Agencies"), in conjunction with other federal law enforcement officers and any individuals operating under a contract with the government and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception,[1] to intercept and record for a thirty-day period wire communications occurring to and from:

the cellular telephone bearing International Mobile Identification Number (IMSI)[2] 310260912507942, currently assigned telephone number 505-

---

[1]  The Investigative Agencies do not have the resources to staff all aspects of the investigation and the requested interceptions with Special Agents and deputized law enforcement officers. As a result, monitoring personnel are expected to include civilian personnel, operating under a contract with the government and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

[2]  The IMSI number is encoded on a removable computer chip, which may be placed in another similarly-equipped telephone. The IMSI number is unique to each subscriber. Accordingly, this Application seeks authorization to intercept communications occurring over any telephones or telephone numbers accessed by or through the use of the IMSI number identified above.

2

615-1212 (TARGET TELEPHONE 2); the cellular telephone bearing IMSI 310260204454041, currently assigned telephone number 520-440-5731 (TARGET TELEPHONE 3); and residential telephone number 505-466-4147 (TARGET TELEPHONE 4). With regard to TARGET TELEPHONES 2 and 3, this request includes any other IMSI numbers subsequently assigned to the instrument bearing the same telephone number assigned to the TARGET TELEPHONE, any telephone numbers subsequently assigned to or accessed by or through the same IMSI number as the TARGET TELEPHONE or assigned to the instrument bearing the same IMSI number as the TARGET TELEPHONE, and any replacement cellular telephones obtained by the TARGET TELEPHONE's subscriber carrying the same telephone number or using the same IMSI number during the effective period of the requested Order.    With regard to TARGET TELEPHONE 4, this request includes any changed telephone numbers subsequently assigned to the same cable, pair, and binding posts utilized by the target residential telephone during the effective period of the requested Order.

5.    T-Mobile Communications lists the subscriber of **TARGET TELEPHONE 2** as George RIPLEY at 3917 Thaxton Avenue SE in Albuquerque, New Mexico.    T-Mobile Communications lists **TARGET TELEPHONE 3** as a pre-paid cellular telephone with no subscriber information available. According to T-Mobile Communications, the only identifier associated with the account is a date of birth of 12-09-1954.    QWEST communications lists the subscriber of **TARGET TELEPHONE 4** as Dana JARVIS at 13 Enebro Road in Santa Fe, New Mexico.    Based on my knowledge derived from the investigation referenced below, it is believed that **TARGET TELEPHONES 3, and 4** are in the possession of, or under the dominion and control of, Dana JARVIS. **TARGET TELEPHONE 2** is believed to be in the possession of, or under the dominion and control of, George RIPLEY.

6.    As a result of my personal participation in the investigation, statements made to me by other law enforcement personnel involved in the investigation, review of reports of other law enforcement personnel and confidential sources, intercepted telephone conversations between the

US v  Jarvis et al    93

subjects of this investigation over **TARGET TELEPHONE 1**,[3] and on the basis of reliable information I have reviewed, there is probable cause to believe that Dana JARVIS a/k/a/ Todd WARD, Ayla JARVIS, Eileen FITZGERALD, Cathy FITZGERALD, Donald TRUJILLO, David REID, Jude AUSTIN. Geno BERTHOD, Jacklyn COOK, Billy Joe COOK a/k/a Bill JONES, Angela CUMMINGS, Dakota FITZNER, Kara GOLD, Joel GOODELL, Barbara HANNA, Greg HILL, Matthew HOTHAN, Melania KIRWIN a/k/a Mila, Joseph MARTIN, Rafal MISTRZAK, Lloyd MONTOYA a/k/a Smiley, John NIETO, Dan CHOMYN, Salvador ABEYTA, George RIPLEY, Ralph GREENE, Nicole RICHMOND a/k/a Chloe, Mary CANANT, Manual GIL, Sam JONES, Richard BELIAN a/k/a/ Rick, Ruskin IPTISAM a/k/a Latifa or Sativa, Raymond MAYNARD, Casey COX a/k/a Case, Matt MOORE a/k/a Matrix, and Pat BERSSENBRUGGE (the SUBJECTS), and others as yet unknown, have committed, are committing, and will continue to commit offenses enumerated in 18 U.S.C. § 2516,[4] that is offenses involving violations of:

a)    21 U.S.C § 841 – possession with intent to distribute and distribution of a controlled substance, namely marijuana;

b)    21 U.S.C § 843(b) – use of a communication facility to further the commission of a felony controlled substance offense;

c)    21 U.S.C § 846 – conspiracy to possess with intent to distribute and to distribute controlled substances;

d)    21 U.S.C § 848 – continuing criminal enterprise;

---

[3] As discussed in paragraph 37(a) below, on March 2, 2005, an Order was signed by Senior United States District Judge John Edwards Conway authorizing the interception of communications to and from **TARGET TELEPHONE 1**, a cellular telephone used by Dana JARVIS.

US v Jarvis et al    94

4

e)    21 U.S.C § 856 – maintaining a place for manufacture, distribution, or use of controlled substances;

f)    21 U.S.C §§ 952(a), 960(a) – importation of a controlled substance;

g)    21 U.S.C § 963 – conspiracy to import a controlled substance

h)    18 U.S.C § 1952 – foreign or interstate travel in aid of racketeering enterprise;

i)    21 U.S.C § 1956 – laundering of monetary instruments; and

j)    21 U.S.C § 1957 – engaging in monetary transactions involving property derived from specified unlawful activity.

7.    There is probable cause to believe that the SUBJECTS and others as yet unknown will be using the TARGET TELEPHONES during the period of interception sought in furtherance of, in connection with, to facilitate, and to commit the above offenses.

## INVESTIGATIVE OBJECTIVES

8.    There is probable cause to believe that particular wire communications of the SUBJECTS and others as yet unknown concerning the above offenses will be obtained through the interception of wire communications for which authorization is herein sought.  In particular, there is probable cause to believe that these wire communications will concern the specifics of the above offenses, including:

---

[4]  Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense enumerated in 18 U.S.C. § 2516, there is also probable cause to believe that the SUBJECTS of this investigation

a)     The nature, extent and methods of operation of the illegal drug trafficking and money laundering of the SUBJECTS and others as yet unknown;

b)     The dates, times, places, and manner in which controlled substances and the proceeds of drug trafficking are being delivered to the SUBJECTS and others as yet unknown;

c)     The identification of others communication facilities used by the SUBJECTS and others as yet unknown in furtherance of the criminal activity alleged herein;

d)     The methods and means of payment for the controlled substances employed by the SUBJECTS and others as yet unknown, and the manner in which these transactions are conducted;

e)     The locations where the controlled substances are stored;

f)     The nature and extent of the mechanism used by the SUBJECTS and others as yet unknown to import, transport, and distribute controlled substances within the District of New Mexico;

g)     The identities of co-conspirators, accomplices, aiders and abetters, and other participants operating in concert with the SUBJECTS and their respective roles and participation in the above-mentioned offenses;

---

have aided a abetted and are aiding and abetting the substantive offenses listed below.

h)    The identities of the sources of supply of the controlled substances distributed by the SUBJECTS and others as yet unknown;

i)    The methods and means by which the SUBJECTS and others as yet unknown maintain, dispose of, and invest the proceeds from the sale of controlled substances; and

j)    The location and sources of resources used to finance the illegal activities described herein.

In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses. It is further expected that interception of wire communications, if authorized, will provide valuable evidence against the perpetrators of the above-described offenses that cannot reasonably be obtained by other means.

