**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**THE UNITED STATES OF AMERICA,**

       **Plaintiff,**

  **vs.**                           **No. CR 05-1849 JH**

**DANA JARVIS, et al.,**

       **Defendants.**

**DEFENDANTS' REPLY TO GOVERNMENT'S RESPONSE
TO MOTION TO SUPPRESS THE FRUIT OF TITLE III WIRETAPS**

Defendants David Reid and Greg Hill, by their respective counsel of record,
hereby reply to the Government's Response to Motion to Suppress the Fruit of
Title III Wiretaps.

    A.     TECHNIQUES NOT UTILIZED, OR NOT SUFFICIENTLY UTILIZED:

    1.     Under-Utilization of Potential Sources: As the Government notes, the
"necessity" requirement is not fulfilled unless ordinary investigative procedures
where "employed in good faith."  (Response at 8.)  That was not done here.  In
analyzing this issue the Government tries to limit the traditional techniques that it
must try to a list of five mentioned in United States v. Cline, 349 F.3d 1276, 1280
(10th Cir. 2003).  (Response at 8.)  That list, however, is not exclusive – it merely
sets forth examples of certain ordinary investigative techniques that always fall
within this category.  Obviously other normal techniques may apply in a given
case, and it certainly cannot be said that those need not be tried.  This does not

mean that the defense is arguing, as the Government claims, that the authorities need to exhaust every other imaginable technique. (Response at 9.) What it does mean is that normal investigative techniques must be employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution. United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977). Such techniques are those that "easily suggest themselves and are potentially productive and not unduly dangerous." United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985). That was not done here.

The Government also argues that a legitimate goal of a wiretap may be to dismantle a conspiracy. (Response at 10.) While that is correct, it is also true that the Government may not, by claiming vast investigative purposes, cast its net so far and so wide as to manufacture necessity in all circumstances, as so doing would render the requirements of 18 U.S.C. § 2518 nullities. United States v. Blackmon, 273 F.3d 1204, 1211 (9th Cir. 2001); see also, United States v. Ailemen, 986 F.Supp. 1228, 1236 (N.D. Cal. 1997) (The Government can always identify some detail of the conspiracy, no matter how trivial, that could not be discovered by traditional law enforcement techniques.)

      a.    CS-3:

Calling off the sample deal: For the first time in its Reply, the Government finally discloses the alleged reason for calling off the "starter" deal between CS-3 and John Whalen for 20 pounds of marijuana. That is, supposedly, because the amount of marijuana involved was too small to justify arresting Jarvis and

Whalen, and yet the Government did not want to let CS-3 turn over a "sample" of marijuana to Mr. Whalen.  (Response at 19.)

First, this excuse has never been disclosed until now, and so cannot have contributed to the initial finding of necessity herein.  This is just one of the many factual assertions in the Government's Response for which no citation to an affidavit, report, or other document is given.  Although not improper, it is precisely these kinds of factual disputes that require a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) in this case.  These issues must be resolved based on evidence and testimony, not on warring motions.

Second, it is respectfully submitted that this is a spurious reason.  The Government fails to state why it could not allow this to be done.  The defense presumes it is because they did no want to let the marijuana "walk away," but in the experience of undersigned counsel this is often done in small cases, and counsel has seen law enforcement officers do so in a case involving over one thousand pounds.  In addition, if the concern was letting the marijuana "walk away," it is absurd to think that this particular 20 pounds of marijuana was not going to inevitably find its way onto the market simply because CS-3 did not supply it to Mr. Whalen.  The Government knew that Mr. Jarvis had the marijuana, and was fully aware that he would sell it to the next buyer on the open market, yet they did nothing to stop that.

Not wanting marijuana to "walk" is not a grounds for calling off a deal that was in the works.  Moreover, there are a number of measures that could have

ameliorated the situation.  Officers could have seized the marijuana from Mr. Whalen in a walled-off stop.  Or, they could have simply had CS-3 tell Mr. Jarvis he was obtaining the marijuana for Whalen, and then taken it to the authorities for them to put into an evidence locker.  The same is true for any amount later purchased.  They could have purchased hundreds of pounds from Mr. Jarvis through CS-3 without ever losing control of it.  (See Second Affidavit of Dana Jarvis, Exhibit I to this Reply, at ¶ 6.)  Mr. Jarvis would not have known where the money came from, or where the marijuana ended up.  (Id.)  It is clear that Mr. Jarvis had interposed CS-3 between himself and Whalen and did not want to meet Whalen directly, so he was unlikely to have found out.

Moreover, if worse came to worst, and Mr. Jarvis somehow learned that the marijuana did not go to Mr. Whalen, CS-3 could have simply told him that the deal fell through and he had sold the marijuana to someone else for a better price.  Although agents would have temporarily lost control of the money (they might have seized it back later) this is something that is often done in narcotics investigations.  See Ailemen, 986 F.Supp. at 1232-33 and 1248 (undercover agent for task force involving DEA purchased $27,000 worth of heroin without keeping control of the money).

It is hard to see how this outcome would have been worse for the investigation than killing the deal outright, as well as future deals that would have flowed from it.  The simple fact is that the Government had an active informant with the ability to purchase marijuana in large quantities from Mr. Jarvis, and yet it

rejected the opportunity without valid reason.  This action was fatal to the finding of necessity in this case.

CS-3's real-time information: The Government also tries to downplay the ability of CS-3 to give important information by claiming that CS-3 had "no specific real-time information regarding marijuana loads or money shipments." (Response at 18.)  This statement is difficult to understand, given that just three pages earlier the Government discussed a seizure of $287,000 that resulted directly from a real-time interview given to the agents by CS-3. (Response at 15.)

CS-3's fear of testifying: the Government also defends its reliance on the unwillingness of CS-3 to testify in court as a reason for not using his services further.  (Response at 19-20.)  One case from the 10th Circuit is cited, which is United States v. Edwards, 69 F.3d 419, 429-30 (10th Cir.1995).  The Edwards case sets forth no specific facts regarding the witness' fear of reprisal that can be compared with the instant case.

Edwards does cite another 10th Circuit case, which is United States v. Smaldone, 583 F2d 1129, 1133 (10th Cir. 1978).  In that case there were a number of potential witnesses, all of whom were "uniformly unwilling to testify in court because of fear of reprisal."  (Id.)  Although their reasons are not stated in the published opinion, it is at least possible to discern that there were several witnesses who were uniformly fearful, giving some credence to their fears.  See also United States v. Matya, 541 F.2d 741, 744 ( 8th Cir. 1976) (discussing a total of seven confidential informants, all of whom were unwilling to testify for fear of

their personal safety.)  Here, in contrast, there are not a large number of witnesses fearful of violence, nor is there any particularized discussion of any violent activities undertaken by this group.

CS-3 was a cocaine dealer: The Government also attempts to downplay the leverage it had over CS-3 by asserting that it had no knowledge of his being a cocaine dealer, and claiming that the defense assertions in this regard likely stem from a disinformation campaign by the agents, instructing CS-3 to pretend that he was a cocaine dealer to bolster his credibility. (Response at 35 n.18.)  It appears that counsel for the Government needs to consult with his agents further.  In fact, CS-3 was a cocaine dealer.  (See Exhibit I to this Reply at ¶¶ 9-10.)  He had been dealing cocaine for years before Mr. Jarvis even met him, as Mr. Jarvis learned from various sources, including an attorney who learned this entirely apart from this case.  (Id. at 9.)  CS-3 had been a target of the DEA in Santa Fe for a long time.  (Id.)  The Government's denial of these facts creates a factual dispute that can only be resolved in a Franks hearing.

Trust of CS-3: The Government draws the conclusion that Mr. Jarvis did not completely trust CS-3 from the fact that Mr. Jarvis told CS-3 to conduct the Whalen transaction on his "behalf."  (Response at 22.)  That is a *non sequitur*. On the contrary, what Mr. Jarvis was saying was that he ***did*** trust CS-3, so much so that he wanted CS-3 to represent him in the marijuana transaction.  The only indication of distrust was against Mr. Whalen, whom Mr. Jarvis did not want to meet face-to-face.  (See Exh. I to this Reply at ¶ 7.)

        b.     <u>CS-2</u>: The Government relegates its discussion of "CS-2" to a footnote. (Response at 18, note 11.) The Government complains that "other than to baldly assert that CS-2 could have worn a wire when meeting with Dana Jarvis" the defense has failed to state what more CS-2 could have done for them. (Id.) First, it must be observed that the Government's Response in no way denies that CS-2 could in fact have worn a wire when meeting with Dana Jarvis. The Government gives no reason for why this was not done, nor why it failed to tell the issuing Court that it could be done. Recording informants while they talk with suspects is undeniably a time-honored law enforcement technique that the Government must either try, or explain why it did not. <u>Cf</u>. <u>United States v. Gonzalez, Inc.</u>, 412 F.3d 1102, 1107, 1113-14 (9th Cir. 2005) (in affirming suppression the court noted that the confidential source had been able to wear a recording device when speaking with a high-level target of the investigation, and finding that the Government had side-stepped its responsibility to use promising traditional techniques.) Here the Government did not use this technique and it did not explain why. Instead, they omitted this vital information from their affidavit.

