# AFFIDAVIT

STATE OF NEW MEXICO    )
                       ) ss.
COUNTY OF TORRANCE     )

I, Dana Jarvis, being duly sworn, depose and say as follows:

I am a Defendant named in United States v. Dana Jarvis et. al, New Mexico District Court Cause no. CR 05-1849 JH. I am filing this Affidavit at the request of Walter Nash and William Kirchner, attorneys for Mr. David Reid, solely to assist the Court in the determination of a pretrial issue. By filing this Affidavit, I am not waiving any applicable right or privilege herein, including my right to remain silent, pursuant to Simmons v. United States, 390 U.S. 377 (1968).

Before signing this affidavit I have reviewed the Government's Affidavit in Support of Wiretap Application in Support of Application for Authorization to Intercept Wire Communications Occurring Over Telephone Number 505-470-1811, dated and filed with the United States District Court, Albuquerque NM on March 3, 2005. I have also reviewed the Defendants' Joint Motion to Suppress The Fruit of Title III Wiretaps, and the Supplement thereto filed in May of 2009. I have also reviewed the Government's response filed in June of 2009.

At the time my previous affidavit in this matter was being prepared I had intended to provide information in addition to that which ultimately became part of the affidavit. I had already discussed all or almost all of the information contained herein with members of the defense team. My attorneys later notified me, however, that the prosecution was contending that the residual charges remaining against me after I pled guilty and was sentenced should be dismissed without prejudice. This created the possibility of the charges being reinstated, and my statements being used against me. Accordingly, my previous affidavit did not contain the information set forth herein. The Government has now changed its position, and the Court has dismissed all of the residual charges against me with prejudice. For this reason I can now supplement my previous affidavit as follows:

1.   <u>CS-3</u>:  The Government's Affidavit discusses a person they call "CS-3." In my previous affidavit I discussed him.  I now add that the affidavit recounts that CS-3 (Damien Vasquez) contacted me about setting up marijuana transactions with a man name John Whalen.  As stated in the affidavit, I agreed to do the deal, and was prepared to work with him, but Mr. Vasquez never followed up on our conversations. The purpose of this deal was to get the ball rolling for a series of larger deals.  This job and a series of larger transactions would have gone through but the Government "ordered CS-3 not to negotiate the transaction any further." In addition, it should be noted that when CS-3 said that I had him searched before speaking with him, this was not true.

2.   <u>CS-2</u>: As I noted in my previous affidavit, the person the Government refers to as "CS-2" is a woman named Lisa, a friend of my ex-wife, Eileen.  In addition to the fact that she could have worn a "wire" when she met with me, if she had called to set up a marijuana transaction I would have met with her.  I knew she did not have the finances to do a large deal, but would have helped her out with smaller amounts if she had approached me.  Over time she could have worked up to larger amounts.  She also could have gotten information from me that would have been useful to the DEA .

3.   <u>Surveillance</u>:  The authorities would have been able to obtain a considerable amount of information helpful to their investigation if they had conducted more surveillance on the locations known to them.  The following are examples:

    A. <u>The Lazy B</u>:   I used the "Lazy B" location discussed in my previous affidavit as the main transfer point for marijuana in Tucson.  If the authorities had positioned a vehicle out of view from the main street they could have looked directly into the garage where the product was loaded and unloaded.

    B. <u>The 1st St. House</u>: In my previous affidavit I discussed the fact that there were several places near the First Street House in Albuquerque where the authorities could have conducted

surveillance. If done properly the DEA would have seen duffle bags and suitcases containing marijuana being taken out of vehicles and put into a guest house, and then transferred to other vehicles that would head east. They could have determined who brought the loads up from Arizona and who took them east, and could have figured out their destination.

C. <u>28 Quail Run</u>: In my previous affidavit I discussed that this was the residence of Kathy Fitzgerald. Had the Government conducted surveillance there they could have observed numerous business meetings and visits by various members of the group. Vehicles used to transport marijuana were parked there for weeks at a time.