9.    The nature of this investigation is such that there is probable cause to believe that additional communications of the same type will continue to occur after the described type of communications have been first obtained.

## PERSONS EXPECTED TO BE INTERCEPTED[5]

10.    **Dana JARVIS a/k/a Todd Ward**: See Attachment A paragraph 10.

11.    **Ayla JARVIS**: See Attachment A paragraph 11.

---

[5] Jude Austin, Kara Gold, Geno Berthod, Jacklyn Cook, Angela Cummings, Greg Hill, Matthew Hothan, Lloyd Montoya, and Dan Chomyn, named in this Affidavit as SUBJECTS, are believed to be participants in the underlying criminal activity. However, there is as of this date no evidence that they have participated in telephone calls to or from the TARGET TELEPHONES. Therefore, while they are identified as SUBJECTS, they are not included in the list of persons expected to be intercepted pursuant to the Order sought. If conversations involving one or more of these SUBJECTS are in fact intercepted, the Court will be advised in the interim progress reports submitted to the Court by the Assistant United States Attorney.

12.   **Eileen FITZGERALD**:  See Attachment A paragraph 12.

13.   **Cathy FITZGERALD**:  See Attachment A paragraph 13.

14.   **Donald TRUJILLO**:  See Attachment A paragraph 14.

15.   **David REID**:  See Attachment A paragraph 15.

16.   **Dakota FITZNER**:  See Attachment A paragraph 16.

17.   **Barbara HANNA**:  See Attachment A paragraph 17.

18.   **Melania KIRWIN a/k/a Mila**:  See Attachment A paragraph 18.

19.   **Joseph MARTIN**:  See Attachment A paragraph 19.

20.   **Rafal MISTRZAK**:  See Attachment A paragraph 20.

21.   **John NIETO**:  See Attachment A paragraph 21.

22.   **Salvador ABEYTA**:  See Attachment A paragraph 22.

23.   **George RIPLEY**:  (DOB:  06/28/1955, SSN:  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).  RIPLEY is a suspected drug courier for the JARVIS DTO.  As discussed below, George RIPLEY is believed to have driven a load of marijuana to the Columbus, Ohio, area on behalf of the JARVIS DTO during the week of February 28, 2005 and stored it in a storage locker registered in his wife's name.

24.   **Ralph GREENE**:  (DOB:  04/23/1967).  GREENE is a suspected drug courier for the JARVIS DTO.  As discussed below, Ralph GREENE flew to Columbus, Ohio, on March 8, 2005, with David REID aboard JARVIS's

aircraft. GREENE later went to a storage locker in Columbus, Ohio, retrieved something, and then delivered a blue duffel bag to a home in a rural area near Columbus, Ohio.

25. **Nicole RICHMOND a/k/a Chloe**: (DOB: 03/11/1982). Based on conversations intercepted during the wiretap on **TARGET TELEPHONE 1**, Nicole RICHMOND is known to take messages for D. JARVIS regarding the activities of other members of the JARVIS DTO. RICHMOND is also believed to be a drug courier for the organization.

26. **Mary CANANT**: (No personal information is available. She is known to be a black female, and to use cellular telephone number 505-907-2589). Based on conversations intercepted during the wiretap on **TARGET TELEPHONE 1**, it is believed that CANANT oversees a marijuana stash house in Bernalillo, New Mexico, on behalf of the JARVIS DTO.

27. **Manual GIL**: (No personal information available. He is known to use cellular telephone number 505-710-8887). Based on conversations intercepted during the wiretap on **TARGET TELEPHONE 1**, GIL is believed to be a drug courier for the organization.

28. **Sam JONES**: (DOB: 04/24/1974 SSN: 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). As discussed below, based on conversations intercepted during the wiretap on **TARGET TELEPHONE 1**, it is believed that GPS trackers have been installed in at least one load vehicle, and that JONES helps the organization with the tracking of said vehicle(s).

29. **Richard BELIAN a/k/a Rick**: (No personal information available. He is believed to use cellular telephone number 505-470-1956). Although BELIAN's role in the JARVIS DTO is unclear, he is believed to obtain telephones on behalf of D. JARVIS.

30. **Ruskin IPTISAM a/k/a Latifa or Sativa**: (DOB: 02-10-1978 SSN: 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) Sativa was intercepted using **TARGET TELEPHONE 1** to arrange a personal use cocaine transaction. Other intercepted calls from said telephone indicate "Sativa" spends time with Ayla JARVIS.

US v Jarvis et al    99

31.   **Raymond MAYNARD**:     (DOB:   12/12/1970,   SSN:   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).
      MAYNARD was observed by agents in Albuquerque, New Mexico, on
      January 12, 2005, driving David REID to a local hotel.   MAYNARD is
      believed to be a drug courier for the organization.

32.   **Billy Joe COOK a/k/a Bill JONES**:   (DOB:   09/08/1949, SSN:  444-50-
      2269).   COOK's Colorado driver's license lists his residence as 14217
      North 107th Street in Longmont, Colorado.   As described below, COOK
      traveled to Tucson, Arizona, with Dana JARVIS in March 2005, and is
      believed to have assisted in arranging a shipment of marijuana for the
      JARVIS DTO.

33.   **Casey COX a/k/a Case**:   (DOB:   08/07/1978, SSN: 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).   Based
      on    conversations    intercepted    during    the    wiretap    on    **TARGET
      TELEPHONE 1**, it is believed that COX helps store and/or transport
      marijuana for the organization.

34.   **Matt MOORE a/k/a Matrix**:     (No personal information is currently
      available.   He is known to use cellular telephones with numbers 505-463-
      4096 and 505-688-8791).   Based on conversations intercepted during the
      wiretap on **TARGET TELEPHONE 1**, it is believed that MOORE is a drug
      and/or bulk cash courier for the JARVIS DTO.

35.   **Pat BERSSENBRUGGE**:   (DOB: 02/15/47, SSN:  Unknown).   Based on
      conversations intercepted during the wiretap on **TARGET TELEPHONE 1**,
      it is believed that BERSSENBRUGGE places assets, including vehicles,
      into her name on behalf of the JARVIS DTO.

## PRIOR APPLICATIONS

36.   Based upon a check of the electronic surveillance indices of the DEA, FBI
      and BICE conducted on April 6, 2005, it was revealed that the following
      previous applications were made requesting authorization to intercept
      wire, oral, or electronic communications involving persons or facilities
      specified in this application:

US v Jarvis et al   100

a)    On March 2, 2005, an order authorizing the interception of wire communications was signed by United States District Court Judge John Edwards Conway, District of New Mexico.    The order authorized interception of communications to and from cellular telephone (505) 470-1811 (**TARGET TELEPHONE 1**), subscribed to Richard Belian at Post Office Box 868 in Tesuque, New Mexico, but known to be under the dominion and control of Dana JARVIS.  The subjects named in that order were Dana JARVIS a/k/a/ Todd WARD, Ayla JARVIS, Eileen FITZGERALD, Cathy FITZGERALD, Donald TRUJILLO, David REID, Jude AUSTIN. Geno BERTHOD, Jacklyn COOK, Billy Joe COOK, Angela CUMMINGS, Dakota FITZNER,  Kara GOLD, Joel GOODELL, Barbara HANNA, Greg HILL, Matthew HOTHAN, Melania KIRWIN a/k/a Mila, Joseph MARTIN, Rafal MISTRZAK,  Lloyd MONTOYA a/k/a smiley, John NIETO, and Dan CHOMYN, Salvador ABEYTA, and John Whalen. Interceptions pursuant to that order were terminated on April 1, 2005.