        Second, the defense is now in a better position to state what CS-2 could have actually done than when the Supplement was filed.[1] (See Exh. I to this

---

       [1] The Government's delay in dismissing with prejudice Mr. Jarvis' remaining charges after his guilty plea interfered with the defense ability to obtain the information necessary from him, as it involves admitting inculpatory facts.

Reply at page 1.)  If CS-2 had called Mr. Jarvis to set up a marijuana transaction
he would have met with her.  (Id. at ¶ 2.)  Although he knew she did not have
enough money to buy a large amount of marijuana, he would have helped her out
with smaller amounts of marijuana if she had approached him.  (Id.)  Over time
she could have worked up to larger amounts.  (Id.)  In sum, CS-2 also could have
dealt directly with, and gotten information from, the head of this group that would
have been useful to the DEA.  (Id.)  The Government spurned the opportunity to
exploit this source of information, which greatly undercuts its necessity claim.
The fact that they should do this is something they could have disclosed.

> c.    Other Possible Informants:

> 1.    Donald Trujillo: The Government dismisses the defense

arguments about other witnesses, including Mr. Trujillo, as being "after-the-fact
supposition."  (Response at 21.)  It asks the Court to take on faith its assertion
that, at the time it applied for wiretap authority, the agents had not yet identified
any "weak links" in the organization. (Id.)  The Government chooses not to
respond to the uncontroverted facts that it knew through CS-3 that Trujillo was a
"weak link" because he had recently had a falling out with Mr. Jarvis over a theft
of marijuana, was said by Jarvis to be "out of the picture" and could have been
contacted through his friend CS-3.  (Defense motion filed 2/2/09 at 39-40.)
Coincidently, only after the agents got the wiretaps was Mr. Trujillo stopped and
turned into an informer.  (Id.)  The Government has not explained why it could not

have done so earlier.

       d.    <u>Barbara Hannah, Joseph Martin or Dan Chomyn</u>: In regard to

seeking cooperation from Barbara Hannah, Joseph Martin and Dan Chomyn, the

Government argues that they had not been identified as "weak links" when the

wiretap authorization was sought.  (Response at 21.)  With all due respect

however, the Government knew that Ms. Hanna was "a woman scorned," Mr.

Martin was a convicted felon, and Mr. Chomyn was in need of money.  As

described in the Defense motion and accompanying affidavit, they were obvious

targets for cooperation.  It is of course true, as the Government notes, that such

people would be unlikely to cooperate unless implicated in criminal activity.

(Response at 21, n.21.)  That, however, is something the Government is usually

able to arrange, especially using the enormous powers they have to conduct

"walled off" stops and "knock-and-talks" derived from inside knowledge they had

at their disposal in this particular case.  These can be done with little risk of

exposing the underlying investigation.  Yet, instead of using such methods to

proactively recruit more informants, they simply waited for volunteers to appear.

      Additionally, the Government argues that the eventual cooperation of these

individuals does not necessarily mean they would have cooperated before the

indictments.  This is true, but it is certainly a favorable indication that they would

have turned on Mr. Jarvis to save themselves had they been given the

opportunity.  Finally, the important point that the Government ignores is that it

created its own "necessity" by not trying.

              e.      Other Commonly-Used Techniques**.**

              1.      Undercover Agents: In regard to placing an undercover agent in the Club Rhythm and Blues, the Government argues that this would have "taken tremendous resources." (Response at 22.) The fact that a particular technique may require a lot of work is not an excuse recognized by the wiretap statute. See 18 U.S.C. § 2518(1)(c) and (3)(c) (requiring that normal investigative procedures be tried unless they reasonably appear to be unlikely to succeed, or to be too dangerous to try). Moreover, the use of a wiretap is often considered the most costly and time-consuming investigative technique of all. (See Exh. F to motion filed 2/2/09 at ¶ 100.) Any "savings" argument is therefore illusory.

      Notably, the Government does not deny that an agent could have been placed within the Club, nor does it claim that it would have been too dangerous to do so. The Government's own affidavit indicated that they believed that everyone who worked at the Club was engaged in trafficking marijuana, the Club itself was used to launder drug proceeds, and that it was an entry-way for people into the Jarvis DTO. (Government's affidavit for first wiretap, Defense Exhibit A, (hereinafter "Gov't Affidavit 1") at ¶¶ 22, 25, 41, 46, 48, 88.) Accordingly, the Government's attempts to discount the usefulness of having an agent working therein (Response at 22-23) cannot be credited. Nor does the possibility that an undercover agent might be "assigned a task that involved illegal activity"

(Response at 23) logically mean that an agent could not just watch and listen.  If the Club was as much of a hotbed of narcotics activity as the Government's Affidavit portrayed it, there was a good chance of overhearing valuable information and possibly witnessing illegal activities.  The fact that it would have taken time and effort to penetrate it (as does any undercover operation) does not justify its failure to do so.

2.     No financial investigation: Interestingly, the Government's response on the issue of the failure to conduct a financial investigation does not deny that no financial work-up was ever conducted in this matter before this wiretap was requested.  Instead, it simply asserts that a financial investigation is "not deemed by the 10th Circuit to be traditional investigative technique that must be discussed in a wiretap affidavit."  (Response at 26.)  In fact, however, the techniques cited in Cline are not an exclusive list. Indeed, the case in which that list originated specifically held that "if other normal investigative techniques *__such as__* pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous."  United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir.1997), overruled on other grounds by United States v. Ramirez-Encarnacion, 291 F.3d 1219 (10th Cir.2002), (emphasis added).

In other words, all the techniques listed therein, and in the cases that flow therefrom, must be explained with particularity in a wiretap affidavit, but so must

all other "normal investigative techniques." This is the only possible interpretation that could be faithful to the statutory mandate set forth in 18 U.S.C. § 2518(1)(c) and (3) (c), because certain ordinary investigative techniques may apply in some cases and not others. Moreover, over time new techniques are developed that become standard, so again, the five stated in Cline cannot be exclusive.

The defense has supplied an affidavit from its expert witness stating that a financial investigation is essential in a case of this particular kind, and creates no risk that the underlying criminal probe will be compromised. (See Exh. B to motion filed 2/2/2009, Doucette Affidavit at ¶ 103.) Conducting a financial investigation has been held to be an important step in a narcotics case. Ailemen, 986 F.Supp. at 1241 and 1304-07. Mr. Jarvis has also stated that if the Government had checked his credit card records they would have gained invaluable information concerning the network of supply and distribution which, combined with some brief surveillance, would have led them to large stashes of marijuana. (Exh. I at ¶ 14.) Yet, that was not attempted, or apparently even considered.

3.    Trash covers: The Government claims that its single attempt at a "trash run" was sufficient, and also that its failure to conduct any other trash runs is excused by the fact that they would be unlikely to succeed in this case because "Jarvis instructs his workers to watch what they throw away." (Response at 25.) Neither assertion is correct. It is simply not a reasonable

effort to attempt only a single trash run, and then just give up, especially when
that one attempt was as badly bungled as this one was.[2]  Nor is it reasonable to
try only a single location when there are as many potential locations from which
to collect trash as there were in this case.

Even if it were true that Mr. Jarvis told his associates to be careful of what
they put in the trash, this does not mean that they religiously followed his advice
to the point that there could never be anything in the trash that would be useful to
trained investigators.  Once again, if a normal investigative technique will produce
helpful evidence, the authorities need to make a reasonable attempt to employ
that technique, whether or not it would, in one fell swoop, solve the entire case.
One botched trash run at a single location was not a reasonable effort.

4.    <u>Failure to adequately utilize pen registers</u>: The
Government argues that pen registers provide only "limited information," and do
not reveal everything that the agents wanted.  (Response 24.)  True, but when
used in conjunction with other information, pen registers can tell the authorities
quite a bit.  They can be used to augment surveillance and make it more
successful because people tend to call each other before, during, and after
important activities.  They can also help the authorities determine who all of the
other conspirators are, especially when used in conjunction with the DEA

---

[2]  The details of this single poorly-executed attempt are set forth in the
Defense Supplement filed 5/4/09 at pp. 26-28.

intelligence database that contains voluminous information regarding persons, locations, and telephones.  The defense is not arguing that pen registers alone could have given the agents everything they wanted, but rather that no single technique will ever do so, and if that were the test then a wiretap would always be appropriate.  The Government could have used pen registers in a much more proactive and sophisticated manner than it did, and its failure to do so shows that it did not reasonably try to use ordinary investigative techniques in this matter.