D. <u>13 Enebro Road</u>: As previously noted, this was my residence in Santa Fe. Surveillance here would revealed a wealth of information, such as the identities of co-conspirators and their vehicles. The authorities could have linked up the comings and goings with the timing of specific jobs.

E. <u>1440 Cielo Vista</u>: This was my house in Bernalillo. People would come there from the airport, and from the other locations mentioned above.

4. <u>Violence</u>: This was not a violent organization. It was a loose-knit group, not a gang. It dealt with marijuana only, not hard drugs. In Footnote 22 of the Government's Response they discuss a conversation I had with Melania Kirwin in which gasoline was mentioned. There was no threat to actually splash gasoline on anyone. What I was saying was the equivalent of "if you play with fire, you will get burned." Menalia Kirwin would testify that I never laid a hand on her in anger. The same footnote also discusses a storage unit in Tucson containing firearms. The storage unit was rented by Adrian Sanford. The weapons were not mine. They belonged to Steve Burkhart. Also mentioned in the same footnote is a statement that I fired a gun at CW4. CW-4 is my ex-girlfriend Barbara Hanna. She had a family history of mental illness, she was under psychiatric care, and was on prescription medications. She

was addicted to Xanax and alcohol. She thought lots of people were trying to kill her. I never fired a weapon at her. I never laid a hand on her in anger.

5. <u>Meeting with CS-3</u>: The wiretap affidavit discusses an occasion when I met with CS-3 (Damien Vasquez) at the Palace Restaurant lounge in Santa Fe. The authorities indicated that they had seen individuals they believed to be conducting counter-surveillance. There was no counter-surveillance taking place. We were dealing with a public place. The door to the street was always left open. You could see into the lounge from across the street. An agent could have been placed in the bar – just walked in, sat down and listened. It was quiet and would have been easy to observe. I never "maintained constant vigilance," nor did I have anyone act as a lookout except during times when marijuana was actually being handled.

6. <u>Sale of marijuana to Whalen</u>: The Government's Response indicates that they were unwilling to turn over a "sample" of marijuana to Mr. Whalen. That is not, however, what they had to do. Mr. Vasquez (CS-3) could have simply told me he was obtaining the marijuana for Whalen, and then taken it to the authorities. The same is true for any amount later purchased. They could have purchased hundreds of pounds from me through Mr. Vasquez without ever losing control of it. If he showed up with the money, I would not have known where it came from, or where the marijuana ended up.

7. <u>Trust of Vasquez</u>: On page 22 of the Government's Response there is a reference to a conversation I had with Damien Vasquez in which I indicated I wanted him to act on my "behalf." They argue that this meant I did not trust Vasquez (CS-3). The fact is I was indicating that I **_would_** trust Vasquez to act on my behalf in making the arrangement for the deal with Whalen. Any indication of distrust was toward Whalen, not Vasquez.

8. <u>The role of the Blues Club</u>: On page 26 of the Government's Response they indicate that they "already knew that the role of the Club in the Jarvis DTO was to launder drug proceeds." That might be what they thought, but that was not the case. The Club had nothing to do with the marijuana business, and certainly had nothing to do

-4-

with laundering money. They could have verified that with a minimum of investigation.

9. <u>CS-3 was a cocaine dealer</u>: I know for certain Damien Vasquez was a cocaine dealer. He had been dealing coke for years before I even met him. I learned from my former attorney Gary Nelson that Vasquez had picked up by the DEA in an investigation for cocaine dealing. Mr. Nelson learned this from his representation of Willow Adams' brother regarding a bust in Santa Fe in approximately 2004. Vasquez had been the DEA's number one target in Santa Fe for a long time. Under threat of prosecution he offered to give them information on me in hopes of getting out from under the coke charges. The DEA has this on record, contrary to the statement in footnote 18 of the Government's Response, claiming the DEA had "no knowledge of CS-3 being a cocaine dealer."