37.    No other application to any judge for authorization to intercept, or for approval for interception, of wire, oral, or electronic communications involving any of the same persons or facilities specified in this application are known to your Affiant.

## OVERVIEW OF THE CRIMINAL ORGANIZATION

38.    This investigation is part of an ongoing law enforcement effort to combat narcotics trafficking by isolating, identifying, and eliminating the means with which this drug trafficking organization imports and distributes controlled substances into the United States.  In addition, investigators are attempting to dismantle the nationwide network of marijuana distributors tied to the JARVIS DTO.

39.    From my training and experience I know that drug traffickers and money launderer's often use several telephones to facilitate their illicit activities.  The traffickers will randomly switch telephones in order to thwart law

enforcement's ability to effectively track their activities through call record analysis. In addition, if an investigator is intercepting only one of several telephones being used by a trafficker, the full scope of the trafficker's activities will not be uncovered because the investigator will only obtain fragmented information regarding the drug trafficking organization. In some instances traffickers prefer to use certain telephones almost exclusively for incoming calls and other telephones for outgoing calls. This limits the number of telephone numbers co-conspirators possess for organizational members, and therefore insulates the entire organization from exposure by cooperating defendants. As discussed below, intercepted calls over **TARGET TELEPHONE 1** have revealed that JARVIS also uses pre-paid cellular telephone 520-440-5731 (**TARGET TELEPHONE 3**) and residential telephone number 505-466-4147 (**TARGET TELEPHONE 4**) to conduct additional drug related business.

40.     Based on my training and experience, I know that drug trafficking organizations such as the JARVIS DTO often use different telephones to speak with co-conspirators with different roles in order to reduce the organization's exposure to law enforcement. For example, the leader of a drug organization that imports and distributes drugs may elect to restrict communications for smuggling ventures to one set of telephones while using another set for distribution and/or money laundering purposes. If a smuggler is arrested and identifies a telephone linked to the organization, an analysis of the telephone would not reveal the other telephone numbers of distributors or the recipients of the drug proceeds. When organizations use multiple telephones for their drug trafficking activities, oftentimes the only avenue to uncovering the full scope of their illegal activities is to intercept several telephones simultaneously.

41.     From my training and experience I also know that drug traffickers and money launderers often use code words for narcotics and use fictitious names for themselves and others when talking on the telephone in order to thwart law enforcement's efforts to combat their criminal activity.

## PROBABLE CAUSE AND INTERCEPTED TELEPHONE CALLS

42.     The affidavit prepared by your Affiant in support of the wiretap on
**TARGET TELEPHONE 1** is attached hereto as Attachment A and
incorporated fully herein by reference.   Your Affiant submits that calls
intercepted during wiretap on **TARGET TELEPHONE 1** demonstrate that
Dana JARVIS is the head of the JARVIS DTO and that he uses multiple
telephones, to also include **TARGET TELEPHONE 3** (520-440-5731) and
**TARGET TELEPHONE 4** (505-466-4147), to help facilitate his drug
trafficking activities.   In addition, JARVIS allows other members of the
JARVIS DTO, to include his daughter Ayla JARVIS and Billy Joe COOK,
to use his telephones to conduct drug related conversations.

43.     The conversations described below were intercepted pursuant to the
wiretap on **TARGET TELEPHONE 1** and were conducted in the English
language.   The conversations were transcribed by professional monitors
that were contracted by the government to monitor the intercepted
telephone conversations on **TARGET TELEPHONE 1**.

## CALLS TO/FROM TARGET TELEPHONE 2

44.     On March 8, 2005, at approximately 2:16 p.m. Dana JARVIS received a
call from George RIPLEY.    RIPLEY called JARVIS from **TARGET
TELEPHONE 2**.   The call was identified as call number 278.  D. JARVIS
and RIPLEY spoke of RIPELY's recent trip (to Ohio).  D. JARVIS said,
"RB is on his way there...he will be there in a couple of hours."  D. JARVIS
then asked, "where did you leave the goodies?"   RIPLEY replied, "Well I
had to go rent a room...a locker...what is a guy to do...but they are pretty
cool over there and I paid my bill in full last time and the guy liked me."  D.
JARVIS asked, "is there some way RB can get in there?"   RIPLEY replied,

"There is if I call them yeah ... the other thing is I have to next day air him a key ... because I have a lock on it." D. JARVIS said, "You guys barely crossed paths here, him leaving and you coming in, he is taking the fast way back." D. JARVIS later stated, "he will be there in about two hours ... if we sent it to RB at the Red Roof ... he could stay there and pick it up tomorrow."

45.  Based on my training and experience, and my participation in this investigation, I believe that when D. JARVIS asked where RIPLEY left "the goodies," he was referring to a load of marijuana that RIPLEY had transported to Columbus, Ohio, on behalf of the JARVIS DTO.[6]  When RIPLEY said he had to "rent a room...a locker," I believe that RIPLEY was saying he had to rent a storage locker to stash the marijuana.  I believe that RIPLEY told D. JARVIS that he would have to send a key for "RB" to use to obtain the marijuana because the storage locker was secured by a lock.  I believe that when D. JARVIS said "RB" was "taking the fast way back" he was telling RIPLEY that "RB" was flying back to New Mexico aboard D. JARVIS' aircraft.

46.  On March 8, 2005 your Affiant, with the help of the United States Customs Service Air/Marine Operations Center (AMOC) tracked the aircraft used by D. JARVIS (aircraft known to have tail number N3AJ, described more fully in Attachment A paragraphs 51 - 54) from Albuquerque, New Mexico, to Springfield, Missouri where it re-fueled.   Agents on the ground in Springfield identified the pilot as David REID and the passenger as Ralph GREENE.   After departing Springfield, the aircraft was tracked to Columbus, Ohio.  REID and GREENE were followed by agents to a Red Roof Inn in Columbus, where they spent the night.

47.  On March 9, 2005, agents followed GREENE from the Red Roof Inn to a U-Haul storage facility in Columbus.  GREENE was observed retrieving an unidentified object from a storage locker at that location.  GREENE was

then followed to a rural area outside of Columbus where agents observed GREENE remove a blue duffel bag[7] from the trunk of his rental car and take it inside a house. Based on my training and experience, along with my participation in this investigation, I believe that GREENE retrieved a quantity of marijuana from the storage locker and delivered it to an unidentified drug dealer in the Columbus, Ohio area. I further believe that GREENE is the "RB" discussed by RIPLEY and JARVIS during call number 278.

48.     On March 9, 2005, REID and GREENE flew in the aircraft to Springfield, Missouri, where they spent the night. On March 10, 2005 the aircraft returned to Albuquerque, New Mexico. On March 10, 2005, your Affiant observed GREENE and REID meet with D. JARVIS at a restaurant in the town of Corrales, New Mexico, a suburb of Albuquerque. GREENE drove away in his own vehicle, and REID was transported back to the airport by D. JARVIS.