> 5.    <u>Use of Search Warrants and Interviews with Witnesses and use of the Grand Jury</u>.

<u>"Knock and talk" and "walled off stop" techniques</u>: The Government attempts to justify its failure to inform the issuing Court about the potential use of such techniques as "walled off stops" and "knock-and- talks" by stating that "Agents cannot indiscriminately knock on the doors of organization members or stop their cars."  (Response at 24.)  That is, of course, incorrect.  Law enforcement officers are free to stop any vehicle for any traffic infraction, even if their ulterior motive is clearly the investigation of some other offense.  <u>Whren v. United States</u>, 517 U.S. 806, 813-14 (1996).  Given the near-impossibility of driving any significant distance without violating some rule or regulation, the authorities are, as a practical matter, able to stop virtually any vehicle they select.

Likewise, it is well-established that our Courts liberally indulge the fiction that so-called "knock and talks" fall within the category of "consensual encounters," and therefore require neither probable cause, nor reasonable

suspicion to initiate.  See, e.g., United States v. Reeves, 524 F.3d 1161, 1666 n.

3 (10th Cir.  200) citing United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th

Cir.  2006).  As a result, police officers regularly wheedle or intimidate their way

into people's homes and cars in this country without showing prior suspicion.  The

Government cannot simply turn a blind eye to these fruitful techniques commonly

utilized by police.

According to the Government this was not done in the present case

because the agents did not have "actionable intelligence."  (Response at 24.)  As

noted elsewhere herein, the purpose of these techniques is to ***gain*** actionable

intelligence.  Thus, again, the Government did not make reasonable use of the

techniques available to it.

Grand Juries: The Government points out that the defense does not

challenge the fact that subpoenaing people involved in a conspiracy to testify

before a grand jury would reveal the existence of the investigation.  (Response at

16.)  This is obvious.  What the Government studiously ignores, however, is that

there are other ways to utilize the grand jury, and the Government did not see fit

to disclose those to the issuing Court, thereby creating the false impression that it

had utilized the grand jury procedure to the maximum possible extent.  (See

Defense motion to suppress filed 2/2/09 at 53-54.)

Potential interview of Ms. Laughton and her husband: The Government

also defends its decision not to interview the police-officer husband of Julie

Sutton Laughton, because they did not know if Ms. Laughton might be involved

with the Jarvis DTO.  (Response at 17.)  It is puzzling why, if they were so concerned with leaking their investigation, they told the internal affairs department about it, since they could have leaked it as well.

In any event, it is respectfully submitted this far-fetched concern is not a cognizable reason for failing to interview a police officer when there is no indication that he is an any way connected with wrongdoing.  If the agents cannot even speak with a sworn law enforcement officer, then the requirement of conducting interviews would effectively be rendered a nullity.

In addition, the Government claims that the defense has failed to allege that any relevant information could have been gained.  (Id.)  In fact, however, what the defense contends is that these folks could have served as a conduit to find out about the suspected organization.  The Government fails to address this argument.


6.     Physical Surveillance.

Too many locations to surveil: The Government claims that it adequately explained to the Issuing Court its failure to conduct surveillance on the grounds that it reasonably appeared to be unlikely to succeed if tried or to be too dangerous.  (Response at 12.)  The Government's position may be best summed up in these words:

> It is simply unreasonable to expect agents to conduct continued surveillance at numerous locations without information that some relevant activity was afoot -- it would be a waste of resources and the surveillance would eventually almost certainly be compromised.

(Response at 15.)

In fact, however, having too many places to surveil is not among the
cognizable conditions that qualifies as "necessity" for a wiretap.  The Government
cites no case, and none is known to the defense, stating that an overabundance
of targets for surveillance is a reason not to conduct surveillance.  Moreover, the
whole point of conducting surveillance before seeking wiretap authority is to
obtain actionable information.  (Cf. Exh. B to defense motion filed 2/2/09 at ¶ 68.)
To argue that information must be known before surveillance can be conducted
puts the cart before the horse.  (See Response at 14-15, arguing that "actionable
intelligence" is prerequisite to surveillance.)   To accept the Government's
argument that surveillance cannot be conducted without first obtaining actionable
information creates a tautology that would nullify the requirement to try
surveillance before proceeding to a wiretap.

The Response attempts to play up the Government's surveillance efforts by
stating that "agents had conducted intermittent surveillance of several locations
between July 2002 and February 2005 and 'did not observe any criminal activity
that would provide evidence toward accomplishing the objectives of this
investigation.'" (Response at 12, citing Affidavit 1 at ¶ 12.)  However, this
statement cannot survive scrutiny.  The truth is that, by and large, this is all they
did for years -- intermittent surveillance.  The New Mexico DEA never conducted

a professional, fully-staffed surveillance designed to really obtain information capable of disrupting a drug ring.  Simply driving by a location a few times a year on the off chance that something worthwhile might be seen is not "surveillance," at least as that word is used in the context of necessity for a wiretap.

Difficulty of surveillance: The Government also seeks to justify its failure to conduct surveillance by claiming that the relevant locations were "in rural locations," and were "very difficult to watch."  (Response at 13.)  Two points must be noted in reply.  First, this is simply not true.  Only two of the 10 locations discussed in the defense Supplement could rightfully be called "rural."  (See Exh. I to this Reply at ¶ 16.)  The pleadings already filed thoroughly document that it was quite possible to have conducted proper surveillance on all 10 of these locations.  They need not be rehashed here.  (See Exh. H to Supplement, Affidavit of Milton Rodriguez filed 5/4/09.)  The Government has not even attempted to make a specific factual refutation of the detailed information presented by the defense regarding any of those locations.  A Franks hearing is required in order to resolve this issue of fact.

In addition, the affidavit of Mr. Jarvis filed as Exhibit I to this Reply sets forth the kinds of things the agents would have seen if they had conducted these surveillances.  (See Exh. I to this Reply at ¶¶ 3A -3E.)  At the "Lazy B" location near Tucson they could have looked directly into the garage where the product was loaded and unloaded.  At the First Street House surveillance agents would

have seen duffle bags and suitcases containing marijuana being taken out of vehicles and put into a guest house, and later transferred to other vehicles that would head east.  From this the authorities could have determined who brought the loads in from Arizona and who took them east, and could have figured out their destinations.  A proper surveillance of the Quail Run residence would have observed numerous visits by various members of the group. Vehicles used to transport marijuana were parked there for weeks at a time.  Surveillance of the 13 Enebro Road location would also have revealed the identities and vehicles of co-conspirators, and enabled the authorities to have linked up the comings and goings with the timing of specific jobs, creating opportunities for "walled-off stops."  Observations of Mr. Jarvis' house at 1440 Cielo Vista in Bernalillo, would have disclosed couriers coming there from the airport, and from the other locations mentioned above.  Thus, watching these locations would likely have been fruitful.

Second, the Government's claim seems to be that if surveillance is merely difficult, it may simply skip that step.  The Government's own response belies this by relying upon United States v. Ramirez-Encarnacion, 291 F.3d, 1219, 1222 (10th Cir. 2002).  According to the Government, the Tenth Circuit in Ramirez-Encarnacion accepted the rural nature of a location as supporting a necessity finding when it "made concealing surveillance vehicles ***almost impossible***."  (Response at 13, emphasis added .)  There has, however, never been such a

claim herein, and certainly never could be.  Not only was it not "almost impossible" to surveil these locations, it would have been downright easy to watch most of them.  (See Exh. H to Supplement, Affidavit of Milton Rodriguez filed 5/4/09.)

Pole cameras: The Government responds to the defense argument regarding "pole cameras" in several ways.  First, the Government asserts "on information and belief" that the only pole cameras available to agents were microwave cameras with a range of only one mile and would have to be monitored in the field.  (Response at 15, n 9.)  The Government provides no explanation as to why microwave cameras with such a range would not be suitable, at least for the more urban or suburban locations discussed in the defense pleadings.  Apparently the Court is to guess at this fact, or simply assume that such a camera cannot be used at any of the locations discussed.

Likewise, the Government's Response leaves the Court and the defense to guess at why the Government felt that it was limited to microwave cameras, if indeed they were not adequate to the task at hand.  It is patently ridiculous to assume that no appropriate cameras were available to the DEA in the entire United States.  Pole cameras are ordinarily able to transmit over long distances using telephone lines, and the defense has identified numerous sites that were suitable for such cameras.  (See Defendants Supplement filed 5/4/09 at pp. 12-21 identifying eight locations for the use of pole cameras.)