10. <u>DEA, CS-3 and cocaine dealing</u>: as stated above the DEA had been aware of CS-3's coke dealing for years. The Government's Response in footnote 18 that agents "instruct[ed] CS-3 to inform others that he/she was a cocaine dealer to bolster CS-3's credibility as he/she attempted to work back into the Jarvis DTO" is absolutely beyond belief.

11. <u>Closed organization</u>: The following is a list of defendants that I had known for only a short time and were not ". . . long time, long term drug associates," or family members. John Nieto was a musician in the Blues Kings band that performed at the nightclub. Mary Cannat was a customer of the Club, and later worked the door and became my house sitter. Sal Abeyta was a bar tender at the Club. Rafal Mistrzak started as a server at the Club and later became a bartender and worked booking the entertainment. Willow Adams was employed as a bartender at the Club and worked the door. Joseph Martin was the manger of the Club when I bought it. Matthew Hothan was a friend of my daughter.

12. <u>Angela Cummings</u>: The Government's Response claims at page 36 that Angela Cummings, who lived in the house with the Red Volkswagen bus counted and stored bulk cash at the house. Ms. Cummings neither counted nor stored cash for me. She had split up with Mr. Kasso and was not even in the United States during this time

frame.

13. <u>Donald Trujillo not a pilot</u>: Donald Trujillo was taking flying lessons, but was not qualified to operate an airplane alone, and never served as a pilot for me.

14. <u>Credit card</u>: If the Government had bothered to check my credit card records they would have gained invaluable information concerning the network of supply and distribution. This information and some brief surveillance would have led them to large stashes of marijuana.

15. <u>Government misrepresentation of the extent of investigation</u>: Several times the Government's Response (pp. 1, 6 and 13) in the impression is created that this was a long, intensive investigation from 2001 to 2005. In fact there was little investigative work during those years. In 2001 a person provided information to the DEA about a house, a man named Joe Martin and a person, Dana LNU. The DEA drove by the house a couple times, wrote down license plate numbers and passed the information on to the Albuquerque DEA. The Albuquerque office verified my home address and ownership of Club Rhythm and Blues. This was the only substantial information developed in that time period.

16. <u>Rural locations</u>: On page 13 of the Government's Response there is a discussion of rural locations. Special Agt. Stark noted that "many of the primary locations suspected as being marijuana 'stash house' locations, or money transfer locations are in rural areas very difficult to watch without being observed." This is not true. Only two of these many locations would be considered rural: Cathy Fitzgerald's house and the "Lazy B" property. It is hard to believe that the DEA with all their resources would consider either of these locations "very difficult to watch." On the contrary they could have been very easily watched.

17. <u>Quail Run Surveillance</u>: In footnote 10 of the Government's Response they argue that they did do surveillance when they had actionable intelligence. They point to the surveillance of Cathy Fitzgerald's property. This is actually an example of what a poor job they did. They knew that she was bringing a load of marijuana from

Donald Trujillo's house in Santa Fe to her residence at 28 Quail Run. This load was brought to her house and successfully transferred to the intended recipient without ever being detected. This involved a Cheverolet Suburban containing several hundred pounds of marijuana being brought to the residence, a silver mini-van with out-of-state plates arriving along the only road in or out connecting to the main road, and the marijuana being transferred to the van during the time the agents were supposedly watching. It is not clear to me how a surveillance involving aircraft and agents on the ground could have missed the transfer.

Dated this 12th day of June, 2009

_____
Signature of Dana Jarvis


SUBSCRIBED AND SWORN to before me on this 12th day of June, 2009.

_____
Notary Public

My Commission expires:

OFFICIAL SEAL
Saby K. Pagan
NOTARY PUBLIC
STATE OF NEW
My Commission Expires 12-31-10

-7-