## CALLS TO/FROM TARGET TELEPHONE 3


49.     On March 8, 2005, at approximately 4:28 p.m., an incoming call to **TARGET TELEPHONE 1** from **TARGET TELEPHONE 3** was intercepted pursuant the wiretap on **TARGET TELEPHONE 1**. The call was identified as number 295. The call was between Ayla JARVIS and Dana JARVIS. During the conversation, A. JARVIS said, "if you need to talk to George and Christian, whatever, I could come and pick up the information that you need to talk to them about or do, you know I could do it on your behalf." D. JARVIS asked A. JARVIS to meet him at a local restaurant where they could talk in person and then said, "I can't talk right now, I've got a time

---

[6] An analysis of cellular telephone sites/towers where electronic signals from TARGET TELEPHONE 2 were relayed revealed that **TARGET TELEPHONE 2** traveled from Albuquerque, New Mexico to Columbus, Ohio and back between 02-27-2005 and 03-08-2005.

frame, I'm missing out on a, I've got to get off."   The call was then disconnected.  At approximately 4:42 p.m., D. JARVIS made an outgoing call to **TARGET TELEPHONE 3**, from **TARGET TELEPHONE 1**.  The call was identified as call number 296.  During the conversation, D. JARVIS told A. JARVIS, "I was on a time thing, something that George has to do."

50.     Based on my training an experience, along with my participation in this investigation, I believe that when A. JARVIS said she could "pick up the information" and "do it on your behalf," she was talking about passing a drug related message from D. JARVIS to George RIPLEY, and was informing D. JARVIS that she could negotiate drug business on his behalf. In addition, I believe that when D. JARVIS later called A. JARVIS back and said he "was on a time thing, something George had to do," that he was referring to working on having George RIPLEY mail the key for the storage unit containing the marijuana to Ralph GREENE, as discussed in paragraphs 46-49 above.

51.     On March 13, 2005, at approximately 2:28 p.m., Dana JARVIS received an incoming call on **TARGET TELEPHONE 1** from telephone number 520-616-8080.  The call was identified as call number 617.  D. JARVIS spoke with a "Sheri" LNU and said he was driving into Tucson from Lordsburg, New Mexico.  D. JARVIS stated, "I'm with Bill, remember Bill Jones ... Bill Jones is back man ... he's doing great, he has been very helpful."  Based on JARVIS telling Sheri that Bill was from Colorado, I believe that "Bill Jones" is Billy Joe COOK.

52.     On March 15, 2005, at approximately 12:02 p.m., Billy Joe COOK made an outgoing call from **TARGET TELEPHONE 1** to 505-264-7593.  The call was identified as call number 724.  During the conversation, COOK spoke with Sam JONES about how to fix the GPS tracking device they were installing inside a vehicle.

---

[7]  Per CS-3 the JARVIS organization uses duffel bags to transport marijuana as referenced in Attachment A paragraph 45.

53.  On March 15, 2005, at approximately 2:21 p.m., Dana JARVIS made an outgoing call on **TARGET TELEPHONE 1** to Billy Joe COOK on **TARGET TELPHONE 3**. The call was identified as number 744. Dana told COOK to pull back in front of him and then he gave directions to a storage unit where they were going to drop off a van.

54.  In my training and experience, I believe that call numbers 617, 724, and 744 show that Billy Joe COOK was with Dana JARVIS in Tucson, Arizona, a marijuana source city for the organization, and that **TARGET TELEPHONE 3** is being used by JARVIS and COOK to facilitate their drug trafficking activities. In call number 724, COOK spoke to Sam JONES about a GPS tracking device. I believe that members of the JARVIS DTO are installing GPS tracking devices in vehicles used to transport marijuana and/or bulk cash in an effort to detect if the vehicles are intercepted by law enforcement personnel and to monitor the location of their drivers.

55.  On March 15, 2005, at approximately 6:17p.m., D. JARVIS placed an outgoing call from **TARGET TELEPHONE 1** to Rafal MISTRZAK at 505-463-3794. The call was identified as number 775. During the conversation, D. JARVIS told MISTRZAK, "I have a new number, it's kind of a private number ... an under the table number ... I'll give it to you if you want ... make sure you just call it from a calling card or a pay phone or something like that." D. JARVIS then gave MISTRZAK the number 520-440-5731, which is the number for **TARGET TELEPHONE 3**.

56.  Based on my training and experience, along with my participation in this investigation, I believe that when D. JARVIS told MISTRZAK to only use a calling card or pay phone to call his "private number" it was an effort to prevent law enforcement authorities from tracking his telephone number, and/or his contacts. I believe that the phrase "private number" is code to describe a phone that will be used to discuss drug related matters.

## CALLS TO/FROM TARGET TELEPHONE 4

US v Jarvis et al     107

57.  On March 5, 2005, at approximately 10:00 p.m., Ayla JARVIS (who was in possession of **TARGET TELEPHONE 1**)[8] received a call from telephone number 505-463-3794, subscribed to by Rafal MISTRZAK.  The call was identified as number 105.  During the conversation, MISTRZAK told A. JARVIS that he was moving to Miami and asked what her father (D. JARVIS) was up to.  A. JARVIS replied, "laying low."  MISTRZAK then asked if "he" (D. JARVIS) was around.  A. JARVIS responded, "uh yeah, he is up at the Eldo."  MISTRZAK said, "gotch ya ... I need to finish up some paperwork with him before I go."

58.  Based on on my training and experience, along with my participation in this investigation, I believe that when A. JARVIS said that her father (D. JARVIS) was at the "eldo," she was saying that he was at his home residence located at 13 Enebro, in the El Dorado subdivision of Santa Fe, New Mexico.  I believe that when MISTRZAK said he needed to "finish up some paperwork with him" he was referring to signing over the title of a vehicle that was registered to him.[9]  The 13 Enebro residence has QWEST hardline number 505-466-4147, **TARGET TELEPHONE 4**.

59.  On March 7, 2005, at approximately 6:08 p.m., Ayla JARVIS (in possession of **TARGET TELEPHONE 1**) received a call from Dana JARVIS, who called her from **TARGET TELEPHONE 4**.  The call was identified as number 217.  During the conversation, D. JARVIS said, "there are some things I could talk to you in person."  A. JARVIS responded, "that would be better."  D. JARVIS then said, "there is something important I need to talk to you about ... that we will need to take care of tomorrow ... we have a new deadline ... I think you can figure it out from there."  A. JARVIS responded, "okay."  D. JARVIS then said, "We need your signature on this receiving, we got a certified letter.  I need you to sign for it ... so we need to get with Pat tomorrow."

---

[8] Intercepted telephone calls indicate that Dana JARVIS lent Ayla JARVIS his cellular telephone (TARGET TELEPHONE 1) from 03-02-2005 to 03-08-2005.

US v Jarvis et al     108

60.    Based on my training and experience, along with my participation in this investigation, I believe that when D. JARVIS said, "we have a new deadline," that he was talking about a new deadline for a drug transaction. I believe that when he said, "I think you can figure it out from there," it was code for saying that it was drug related without stating specifics. I believe that when D. JARVIS told A. JARVIS, "We need to get with Pat tomorrow," he was referring to transferring the title of a vehicle or vehicles into Pat BERSSENBRUGGE's name in an effort to shield true ownership of the vehicle(s).[10]

61.    On March 7, 2005, at approximately 10:10 p.m., Ayla JARVIS (in possession of **TARGET TELEPHONE 1**) called D. JARVIS on **TARGET TELEPHONE 4.** The call was identified as call number 226. During the conversation, A. JARVIS asked if she could go to Las Vegas (Nevada) with Julian and Elena on Wednesday (March 9, 2005). A. JARVIS said, "I was going to ask if maybe we could have your sir David take us to Vegas." D. JARVIS said maybe. A. JARVIS said they would provide half the gas money. D. JARVIS said, "If he's back by then. He's leaving tomorrow for a couple of days ... taking RB on a mission." A. JARVIS responded, "you don't need to tell me that." D. JARVIS then said, "but we'll see when he gets back."