Was it just an internal DEA bureaucratic decision to restrict these agents to microwave cameras?   The Government's Response gives no clue in this regard. If it was just the DEA's own decision, that could not possibly be grounds for necessity, because an agency cannot simply create its own "necessity" by refusing to use ordinary investigative techniques such as obtaining usable pole cameras.  See Ailemen, 986 F.Supp. at 1240 (Agency's own actions cannot create the necessity required for a wiretap.   Moreover, it is important to note that the Government's Response contains no specific disagreement with the assertions in the defense briefs as to which locations were suitable for pole-camera surveillance.

Use of counter-surveillance by the DTO: The Government also trots out an alleged statement by CS-3 that the Jarvis DTO was trained to avoid police detection and supposedly conducted counter-surveillance.  (Response at 13.) This is both factually untrue, and also does not satisfy the applicable test.  First, contrary to what the issuing Court was told, and this Court is still being told, Mr. Jarvis never "maintained constant vigilance," nor did he have anyone act as a lookout except during times when marijuana was actually being handled.  (See Exh. I to this Reply at ¶ 5.)  There was no counter-surveillance at the meeting between CS-3 and Mr. Jarvis.  (Id.)  The meeting took place at the lounge in the Palace Restaurant in Santa Fe.  (Id.)  The door to the street was always left open, and the lounge could be seen from across the street.  (Id.)  An agent could have

been placed in the bar – just walked in, sat down and listened.  (Id.)  It was quiet and would have been easy to observe.  (Id.)  Nor did Mr. Jarvis have CS-3 searched before talking with him.  (Id. at ¶ 1.)

Second, even if Mr. Jarvis used counter-surveillance (i.e. watching for police) on occasion, that would not satisfy the very test the Government propounds: "visual surveillance would be fruitless where the conspirators were on guard, ***maintained constant vigilance*** for surveillance teams, and ***warned neighbors to be on alert for strangers***."  (Response at 13, citing United States v. Hyde, 574 F.2d 856, 868 (5th Cir. 1978) (emphasis added).)  There is absolutely no indication in the present case that Mr. Jarvis and his loose-knit group of friends "maintained constant vigilance," or that they "warned neighbors to be on alert for strangers."  Again, this sort of fact issue must be developed and resolved in a Franks hearing.

Spot-check surveillance: The Government also makes a number of unfounded arguments regarding "spot check" surveillance.  First it claims that agents conducted numerous such surveillances without generating reports because nothing significant was observed.  (Response at 14, n. 7.)  This allegation is puzzling for a number of reasons.  The Government has submitted no documentation, such as an affidavit from the agents, to support this argument, even though the issue concerns whether or not a Franks hearing should be granted, an issue that requires such documentation.

-22-

Second, it is difficult to believe that there were numerous surveillances that the Government did not disclose in its Affidavit.  The Government has no incentive to understate its surveillance efforts when trying to persuade a judge that normal techniques had been tried.  See Ailemen, 986 F.Supp. at 1297.  Finally, the Government claims that this was done on "numerous occasions," but gives no specifics.  How many is numerous?  Where was this done?  When was this done?  Not one specific example is given.  The Government's mere mention is not enough to support its argument.

The Government  also tries to defend the misleading statements in its affidavit by stating that the defense has provided no definition of the word "surveillance" that is incompatible with "drive-by" or "spot check" surveillances.  (Response at 14, n. 8.)   That is incorrect.  The Affidavit of Ms. Doucette discusses what goes into a true surveillance.  (See Exh. B to Defense motion filed 2/2/09 at ¶ 67.)  Moreover, Black's Law dictionary defines "surveillance" as "Close observation or listening of a person or place in the hope of gathering evidence."  (Blacks Law Dictionary 7th ed.)  Random House Webster's College Dictionary defines "surveillance" as "a watch kept over someone or something."  It is clear that merely driving by a residence could not constitute either "close observation," or "a watch."

What is more important, however, is the common understanding of the word "surveillance."  What did Judge Conway think when he read that word?  It is

-23-

respectfully submitted that no one would assume that "surveillance" referred to merely driving by a residence in the hopes that something important might happen during the few seconds of the observation. Instead any reader would naturally picture the true "surveillance" consisting of a prolonged observation in a diligent attempt to actually find out what was happening at a given location. Thus, the misleading assertions in the affidavit must have been intentional, or at least reckless.

Professional surveillance efforts: The Government also takes issue with the recitation of the deficiencies in its surveillance efforts. It points out that the Indianapolis surveillance, discussed by the defense as an example of a truly professional surveillance effort, was conducted in conjunction with this investigation, and therefore is to the Government's credit. (Response at 15.) Perhaps so.[3] The point the Government ignores, however, is that during the many years the New Mexico DEA had to conduct surveillance of the numerous locations relevant to this case, it never did so in the same fully-staffed professional manner that the Indianapolis DEA was able to do on extremely short notice. Instead, the New Mexico DEA continually made half-hearted attempts involving only a few agents in very cursory ways not designed in earnest to obtain information that could really make a case against this group.

―――――――――――――

[3] If that investigation is a part of the present case, then the defense wonders why the files on it have not been disclosed.

The Response also quarrels with Ms. Doucette's description of the surveillance at the Quail Run location as having had only three agents, and no aerial or lookout support.  (Response at 15, n.10.)  The Government points out that Ms. Doucette *sua sponte* corrected the statement in her first affidavit that only "three agents" were involved to note that there were actually four, stating that she had forgotten to include the author of the report.  (Id.; Exhibit F to defense supplement filed 5/4/09, Doc. # 1627, at ¶ 114.)  This is an indication of Ms. Doucette's scrupulous honesty and integrity, which is to her credit, not detriment.

Regarding whether or not there was aerial surveillance, the Government now states that two of the officers listed in the report were pilots who were conducting aerial surveillance on Quail Run.  (Id. at 15-16, n. 10.)  The Government's only citation for this "fact" is its Exhibit 7, which says nothing of the kind.  Once again, the Government's "facts" are not backed up by any affidavit or document, but merely the say-so of counsel.  Moreover, Ms. Doucette's thoroughness and expertise is demonstrated by the fact that, while reviewing the disclosure, she did recall the fact that one of these agents was a pilot, and so noted in her affidavit:  "SA McClung is a pilot and participated in this surveillance, but the report does not contain any reference to aerial support."  (Exhibit F to Defense supplement filed 5/4/09 at 8, n. 7.)  She was correct --  just because an agent is a pilot does not mean that in every surveillance they are in an airplane. It is respectfully requested that the Court review Government's Exhibit 7 to see if

there is any indication therein that an aerial surveillance was conducted.  Once

again, the Government provides no more on this point than argument of counsel.

Finally, as a substantive matter, a surveillance conducted by just four agents is

still a poor substitute for a fully-staffed professional surveillance, even if an

airplane is used.  (See Exh. B to Defense motion filed 2/2/09 at ¶ 67.)


                7.    Liquor license Investigation: The Government also takes

issue with the argument in the defense Supplement that it could have

investigated the Club Rhythm and Blues under the guise of a liquor license

inspection.  (Response at 26-27.)  The Government finds it unclear how

assessing "penalties would have assisted agents in their drug trafficking

investigation."  (Id.)   This is a "straw-man argument."  The defense has never

said that imposing penalties would have assisted the investigation.  Instead, the

thrust of the defense argument is that a liquor license gives the authorities *carte*

*blanche* to walk into a place that they believe is closely associated with a drug

distribution ring, and scrutinize it with a fine-tooth comb, all without ever

disclosing that the true reason for doing so is to investigate drug activities.  One

wonders how many chances these agents have had to inspect the headquarters

of a drug trafficking operation, where every employee therein is thought to be

involved in drug dealing with their target, and ask the most searching questions,

all without ever disclosing the true reason for their investigation.  Yet, they neither

took advantage of this opportunity, nor satisfactorily explained their failure to do so.

At the very least such an inspection could have vetted the claims of CS-2 about large-scale money laundering going on there.  The Government claims it already knew" that the role of the club . . was to launder drug proceeds." (Response at 26.)  They were wrong.  (See Exh. I to this Reply at ¶ 8.)  The Government's lack of interest in double checking their "knowledge" is telling as to how much they really wanted normal investigative techniques to work.  Finally if, as the Government argues, the claims that $750,000 per month was to be laundered were "not material to the determination of probable cause" (Response at 42), one wonders why they included them in their affidavit.

8.    Investigations conducted by other DEA offices: The Government defends its failure to disclose to the issuing Court that investigations of this same group were being conducted in other districts by stating that parallel investigations need not be discussed in a wiretap affidavit.  (Response at 27.)  No citation of authority is offered for that proposition.