62.    Based on my training and experience, along with my participation in this investigation, I believe that when A. JARVIS asked if "Sir David" can take her to Vegas, she was referring to David REID, the primary pilot that flies

---

[9] Reference call #257, intercepted on 03-08-2005, an outgoing call from **TARGET TELEPHONE 1** to 505-450-4131. During that call, Dakota FITZNER told D. JARVIS that Rafal MISTRZAK left the title to the Honda with him because he couldn't get a hold of D. JARVIS.

[10] A "Pat" (believed to be Pat BERSSENBRUGGE) is mentioned during call number 681 made from **TARGET TELEPHONE 1** on March 14, 2005, at approximately 3:14 p.m., between Billy Joe COOK and Cathleen FITZGERALD. During the conversation, COOK said that he was trying to find the title for a vehicle in Arizona but couldn't find it. FITZGERALD said, "basically Bill there are only a couple of titles that Pat has up here (in Santa Fe, New Mexico) and those are the ones she is in charge of, you know and I don't think it has anything to do with the vehicles down there." Based on my training and experience, I believe that when FITZGERALD said "there are only a couple of titles Pat has up here," she was referring to vehicles that D. JARVIS placed in Pat BERSSENBRUGGE's name to try to prevent law enforcement personnel from connecting him to vehicles that may be seized with drugs in them.

the aircraft used by JARVIS to ferry bulk cash and to meet with drug associates. I believe that when D. JARVIS stated that REID was taking RB "on a mission," he was referring to the drug related mission for the organization involving Ralph GREENE, discussed in paragraphs 46-50 above. I believe that when A. JARVIS said, "you don't need to tell me that," she was telling D. JARVIS not to talk so openly about drug related matters on the telephone.

## TOLLS RECORDS, PEN REGISTER AND TRAP AND TRACE INFORMATION

63.   I, along with Intelligence Research Specialists and other investigative agents, have analyzed toll records obtained pursuant to subpoenas for TARGET TELEPHONES 2 and 3, as well as other telephones believed to be used by the SUBJECTS. The toll records for TARGET TELEPHONES 2 and 3 cover the time period from January 18, 2005 through March 16, 2005. An order authorizing a pen register and trap and trace on **TARGET TELEPHONE 4** was entered on March 8, 2005. The pen register was installed on March 29, 2005. The trap and trace device was activated on March 21, 2005. Thus, the calls described below on **TARGET TELEPHONE 4** cover the time period from March 21, 2005, through March 31, 2005.

64.   Analysis of the toll records available to me shows the user of the TARGET TELEPHONES have had contact with the following telephone numbers believed to be relevant to this investigation.[11]

### TARGET TELEPHONE 2 505-615-1212

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
| 505-471-1811 | **TARGET TELEPHONE 1** | 1-18-2005 to 03-17-2005 | 49 |
| 505-501-2766 | Cathy FITZGERALD, 28 Quail Run, Santa Fe, New Mexico. As described in Attachment A at | 01-31-2005 to 03-17-2005 | 19 |

---

[11]  The last date listed for each telephone number in the column "Time Period of Calls" indicates the last known phone call to or from the TARGET TELEPHONE.

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
|  | paragraph 13, Cathy FITZGERALD performs various tasks for the JARVIS DTO, including storing marijuana at her residence. |  |  |
| 505-385-2798 | Ralph GREENE, 618 Central Avenue, Albuquerque, New Mexico. As described in paragraph 24 above, GREENE is a suspected drug courier for the JARVIS DTO. | 03-07-2005 – 03-17-2005 | 9 |
| 505-362-0433 | Salvador ABEYTA, 2516 Vernada Rd NW, Apt. 4, Albuquerque, NM. As described in Attachment A at paragraph 22, ABEYTA is believed to work for the JARVIS DTO. | 02-25-2005 to 02-26-2005 | 5 |
| 505-385-2923 | John NIETO, P.O. Box 4279, Albuquerque, NM. As described in Attachment A at paragraph 21, NIETO is believed to be an "enforcer" for the JARVIS DTO, collecting debts owed to the organization. | 02-01-2005 to 02-16-2005 | 5 |
| 520-251-0243 | RC Computer and Graphics Inc, 9227 Weaver Cir., Casa Grande, Arizona. This phone is used by Dave REID. As described in Attachment A at paragraph 15, REID is the primary pilot for the JARVIS DTO. | 01-21-2005 to 01-23-2005 | 4 |
| 505-450-3631 | Melania KIRWIN, 4891 North Via Serenidad, Tucson, Arizona. As described in Attachment A at paragraph 18, KIRWIN is D. JARVIS' paramour and assists him in the operation of the DTO. | 01-18-2005 | 1 |
| 505-470-1956 | Richard BELIAN, P.O. Box 868, Tesuque, NM. As described in paragraph 29 above, BELIAN is believed to subscribe to telephones on behalf of D. JARVIS. | 03-07-2005 | 1 |
| 505-730-5161 | Nichole Richmond, P.O. Box 32214, Santa Fe, NM. As described in paragraph 25 above, RICHMOND is believed to be a courier for the JARVIS DTO. | 03-07-2005 | 1 |
| 505-907-2589 | Mary CANANT, 1440 Calle Ciello Vista, Bernalillo, NM. As described in paragraph 26 above, it is believed that CANANT oversees a marijuana stash house in Bernalillo, New Mexico, on behalf of the JARVIS DTO. | 03-10-2005 | 1 |
| 520-977-6320 | Phil Spectre (Pre Paid Cellular with no subscriber information). This phone is known to be under the dominion and control of "Ray," believed to be Raymond MAYNARD. As described in paragraph 31 above, MAYNARD is a courier for the JARVIS DTO. | 03-17-2005 | 1 |

## TARGET TELEPHONE 3 520-440-5731

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
| 520-251-0243 | RC Computer and Graphics Inc, 9227 Weaver Cir., Casa Grande, Arizona. Under the dominion and control of pilot Dave REID. | 01-30-2005 to 03-16-2005 | 16 |