Moreover, it is impossible for the issuing Court to assess the existence of "necessity" without knowing all of the resources at the Government's disposal.  If, for example, the DEA had an informant in another district who could have eliminated the need for a wiretap, or had done extensive surveillance, or had

planted undercover agents or had other pertinent resources, as a logical matter
that must be disclosed to the issuing Court.  Thus, the full results of those parallel
investigations should be, but never have been, disclosed to this Court.  See
Ailemen, 986 F.Supp. at 1239 (Government should have disclosed to issuing
Court Canadian investigation it knew of on subject related to case for which
wiretap was sought.)


         9.     Target Telephone 2: The Government also defends its
failure to show the necessity for a wiretap on the telephone of George Ripley
("Target Telephone 2") in the affidavit dated April 7, 2005.  (Reply at 27-28.)
They argue that there was no requirement to make a showing regarding Mr.
Ripley because they were not targeting George Ripley individually, but rather the
Jarvis organization as a whole.  (Response at 28.)

     The Government's entire argument rests upon two cases holding that a
wiretap application need not demonstrate necessity as to all named interceptees
of a given telephone.  Id., citing United States v. Mitchell, 274 F.3d 1307, 1312
(10th Cir. 2001), and United States v. Cline, 349 F.3d 1276, 1283 (10th Cir.
2003).  Neither case is on point because in each of them the holding was
premised upon a finding that the authorities had made a sufficient showing of
"necessity" as to at least one user of each of the target telephones.  Those cases
merely hold that the Government was not required in addition to make a

"necessity" showing as to each of the named interceptees, and to keep repeating the name of the targeted individual throughout its recitation of necessity.

Here, in contrast, the Government never made a showing of "necessity" as to Mr. Ripley, and it never showed, or even claimed, that his telephone was used by another defendant.  On the contrary, according to the Government's own affidavit, Target Telephone 2 was subscribed to and used solely by Mr. Ripley. (Government's affidavit dated April 7, 2005 at ¶ 5.)  Instead of making a showing of necessity as to Mr. Ripley, however, the Government simply copied the showing it had made for Mr. Jarvis.

This is not sufficient.  A showing of necessity as to the primary user of a telephone, or at least one user thereof is most definitely required by 18 U.S.C. § 2518(1)(c) and (3)(c).  <u>United States v. Brone</u>, 792 F.2d 1504, 1506 (9th Cir. 1986); <u>United States v. Abascal</u>, 564 F.2d 821, 826 (9th Cir.1977); <u>United States v. Carniero</u>, 861 F.2d 1171, 1176-1177 (9th Cir. 1988).  No such showing was made herein, and all fruits of those interceptions must therefore be suppressed.


## IV.    **POST-CUT-THROUGH DIALED DIGITS**

The Government's Response regarding the issue of post-cut-through dialed digits ("PCTDD") confuses the issue of an ***unauthorized*** pen register/trap-and-trace device (hereinafter "pen register"), with one that ***captures content***. (Response at 28-30.)  An unauthorized pen register is any pen register used

without previous authorization from a Court.  In contrast, a pen register that

captures content is one that, even if properly authorized by a Court to capture the

digits dialed in placing a call, goes beyond that and records digits dialed after the

call has been connected.

For example, after connecting to a pharmacy to refill a prescription, a caller

may be instructed to input the prescription number and other information.  That is

content -- analogous to a letter or voice conversation, and it goes beyond what

may be collected without wiretap authorization.  Similarly, a text message or e-

mail would be content.  Pen registers are frequently set to capture these digits,

just as they capture the digits dialed before the call is connected.  It is the latter

issue that the defense has raised -- that content may have been captured in this

case by a pen register used essentially as a wiretap.

It is indisputable that PCTDD may contain constitutionally-protected

content.  See, e.g., United States Telecom Ass'n v. F.C.C., 227 F.3d 450, 462

(D.C. Cir.2000).  Capture of such content violates the Fourth Amendment to the

United States Constitution.  In re U.S. for Orders (1) Authorizing Use of Pen

Registers and Trap and Trace Devices, 515 F.Supp.2d 325, 339 (E.D.N.Y. 2007)

citing In the Matter of the Application of the United States of America, 441

F.Supp.2d 816, 818 (S.D.Tex.2006) and In the Matter of the Application of the

United States of America, No. 06-MJ-1130 (M.D. Fla. 2006) (unpublished)

affirming In re U.S., No. 06-MJ-1130 (M.D.Fla. 2006)(unpublished).  Further, the

In re U.S. for Orders (1) decision provides references to cases in which the issue was addressed in *dicta* that was supportive of the decision.  See United States Telecom Ass'n. v. F.C.C., 227 F3d. 450, 462 (D.C. Cir.2000) and In re Application of the United States, 396 F. Supp.2d 45, 48 (D.Ma.2005).

The Government attempts to negate this issue by citing two cases for the sweeping proposition that "violation of the pen register statute does not result in an unconstitutional search and Congress did not provide for exclusion of evidence for violation of the statute."  (Response at 29 citing United States v. Thompson, 936 F.2d 1249 (11th Cir. 1991) and United States v. German, 486 F.3d 849, 853 (5th Cir. 2007)).  Those cases are not on point, however, because they refer only to unauthorized pen registers.  See German, 486 F.3d at 853 ("In *Smith v. Maryland* the Supreme Court held that the ***non-content*** surveillance of a pen register is an insufficient invasion of privacy to implicate the Fourth Amendment.") (emphasis added.)  Thompson discusses only ***unauthorized*** pen registers.  The holdings of Thompson and German are entirely inapplicable where, as here, the issue is of capturing ***content***.

The Government notes that it has disclosed some data to the defense regarding what it captured on its pen registers.  (Response at 30, fn 17.)  What was disclosed, however, is not the raw data as intercepted, but rather data downloaded to a computer program utilized by the DEA called Penlink.  (Id.)  In other words, what has been disclosed to the defense has been changed from its

original form -- sanitized so to speak -- to a form that fits within a computer database program.

"The Government may not collect content and must use all reasonably available technology to prevent such collection."  <u>In the Matter of the Application of the United States for an Order</u>, __ F.Supp.2d __, 2007 WL 3036849 (S.D.Tex. 2007).  It is entirely possible for the Government to prevent collection of content, simply by configuring its pen register to collect only ten digits.  <u>See</u> <u>In the Matter of the Application of the United States of America</u>, 441 F.Supp.2d 816, 818 (S.D.Tex.2006) ("In most instances, any digit dialed after the first ten is a PCTDD.")

The Pen Register Statute was amended in 2001 to include a clause at the end of the pen register definition that clearly prohibits the collection of content. See <u>In re Matter</u> 515 F.Supp.2d at 330, <u>citing</u> USA PATRIOT Act of 2001 (Pub.L. No. 107-56. 115 Stat. 272.  The Court noted:

> Title III requires that the Government obtain a court order (known as a "Wiretap Order") before its agents are permitted to "intercept" the "content" of an individual's "wire communications" with an "electronic, mechanical or other device.

<u>Id</u>. at 331  It went on to note that "Title III also contains an exclusionary rule that prohibits the Government from making use of the contents of a communication obtained in violation of Title III."

The defense believes from experience in other DEA cases involving pen register data from the same time period that content was intercepted in the

instant case. (Exh. B to 2/2/09 motion Doucette Affidavit at ¶ 57.)    The

Government nowhere explicitly denies this.  Instead, it only notes that Agt. Stark

does not refer to such content in his affidavit.  Although true, this is not dispositive

because it is still possible that such content was captured, and its "fruits" used

without attribution to further this investigation.  Certainly the affidavit leaves open

that possibility by stating that the agent relied upon "statements made to me by

other law enforcement personnel involved in the investigation, review of reports of

other law enforcement personnel and confidential sources, and on the basis of

reliable information I have reviewed."  (Government's initial affidavit at ¶ 6; see

also ¶ 2.)  If PCTDD is among that information, that would be an unlawful wiretap,

and would require this Court to determine whether probable cause had been

shown with the fruits thereof excised from the affidavit.  Accordingly, the defense

again respectfully seeks disclosure of the raw data obtained from these pen

registers, not data that has been subjected to any modification.  If that data

discloses the collection of PTCDD, then further investigation will be needed to

determine what was the "fruit" of that violation, and whether suppression is

warranted pursuant to the Fourth Amendment and Title III.


## V.    *LEON* GOOD FAITH

The Government argues the applicability of the "good faith" doctrine

announced in United States v. Leon, 468 U.S. 897 (1984).  (Response at 31.)