21                                        US v Jarvis et al    111

| 520-977-6320 | Phil Spectre (Pre Paid Cellular with no subscriber information). This phone is known to be under the dominion and control of "Ray," believed to be Raymond MAYNARD. | 02-09-2005 to 03-16-2005 | 15 |
|---|---|---|---|
| 505-385-2798 | Ralph GREENE, 618 Central Avenue, Albuquerque, NM. | 02-17-2005 to 03-17-2005 | 12 |
| 505-470-1956 | Richard BELIAN, PO Box 868 Tesuque, NM. | 02-03-2005 to 03-08-2005 | 10 |
| 505-304-4696 | Iptisam Ruskin, 212 San Clemente NW Apt 1, Albuquerque, NM. As described in paragraph 30 above, Ruskin IPTISAM was intercepted using **TARGET TELEPHONE 1** to arrange a personal use cocaine transaction. | 02-10-2005 to 03-17-2005 | 9 |
| 505-501-2766 | Cathy FITZGERALD, 28 Quail Run, Santa Fe, NM. | 02-01-2005 to 03-08-2005 | 8 |
| 505-615-1212 | **TARGET TELEPHONE 2** | 02-17-2005 to 03-17-2005 | 8 |
| 505-466-1946 | Eileen FITZGERALD 3 Dovela Place, Santa Fe, NM. As described in Attachment A at paragraph 12, FITZGERALD is D. JARVIS' ex-wife and distributes drugs on behalf of the JARVIS DTO. | 02-10-2005 to 03-17-2005 | 6 |
| 505-907-2589 | Mary CANANT 1440 Calle Ciello Vista Bernalillo, NM. | 02-10-2005 to 03-15-2005 | 6 |
| 505-471-2139 | Cathy FITZGERALD 28 Quail Run, Santa Fe, NM. | 02-16-2005 to 03-16-2005 | 4 |
| 505-362-0433 | Salvador ABEYTA 2516 Vernada Rd NW Apt 4 Albuquerque, NM. | 02-20-2005 to 02-23-2005 | 3 |
| 505-466-4147 | **TARGET TELEPHONE 4** | 02-10-2005 to 02-16-2005 | 3 |
| 303-775-2912 | Bill and Jacklyn COOK, 14217 107th Street, Longmont, Colorado. As described in paragraph 32 above, Billy Joe COOK traveled to Tucson, Arizona, with Dana JARVIS in March 2005, and is believed to have assisted in arranging a shipment of marijuana for the JARVIS DTO. | 03-02-2005 to 03-15-2005 | 2 |
| 505-385-2923 | John NIETO, P.O. Box 4279, Albuquerque, NM. | 02-01-2005 | 2 |
| 505-412-1520 | Barbara HANNA, P.O. Box 22882, Santa Fe, NM. As described in Attachment A at paragraph 17, HANNA assists in the counting of bulk cash received by the JARVIS DTO as payment for marijuana. | 02-20-2005 | 1 |

## TARGET TELEPHONE 4 505-466-4147

| Telephone Number | Telephone Subscriber | Time Period of Calls | No. of Calls |
|---|---|---|---|
| 505-385-2923 | John NIETO, P.O. Box 4279, Albuquerque, NM. | 03-21-2005 to 03-30-2005 | 11 |
| 505-466-1946 | Eileen FITZGERALD, 3 Dovela Pl., Santa Fe, NM. | 03-23-2005 to 03-25-2005 | 10 |
| 505-362-0433 | Salvador ABEYTA, 2516 Vernada Road NW, Apt. 4, Albuquerque, NM. | 03-25-2005 to 03-30-2005 | 7 |

| | | | |
|---|---|---|---|
| 505-470-1811 | Richard BELIAN, P.O. Box 868, Tesuque, NM. | 03-21-2005 to 03-22-2005 | 4 |
| 505-501-2766 | Cathy FITZGERALD, 28 Quail Run, Santa Fe, NM. | 03-24-2005 to 03-24-2005 | 4 |
| 505-615-1212 | **TARGET TELEPHONE 2** | 03-22-2005 to 03-23-2005 | 4 |
| 505-792-2833 | M. KIRWIN, 9677 Eagle Ranch Road NW, Apt. 21, Albuquerque, NM. | 03-22-2005 to 03-22-2005 | 4 |
| 520-876-4009 | Dave REID, 9227 West Weaver Circle, Casa Grande, Arizona. | 03-23-2005 to 03-25-2005 | 3 |
| 505-471-2139 | Cathy FITZGERALD, 28 Quail Run, Santa Fe, NM. | 03-24-2005 to 03-24-2005 | 2 |
| 505-660-8817 | Pat BERSSENBRUGGE, Camerada Road, Santa Fe, NM.  As described in paragraph 35 above, it is believed that BERSSENBRUGGE places assets, including vehicles, into her name on behalf of the JARVIS DTO. | 03-23-2005 to 03-25-2005 | 2 |
| 505-730-5161 | Nichole RICHMOND, P.O. Box 32214, Santa Fe, NM. | 03-22-2005 to 03-23-2005 | 2 |
| 520-251-0243 | RC Computer and Graphics Inc, 9227 Weaver Cir., Casa Grande, Arizona.  Under the dominion and control of pilot Dave REID. | 03-25-2005 | 1 |
| 505-577-5747 | Eileen FITZGERALD, 3 Dovela Place, Santa Fe, NM. | 03-24-2005 | 1 |

## NEED FOR INTERCEPTION

65.    I am aware that a number of normal and routine investigative techniques are available for the investigation of drug trafficking and money laundering offenses.  These techniques are used in conjunction with one another and include:   physical surveillance, the use of confidential informants and cooperating sources, the introduction of undercover officers into the organization, the execution of search warrants, the examination of discarded trash, the use of grand jury or administrative subpoenas to – or interviews of – subjects and potential witnesses, and the analysis of pen register and trap and trace data and toll records.

66.    Based upon my training and experience, and based upon all of the facts set forth herein, I believe that the interception of wire communications over the target telephones is the only available technique that has a reasonable likelihood of achieving all the objectives of this investigation and securing the evidence necessary to prove beyond a reasonable doubt that the SUBJECTS and others as yet unknown are engaged in the above-

described offenses.  The following investigative techniques, which are usually employed in the investigation of this type of criminal case, have been tried and have failed, reasonably appear to be unlikely to succeed if they are tried, or are too dangerous to employ, as detailed in the paragraphs below.

## ALTERNATIVE INVESTIGATIVE TECHNIQUES

### A. THE USE OF PEN REGISTERS, TRAP AND TRACE, AND TOLL RECORDS.

67.    As described in Attachment A paragraph 73. agents conducting this investigation have used normal investigative techniques to include informants, surveillance, telephone toll analysis, public and private record searches, record searches for vehicles and residences, and telephone "dialed digit recorders" (commonly referred to as pen registers).  These techniques have been successful, however, these techniques can only provide limited information and will not reveal the full scope of this investigation.  Pen register information can provide useful information, but that information alone cannot result in a prosecutive effort.  Pen register information only indicates contact between telephones from which inferences can be drawn.  It cannot provide the identities of the speaker or the contents of the conversations.  Telephone toll records suffer the same critical limitations.  When used in conjunction with a wire interception, pen registers and toll records supply useful confirmation of the numbers called.

### B. THE EXAMINATION OF DISCARDED TRASH.

68.    As described in Attachment A, paragraph 74, on June 13, 2002 your Affiant attempted a "trash run" at JARVIS' 13 Enebro residence.  Working in conjunction with a supervisor at Waste Management of Santa Fe,

US v Jarvis et al     114

workers attempted to replace several trash cans on JARVIS' street with new ones. JARVIS ran out of his house and confronted said supervisor. JARVIS made the supervisor empty his trash can into the new one. He told the supervisor that there were private investigators trying to learn stuff about him. JARVIS then stood beside his trash can for approximately half an hour until the Waste Management garbage truck picked up his trash and dumped it into the garbage truck.[12]     According to CS-3 JARVIS instructs his workers to watch what they throw away. In addition the JARVIS DTO is very surveillance conscious and if an agent was observed picking up someone's trash it would risk tipping the drug traffickers off about the investigation.

69.     On March 16, 2005, at approximately 9:59 p.m. Dana JARVIS received a call on **TARGET TELEPHONE 1** from Ayla JARVIS.[13]     D. JARVIS told A. JARVIS, "There is a bag of trash on her porch...grab it and see what is in it." In my training and experience, I believe this demonstrates that Dana JARVIS is aware of what type of information can be collected from an individuals trash and thus he, and others in his organization, will not make the mistake of discarding valuable documents in their own trash.