That concept does not apply herein, however, for two reasons.  First, the wiretap statute incorporates its own exclusionary rule, which contains **_no_** good-faith exception.  See 18 U.S.C. § 2515, and 18 U.S.C. § 2518(10)(a).  As our Supreme Court has stated "The availability of the suppression remedy for these statutory, as opposed to constitutional, violations . . . turns on the provisions of Title III rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights."  United States v. Donovan, 429 U.S. 413, 432 n. 22 (1977).  The Leon "good-faith rule" is a judicially-crafted exception to judicially-crafted exclusionary rules, and so has no application to the statutory exclusion rule enacted through the legislative process.

Although the Government cites two older cases from the 1980's and 90's, the more recent cases affirm that the Leon rule does not apply.  United States v. Rice, 478 F.3d 704, 714 (6th Cir. 2007);  People v. Jackson, 28 Cal.Rptr.3d 136,153-54 (App. 2005).  See also United States v. McGuinness, 764 F.Supp. 888, 897 n. 2 (S.D.N.Y. 1991) (expressing doubt, but not deciding, that Leon does not apply); United States v. Spadaccino, 800 F.2d 292, 296 (2d Cir. 1986) (interpreting similar Connecticut state statute, and finding good faith doctrine inapplicable).  Although the Tenth Circuit has not expressly considered the applicability of Leon good faith, its understanding that suppression must follow a successful "necessity" challenge is evident in United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 (10th Cir. 2002) ("A successful

challenge to the necessity of a wiretap results in the suppression of evidence seized pursuant to that wiretap.") citing United States v. Green, 175 F.3d 822, 828 (10th Cir.1999).

Second, where an issuing Court's order is based on the Government's false statements or material admissions made intentionally or recklessly, Leon does not apply by its own terms. Leon, 468 U.S. at 923. See also People v. Bockman, 767 N.E.2d 832, 83, 263 (Ill. App. 2002) (Good-faith doctrine inapplicable where mandatory statutory requirements to use eavesdropping device were not fulfilled, so officers could not have concluded in good faith that the application was valid). That is the situation presented to this Court. Accordingly, the theoretical applicability of a "good-faith" exception is moot in this case. Suppression is required for these violations based on the facts of this case.

## VI.    **EXTENSIONS**

    A.    SUPPRESSION IS REQUIRED BECAUSE THE INVALIDITY OF THE FIRST WIRETAP TAINTS THE EVIDENCE DERIVED THEREFROM.

        1.    Evidence derived from an Invalid Wiretap is tainted.

As noted by the Government, the defendants challenge all of the other wiretaps to the extent they were based on the initial wiretap. (Response at 4, n.1)

## VII.   REQUEST FOR *FRANKS* HEARING

The Government challenges the defense request for a <u>Franks</u> hearing by disputing nine specific false facts or material omissions pointed out by the defense.  (Response at 31- 43.)  Before addressing those individually, it should be noted that this divide-and-conquer tactic is inappropriate here.  The Court should look at the totality of the falsehoods and material omissions, not examine them piecemeal.  <u>Ailemen</u>, 986 F.Supp. at 125-36, 1241 and 1302 n.108. Moreover, the Court should also keep in mind that, at the pleading stage, the defense need not present clear proof of deliberate or reckless omissions or misrepresentations in order to obtain a <u>Franks</u> hearing.  <u>U.S. v. Gonzalez, Inc.</u>, 412 F.3d 1102, 1111 (9th Cir. 2005) <u>citing</u> <u>United States v. Stanert</u>, 762 F.2d 775, 781 (9th Cir.1985).  Instead, at this stage the defense need only make a substantial showing that would support a finding of intent or recklessness.  <u>Id</u>. That showing has been made in the present case.

The Government has, throughout its Response, suggested that a <u>Franks</u> hearing is not needed based on ***its*** version of the facts, which conflict with those espoused by the defense.  It has asked the Court to weigh evidence based solely on pleadings and averments of counsel.  Ten specific factually-disputed issues are discussed below, but each has a whole constellation of pertinent facts that

cannot be fully developed in writing.[4]  The defense has set forth enough of a factual basis for a <u>Franks</u> hearing, but in addition it is only by conducting such a hearing that this Court can fully understand the evidence, assess the veracity of the witness and thereby reach the correct judgment on these issues.  Moreover, only by conducting a <u>Franks</u> hearing can the Court permit the making of a proper record for review, should that become necessary in the future.  With these points in mind, we turn to the specific issues.

     a.   <u>CS-3</u>: The Government's argument regarding CS-3 boils down to the contention that the Government does not agree that CS-3 was in fact a cocaine dealer, and therefore could not have withheld that fact from the issuing Judge. (Response at 34-35.)  According to the Government, "This assertion is not based on fact, however, but on co-defendant Dana Jarvis's conclusory claim" and the same assertion by Ms. Doucette.  (<u>Id</u>. at 18.)  The Government suggests that the claim is likely the result of a disinformation campaign purposely started by the agents themselves.[5]  (<u>Id</u>. at 35, n. 18)

_____

[4]  For example, in <u>United States v. Gonzalez</u> the Government claimed, much as it does here, that it did not have pole cameras available.  The briefs presented the issue, but the <u>Franks</u> hearing provided the Judge with further information pertinent to the decision, which was that the Border Patrol could have gotten the needed cameras from the F.B.I, but did not want to do so because it would have meant sharing credit with that agency.

[5]  The Government acknowledges that CS-3 received "immunity," but does not say for what offenses.

The Government's argument is premised at least in part on the implication that the sworn statement of Mr. Jarvis is not to be considered a "fact," for purposes of whether a <u>Franks</u> hearing should be held.  (Response of 36.)   On the contrary, however, the affidavit of Mr. Jarvis does satisfy the requirement of documentation upon which to base a <u>Franks</u> hearing.  Indeed it is the Government that has presented no sworn statement by its agents, or any other documentation whatsoever, for its assertion that the Government did not know that CS-3 was a cocaine dealer.  All it presents is the argument of counsel.  This is another factual dispute that can only be resolved through a hearing.

As noted above, Mr. Jarvis' affidavits state that CS-3 was a cocaine dealer, and had been for a long time before Mr. Jarvis even met him.  (See Exh. I to this Reply at ¶¶ 9-10.)  Moreover, he stated that CS-3 had long been a target of the DEA in Santa Fe, thus showing that the omission of this information in the Affidavit filed by a DEA agent was either intentional or at the very least reckless. (<u>Id</u>.)  The Government's denial of these facts creates an issue that can only be resolved in a <u>Franks</u> hearing.


b.    <u>The Red Volkswagen Van</u>:  The  Government defends its statements about the red Volkswagen van by claiming that, even assuming that the van was never used for surveillance, the Government's affidavit is still true because it merely relayed the falsehood that CS-3 told the agents.  (Response at 35-36.)

What happened here, however, went well beyond that.  The Government received false information that was obviously suspicious enough to have a raised a red flag (using a slow-moving and conspicuous vehicle such as a red Volkswagen van for surveillance), yet it did not bother to check it out, even though doing so was completely within its power.  Instead, it simply passed the falsehood on as "fact" under oath to the issuing Court, backed up by the imprimatur and prestige of the federal Government.  It is respectfully submitted that the Government has a duty not to endorse in a sworn affidavit statements that it knows or should know to be false, and that it could easily check.  This was a false statement, and it was recklessly made.  Similarly, the Government insists that Ms. Cummings, a former resident of the house where the red van parked, counted money for Mr. Jarvis.  This is untrue as well.  (Exh. I to this Reply at ¶ 12.)  The defense is unable to find any report in the disclosure verifying this.


    c.    Closed Organization: The Government seems to imply, without explicitly stating, that Agent Stark did not know at the time he swore out his affidavit how Mr. Reid came to be associated with this drug organization.  (Response at 36-37.)  Yet, in its initial affidavit it portrayed Mr. Reid as a full-blown member of the organization, and claimed that all such people were either long-term associates or individuals recruited through the nightclub.  (See Gov't Affidavit 1 at ¶¶ 15, 53-54, 82, 88.)   The Government does not now dispute that

-39-

this was a false statement, and it gives no indication that it was somehow misled to believe that Mr. Reid fit within this category.  It simply fed the issuing Court false information painting Mr. Reid as a long-term drug associate of Mr. Jarvis, apparently without asking any of its informants how Mr. Reid came to fly an airplane for Mr. Jarvis, or doing any other investigation into the matter.  Once again, the Government has a duty not to include in a sworn affidavit statements that it knows or should have known to be false, yet it did recklessly include just such false information here.

       d.    <u>Arrests for Which Dispositions Were Unavailable</u>: The Government claims that the dispositions of Mr. Jarvis' previous arrests would have been difficult for them to learn, and in any event were immaterial.  (Response at 37-30.) Neither is true. They point to the fact that "even" Pretrial Services was unable to determine the correct disposition of the second arrest at Mr. Jarvis' initial detention hearing.  (<u>Id</u>. at n. 19.)  Pretrial Services, however, has at most a few days to make a quick check and write its report, and therefore must rely upon only a cursory computerized search.