## C. PHYSICAL SURVEILLANCE

70.     As described in Attachment A paragraphs 75 through 78 physical surveillance of the JARVIS drug trafficking organization has met with mixed success. With the interception of wire communications on **TARGET TELEPHONE 1** agents have been able to see a clearer picture of what the organization is doing, but do not have an understanding of the nationwide marijuana distribution network run by Dana JARVIS. For example, on March 7, 2005 agents in Columbus, Ohio were able to follow

---

[12] The supervisor of Waste Management did not drive a trash truck. Agents felt they could not trust the employees of Waste Management who drive the trash trucks to use the trucks in order to effect a trash pick-up of JARVIS's trash outside his residence

Ralph GREENE and Dave REID from the airport to a local Red Roof Inn. Because of intercepted telephone calls between Dana JARVIS and George RIPLEY, agents knew that GREENE was waiting for a key to a storage locker in Columbus. Anticipating this allowed agents to place a GPS tracker (court ordered) on their rental car. Agents successfully followed GREENE the next day to a U-Haul storage unit where he retrieved something. GREENE was then followed to a rural location near Columbus where he delivered a blue duffel bag believed to be marijuana. Physical surveillance in this instance helped to confirm telephone conversations. Conversely, on March 16, 2005 Dana called Manuel Gil and asked "Manny" to come to Tucson, for "work." Pen register information indicates Gil; was not contacted again from either TARGET TELEPHONE 1 or TARGET TELEPHONE 3. I believe this indicates that there was a pre-arranged meet spot in Tucson, Arizona. Because there were no additional telephone conversations between GIL and JARVIS on TARGET TELEPHONE 1 agents were unable to determine GIL's location and were thus unable to follow him to where the marijuana was being stored. Surveillances thus have had minimal success in achieving the objectives of the investigation. In combination however, with telephone conversations on the primary command and control telephones of the organization (TARGET TELEPHONES 1, 2, 3 and 4) agents hope to gain significant knowledge of the organizations methods and hope to identify the co-conspirators of the JARVIS organization. Physical surveillance alone can not accomplish this goal.

D. **USE OF COOPERATING SOURCES**

71.    As described in Attachment A, paragraphs 79 through 82, we have used confidential sources in this investigation, and nothing has changed. The

---

[13]  Reference call #445 made on March 10, 2005 at 9:59 p.m. incoming call from 520-440-5713 Ayla JARVIS to Dana JARVIS.

US v Jarvis et al    116

technique of using cooperating sources often is very productive in an investigation. In this case three cooperating sources of information have provided information about the JARVIS DTO that has been beneficial to the investigation. However, for the reasons set forth below, your Affiant believes that, at this stage of the investigation, the use of cooperating sources is unlikely to achieve the goals of the investigation.

72.    The objectives of this investigation include identifying the JARVIS DTO drug suppliers, identifying where and when the leaders of the organization meet their sources of supply, identify how the drugs are being smuggled into the United States from the Republic of Mexico, where and who is stashing the drugs in the various stash houses in Arizona and New Mexico, identifying where the money is being stored and fully identifying the participants in the conspiracy. As documented in Attachment A, CS-1 provided valuable information regarding some of these objectives, CS-1's usefulness reached it's maximum potential in 2002 in furthering the goals of the investigation. CS-1 was not a member of the JARVIS DTO and is no longer in a position to learn anymore information about its members.

73.    Likewise. CS-2 has provided information useful to this investigation. CS-2's information was historical in nature, and was limited information regarding the JARVIS DTO. CS-2 is not in a position to learn how, when and where the marijuana is being smuggled into the United States. In addition, CS-2 is not in a position to learn about the nationwide co-conspirators or about details regarding the delivery methods, the times illegal activities are taking place, or the locations for said activities. Because of CS-2's personal relationship with many of the individuals he/she has provided information about, CS-2 has no interest in testifying or publicly providing information about the conspirators. Therefore, agents must develop independent evidence of crimes being committed by the conspirators.

74.    CS-3 was a money courier for the JARVIS DTO, but left the organization a year or more ago. CS-3 has provided detailed information about the

methods, used by the targets of this investigation, many of the locations used by the organization, and has identified many conspirators involved in drug trafficking and or money laundering violations. In addition, CS-3 has provided unique information from an "insiders" perspective. This "unique" information allowed agents in October 2004 to anticipate the actions of Ayla JARVIS and David REID when they landed in Bloomington, Indiana aboard the private aircraft owned by Dana JARVIS. The information from CS-3 was instrumental in the seizure of $287,210.00. The bulk of the information from CS-3 is dated, and historical in nature. CS-3 does not currently have immediate access to information regarding JARVIS the organization conspirators and its methods. CS-3, under the direction of controlling agents, has been attempting to work back into the organization as a money courier, but to date has not been able to do so. CS-3 also has no interest in testifying or publicly providing information about the conspirators. CS-3 has expressed a fear of members of the organization and worries that his/her family would be in significant danger if CS-3's involvement with law enforcement were revealed. Again agents must develop independent evidence of the crimes being committed by the conspirators.

D.     **USE OF SEARCH WARRANTS**

75.     As described in Attachment A, paragraph 83, your Affiant has experience with search warrants as an investigative technique in drug trafficking investigations. Search warrants often lead to the seizure of drugs, money, and other evidence of criminal violations. However, in this investigation the execution of search warrants at this time is not likely to achieve the objectives of the investigation. The premature execution of search warrants would not likely reveal the total scope of the illegal operations of the organization and would also alert the TARGETS to the scrutiny of law enforcement and thereby risk this investigation. Additionally, the fact that

many of the target subjects are unidentified, renders law enforcement authorities unable to locate all potential search locations at this time. Furthermore, interception of wire communications for the **TARGET TELEPHONES** would aid in identifying stash locations which have not been identified at this time.

E.    **INTERVIEWS WITH WITNESSES AND USE OF A GRAND JURY**

76.    As described in Attachment A, paragraphs 84 through 86, at this stage of the investigation, your Affiant believes that the interviewing of witnesses and use of a grand jury would be premature and deleterious to the ongoing investigation.    Agents have not yet identified any individuals (other than the cooperating sources of information) considered likely to provide information on the JARVIS DTO without revealing the investigation to its members.    In many investigations agents are able to identify a "weak link," an individual who is considered likely to cooperate with agents without exposing the investigation.    Usually, such an individual is targeted because strong evidence has been gathered implicating the individuals criminal activity.    Agents are then able to approach the individual and seek his/her cooperation in exchange for a more lenient prosecution.    In this investigation, no "weak links" have yet been identified. It is possible that such individuals will eventually be identified, particularly through the interception of wire communications.    At this stage in the investigation it appears pointless and foolish to attempt to interview witnesses.

77.    If such interviews were attempted, your Affiant believes they would produce insufficient information concerning the identities of all of the persons involved in the conspiracy, the sources of the drugs and drug proceeds, the location of records, drugs, money or other pertinent information regarding the subject crimes.    In addition, any responses to the interviews would contain a significant number of half-truths and

US v Jarvis et al    119

untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Additionally, such interviews would likely result in non-targeted interviewees alerting other members of the conspiracy, thereby compromising the investigation and resulting in the possible concealment, movement or destruction of drugs, money, documents and/or other evidence.