       The DEA, in contrast, had been investigating Mr. Jarvis for years.  It had plenty of time to do whatever research was necessary to avoid creating a false impression for the issuing Court.  If that took making telephone calls to prosecutorial agencies, visiting court clerk offices to read files, or interviewing

witnesses, the DEA certainly had the time and resources to do this. (See Exhibit B to defense motion filed 2/2/09 at ¶¶ 40-44.) They know very well that innocent people are sometimes arrested; they know that Court cases can be resolved in many different ways, including findings of innocence; they know that convictions produce a paper trail that would be findable. They simply chose to portray guilt, and not bother to check for innocence.

It is also incorrect to say that this information was not material.[6] The obvious intention here was to portray the lead target of this investigation as being a longtime drug dealer. Smearing him with an arrest record that did not result in convictions fit with that agenda, and that is what they were content to do.


e.    Donald Trujillo: The Government wields a very sharp pencil to claim that the statement in its affidavit that Mr. Trujillo was a "pilot" did not necessarily mean that he was a licensed pilot. (Response at 38.) This is a fine distinction indeed. The Government told the issuing Judge that Trujillo "has worked for the Jarvis DTO as a pilot and as a drug and money courier. (See Gov't Affidavit 1 at ¶¶ 15, 53-54, 82, 88.) That statement carried the clear implication that he was capable of flying an airplane. He was not. (See Exh. I to this Reply at ¶ 13.) The Government could have easily determined that he had not advanced far enough

---

[6] Throughout its Response the Government downplays the materiality of facts presented in Agt. Stark's affidavit. However, it is the Government that has chosen to make them material by including them therein.

to fly an airplane solo by requesting that CS-3 inquire further about his flying

experience, or conducting further background checks.  Certainly the fact that Mr.

Jarvis employed Mr. Reid as a pilot was a tip-off that this "fact" was unlikely to be

true.  The Government's failure to check its sources when an obvious red flag

arises results in another example of false information recklessly included in the

affidavit, and it was material in that it portrayed this organization as being large

enough to employ two pilots.


        f.    Ayla Jarvis Money Seizure: To its credit, the Government now

candidly admits that there was a "discrepancy" between the report of the state

trooper who stopped Ms. Jarvis, and the facts regarding that stop that were

presented in the wiretap affidavit. (Response at 39-41.)  It is not quite as candid

about where this "discrepancy" came from, or its effect in this case.

        This incident gives the Court a "peek behind the curtain" at how the

Government has prepared its sworn affidavit, and the level of its concern for the

truth of the facts therein.  Agt. Stark casually amplifies the offer to settle the claim

quickly by donating $25,000.00 to the Troopers fund into an offer to let the

trooper personally keep $143,650.  Agt. Stark omits to mention that this offer was

suggested by an attorney.  Just as casually he converts the Trooper's obvious

confusion about the identity of the caller into an explicit statement that Mr. Reid

said "that he was Ayla's father" (which is nowhere in the trooper's report).   It

conveniently leaves out the fact that Mr. Reid gave his true name, which one would not have done if he was falsely claiming to be the father of a young lady named Ms. Jarvis. A continual disregard for literal truth, and a willingness to bend it to fit the Government's needs is evidenced throughout. Yet we are supposed to accept his claims throughout the case as gospel.

The Government claims that these discrepancies were "not material to Judge Conway's finding of probable cause." (Response at 40-41.) False again. Their inclusion in the affidavit makes them material. Moreover, there was nothing else whatsoever in this affidavit to connect Mr. Reid with wrongdoing other than this incident. (See Gov't Affidavit 1 at ¶¶ 15, 53-54, 82, 88.) The probable cause to name Mr. Reid as a target interceptee was entirely based on it. Therefore, an argument that these falsehoods and distortions was immaterial hardly passes the straight-face test.

g.    Ayla Jarvis Pilot's License: This issue echoes the previous one, in that it demonstrates the Government's reckless disregard for veracity in this matter. Instead of stating the plain unvarnished truth (i.e. that Ms. Jarvis had what is essentially a learner's permit, rather than a true pilot's license) the Government distorts this into her having a full license to fly airplanes solo. The defense concedes that the materiality is far less here than in the previous issue, because there was far more probable cause against Ayla Jarvis then there was

against Mr. Reid.  Nevertheless, it again fits within a disturbing pattern of playing

fast and loose with the truth in sworn statements that are to be presented to, and

relied upon, by a Federal Judge.


      h.    <u>Information from CS-2 Regarding Amount of Money to Be Laundered
Through Club</u>.

This issue shows once again that the Government was willing to ignore a

red flag that it should have investigated, and recklessly quoted its confidential

informants in a sworn affidavit without properly investigating them.  In so doing it

allowed false and misleading information to be placed in its affidavit.  It thereby

led the Court to believe that the Club Rhythm and Blues was far more lucrative

than it actually was, and that the Jarvis DTO was far, far larger and more lucrative

than it actually was, with Mr. Jarvis achieving astonishing net profits of over

$750,000 in cash per month, which is utter nonsense.  Its falsely portrayed him as

a huge drug kingpin, which he was not, and thereby enhanced the likelihood that

anyone who dealt with him (such as Mr. Reid) would have known that he was

dealing in illegal drugs.

      I.    <u>Tracking of Airplane</u>: The Agents were able to place a tracking

device on the airplane used by Mr. Jarvis. They did not bother to tell that to the

issuing Court at all.  They were able to place a "lookout" on the aircraft, resulting

in the ability to track it approximately 16 times. They only told the Court about one

such instance. The Government's Response implies that this was somehow close

enough for Government work.  (Response at 42-43.)   On the contrary, however, it did not fulfil the requirement that Congress has imposed of making a "full and complete" statement.  Certainly the one mention in Agt. Stark's affidavit of tracking the aircraft through AMOC (which is triggered by the filing of a flight plan) left the Court completely in the dark about the placement of a tracking device, which operates regardless of whether a flight plan is filed or not.

The Government states that the ability to do these things "does nothing to change SA Stark's overall opinion regarding surveillance."  Perhaps not, but **his** "overall opinion" is not dispositive.  It is the opinion of the **issuing Court** that counts.  The law requires the Government to inform that Court of what it could and could not do, so that the Court can make its own independent judgment regarding necessity.  See United States v. Spagnuolo, 549 F.2d 705 ,710 (9th Cir 1977); Ailemen, 986 F.2d at 1237-38.

The Government's ability to track this airplane so thoroughly was clearly material to the showing of necessity.  The Government had a duty under 18 U.S.C. § 2518(1)(c) to make a "a full and complete statement as to whether or not other investigative procedures have been tried and failed."  There is simply no way that it can be said that this was a "full and complete statement."


j.    Use of guns and violence: In a footnote, the Government feigns surprise at a statement made by the defense: "Incredibly, the defendants assert

that there 'were no guns used anywhere in this case' and '[t]here was no violence

in this case.'"  (Response at 43, n. 22.)  Yet the "facts" the Government gives to

refute this statement are either false, or not at odds with it, and were unknown to

agents when the wiretap was being requested.

One is a statement made on the telephone to a woman Mr. Jarvis believed

had stolen marijuana from him: "Do you know what happens to people who burn

other people?  They get gasoline splashed on them and they get lit on f—ing fire."

(Id.)  Contrary to the implication the Government tries to draw, this was quite

obviously not a literal threat to actually splash gasoline on anyone, as the

Government now pretends.  (See Exh. I to this Reply at ¶ 4.)  What Mr. Jarvis

was saying was the equivalent of the proverb "if you play with fire, you will get

burned."  (Id.)[7]  *I.e.,* if you steal things, someday things will be stolen from you.

Apparently the allusion was lost on the Government.  Mr. Jarvis states that

Melania Kirwin would testify that he never laid a hand on her in anger.  (Id.)  In

any event, this statement was not overheard until <u>after</u> the wiretap was in place,

and no violence actually occurred.

The Government also notes that the agents eventually discovered a "cache

of weapons in a storage unit used by Mr. Jarvis."  (Response at 43, n. 22.)  In

fact, however, the storage unit was rented by a man named Adrian Sanford, not

---

[7]  The Yale Book of Quotations lists this under "Proverbs," and notes that it
appears, in the form "If people will play with fire, they must expect to be burned
by it some time," in R. H. Thorpe, The Fenton Family (1884).