78.   Furthermore, based upon my training and experience and conversations with Assistant United States Attorneys who have experience prosecuting violations of criminal law, your Affiant believes that issuing subpoenas to persons who are believed to be involved in this conspiracy compelling them to testify before a Federal Grand Jury would likely not be successful in achieving the stated goals of this investigation. Should the targets of this investigation , their co-conspirators and other participants be called to testify before the grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would then be unwise to seek use of immunity for any of these persons because the granting of such immunity could irreparably complicate or foreclose their prosecution, even though they might be among the most culpable members of this conspiracy. Also, to corroborate the testimony given by these immunized witnesses before the grand jury would usually require that other conspirators and witnesses be immunized, especially when there may not be evidence in the form of intercepted communications other than those obtained through consensually monitored conversations, such as when a cooperating source or an undercover agent meets with a conspirator or participant in a criminal venture. Under the facts and circumstances of this investigation as set forth above, only the highest level conspirators and participants would be knowledgeable as to the source(s) of the drugs, the whereabouts of the proceeds generated from drug trafficking, etc. It cannot be expected that the highest level conspirators who are the subject of this investigation would either give information or testimony without their receiving use immunity through an

US v Jarvis et al   120

agreement with the government or through a compulsion Order issued by a Federal Magistrate. Nor should the government be required to seek to give use immunity to the highest level conspirators and participants. Additionally, the serving of the grand jury subpoenas upon the targets and/or their co-conspirators would only alert the targets and/or their co-conspirators to the existence of this investigation, thereby causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, or to otherwise compromise this investigation.

F.    **USE OF UNDERCOVER AGENTS**

79.    As described in Attachment A, paragraph 87 through 88 we still do not have the ability to use an undercover agent. There are presently no undercover agents who have infiltrated the JARVIS DTO, nor id there the likelihood that one could be introduced to them. In most investigations in which an undercover officer has infiltrated an organization, a cooperating source has introduced the officer into the organization. CS-1, CS2 and CS-3 do not have the ability to introduce an undercover agents into the JARVIS DTO.

80.    Information from CS-2 and CS-3 indicates that JARVIS and his associates are long time, long term drug associates, family members, or individuals that have worked with JARVIS at his night club and were later recruited into the organization. In addition, CS-3 told agents the JARVIS DTO uses a "surveillance van" equipped with digital cameras and night vision equipment to watch new members of the organization perform specified assignments. If the assignments are not performed, or not performed correctly, the individual in not allowed to join the organization. It is likely that even if an undercover agent was introduced to the organization, that agent would be assigned a task that involved illegal activity. If the agent did not perform the task, which is prohibited by DEA policy, it is unlikely the agent would be allowed into the organization, and at best would be

US v Jarvis et al    121

able to collect "peripheral" information regarding the organization. Therefore, there is no reasonable way to use the traditional investigative technique of undercover agents to achieve the objectives of the investigation.

G.    **WIRETAP ON TARGET TELEPHONE 1 (505-470-1811)**

81.    The Title-III intercept of cellular telephone 505-470-1811 (**TARGET TELEPHONE 1**) revealed information about the JARVIS drug trafficking organization and helped to identify co-conspirators.    Unfortunately, because JARVIS uses **TARGET TELEPHONE 3** and **TARGET TELEPHONE 4** to conduct drug related conversations, intercepted telephone conversations only revealed a small portion of the overall drug conspiracy.  In addition, agents have intercepted calls to couriers, but the subscriber information on the courier's telephone is false, thus preventing identification of the drug courier.  For example, on March 13, 2005, at approximately 12:22 p.m., Dana JARVIS placed outgoing call  number 602 to an unidentified female at 505-490-3002.  From this conversation and another it is clear the female is a student attending classes in Colorado. During the conversation, D. JARVIS made plans to fly the female to Tucson for an "adventure" and said he wanted to explain everything from a pay telephone because he did not trust the phone he was on.  From the conversation it appears the female is a drug courier and that D. JARVIS is planning to have her drive a load of marijuana back to the state of Colorado.  Subscriber information on her telephone, however, reveals the subscriber to be Greg Sadler at 126 Vaquero Road in Santa Fe, NM. Agents have been unable to identify the female drug courier.

82.    On March 16, 2005 Dana JARVIS called Manual Gil, a suspected courier, and told him to come down (to Tucson, Arizona) because he had some "good work" for him.  On March 17, 2005, the day D. JARVIS was supposed to take delivery of the marijuana shipment, no calls were

answered on **TARGET TELEPHONE 1**.  I believe this shows that D. JARVIS is using **TARGET TELEPHONE 3** and likely other unknown telephones to conduct his drug related business while he is in the Tucson, Arizona area.     As described in paragraph 76 above, GIL was never contacted on **TARGET TELEPHONE 1** or **TARGET TELEPHONE 3** and agents believe there was a pre-arranged meet spot in Tucson where GIL met with JARVIS and received his instructions on where to pick up and deliver the marijuana.   There may also be another telephone used by JARVIS that is unknown to agents.  JARVIS was alternating use between **TARGET TELEPHONE 1** and **TARGET TELEPHONE 3** while in Tucson, and toll analysis revealed several Arizona numbers that were contacted from **TARGET TELEPHONE 3** while JARVIS was in Tucson.  It stands to reason that JARVIS is using several telephones to run his drug organization.

## CONCLUSION

83.    Based upon the foregoing, I believe that the interception and recording of wire communications to and from the TARGET TELEPHONES is an essential investigative means in obtaining evidence of the offenses in which the SUBJECTS and others as yet unknown are involve.

84.    Based on the facts presently in this affidavit, I believe that probable cause has been established that the SUBJECTS and others yet unknown are actively involved in the distribution of marijuana throughout the United States.     There is also probable cause to believe the **TARGET TELEPHONES 2, 3, and 4** have been used, are being used, and will continue to be used by the subjects to arrange for the delivery, planning, and distribution of controlled substances.

85.    I further believe that the facts stated herein establish that the SUBJECTS and others yet unknown are engaged in an ongoing criminal enterprise and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the

object of this request. Therefore, I request that the Court order that the interception need not terminate when the communications described herein are first intercepted, but may continue until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation and the various activities in which they are engaged in furtherance of the enterprise, or for a period of thirty days from the earlier of the day on which law enforcement officers first begin to conduct the interception or ten days from the date this Order is entered.

## MINIMIZATION

86.    Conversations intercepted pursuant to the Court's Order will be minimized in accordance with Chapter 119 of Title 18, United States Code. Monitoring of intercepted conversations will be suspended when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will also be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the SUBJECTS or any of their confederates, when identified, are participants in the conversations, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation is minimized, the monitoring personnel will be instructed to spot check to ensure that the conversation has not turned to criminal matters.    To avoid interception of privileged communications, the monitoring personnel will be instructed to minimize privileged communications between husbands and wives, between physicians and patients, between clergy and patients, or between those named SUBJECTS and legal counsel that pertain to strategy or conduct of any trial or otherwise privileged communications.    If a privileged communication is intercepted, such interception will be minimized and the monitoring personnel will be instructed to enter into the logs kept pursuant

to the monitoring a notation that the communication was minimized, and the supervising attorney will be immediately notified of the interception.

87.     The investigation has revealed that the SUBJECTS may sometimes communicate in coded language and in the Spanish language. It is anticipated that mostly persons who are fluent in both Spanish and English will be assigned to monitor communications during this investigation. However, in the event that an intercepted communication is in code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, I request authority for the monitoring personnel to intercept the entire communication, with minimization to be accomplished as soon as practicable after the interception.

RICHARD L. STARK
Special Agent


Sworn to before me this ___ 7th day of _____, 2005.

UNITED STATES DISTRICT JUDGE


CERTIFIED a True Copy of the
original filed in the office
of the Clerk
by _____
Deputy

35                              US v Jarvis et al     125