Mr. Jarvis, and the weapons did not belong to Mr. Jarvis, but to a man named Steve Burkhart. (Exhibit I to this Reply at ¶ 4.) Again, this information was not learned until **_after_** the indictment, and thus cannot support the wiretap application.

Also mentioned in the same footnote is a statement that Mr. Jarvis fired a gun at CW-4. According to Mr. Jarvis, however, CW-4 had a family history of mental illness, she was under psychiatric care, and was on prescription medications. (Id.) She was addicted to Xanax and alcohol. (Id.) She thought a lot of people were trying to kill her. (Id.) Mr. Jarvis never fired a weapon at her nor did he ever lay a hand on her in anger. (Id.) Moreover, CS-4 did not even begin to cooperate until after the wiretaps were approved, so this information can have had no bearing on the case, even if it were true. In summary, the defense statements that there "were no guns used anywhere in this case" and "[t]here was no violence in this case" are absolutely correct, and it is the Government's assertions to the contrary that are false or at the very least misleading and immaterial. The fact remains that this was not a violent organization, it dealt with marijuana only, not hard drugs, and the impression of danger that the Government tried to foist upon the issuing Court was utterly false. (Exhibit I to this Reply at ¶ 4.)

       k.    <u>The Government's attack on Ms. Doucette's credibility</u>: Toward the

end of the Government's brief it launches an attack on the credibility of the expert whose services the defense has utilized, Ms. Suzane Doucette. (Response at 44.) Essentially the Government is asking the Court to determine Ms. Doucette's credibility from written documents, instead of conducting a hearing, as the law requires.

The Government's attack is unwarranted. Ms. Doucette's credentials are impeccable. After serving as a police officer in Arizona Ms. Doucette became an FBI Special Agent, in which capacity she served for approximately ten years. (Exhibit B to Defense suppression motion filed 2/2/09 at ¶¶ 1, 3.) During that time she participated in numerous investigations into public corruption, white-collar crime, organized crime, bank robbery, kidnaping, counter-terrorism, counter-intelligence, and drugs, including the use of pen register / trap-and-trace devices. (Id. at ¶ 3.) She has personal experience in wiretap investigations and search warrants. (Id.) She has participated in hundreds of surveillances and surveillance detection runs. (Id.)

Ms. Doucette holds a law degree from Pepperdine University, and a Master of Laws from Georgetown Law School. (Id. at ¶ 1.) She graduated from both programs with honors. (Id.) Her Masters program was specifically centered on wiretapping law. (Id.) She studied with current and former high-ranking Justice Department officials, private telecommunications company officials, and some of the finest professors and experts in the world. (Id.) Ms. Doucette also received a

National Security Law Certificate, with a significant focus on wiretapping in the National Security Law arena.  (Id.)  She serves as an Adjunct Professor of Law at the University of Arizona Law School, teaching National Security Law and Investigations.  (Id. at ¶ 2.)  She has served as an expert in court on wiretap matters, including United States v. Gonzalez, Inc., supra.  (Id. at ¶ 4.)  She also served in United States v. Raymond Llamas; et. al., a multi-defendant death penalty case with eight death-eligible defendants.  (Id.)

        Despite this stellar background the Government asks this Court to find Ms. Doucette not credible based solely on her affidavits.  Yet, out of the 75 pages of affidavits Ms. Doucette has filed in this case, the Government fails to contest with any specificity almost anything Ms. Doucette says.  As discussed above, the Government did point out that she forgot to include the author of the report on the Quail Run surveillance as participating in the surveillance, resulting in saying there were three instead of four agents -- an error which, to her credit, she pointed out of her own accord in her next affidavit.  (Response at 15-16, .n15.)  In the same footnote the Government complains that she mistakenly said there was no aerial surveillance.  As previously noted, however, this was because it is not possible to tell from the report (Government's Exhibit 7) whether an airplane was used.  Ms. Doucette did, however, correctly note in her affidavit that one of the agents involved was a pilot, and discussed whether or not this necessarily meant there was aerial surveillance.  This issue would surely impact her credentials as a

mind-reader; it does not diminish her credentials one iota as an expert in law enforcement methods.

 Out of the hundreds of lines of her affidavits, the Government takes specific issue with only one, which it claims "sums up Ms. Doucette's lack of credibility as a detached expert: "In my opinion this was a routine marijuana case." (Response at 44, n. 24.)  The Government portrays this statement as laughably wrong, refuted by the years of litigation in the case, and the comments made by defense counsel about declaring this a complex case.  (Id.)

What the Government neglects, however, is that the extensive litigation in this case has nothing to do with any inherent complexity, and everything to do with the Government's own employment of numerous wiretaps, the most intrusive method in its arsenal, which were not justified by the facts.  This was a loose-knit, rag-tag group of aging hippie pot runners, not a cartel of super-villain drug kingpins.

Yes, it is now a complex case – because the Government chose to wiretap these folks for months on end when ordinary methods would have sufficed.  Had the Government conducted professional surveillance instead of just a handful of drive-bys year after year, had they installed pole-cameras where they could have, had they assiduously conducted trash covers in a halfway competent manner, had they capitalized on the advantages presented by the liquor license, had they infiltrated the Club, had they tried "knock-and-talks" and "whisper stops" and used

pen registers and their subpoena powers in a proactive manner, and most of all

***had they fully utilized their informants instead of calling them off just as***

***they were achieving success***, they could have cracked this group of folks wide

open.  Essentially the Government has fired a cannon at a canary, and now

points to the massive spray of feathers as proof of how giant the bird must have

been.

    True, the amounts of marijuana here are somewhat large, but not

uncommonly so.  The shipments in this case were generally a few hundred

pounds at a time, not tons.  Cases involving such quantities are common in the

Southwest.  True, the time span stretches back over years, but there were also

years where Mr. Jarvis was inactive.  True, there were large amounts of money

involved, but the net profits were not even enough to keep Mr. Jarvis from

suffering money troubles.  Ms. Doucette is absolutely correct in saying this was a

routine marijuana case, the Government's attempt at ridicule notwithstanding.  To

argue that the Court should make a determination of a witness' credibility without

ever hearing from that witness is the true absurdity here.  A <u>Franks</u> hearing is

most definitely required herein.


    l.    <u>Length of investigation</u>: At least twice in its Response the

Government emphasizes that it investigated this case for three years before

requesting a wiretap.  (<u>See</u> Response at 1, 13.)  The defense is not able to

calculate the average number of hours per year put into this case, but it is respectfully submitted that it would be well below the number of hours one agent works in a year's time. It is, therefore, misleading to suggest that three years were spent on this case. The truth is, as established above, that "investigation" consisted of very little other than having informants present themselves, and doing a few drive-by surveillances. It is a material fact that an issuing Judge should know that agents spent less than full time investigating a case and DEA did not want to commit more resources, before requesting a wiretap. Ailemen, 986 F.Supp. At 1247-48 and 1302 n.109.


        M.    Summary: The Government claims that the defense is simply "imagining ways in which the case could have been investigated without resorting to a wiretap." (Response at 45.) The defense is doing nothing of the kind. Instead, the defense has pointed out time-tested investigative methods that are commonly used by law enforcement, which were known to the Government, and which were likely to have worked in this case. That is the duty of the defense in a case of this kind. In fulfilling that duty the defense has made a sufficient showing that false information and material omissions were intentionally or recklessly included in the Government's application in this case. Only by conducting a Franks hearing can this Court ascertain the facts, resolve any conflicts in the factual claims, and then properly weigh them to determine whether they require

suppression in this case.  The Government's contention that this can be done

based solely on the pleadings is incorrect on this record and on the law.


IX.     <u>CONCLUSION</u>

Due to the Government's violations of 18 U.S.C. § 2518 discussed above,

Mr. Reid and Mr. Hill, respectfully request this Court to set hearings on this

matter, and to suppress the fruits of these wiretaps and disallow the

Government's use of those fruits in its case in chief at trial.  *See* 18 U.S.C. §

2518(10)(a) (suppression remedy).

Electronically filed,


_____/s/_____
Walter Nash, for Defendant Reid
Reid
P.O. Box 2310
Tucson, Arizona 85702
(520) 792-1613

_____/s/_____
William J. Kirchner for Defendant

P.O. Box 2310
Tucson, Arizona 85702
(520) 792-1613


_____/s/_____
Billy R. Blackburn for Defendant Hill
1011 Lomas NW
Albuquerque, New Mexico   87102

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of July, 2009, I filed the foregoing

electronically through the CM/ECF system, which caused all counsel to be served

by electronic means, as more fully reflected on the Notice of Electronic filing.

<u>Electronically filed</u>

Walter Nash